UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

GLORIA VARELA AND GREGG LAMBDIN,

*on behalf of themselves and all other employees similarly situated,*

*Plaintiffs,*

v.

NORTH SHORE-LONG ISLAND JEWISH HEALTH SYSTEM, NORTH SHORE-LONG ISLAND JEWISH HEALTH CARE, INC., NORTH SHORE-LONG ISLAND JEWISH MEDICAL CARE CENTERS, INC., FOREST HILLS HOSPITAL, FRANKLIN HOSPITAL, GLEN COVE HOSPITAL – THE MILDRED AND FRANK FEINBERG CAMPUS, HUNTINGTON HOSPITAL, LONG ISLAND JEWISH MEDICAL CENTER, NORTH SHORE UNIVERSITY HOSPITAL, PLAINVIEW HOSPITAL, SCHNEIDER CHILDREN'S HOSPITAL, SOUTHSIDE HOSPITAL, STATEN ISLAND UNIVERSITY HOSPITAL, SYOSSET HOSPITAL, MICHAEL J. DOWLING, AND JOSEPH CABRAL,

*Defendants.*

COMPLAINT- CLASS ACTION AND DEMAND FOR JURY TRIAL

Civil Action No. **10    1341**

BIANCO, J.

BOYLE, M.J.

RECEIVED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★  MAR 2 4 2010

BROOKLYN OFFICE

## NATURE OF CLAIM

1.      This is a proceeding for injunctive and declaratory relief and monetary damages to redress the deprivation of rights secured to plaintiffs, Gloria Varela and Gregg Lambdin, individually, as well as all other employees similarly situated ("Class Members"), under the Fair Labor Standards Act of 1938 ("FLSA"), as amended, 29 U.S.C. § 201 *et seq.* and under the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1961 *et seq.*

## JURISDICTION AND VENUE

2.      The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331, 28

U.S.C. § 1343 (3) and (4) conferring original jurisdiction upon this Court of any civil action to recover damages or to secure equitable relief under any Act of Congress providing for the protection of civil rights; under 28 U.S.C. § 1337 conferring jurisdiction of any civil action arising under any Act of Congress regulating interstate commerce; under the Declaratory Judgment Statute, 28 U.S.C. § 2201; under 29 U.S.C. § 216(b); and under 18 U.S.C. § 1964(a) and (c).

3.      Venue is appropriate in the Eastern District of New York since the allegations arose in this district and at least one of the Plaintiffs resides in this district.

## CLASS ACTION ALLEGATIONS

4.      The claims arising under RICO are properly maintainable as a class action under Federal Rule of Civil Procedure 23.

5.      The class action is maintainable under subsections (1), (2) and (3) of Rule 23(b).

6.      The class consists of current and former employees of defendants who were injured by defendants' scheme to cheat employees out of their property and to convert the employees' property, including their wages and/or overtime pay, by misleading employees about their rights under the FLSA.

7.      The class size is believed to be over 38,000 employees.

8.      The Plaintiff will adequately represent the interests of the Class Members because they are similarly situated to the Class Members and their claims are typical of, and concurrent to, the claims of the other Class Members.

9.      There are no known conflicts of interest between the Plaintiff and the other Class Members.

10.     The Class Counsel, Thomas & Solomon LLP, is qualified and able to litigate the Plaintiffs' and Class Members' claims.

11.     The Class Counsel concentrates its practice in employment litigation, and its attorneys are experienced in class action litigation, including class actions arising under federal wage and hour laws.

12.     Common questions of law and fact predominate in this action because the claims of Plaintiff and Class Members are based on whether defendants' policies and practices of not properly paying employees for all hours worked is a part of a scheme to defraud Plaintiffs in violation of RICO.

13.     The class action is maintainable under subsections (2) and (3) of Rule 23(b) because the Plaintiff and Class Members seek injunctive relief, common questions of law and fact predominate among the Plaintiff and Class Members and the class action is superior to other available methods for the fair and efficient adjudication of the controversy.

**PARTIES**

**A.     Defendants**

14.     Collectively, defendants North Shore-Long Island Jewish Health System, North Shore-Long Island Jewish Health Care, Inc., North Shore-Long Island Jewish Medical Care Centers, Inc., Forest Hills Hospital, Franklin Hospital, Glen Cove Hospital, Huntington Hospital, Long Island Jewish Medical Center (Long Island Jewish Hospital, Schneider Children's Hospital and the Zucker Hillside Hospital), North Shore University Hospital, Plainview Hospital, Southside Hospital, Staten Island University Hospital, Syosset Hospital, Michael J. Dowling and Joseph Cabral (collectively, "Named Defendants") are related organizations through, for example, common membership, governing bodies, and trustees

-3-

and/or officers.

15.     Named Defendants' health care facilities and centers include the following:

Knapp Cardia Care Center, Suffolk County South Brookhaven Family Health Center West:

Patchogue, Suffolk County Marilyn Shellabarger South Brookhaven Family Health Center

East: Shirley, Coumadin Management Center at Brookhaven Memorial Hospital Medical

Center, Diabetes Wellness Center, Hemodialysis Center, The Center for Wound Care and

Hyperbaric Medicine, Bariatric Surgery Center of Excellence, Fortunato Breast Health

Center, Contessa Nadia Farber Emergency Pavilion, Outpatient Infusion Center at Mather

Hospital, Lymphedema Treatment Center at John T. Mather Memorial Hospital, Weiss

Center for Pain Management, The Men's Prostate Health Center at Mather Hospital, Sleep

Disorders Center, Cody Ambulatory and Inpatient Surgical Pavilion, The Balance Center,

Center for Sleep Medicine, Oceanside Counseling Center, Complete Women's Imaging, PC,

South Nassau's Counseling Center, Lactation Resource Center, Bellmore Primary Care

Center, Valley Stream Cancer Center, Long Island Joint Replacement Institute, Sports

Medicine and Rehabilitation Therapy (SMART) Center, The Wound Care Center at South

Nassau Communities Hospital, Winthrop Pain Center, Osteoporosis Research, Diagnosis &

Treatment Center, Winthrop Osteoporosis Network, Endoscopic Ultrasound Center,

Diagnostic Motility Center, Infection Disease/Chronic Fatigue Syndrome, Wound Treatment

Center, Liver, Biliary & Pancreatic Diseases Center, Crohn's & Colitis Center, Diabetes

Education Center, Infectious Disease/Fever Center, Infectious Disease/Lyme Disease Center,

Long Island Regional Poison & Drug Information Center at Winthrop, Sleep Disorders

Center, Sports Medicine Center, Vein Center, Weight & Nutrition Center, Adult Asthma

Program, The Ambulatory Surgery Center, CyberKnife Center, Human Genetics Center,

Hypertrophic Cardiomyopathy Center, Kidney Center, Lung Cancer Center, Lung Center, New Life Center, Pediatric Diabetes Center, Pediatric Specialty Center, Rheumatoid Arthritis Center, Trauma Center, Travel Center, Institute for Cancer Care, Institute for Digestive Care, Institute for Family Care, Institute for Heart Care, Institute for Lung Care, Institute for Neuroscience, Institute for Specialty Care, McCann Endoscopy Center, Diabetes Care Center, The Women's Center at St. Francis Hospital, The Heart Center at St. Francis Hospital, The Physical Therapy Center of St. Francis Hospital, DeMatteis Center, The Center for Pediatric Specialty Care, Breast Health Center, Mammography & Breast, Diagnostic Center, Bay Shore Dialysis Center, Lindenhurst Dialysis Center, Emergency, Cardiac Care Center, Martin Luther King, Jr., Community Health Center, Eat Right Counseling Center, The Pulmonary Care Center at Good Samaritan Hospital Medical Center, Radiation Oncology Center, Sleep Apnea Center, Suffolk Hearing and Speech Center, Comprehensive Epilepsy Center of Long Island, The Diabetes Care Center, St. Charles Sleep Disorders Center, Memorial Sloan-Kettering Cancer Center at Mercy, The Stroke Center, Express Care Center, The Sleep Disorders Center and Woman/or-Child Care Center (collectively "Health Centers").

16.     Named Defendants affiliated health care facilities and centers include the following: A. Holly Patterson Extended Care Facility, Adults & Children with Learning and Developmental Disabilities (ACLD), Aletta Co., Albert Einstein College of Medicine, Association for the Help of Retarded Children (AHRC), Atria Senior Living, Broadlawn Manor Nursing and Rehabilitation Center, Care Management Group of Greater NY, Carillon Nursing and Rehabilitation Center, Central Island Nursing and Rehab, Chaps Community Health Center, Inc., Cold Spring Hills Center for Nursing & Rehabilitation, Elmezzi

Graduate School of Molecular Medicine, Emergency Medicine Services of SI PC, Fairview Nursing Care Center, Fay J. Lindner Center for Autism, F.E.G.S. Health and Human Services System (Corporate Office), Forest Hills Care Center LLC, Forest Hills Healthcare Physician, P.C., Forest Hills Diagnostic Imaging, P.C., Forest Hills Hematology & Oncology, P.C., Glen Cove Physician Hospital Organization, Inc., Glengariff Health Care Center, Glenhaven Health Care Organization, Goethals Radiology PC, Grace Plaza Nursing & Rehabilitation Center, Heart Institute At Staten Island University Hospital, Highfield Gardens Care Center of Great Neck, Hillside Hospital Houses, Inc., Huntington Hills Center for Health and Rehabilitation, Huntington Hospital Association, Huntington Hospital Dolan Family Health Center, Inc., Huntington Hospital Nurses Association, Inc., Huntington Hospital Physician Hospital Organization, Inc., Hofstra University School of Medicine, Hospice Care Network, Krasnoff Consultative Services, LLC, Laguardia Hospital Hip Hospital Inc Self Insured Malpractice Trust, Long Island Jewish Medical Center At Home Pharmacy Inc., Long Island Jewish Medical Center Staff Society, Inc., Long Island Jewish-Hillside Medical Center, Long Island Medical Care PC, Multispecialty Physicians of University, Nassau University Medical Center, New York University School of Medicine, North Shore Community Services Inc., North Shore Health Enterprises, North Shore Hospital Apartments Inc., North Shore-LIJ Alliance, North Shore-LIJ Health System's Graduate Medical Education Programs, North Shore-LIJ Health System IPA #1, North Shore-LIJ Health System IPA #2, North Shore-LIJ Health System IPA #3, North Shore-LIJ Health System IPA #4, North Shore-LIJ Health System IPA #5, North Shore-LIJ Health System Labs, the North Shore-LIJ Institute for Nursing, North Shore-LIJ IPA #5 Inc., North Shore-LIJ Network Inc., the North Shore-LIJ Office of Academic Affairs, North Shore-LIJ Radiology Services PC, North Shore-LIJ Service

Alliance, North Shore-Long Island Jewish Health System Foundation, North Shore-Long Island Jewish Medical Care, P.C., North Shore Radiology at Glen Cove PC, North Shore University Hospital at Glen Cove Housing, Inc., North Shore University Hospital Housing, Inc., North Shore University Hospital Medical Staff Independent Practice Association, Inc., North Shore University Hospital Medical Staff Society, Inc., North Shore University Hospital Stern Family Center for Extended Care and Rehabilitation, NS-LIJ Physician Insurance Co., Ocean Breeze Home Care Agency, Ocean View Management, Parker Jewish Institute for Health Care and Rehabilitation, Port Jefferson Health Care Facility, Regal Heights Rehabilitation and Health Care Center, Regency Alliance Services Inc., Regional Insurance Co., Ltd., Regioncare Inc., Richmond University Medical Center, the Rosalind and Joseph Gurwin Jewish Geriatric Center of Long Island, Inc., S I U H Systems Inc., S I U H Perinatology PC, Sports Physical Therapy & Rehabilitation, Staten Island Imaging Corp., Staten Island Hospital Nurses Alumnae Association Inc., Staten Island Hospitalists PC, Staten Island Medical Intensivits PC, Staten Island Neonatology PC, Staten Island University Hospital Foundation, Staten Island University Hospital Perinatology, P.C., South Shore Healthcare, Syosset Community Hospital Self Insured Malpractice Trust, United Medical Surgical PC, University Physicians Oncology Hematology and Verrazano Radiology Associates PC (collectively, "Affiliates").

17.     Together the Named Defendants, the Health Centers and the Affiliates are referred to as "North Shore-Long Island Jewish Health System" or "defendants."

18.     North Shore-Long Island Jewish Health System is an enterprise engaged in the operation of a hospital and/or the care of the sick and is a healthcare consortium.

19. Defendants operate over 70 health care facilities and centers and employ approximately 38,000 individuals.

20. Defendants constitute an integrated, comprehensive, consolidated health care delivery system, offering a wide range of services.

21. For example, defendants have centralized supply chain management, and financial, computer, payroll and health records systems that are integrated throughout their locations.

22. Further, defendants' labor relations and human resources are centrally organized and controlled, including defendants' employment of one Vice President of Human Resources as part of the management team, as well as the maintenance of system-wide policies and certain employee benefit plans.

23. Defendants share common management, including oversight and management by a senior executive team and board of directors.

24. Defendants have common ownership.

25. At all relevant times, North Shore-Long Island Jewish Health System has suffered or permitted Plaintiff and Class Members to perform work for it at its various health care locations.

26. Plaintiff and Class Members are or have been employed by North Shore-Long Island Jewish Health System and/or have been jointly employed by North Shore-Long Island Jewish Health System.

27. North Shore-Long Island Jewish Health System operates locations, either directly or indirectly through the Health Centers and Affiliates, and therefore is the employer of Plaintiff and Class Members who are or were employed at all locations.

-8-

28. As such, defendants are the employer (single, joint or otherwise) of the Plaintiff and Class Members and/or alter egos of each other.

29. In light of the economic realities of the enterprise operated by North Shore-Long Island Jewish Health System, North Shore-Long Island Jewish Health System is a joint employer of Plaintiff and Class Members.

30. Collectively, North Shore-Long Island Jewish Health System comprises a single, integrated enterprise, as they perform related activities through common control for a common business purpose.

31. Defendants also engage in a joint venture for providing healthcare services by entering an agreement, established through their conduct in sharing the profits and losses.

32. Defendants jointly managed and controlled this venture as well as its employees and assets.

33. Defendants are jointly and severally liable to the class members for the damages arising out of this joint venture.

34. Michael J. Dowling is the President and CEO of North Shore-Long Island Jewish Health System.

35. Mr. Dowling's responsibilities include actively managing North Shore-Long Island Jewish Health System.

36. In concert with others, Mr. Dowling has the authority to, and does, make decisions that concern the policies defendants adopt and the implementation of those policies.

37. In concert with others, Mr. Dowling has the authority to, and does, make decisions that concern defendants' operations, including functions related to employment,

human resources, training, payroll, and benefits.

38.     Due in part to his role as President, Mr. Dowling is actively involved in the creation of the illegal policies complained of in this case.

39.     Due in part to his role as President, Mr. Dowling actively advises defendants' agents on the enforcement of the illegal policies complained of in this case.

40.     Due in part to his role as President, Mr. Dowling actively ensures defendants' compliance or non-compliance with federal law, including the requirements of the FLSA and RICO.

41.     In concert with others, Mr. Dowling has the authority to, and does, make decisions that concern the reviewing and counseling of defendants regarding employment decisions, including hiring and firing of Plaintiff and Class Members.

42.     In concert with others, Mr. Dowling has the authority to, and does, make decisions that concern employees' schedules, hours and standard benefit levels.

43.     Mr. Dowling has the authority to, and does, make decisions that concern standard pay scales.

44.     Mr. Dowling has the authority to, and does, make decisions that concern defendants' human resources policies, the resolution of issues and disputes regarding policies and their applications, the counsel locations receive regarding human resources issues, and communications with employees about human resources issues and policies.

45.     Mr. Dowling has the authority to, and does, make decisions that concern defendants' employment and human resources records, including the systems for keeping and maintaining those records.

46.     Mr. Dowling has the authority to, and does, make decisions that concern

training and education functions across North Shore-Long Island Jewish Health System.

47. Mr. Dowling has the authority to, and does, make decisions that concern the type and scope of training employees must attend as well as any compensation they receive for attending training.

48. Mr. Dowling has the authority to, and does, make decisions that concern payroll functions across North Shore-Long Island Jewish Health System.

49. Mr. Dowling has the authority to, and does, make decisions that concern the system for keeping and maintaining employees' payroll records, the timing and method with which payment is conveyed to employees, and the manner and method in which employees receive payroll information including their payroll checks.

50. Mr. Dowling has the authority to, and does, make decisions that concern benefit plans across North Shore-Long Island Jewish Health System.

51. Mr. Dowling has the authority to, and does, make decisions that concern the type and scope of benefits available to employees, the method and manner in which information regarding those plans is conveyed to employees, and the system for keeping and maintaining records related to employees' benefits.

52. Because Mr. Dowling has authority to hire or fire employees, provide and direct support regarding human resources issues, including the hiring and firing of Plaintiff and Class Members, and control the drafting and enforcement of the policies which govern the hiring and firing of employees, Mr. Dowling has the power to hire and fire employees.

53. Because Mr. Dowling has authority to establish work schedules and/or conditions of employment, provide and direct support regarding human resources issues, including work schedules and/or conditions of employment, control the drafting and

-11-

enforcement of the policies which govern employees' schedules and/or conditions of employment, establish the type and scope of training employees receive, and administer employees' benefit programs, including standard benefit levels and the type and scope of benefits available to employees, Mr. Dowling supervises and controls employees' work schedules and/or conditions of employment.

54. Because Mr. Dowling has authority to establish employees' rate and method of payment and centrally control payroll functions, including standard pay scales, the provision of payroll information, and the timing of payment, Mr. Dowling determines the rate and method of employees' payment.

55. Because Mr. Dowling has authority with respect to defendants' centralized records, including a database regarding employees' employment records, and systems for keeping and maintaining payroll, benefits, and other employment-related records, Mr. Dowling maintains employees' employment records.

56. Because Mr. Dowling provides day-to-day support regarding human resources issues, including employees' work schedules and/or conditions of employment, controls the drafting and enforcement of the policies which govern employees' schedules and/or conditions of employment, and administers employees' benefit programs, he is affirmatively, directly, and actively involved in operations of the defendants' business functions, particularly in regards to the employment of Plaintiff and Class Members.

57. Because Mr. Dowling is actively involved in the creation of the illegal policies complained of in this case, actively advises defendants' agents on the enforcement of the illegal policies complained of in this case and actively ensures defendants' compliance or non-compliance with federal law, including the requirements of the FLSA and RICO, he actively

participates in the violations complained of in this action.

58.     Based upon the foregoing, Mr. Dowling is liable to Plaintiff and Class Members because of his active role in operating the business, his status as an employer, and/or according to federal law.

59.     Joseph Cabral is the Senior Vice President and Chief Human Resources Officer for North Shore-Long Island Jewish Health System.

60.     Mr. Cabral is responsible for, provides direction and control over, and is authorized to direct all aspects of human resources functions across North Shore-Long Island Jewish Health System.

61.     Due in part to his role of overseeing human resources, training and education, and payroll and commission services, in concert with others, Mr. Cabral is actively involved in the creation of the illegal policies complained of in this case.

62.     Due in part to his role of overseeing human resources, training and education, and payroll and commission services, in concert with others, Mr. Cabral actively advises defendants' agents on the enforcement of the illegal policies complained of in this case.

63.     Due in part to his role of overseeing human resources, training and education, and payroll and commission services, in concert with others, Mr. Cabral actively ensures defendants' compliance or non-compliance with federal law, including the requirements of the FLSA and RICO.

64.     Mr. Cabral is actively involved in reviewing and counseling defendants regarding employment decisions, including hiring and firing of Plaintiff and Class Members.

65.     Mr. Cabral is actively involved in decisions that set employees' schedules,

hours and standard benefit levels.

66.     Mr. Cabral is actively involved in decisions that set standard pay scales.

67.     Mr. Cabral is actively involved in the determination and drafting of human resources policies, the resolution of issues and disputes regarding policies and their application, the counseling locations receive regarding human resources issues, and communications with employees about human resources issues and policies.

68.     Mr. Cabral is actively involved in defendants' employment and human resources records, including the systems for keeping and maintaining those records.

69.     Mr. Cabral is actively involved in training and education functions across North Shore-Long Island Jewish Health System.

70.     Mr. Cabral is actively involved in determining the type and scope of training employees must attend as well as any compensation they receive for attending training.

71.     Mr. Cabral is actively involved in payroll functions across North Shore-Long Island Jewish Health System.

72.     Mr. Cabral is actively involved in the system for keeping and maintaining employees' payroll records, the timing and method with which payment is conveyed to employees, and the manner and method in which employees receive payroll information, including their payroll checks.

73.     Mr. Cabral is actively involved in benefit plans across North Shore-Long Island Jewish Health System.

74.     Mr. Cabral is actively involved in determining the type and scope of benefits

available to employees, the method and manner in which information regarding those plans is conveyed to employees, and the system for keeping and maintaining records related to employees' benefits.

75.     Because Mr. Cabral has authority to hire or fire employees, provide and direct support regarding human resources issues, including the hiring and firing of employees, and control the drafting and enforcement of the policies which govern the hiring and firing of employees, Mr. Cabral has the power to hire and fire employees.

76.     Because Mr. Cabral has authority to establish work schedules and/or conditions of employment, provide and direct support regarding human resources issues, including work schedules and/or conditions of employment, control the drafting and enforcement of the policies which govern employees' schedules and/or conditions of employment, establish the type and scope of training employees receive, and administer employees' benefit programs, including standard benefit levels and the type and scope of benefits available to employees, Mr. Cabral supervises and controls employees' work schedules and/or conditions of employment.

77.     Because Mr. Cabral has authority to establish employees' rate and method of payment and centrally control payroll functions, including standard pay scales, the provision of payroll information, and the timing of payment, Mr. Cabral determines the rate and method of employees' payment.

78.     Because Mr. Cabral has authority with respect to defendants' centralized records, including a database regarding employees' employment records, and systems for keeping and maintaining payroll, benefits, and other employment-related records, Mr.

Pizarro maintains employees' employment records.

79.     Because Mr. Cabral provides day-to-day support regarding human resources issues, including employees' work schedules and/or conditions of employment, controls the drafting and enforcement of the policies which govern employees' schedules and/or conditions of employment, and administers employees' benefit programs, he is affirmatively, directly, and actively involved in operations of defendants' business functions, particularly in regards to the employment of Plaintiff and Class Members.

80.     Because Mr. Cabral is actively involved in the creation of the illegal policies complained of in this case, actively advises defendants' agents on the enforcement of the illegal policies complained of in this case and actively ensures defendants' compliance or non-compliance with federal law, including the requirements of the FLSA and RICO, Mr. Cabral actively participates in the violations complained of in this action.

81.     Based upon the foregoing, Mr. Cabral is liable to Plaintiff and Class Members because of his active role in operating the business, his role in the violations complained of in this action, his status as an employer, and/or otherwise according to federal and state law.

B.     **Plaintiffs**

*Named Plaintiffs*

82.     At all relevant times, Gloria Varela and Gregg Lambdin ("Plaintiffs") were employees under the FLSA, employed within this District and one Named Plaintiff resides within this District.

*Class Members*

83.     The Class Members are those employees of defendants who were suffered or permitted to work by defendants and not paid their regular or statutorily required rate of pay

for all hours worked.

## FACTUAL BACKGROUND

84.     North Shore-Long Island Jewish Health System is one of the largest health care providers in Long Island, NY.

85.     As discussed below, defendants maintained several illegal pay policies that denied Plaintiff and Class Members compensation for all hours worked, including applicable premium pay rates.

### *Meal and Break Deduction Policy*

86.     Pursuant to defendants' "Meal and Break Deduction Policy," defendants' computerized timekeeping system automatically deducts time from employees' paychecks each day for meals, breaks and other reasons.

87.     Despite having this policy, defendants do not ensure that Plaintiff and Class Members perform no work during the breaks.

88.     Plaintiff and Class Members do in fact perform work during those breaks and are not paid for that time.

89.     Defendants know that the Plaintiff and Class Members perform work during these meal and other unpaid breaks, but still do not pay them for this time pursuant to their Meal and Break Deduction Policy.

90.     Defendants maintain the Meal and Break Deduction Policy throughout their facilities and centers.

91.     Plaintiff and Class Members allow defendants to operate on a 24/7 basis, and in doing so, Plaintiff and Class Members often perform compensable work for defendants during their uncompensated breaks.

-17-

92.     Defendants do not prohibit Plaintiff and Class Members from working during their unpaid breaks and do not have rules against such work.

93.     Although defendants' policy deducts time each shift, defendants expect Plaintiff and Class Members to be available to work throughout their shifts and consistently require their employees to work during their unpaid breaks.

94.     Plaintiff and Class Members are not relieved by another employee when their break comes, or asked to leave their work location.

95.     Defendants know that Plaintiff and Class Members perform work during their unpaid breaks.

96.     For example, Plaintiff and Class Members perform work for the defendants, on defendants' premises, in plain sight, and at management's request.

97.     Defendants' management has repeatedly observed Plaintiff and Class Members working though their unpaid breaks.  Defendants' management has gone so far as to direct Plaintiff and Class Members to work during their unpaid breaks even though defendants' management knew that they would not be able to have a full break.

98.     Plaintiff and Class Members had conversations with defendants' managers in which they discussed how they were working through their meals or unpaid breaks and were not getting paid for such work.

99.     When questioned by employees about the Meal and Break Deduction Policy, the defendants affirmatively stated that the employees were being fully paid for the work time for which they were entitled to be paid, even though defendants knew compensable work time was being excluded from the employees' pay.  Such conversations occurred with Plaintiff and Class Members on a number of occasions.  These representations were part of a

-18-

course of conduct (*see e.g.*, ¶¶ 113-117, 133-143) to defraud Plaintiff and Class Members from the pay they were owed, and to mislead them into believing they had been fully paid as required by law.

100.    Further, given the demands of the health care industry and short staffing, defendants' management knew that to get the tasks done they assigned to Plaintiff and Class Members, when they needed to get done, Plaintiff and Class Members had to work through their meal breaks, even during times they were not paid for their meal breaks.

101.    Even though defendants know their employees are performing such work, defendants fail to compensate their employees for such work.

102.    All Plaintiff and Class Members are subject to the Meal and Break Deduction Policy and are not fully compensated for work they perform during breaks, including, without limitation, hourly employees working at North Shore-Long Island Jewish Health System's facilities and centers, such as secretaries, housekeepers, custodians, clerks, porters, registered nurses, licensed practical nurses, transport nurses, nurse aides, administrative assistants, anesthetists, clinicians, medical coders, medical underwriters, nurse case managers, nurse interns, nurse practitioners, nurse aides, practice supervisors, professional staff nurses, quality coordinators, resource pool nurses, respiratory therapists, senior research associates, operating room coordinators, surgical specialists, admissions officers, student nurse techs, trainers, transcriptionists, occupational therapists, occupational therapy assistants, physical therapists, physical therapy assistants, radiation therapists, staff therapists, angiotechnologists, x-ray technicians, CAT scan technicians, mammographers, MRI technologists, sleep technologists, surgical technologists, radiographers, phlebotomists, respiratory technicians, respiratory care specialists, respiratory care practitioners, clinical coordinators, medical assistants, home care

nurses, home health aides, clinical case managers, midwives and other health care workers.

103. Plaintiff and Class Members are entitled to compensation for all time they performed work for defendants, including during their unpaid breaks.

104. In addition, if Plaintiff and Class Members' hours had been properly calculated, the time spent working during unpaid breaks often would include work that should have been calculated at applicable premium pay rates.

105. Plaintiff and Class Members subject to the Meal and Break Deduction Policy are members of Subclass 1.

### Unpaid Preliminary and Postliminary Work Policy

106. Defendants suffered or permitted Plaintiff and Class Members to perform work before and/or after the end of their scheduled shifts.

107. However, defendants failed to pay Plaintiff and Class Members for all time spent performing such work as a result of defendants' policies, practices and/or time recording system (the "Unpaid Preliminary and Postliminary Work Policy").

108. In addition, if Plaintiff and Class Members' hours had been properly calculated, the time spent performing work before and/or after their shifts often would have included work that should have been calculated at applicable premium pay rates.

109. Plaintiff and Class Members subject to the Unpaid Preliminary and Postliminary Work Policy are members of Subclass 2.

### Additional Allegations

110. Plaintiff and Class Members were subject to defendants' timekeeping policies which fail to ensure that employees are compensated for all hours worked, including pursuant to the Unpaid Work Policies.

111. Even though North Shore-Long Island Jewish Health System knew its employees are performing such work, North Shore-Long Island Jewish Health System fails to compensate its employees for such work.

112. Defendants' practice is to be deliberately indifferent to these violations of the statutory wage and overtime requirements.

113. Through the paystubs and payroll information it provided to employees, North Shore-Long Island Jewish Health System deliberately concealed from its employees that they did not receive compensation for all compensable work that they performed and misled them into believing they were being paid properly.

114. Further, by maintaining and propagating the illegal Unpaid Work Policies, defendants deliberately misrepresented to Plaintiff and Class Members that they were being properly paid for all compensable time, even though Plaintiff and Class Members were not receiving pay for all time worked including applicable premium pay.

115. The defendants engaged in such conduct and made such statements to conceal from the Plaintiff and Class Members their rights and to frustrate the vindication of the employees' federal rights.

116. As a result, employees were unaware of their claims.

117. Defendants' failure to pay overtime as required by the FLSA is willful.

118. Defendants, however, at all times, intended to violate applicable federal laws by failing to pay Plaintiff and Class Members their regular or statutorily required rate of pay for all hours worked including applicable premium pay.

119. Among the relief sought, Plaintiff and Class Members seek injunctive relief to prevent defendants from continuing the illegal policies and practices perpetuated pursuant to

the Unpaid Work Policies.

120.    Defendants failed to keep accurate records of all time worked by Plaintiff and Class Members.

121.    As used in this Complaint, "mailed" means: (1) placing in any post office or authorized depository for mailed matter, any matter or thing to be delivered by the United States Postal Service; (2) causing to be deposited any matter or thing to be delivered by any private or commercial interstate carrier; (3) taking or receiving therefrom any such matter or thing; and/or (4) knowingly causing to be delivered by any such means any such matter.

122.    Plaintiff and Class Members allege that defendants devised, intended to devise, and carried out a scheme to cheat Plaintiff and Class Members out of their property and to convert Plaintiff and Class Members' property, including their wages and/or overtime pay (the "Scheme"). Defendants' Scheme consisted of illegally, willfully and systematically withholding or refusing to pay Plaintiff and Class Members their regular or statutorily required rate of pay for all hours worked in violation of federal law, as described previously in this Complaint.

123.    Defendants' Scheme involved the employment of material misrepresentations and/or omissions and other deceptive practices reasonably calculated to deceive Plaintiff and Class Members. The Scheme involved depriving Plaintiff and Class Members of their lawful entitlement to wages and overtime.

124.    In executing or attempting to execute the Scheme and to receive the financial benefits of the Scheme, defendants repeatedly mailed payroll checks, either directly to Plaintiff and Class Members or between defendants' business locations. These mailings occurred on a regular basis and more than 100 such mailings occurred in the last 10 years.

125.    The payroll checks were false and deceptive because they misled Plaintiff and Class Members about the amount of wages to which they were entitled, and whether defendants had included all compensable work time, as well as their status and rights under the FLSA.  Plaintiff and Class Members relied to their detriment on the misleading payroll checks that defendants mailed and those misleading documents were a proximate cause of Plaintiff and Class Members' injuries.

126.    Defendants' predicate acts of mailing the misleading payroll checks in furtherance of their Scheme constitute a pattern of conduct unlawful pursuant to 18 U.S.C. § 1961(5) based upon both the relationship between the acts and continuity over the period of time of the acts.  The relationship was reflected because the acts were connected to each other in furtherance of the Scheme.  Continuity was reflected by both the repeated nature of the mailings during and in furtherance of the Scheme and the threat of similar acts occurring in the future.  The threat was reflected by the continuing and ongoing nature of the acts.

127.    Defendants' predicate acts were related, because they reflected the same purpose or goal (to retain wages and overtime pay due to Plaintiff and Class Members for the economic benefit of defendants and members of the enterprise); results (retention of wages and overtime pay); participants (defendants and other members of the enterprise); victims (Plaintiff and Class Members); and methods of commission (the Scheme and other acts described in the Complaint).  The acts were interrelated and not isolated events, since they were carried out for the same purposes in a continuous manner over a substantial period of time.

128.    At all relevant times, in connection with the Scheme, defendants acted with malice, intent, knowledge, and in reckless disregard of Plaintiff and Class Members' rights.

129.    Each of the Plaintiff and Class Members is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964.

130.    Each defendant is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

131.    Defendants were members of an "enterprise" under 18 U.S.C. §§ 1961(4) and 1962(a), which was engaged in or the activities of which affected interstate and foreign commerce.

132.    Each defendant received income from a pattern of conduct unlawful under RICO, in which defendants participated through continuous instances of providing Plaintiff and Class Members with misleading documents which defendants mailed and upon which Plaintiff and Class Members relied to their detriment.

133.    Plaintiff and Class Members were injured in their business and property under 18 U.S.C. § 1964(c) by reason of defendants' commission of conduct which was unlawful under RICO.

134.    Every wage payment that the defendants mailed to the Plaintiff and Class Members as part of the Scheme constituted a new legal injury to the Plaintiff and Class Members.

135.    Therefore, each and every improper payment within the relevant statute of limitations period constitutes a new legal injury and the Plaintiff and Class Members are entitled to recover based on the reduction in each improper payment.

136.    Additionally, as set forth in the allegations above, including ¶¶ 99, 113-117, the defendants fraudulently concealed from the Plaintiff and Class Members the facts that are the basis for their claims. Further, such conduct by the defendants equitably tolls the

statute of limitations covering Plaintiff and Class Members' claims.

137. Because of such conduct, the Plaintiff and Class Members did not discover in the relevant statute of limitations period that the defendants were not paying them properly.

138. The Plaintiff and Class Members exercised due diligence, but still were unaware of their rights.

139. The Plaintiff and Class Members are not experts in proper payment under federal labor laws, and more specifically are not aware of what time is compensable for interrupted and missed meal breaks, nor how the defendants' internal computer systems were determining the amount they were being paid.

140. Further, when questioned, the defendants falsely assured Plaintiff and Class Members that the defendants understood federal and state labor laws and that based on that knowledge, the defendants were ensuring that they were properly paying the Plaintiff and Class Members.

141. The defendants made this representation despite the fact that such claims were false, fully knowing that Plaintiff and Class Members were relying on the defendants' "expertise" and assurances.

142. Further, these assurances were not contradicted by the information in legal postings required by state or federal law to be displayed prominently at places of work to which Plaintiff and Class Members had access.

143. Prior to seeking legal advice from Class Counsel, the Plaintiff were never alerted to the defendants' concealment of their violation of the law by failing to pay the Plaintiff and Class Members properly.

144. Further, not until the commencement of this action were Class Members

made aware that the defendants' conduct in fact violated the law.

145. Plaintiff and Class Members were not classified as exempt employees because hourly employees do not fall under one of the enumerated exemptions under the FLSA.

## FIRST CAUSE OF ACTION
### *FLSA*

146. Plaintiff and Class Members reallege the above paragraphs as if fully restated herein.

147. Defendants willfully violated their obligations under the FLSA and are liable to Plaintiff and Class Members.

## SECOND CAUSE OF ACTION
### *RICO*

148. Plaintiff and Class Members reallege the above paragraphs as if fully restated herein.

149. Plaintiff and Class Members bring these claims under 18 U.S.C. § 1964(c), which confers on private individuals the right to bring suit for any injury caused by a violation of 18 U.S.C. § 1962.

150. Defendants' conduct, and the conduct of other members of the enterprise, injured Plaintiff and Class Members by refusing to pay their regular or statutorily required rate of pay for all hours worked. Defendants conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity, by devising a Scheme to obtain Plaintiff and Class Members' property by means of false or fraudulent representations, at least some of which were made in the misleading payroll checks which defendants mailed.

WHEREFORE, Plaintiff and Class Members demand judgment against defendants in their favor and that they be given the following relief:

(a)     an order preliminarily and permanently restraining defendants from engaging in the aforementioned pay violations;

(b)     an award crediting Plaintiff and Class Members for all hours worked;

(c)     an award of the value of Plaintiff' and Class Members' unpaid wages;

(d)     liquidated damages under the FLSA equal to the sum of the amount of wages and overtime which were not properly paid to Plaintiff and Class Members;

(e)     an award of reasonable attorneys' fees, expenses, expert fees and costs incurred in vindicating Plaintiff' and Class Members' rights;

(f)     an award of pre- and post-judgment interest; and

(g)     such other and further legal or equitable relief as this Court deems to be just and appropriate.

<u>JURY DEMAND</u>

Plaintiff demands a jury to hear and decide all issues of fact in accordance with Federal Rule of Civil Procedure 38(b).

Dated: March 24 , 2010

THOMAS & SOLOMON LLP

By: _____

Justin M. Cordello, Esq.
*Attorneys for Plaintiff and Class Members*
693 East Avenue
Rochester, New York 14607
Telephone:  (585) 272-0540
jcordello@theemploymentattorneys.com