# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

————————————

Nº 10-CV-1341 (JFB) (ETB)

————————————

CLAUDIA DESILVA, ET AL.,

Plaintiffs,

VERSUS

NORTH SHORE-LONG ISLAND JEWISH HEALTH SYSTEM, INC., ET AL.,

Defendants.

————————————

MEMORANDUM AND ORDER
March 16, 2011

————————————

JOSEPH F. BIANCO, District Judge:

Plaintiffs Claudia DeSilva, Gregg Lambdin, Kelly Iwasiuk, Eileen Bates-Bordies, Margaret Hall, and Brenda Gaines (collectively, "plaintiffs") commenced this action on March 24, 2010, on behalf of themselves and others similarly situated, against defendants North Shore-Long Island Jewish Health System, Inc., North Shore-Long Island Jewish Health Care, Inc., Peninsula Hospital Center, Forest Hills Hospital, Franklin Hospital, Glen Cove Hospital, Huntington Hospital Association, Long Island Jewish Medical Center, Long Island Jewish Hospital, Zucker Hillside Hospital, North Shore University Hospital, Plainview Hospital, Schneider Children's Hospital, Southside Hospital, Staten Island University Hospital, Syosset Hospital, Michael J. Dowling, Joseph Cabral, and

North Shore-Long Island Jewish Health System 403B Plan (collectively, "defendants" or "LIJ"),[1] alleging violations of the Fair Labor Standards Act of 1938, 29 U.S.C. §§ 201 *et seq.* ("FLSA"), the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 *et seq.* ("ERISA"), the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 *et seq.* ("RICO"), and New York Labor Law ("NYLL"). Plaintiffs also alleged a number of state common law

---

[1] Plaintiffs' Second Amended Complaint lists dozens of health care facilities and centers that are affiliated with or part of the named defendant hospitals. (*See* Second Am. Compl. ¶¶ 19-20.) Plaintiffs refer collectively to the named defendants and their health centers and affiliates as the "North Shore-Long Island Jewish Health System," the "System," or "defendants." (*Id.* ¶ 21.)

claims, namely: breach of implied oral contract, breach of express oral contract, breach of implied covenant of good faith and fair dealing, *quantum meruit*, unjust enrichment, fraud, negligent misrepresentation, conversion, and estoppel. Plaintiffs are seeking, *inter alia*, unpaid wages and overtime, an order enjoining defendants from engaging in the pay violations that form the basis of plaintiffs' complaint, an award crediting plaintiffs for all hours worked, liquidated damages under the FLSA and NYLL, and an amount equal to the value that would make plaintiffs whole for defendants' alleged violations.

Defendants contend, *inter alia*, that plaintiffs have failed to state plausible FLSA or ERISA claims and that plaintiffs' civil RICO and state common law claims are preempted by the FLSA, and, accordingly, defendants have moved to dismiss plaintiffs' Second Amended Complaint. Plaintiffs oppose defendants' motion and, in turn, have moved for expedited notice to all class members. For the reasons set forth herein, the Court grants in part and denies in part defendants' motion to dismiss, and denies plaintiffs' motion for expedited notice as moot. Specifically, plaintiffs' FLSA claims—construed only as claims regarding overtime and not as claims regarding "straight time" or "gap time" pay—are dismissed without prejudice for failure to state a claim. Likewise, plaintiffs' NYLL claim is dismissed without prejudice for failure to state a claim. Plaintiffs' RICO cause of action is dismissed with prejudice to the extent that this claim is based upon defendants' failure to pay plaintiffs overtime, and thus is duplicative of plaintiffs' FLSA claim. However, to the extent that the RICO cause of action is based upon defendants' alleged failure to pay plaintiffs for "straight time" wages, this claim is not preempted by the FLSA. Nevertheless, this remaining RICO cause of

action is dismissed without prejudice for failure to state a claim. As to plaintiffs' state common law claims, these claims are dismissed with prejudice as preempted by the FLSA to the extent that they seek overtime wages and, thus, are duplicative of the FLSA claim. The surviving common law claims are construed as seeking only unpaid "straight time" pay. However, plaintiffs' breach of implied oral contract, breach of express oral contract, breach of implied covenant of good faith and fair dealing, *quantum meruit*, fraud, and negligent misrepresentation claims are dismissed without prejudice for failure to state a claim. Plaintiffs' estoppel claim is dismissed because, as pled by plaintiffs, "estoppel" is not a distinct cause of action but instead is an equitable bar to defendants' assertion of a statute of limitations defense. Plaintiffs, however, may assert equitable estoppel at an appropriate point in the litigation, should defendants choose to assert a statute of limitations defense. Regarding plaintiffs' ERISA claims, the claim for failure to keep accurate records is dismissed without prejudice for failure to plead exhaustion of administrative remedies. As to the breach of fiduciary duty claim, the Court is denying defendants' motion to dismiss this claim, but will allow defendants to renew this motion after the parties have conducted limited discovery on the issue of how benefits are determined under the controlling ERISA plans. Defendants' motion to dismiss on the grounds of preemption under the Labor Management Relations Act ("LMRA") is also denied at this juncture without prejudice. Finally, plaintiffs' motion for expedited notice is dismissed with leave to renewal at a later date, if plaintiffs choose to re-plead their FLSA claims and are able to sufficiently plead a cause of action.

## I. BACKGROUND

## A. FACTS[2]

Named plaintiffs work or have worked for defendants in various nursing positions and in various locations.[3] (Second Amended Complaint ("SAC") ¶¶ 65-71.) According to plaintiffs, each of the hospitals and locations for which plaintiffs worked is part of the North Shore-Long Island Jewish Health System ("LIJ"), which is a consortium that operates over seventy health care facilities and centers. (*Id.* ¶¶ 21-23.) Plaintiffs purport to represent a class of over 38,000 current and former employees of the defendant hospitals and LIJ system "whose pension and 401(k) or 403(b) plans were not credited with their non-reduced weekly wages and correct overtime compensation" and "who were injured by defendants'

scheme to cheat employees out of their property and to convert the employees' property, including their wages and/or overtime pay. . . ." (*Id.* ¶¶ 7, 12.)

Specifically, plaintiffs contend that LIJ maintained three illegal pay policies—the meal and break deduction policy, the unpaid pre-and post-schedule work policy, and the unpaid training policy—that denied plaintiffs and class members compensation for all hours worked, including overtime hours and hours that would have been compensated at applicable premium pay rates. (*Id.* ¶¶ 74, 104, 159.) As to the meal and break deduction policy, plaintiffs note that defendants' timekeeping system automatically deducts time from employees' paychecks for meals and breaks. (*Id.* ¶ 75.) However, plaintiffs allege that they do, in fact, work during their meals and breaks and are not paid for that work. (*Id.* ¶ 77; *see also id.* ¶ 82 ("[D]efendants expect Plaintiffs and Class Members to be available to work throughout their shifts and consistently require their employees to work during their unpaid breaks.").) Plaintiffs further allege that defendants know, or should have known, that plaintiffs work through their breaks, because, *inter alia*, such work has been performed in plain sight of defendants' management and also at management's request. (*Id.* ¶¶ 78, 87-88.) When asked by employees about the meal and break deduction policy, "defendants affirmatively stated that the employees were being fully paid for the work time for which they were entitled to be paid, even though defendants knew compensable work time was being excluded from the employees' pay." (*Id.* ¶ 90.) Plaintiffs claim that these representations by defendants were part of a course of conduct to defraud plaintiffs "from the pay they were owed, and to mislead them into believing they had been fully paid as required by law." (*Id.*) Plaintiffs state that they are entitled to compensation for all

---

[2] The following facts are taken from the complaint and are not findings of fact by the Court. Instead, the Court will assume the facts in the Second Amended Complaint to be true and, for purposes of the pending 12(b)(6) motion to dismiss, will construe them in a light most favorable to plaintiffs, the non-moving party.

[3] Plaintiff Claudia DeSilva has worked as a field nurse at Franklin Hospital since February 2006. (SAC ¶ 66.) Plaintiff Gregg Lambdin worked as a registered nurse and nurse clinician at North Shore University Hospital from 1995 until 2007. (*Id.* ¶ 67.) Plaintiff Kelly Iwasiuk worked as a registered nurse at "defendants' Huntington location" from May 2003 until November 2007. (*Id.* ¶ 68.) Plaintiff Eileen Bates-Bordies worked as a registered nurse at Southside Hospital from May 2001 until August 2006. (*Id.* ¶ 69.) Plaintiff Margaret Hall worked as a staff registered nurse and field nurse at North Shore University Hospital and North Shore Home Care division from July 1991 until April 2009. (*Id.* ¶ 70.) Plaintiff Brenda Gaines worked as a staff nurse and a home care staff nurse for Long Island Jewish Hospital from July 1990 until June 2009. (*Id.* ¶ 71.)

time spent working for defendants, including during plaintiffs' breaks, and that if all of their hours had been properly compensated, certain time spent working for defendants would have been compensated under "applicable premium pay rates." (*Id.* ¶¶ 93-94.)

Furthermore, plaintiffs allege that, pursuant to defendants' "unpaid pre- and post-schedule work policy," plaintiffs are required to perform work before and after their scheduled shifts, but are not fully and properly compensated for such work. (*Id.* ¶¶ 96-99.) Likewise, plaintiffs claim that, under defendants' "unpaid training policy," plaintiffs are required to attend compensable training programs but are not paid for all time spent attending such programs. (*Id.* ¶¶ 100-103.) As a result of these "unpaid work policies," defendants required plaintiffs and class members to work hours under and in excess of forty hours per week without full compensation for those hours. (*Id.* ¶¶ 174-75.) Plaintiffs also contend that, through paystubs and payroll information provided to employees, defendants deliberately concealed from plaintiffs and other employees that they were not being fully compensated for all hours worked and "misled them into believing they were being paid properly." (*Id.* ¶ 108.)

### B. PROCEDURAL HISTORY

Plaintiffs filed their original Complaint in this action on March 24, 2010. Prior to defendants' answer, plaintiffs filed an Amended Complaint on June 16, 2010. On August 23, 2010, defendants filed a motion to dismiss, and plaintiffs filed a motion for expedited notice to affected employees pursuant to Section 216(b) of the FLSA. On September 24, 2010, plaintiffs filed their opposition to defendants' motion to dismiss, and defendants filed their opposition to plaintiffs' motion for expedited notice. The

parties submitted their replies in support of their respective motions on October 8, 2010. The Court heard oral argument on the parties' motions on November 22, 2010. During oral argument, the Court informed plaintiffs that their Amended Complaint clearly was deficient insofar as it did not provide sufficient information regarding the named plaintiffs. Accordingly, the Court granted plaintiffs leave to file a Second Amended Complaint to remedy this deficiency, and directed that the complaint as amended should set forth the facilities at which the named plaintiffs worked, the positions they held, and the approximate dates of their employment. Plaintiffs filed their Second Amended Complaint on December 8, 2010. The parties thereafter filed several letters to supply the Court with supplemental authority.

The motions are fully submitted and the Court has considered all of the parties' arguments.

### II. MOTION TO DISMISS

#### A. STANDARD OF REVIEW

In reviewing a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *See Cleveland v. Caplaw Enters.*, 448 F.3d 518, 521 (2d Cir. 2006). "In order to survive a motion to dismiss under Rule 12(b)(6), a complaint must allege a plausible set of facts sufficient 'to raise a right to relief above the speculative level.'" *Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 91 (2d Cir. 2010) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). This standard does not require "heightened fact pleading of specifics, but only enough facts to state a claim to relief

that is plausible on its face." *Twombly*, 550 U.S. at 570.

The Supreme Court recently clarified the appropriate pleading standard in *Ashcroft v. Iqbal*, setting forth a two-pronged approach for courts deciding a motion to dismiss. --- U.S. ----, 129 S. Ct. 1937 (2009). The Court instructed district courts to first "identify[ ] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." 129 S. Ct. at 1950. Though "legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* Second, if a complaint contains "well-pleaded factual allegations[,] a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 1949 (quoting and citing *Twombly*, 550 U.S. at 556-57 (internal citations omitted)).

The Court notes that, in adjudicating this motion, it is entitled to consider: "(1) facts alleged in the complaint and documents attached to it or incorporated in it by reference, (2) documents 'integral' to the complaint and relied upon in it, even if not attached or incorporated by reference, (3) documents or information contained in defendant's motion papers if plaintiff has knowledge or possession of the material and relied on it in framing the complaint, (4) public disclosure documents required by law to be, and that have been, filed with the Securities and Exchange Commission, and (5) facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence." *In re Merrill Lynch & Co., Inc.*, 273 F. Supp. 2d 351, 356-57 (S.D.N.Y. 2003) (internal citations omitted), *aff'd in part and vacated in part on other grounds sub nom.*, *Dabit v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 395 F.3d 25 (2d Cir. 2005), *vacated on other grounds*, 547 U.S. 71 (2006); *see also Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("[T]he district court . . . could have viewed [the documents] on the motion to dismiss because there was undisputed notice to plaintiffs of their contents and they were integral to plaintiffs' claim."); *Brodeur v. City of N.Y.*, No. 04 Civ. 1859, 2005 U.S. Dist. LEXIS 10865, at *9-10 (E.D.N.Y. May 13, 2005) (stating court could consider documents within the public domain on a Rule 12(b)(6) motion to dismiss).

## B. DISCUSSION

### 1. FLSA

Defendants argue that plaintiffs have failed to set forth sufficient factual allegations to support a plausible claim for relief under the FLSA. For the reasons set forth below, the Court agrees.

Under the FLSA, "no employer shall employ any of his employees . . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1). The regular, minimum rates at which employees must be paid are established by section 206 of the FLSA. 29 U.S.C. § 206(a). In addition, the FLSA sets forth a broad civil enforcement scheme, pursuant to which "[a]ny employer who violates the provisions of section 206 or section 207 of this title shall be liable to the employee or employees

affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages." 29 U.S.C. § 216(b). In an action to recover unpaid overtime wages under FLSA, a plaintiff must show that: "(1) he was an employee who was eligible for overtime ([*i.e.*,] not exempt from the Act's overtime pay requirements); and (2) that he actually worked overtime hours for which he was not compensated." *Hosking v. New World Mortg., Inc.*, 602 F. Supp. 2d 441, 447 (E.D.N.Y. 2009).

Plaintiffs have identified three policies or practices of defendants that allegedly have resulted in plaintiffs not being compensated for "all hours worked." (SAC ¶ 74.) In particular, plaintiffs have pointed to: (1) defendants' "meal and break deduction policy," pursuant to which defendants would automatically deduct time from employees' paychecks for meal and break time regardless of the fact that plaintiffs and class members were often required to work through those times (*id.* ¶¶ 75-95); (2) defendants' "unpaid pre- and post-schedule work policy," pursuant to which plaintiffs and class members were not compensated for work that defendants "suffered or permitted" them to perform before and/or after their scheduled shifts (*id.* ¶¶ 96-99); and (3) defendants' "unpaid training policy," under which plaintiffs and class members were not compensated for training sessions that defendants "suffered or permitted" them to attend (*id.* ¶¶ 100-103). As a result of these policies, plaintiffs allege that they "regularly worked hours both under and in excess of forty per week and were not paid for all of those hours" (*id.* ¶¶ 159, 174-75), and, likewise, that class members are employees who were "not paid their regular or statutorily required rate of pay for all hours worked" (*id.* ¶ 72),

including for hours worked in excess of forty hours per week (*id.* ¶ 159).[4]

At oral argument, the Court informed plaintiffs that their Amended Complaint clearly was deficient with regard to the information provided about the named

---

[4] The Court notes that to the extent plaintiffs are seeking to recover "straight time" or "gap time" pay for hours worked under the forty-hour FLSA cap (*i.e.* non-overtime hours), plaintiffs may not pursue such claims under the FLSA. Instead, those claims will be treated as part of plaintiffs' contractual or quasi-contractual state common law claims. *See Sampson v. Medisys Health Network, Inc.*, No. 10-cv-1342 (SJF) (ARL), 2011 WL 579155, at *5 (E.D.N.Y. Feb. 8, 2011) ("So long as an employee works fewer than forty (40) hours in a week, and is paid for those hours at a rate of at least minimum wage, an employee cannot state a gap time claim under the FLSA. As noted in [*Wolman v. Catholic Health System of Long Island*, No. 10-cv-1326 (JS) (ETB), 2010 WL 5491182 (E.D.N.Y. Dec. 30, 2010)], to the extent courts have reached a consensus with respect to gap time claims, they have held that there can be no FLSA gap time claim when an employment contract provides that an employee be compensated for all non-overtime hours, and the employee has been properly compensated for overtime hours." (additional citations omitted)). Indeed, plaintiffs acknowledge in their opposition papers that their FLSA claims are limited to their claims seeking unpaid overtime and that any claims for "straight time" are brought as common law claims. (*See* Pls.' Opp. at 20 (noting in connection with state common law claims that although "[p]laintiffs do claim entitlement for unpaid overtime hours under the FLSA . . . plaintiffs also seek unpaid straight-time wages for work performed under 40 hours in a week. Therefore the state common law claims are not duplicative of the FLSA claims and are not preempted.").) Accordingly, in connection with plaintiffs' FLSA claim, the Court will only consider plaintiffs' allegations that they were not properly compensated for overtime hours worked (*i.e.* hours worked above forty hours per week).

plaintiffs. In particular, the Amended Complaint failed to state where the named plaintiffs worked, what positions they held, or what their dates of employment were. Accordingly, the Court directed that plaintiffs file a Second Amended Complaint solely for the purpose of correcting these specific defects. Plaintiffs followed the Court's direction, and submitted a Second Amended Complaint that provides the positions that named plaintiffs held with defendants, the hospitals at which they worked, and the time periods during which they were employed. The Court finds that, with the addition of these facts, the Second Amended Complaint provides sufficient information regarding the named plaintiffs. *See Acho v. Cort*, No. C 09-00157 MHP, 2009 WL 3562472, at *3 & n.2 (N.D. Cal. Oct. 27, 2009) (noting that "the addition of an alleged employment period is required in the complaint" and finding that plaintiff stated a claim where plaintiff "indicated the time period during which he worked for defendant," thereby enabling defendants to review its employment records to determine "the specific number of overtime hours worked by plaintiff"); *cf. Harding v. Time Warner, Inc.*, No. 09-cv-1212 (WQH) (WMC), 2010 WL 457690, at *5 (S.D. Cal. Jan. 26, 2010) ("The First Amended Complaint contains no factual allegations indicating when and where Plaintiff was employed by Time Warner. This is a minimal requirement necessary to enable a defendant to frame a response to a FLSA complaint.").

However, as to the specifics of the alleged FLSA overtime violations, the Court finds that plaintiffs have not alleged sufficient facts to survive a motion to dismiss. Significantly, after oral argument, three district courts in this Circuit dismissed complaints that were nearly identical to the complaint brought here. *See Sampson v. Medisys Health Network Inc.*, No. 10-cv-

1342 (SJF) (ARL), 2011 WL 579155 (E.D.N.Y. Feb. 8, 2011); *Nakahata v. New York-Presbyterian Healthcare Sys., Inc.*, Nos. 10-cv-2661 (PAC), 10-cv-2662 (PAC), 10-cv-2683 (PAC), 10-cv-3247 (PAC), 2011 WL 321186 (S.D.N.Y. Jan. 28, 2011); *Wolman v. Catholic Health Sys. of Long Island, Inc.*, No. 10-cv-1326 (JS) (ETB), 2010 WL 5491182 (E.D.N.Y. Dec. 30, 2010). The Court finds the analysis in these decisions to be persuasive. In particular, each of these courts found that plaintiffs' complaint—which appears to be a boilerplate complaint that has been filed, with only minor variations, in at least a dozen different cases—failed to state a claim for relief insofar as it contained "no factual allegations about when the alleged unpaid wages were earned (*i.e.*, which lunches and breaks were worked through without proper compensation), or the number of hours allegedly worked without compensation— the heart of the claim." *Nakahata*, 2011 WL 321186, at *4; *accord Sampson*, 2011 WL 579155, at *4 ("These conclusory allegations are not sufficient to plead a violation of the overtime provision. . . . [P]laintiffs do not allege any facts to support the general conclusion that by working during the challenged periods they would have been working in excess of forty hours in one week period. Without alleging facts that support the claim that by working during the challenged periods plaintiffs, or the named plaintiff at a minimum, would be working compensable overtime hours, plaintiffs have not given defendants fair notice of the basis of the FLSA overtime claim as is required by *Twombly* and *Iqbal*." (internal citations omitted)); *Wolman*, 2010 WL 5491182, at *4. To state a claim for relief for overtime violations under the FLSA, "the complaint should, at least approximately, allege the hours worked for which these wages were not received." *Zhong v. August August Corp.*, 498 F. Supp.

2d 625, 628 (S.D.N.Y. 2007). Here, plaintiffs have alleged only that they "regularly" worked hours "in excess of forty" hours per week. (SAC ¶ 159.) However, as noted in *Wolman*, 2010 WL 5491182, it is not enough "to 'merely allege[ ]' that Plaintiffs worked 'beyond forty hours per week.'" *Id.* at *4 (quoting *Zhong*, 498 F. Supp. 2d at 630). Instead, plaintiffs must provide at least some approximation of the overtime hours that defendants required them to work and a time frame for when those hours were worked. *See Connolly v. Smugglers' Notch Mgmt. Co.*, No. 09-cv-131, 2009 WL 3734123, at *2-3 (D. Vt. Nov. 5, 2009) (plaintiff stated a FLSA overtime claim where she alleged that she "averaged working between 2100-2300 hours every year. As best a [sic] she can recall, Plaintiff worked 60-70 hours in some work weeks, worked 50 hours in other weeks and up to 45 hours in other weeks."); *Nichols v. Mahoney*, 608 F. Supp. 2d 526, 547 (S.D.N.Y. 2009) (where plaintiffs alleged that they worked an average of fifty to sixty-five hours per week, plaintiffs stated an overtime violation claim because they "specified the approximate time period they were employed by defendants . . . and the approximate number of overtime hours they each worked per week without receiving overtime pay").

As stated by the court in *Pruell v. Caritas Christi*, No. 09-11466-GAO, 2010 WL 3789318 (D. Mass. Sept. 27, 2010), in dismissing another substantially similar complaint:

> The plaintiffs also cannot avoid their pleading obligations by arguing that [their employer] has better access to information concerning hours worked or wages paid. Even when facts are peculiarly within the possession of a defendant, a plaintiff is not excused from his pleading obligations. The necessary facts should be pled upon "information and belief." But that is not the case here. The facts necessary to state a claim . . . are not peculiarly within the possession of [defendant]. The plaintiffs should know approximately how many hours they worked per week and their hourly rate or weekly wages. [Defendant] may have the exact records necessary to ultimately prove the wage claims, but approximations are sufficient to state a wage claim.

*Id.* at *4 (internal citations omitted). Thus, the burden placed on plaintiffs here is not an onerous one. They are not required to state every single instance of overtime work or to state the exact amount of pay which they are owed; instead, they are only required to provide some approximation of the overtime hours that they worked. Plaintiffs here, however, have failed to satisfy even this minimal burden.

Furthermore, as to the "unpaid work policies" alleged in the complaint, plaintiffs have failed to provide *any* factual allegations whatsoever to support their claims regarding the "unpaid preliminary and postliminary schedule work policy" or the "unpaid training policy." Their allegations regarding these policies consist only of four paragraphs per policy that contain nothing but vague and unfounded conclusions that plaintiffs were not being properly paid. As explained in *Wolman*, 2010 WL 5491182, at *2, "not all time spent on work related tasks before or after a shift is compensable." Likewise, although time spent attending training sessions is generally compensable, there are specific statutory exceptions to this rule. *Id.* at *3. The Second Amended Complaint, however, contains no factual allegations that would enable the Court to determine whether the training programs

that defendants "suffered or permitted" plaintiffs to attend were compensable under the FLSA. Accordingly, this Court agrees with the court in *Wolman* and finds that plaintiffs have failed to state a plausible claim for relief based upon either the unpaid pre- and post-schedule work policy or the unpaid training policy. *See also Sampson*, 2011 WL 579155, at *4 n.1. *But see Hinterberger v. Catholic Health*, No. 08-cv-380S, 2008 WL 5114258, at *2 (W.D.N.Y. Nov. 25, 2008) (finding plaintiffs satisfied notice pleading requirements where they identified specific policies and practices of defendants, including an automatic break deduction policy, a practice of not paying plaintiffs for work performed before and after their scheduled shifts, and a practice of not compensating plaintiffs for attendance at compensable training sessions).

Thus, because plaintiffs have failed to approximate the number of overtime hours that they worked as a result of any of the "unpaid work policies," and because they have failed to provide any specific factual allegations for their claims regarding the unpaid training policy and the unpaid pre- and post-schedule work policy, the Court finds that plaintiffs have failed to state a claim for a FLSA overtime violation and, thus, dismisses plaintiffs' FLSA claim without prejudice.[5]

---

[5] Although the parties' briefing focused on plaintiffs' FLSA claims rather than their New York Labor Law ("NYLL") claims, the Court notes that "[t]he relevant portions of New York Labor Law do not diverge from the FLSA," and, as such, the analysis above "applies equally to [NYLL] state law claims." *Whalen v. J.P. Morgan Chase & Co.*, 569 F. Supp. 2d 327, 330 n.2 (W.D.N.Y. 2008), *rev'd on other grounds sub nom. Davis v. J.P. Morgan Chase & Co.*, 587 F.3d 529 (2d Cir. 2009). *See also Bennett v. Progressive Corp.*, 225 F. Supp. 2d 190, 215 (N.D.N.Y. 2002) ("Because neither plaintiffs nor

## 2. RICO

In addition to their claims under the FLSA, plaintiffs have also brought a cause of action for civil RICO violations. Specifically, plaintiffs contend that defendants devised a scheme to defraud plaintiffs by concealing that defendants were willfully and systematically withholding from plaintiffs their regular or statutorily required rate of pay for all hours worked. (SAC ¶ 120.) In furtherance of this scheme, defendants allegedly mailed payroll checks to plaintiffs that were "false and deceptive because they misled Plaintiffs and Class Members about the amount of wages to which they were entitled, the number of hours which they had worked, and whether defendants had included all compensable time, as well as their status and rights under the FLSA." (*Id.* ¶ 123.) Plaintiffs claim that these deceptive payroll checks prevented plaintiffs from discovering that defendants were not paying them properly—in other words, because plaintiffs were not experts in proper payments under labor laws, were not aware of what time is compensable for interrupted and missed meal breaks, and did not know how defendants' computer systems determined the amount plaintiffs were being paid, plaintiffs relied upon defendants' representations (orally and in plaintiffs' paychecks) that plaintiffs were being properly compensated. (*Id.* ¶¶ 137-41.) Plaintiffs allege that the mailing of

---

defendants direct this court to authority mandating a different analysis under New York State law and the FLSA, 'the ensuing analysis focuses solely on federal law, but applies equally to Plaintiff's claims under the FLSA and New York State law.'" (quoting *Debejian v. Atlantic Testing Labs., Ltd.*, 64 F. Supp. 2d 85, 87 n. 1 (N.D.N.Y. 1999)). Thus, for the reasons set forth *supra*, plaintiffs' NYLL claim, like their FLSA claim, is dismissed without prejudice for failure to state a claim.

these misleading payroll checks constituted individual acts of mail fraud, which serve as the predicate acts underlying plaintiffs' RICO claim. (*Id.* ¶ 126.) Defendants have moved to dismiss this cause of action on the grounds that, *inter alia*, plaintiffs' civil RICO claim is preempted[6] by the FLSA and

plaintiffs lack standing under RICO because the alleged predicate acts (*i.e.*, the mailing of the paychecks) did not proximately cause plaintiffs' claimed injuries. For the reasons set forth herein, the Court finds that the RICO cause of action is unavailable to the extent that it is duplicative of the FLSA claims seeking unpaid overtime. However, to the extent that plaintiffs are seeking unpaid wages for hours that were not overtime hours—in other words, wages that would not be covered by the requirements of the FLSA—the civil RICO claims are not duplicative of the FLSA claims and, thus, are not precluded. Nevertheless, the Court agrees with defendants that, regardless of the specific type of wages sought, plaintiffs lack standing under RICO because they cannot establish as a matter of law, given the allegations in the pleadings, that the defendants' alleged "racketeering" activity was the proximate cause of plaintiffs' injuries. Plaintiffs' RICO claims also suffer from a number of other pleading defects. Accordingly, for the reasons set forth *infra*, the Court dismisses plaintiffs' RICO cause of action.

### a. FLSA Preemption

As an initial matter, it is a "well-established principle that, in most contexts, a precisely drawn, detailed statute pre-empts more general remedies." *Hinck v. United States*, 550 U.S. 501, 506 (2007) (internal quotation marks and citations omitted). This principle was first espoused by the Supreme Court in *Brown v. General Services Administration*, 425 U.S. 820 (1976), in which the Court held that the "careful blend of administrative and judicial enforcement

---

[6] Some courts have taken issue with the use of the term "preempt" in the context of determining the impact of one federal statute on actions brought under another federal statute. *See Baker v. IBP, Inc.*, 357 F.3d 685, 688 (7th Cir. 2004) ("Federal statutes do not 'preempt' other federal statutes, and, though one may repeal another implicitly if they are irreconcilable, RICO was enacted after the National Labor Relations Act. Federal laws *do* preempt state laws, but preemption is a defense and thus does not affect subject-matter jurisdiction." (emphasis in original)); *Danielsen v. Burnside-Ott Aviation Training Center, Inc.*, 941 F.2d 1220, 1226-27 (D.C. Cir. 1991) ("We have a slight semantic difficulty with the use of the word 'preemption' for the concepts we discuss in this section. We recognize that this use of 'preempt' is not inconsistent with uses of that word in the labor law context. For example, in *Amalgamated Association of Street Employees, etc. v. Lockridge*, 403 U.S. 274, 276 (1971), the Supreme Court held that the NLRA 'preempts state and federal court jurisdiction to remedy conduct that is arguably protected or prohibited by the Act.' Most recent use of the word in federal jurisprudence, however, generally has been in the context of the 'preemption doctrine,' which recognizes that 'certain matters are of such a national, as opposed to local, character that federal laws pre-empt or take precedence over state laws.' *Black's Law Dictionary* 1060 (West 5th ed. 1979) (emphasis added). As the present case raises a narrower question, our task is more accurately described as determining whether there is a statutory provision of an exclusive remedy rather than the preemption of an entire field. Therefore, while we agree with the District Court in its conclusion, we differ in terminology."). This Court need not resolve this question, however, because, regardless of the terminology used, the analysis underlying this

Court's decision remains the same, namely, that the broadness of the FLSA's remedial scheme precludes, or otherwise renders unavailable, civil RICO actions as a method for vindicating rights established under the FLSA.

powers" set forth in Section 717 of the Civil Rights Act of 1964 led "unerringly to the conclusion that [Section 717] . . . provides the exclusive judicial remedy for claims" falling within its scope. *Id.* at 833-35. In so holding, the Court pointed to subsections (b) and (c) of the statute, which "establish[ed] complementary administrative and judicial enforcement mechanisms." *Id.* at 831. Specifically, subsection (b) delegated to the Civil Service Commission full authority to enforce the provisions of the statute, while subsection (c) permitted an aggrieved employee to file a civil action and have a federal district court review his claim. *Id.* at 831-32. This private right of action was circumscribed, however, by the requirement that the aggrieved party satisfy certain preconditions before exercising this private right. *Id.* at 832. In addition, subsection (d) of the statute set forth requirements governing venue, the appointment of attorneys, attorneys' fees, and the scope of relief available. *Id.* The Supreme Court found that the "balance, completeness, and structural integrity" of Section 717 were "inconsistent with the . . . contention that the judicial remedy afforded by § 717(c) was designed merely to supplement other putative judicial relief." *Id.* Indeed, to allow parties "immediate access to the courts under other, less demanding statutes" would "drive[] [Section 717] out of currency." *Id.* at 833. Accordingly, the Court explained that "[i]t would require the suspension of disbelief to ascribe to Congress the design to allow its careful and thorough remedial scheme to be circumvented by artful pleading." *Id.*

Applying the reasoning in *Brown* to the instant case, this Court finds that the FLSA sets forth a similarly detailed statutory scheme that "provides for a careful blend of administrative and judicial enforcement powers," *id.* at 833, and that, accordingly, provides the exclusive remedy for wage and hour violations that fall within the FLSA's scope. By way of example, the FLSA's "unusually elaborate enforcement scheme," *Anderson v. Sara Lee Corp.*, 508 F.3d 181, 192 (4th Cir. 2007) (citation omitted), establishes criminal penalties for willful violations of the Act, 29 U.S.C. § 216(a), and specifies the damages that can be sought against employers who violate the FLSA, namely, unpaid wages, liquidated damages, and, in retaliation cases, appropriate legal and equitable relief, including reinstatement and promotion. *See id.* § 216(b). In addition, the Secretary of Labor is authorized to bring an action in a court of competent jurisdiction to seek unpaid wages and liquidated damages, injunctive relief, and appropriate equitable relief, and to supervise the payment of any unpaid minimum wages or overtime compensation. *See id.* §§ 216-217. An employee may also institute an action against an employer in either federal or state court to recover unpaid wages, liquidated damages, attorneys' fees, and costs, but, significantly, this private right of action terminates upon the filing of a complaint by the Secretary of Labor. *See id.* § 216(b)-(c).

Although the Second Circuit has not yet spoken to the precise question raised in this case, this Court's analysis regarding the comprehensive nature of the FLSA scheme is supported by the Second Circuit's decision in *Herman v. RSR Security Services, Ltd.*, 172 F.3d 132 (2d Cir. 1999). In *Herman*, the Court of Appeals addressed whether employers had a right to the remedy of contribution or indemnification under either the FLSA or through state law based on a violation of the FLSA. In evaluating whether the FLSA barred the remedies of contribution and indemnification, the Court noted that the FLSA had "a comprehensive remedial scheme as shown by the express provision for private enforcement in certain carefully defined circumstances," and found

that "[s]uch a comprehensive statute strongly counsels against judicially engrafting additional remedies." *Id.* at 144 (internal quotation marks omitted). In addition, with regard to whether the employers could use state common law to pursue contribution or indemnification claims for a violation of the FLSA, the court held that "the FLSA's remedial scheme is sufficiently comprehensive as to preempt state law in this respect." *Id.*

Furthermore, the First and Fourth Circuits, and several district courts, have similarly held that the FLSA's broad remedial scheme is exclusive and can preclude parallel actions brought under federal and state law. For example, in *Kendall v. City of Chesapeake, Virginia*, 174 F.3d 437 (4th Cir. 1999), the Fourth Circuit held that "the elaborate remedial scheme provided in the FLSA demonstrates a congressional intent to prohibit § 1983 actions to enforce . . . FLSA rights" to overtime compensation. *Id.* at 439. In *Kendall*, the plaintiffs had alleged that the defendant City of Chesapeake had fraudulently induced plaintiffs to accept payments and sign releases that concealed defendant's liability for wrongfully withheld overtime compensation and for liquidated damages. *Id.* at 440. This fraudulent conduct, according to plaintiffs, violated § 1983 insofar as defendant had "acted 'to disregard, dishonor, and defeat' [plaintiffs'] rights under the FLSA." *Id.* The Fourth Circuit disagreed with plaintiffs' assessment of their claim, however, and found that although plaintiffs "suggest[ed] that their claim is in some sense independent of the FLSA . . . [they] identif[ied] no source for the right giving rise to their § 1983 claim other than the FLSA." *Id.* at 441. In holding that "the FLSA implicitly precludes the [plaintiffs'] § 1983 claim by creating a comprehensive enforcement scheme that is incompatible with individual enforcement

under § 1983," *id.* at 442 (internal quotation marks and citation omitted), the court pointed not only to the comprehensiveness of the FLSA scheme, but also to the fact that a plaintiff's private right of action is terminated upon commencement of an action by the Secretary of Labor. *Id.* at 443. Specifically, the Fourth Circuit explained:

> [I]n the FLSA Congress manifested a desire to exclusively define the private remedies available to redress violations of the statute's terms, for the FLSA mandates that the commencement of an action by the Secretary of Labor terminates an employee's own right of action. [29 U.S.C.] § 216(b). If parallel § 1983 actions were allowed, this provision would become superfluous.

*Id.* (internal quotation marks and citation omitted). Because plaintiffs had "cited nothing indicating a Congressional intent to permit a plaintiff to circumvent the carefully tailored statutory scheme created in the FLSA," the court held that "Congress has evinced a clear intent to preclude the use of § 1983 for the protection of overtime compensation rights secured by the FLSA," and accordingly dismissed plaintiffs' § 1983 action. *Id.* (internal quotation marks and citation omitted).

Other courts have likewise held that the FLSA sets forth the exclusive remedy for wage and hour violations that fall within the statute's scope, thus precluding the use of other statutes or common law actions to remedy alleged FLSA violations. *See, e.g.*, *Anderson*, 508 F.3d at 194 ("Congress's intention to create exclusive remedies was clear in that 'the FLSA mandates that the commencement of an action by the Secretary of Labor terminates an employee's own right of action'—a special feature of the FLSA's enforcement scheme, found in

29 U.S.C. § 216(b) and (c), that would be rendered superfluous if workers were able to circumvent that scheme while pursuing their FLSA rights. . . . Because the FLSA's enforcement scheme is an exclusive one, we further conclude that the Class Members' FLSA-based contract, negligence, and fraud claims are precluded under a theory of obstacle preemption." (quoting *Kendall*, 174 F.3d at 443)); *Roman v. Maietta Constr., Inc.*, 147 F.3d 71, 76 (1st Cir. 1998) (holding that plaintiff was not entitled under state law to damages in excess of those provided by the FLSA because "the FLSA is the exclusive remedy for enforcement of rights created under the FLSA" and a "plaintiff cannot circumvent the exclusive remedy prescribed by Congress by asserting equivalent state claims in addition to the FLSA claim" (internal quotation marks and citations omitted)); *Petras v. Johnson*, No. 92-cv-8298 (CSH), 1993 WL 228014, at *2 (S.D.N.Y. June 22, 1993) (dismissing plaintiff's common law tort claims for fraud on the ground that "Congress had created a very detailed and carefully defined right of action to enforce the FLSA overtime rules" and finding that "[c]ourts have consistently held that the [Section 216(b) of the FLSA] is the exclusive remedy for enforcing rights created under the FLSA" (internal quotation marks omitted) (collecting cases)).[7]

Applying the analysis of these cases (which the Court finds persuasive) to the current context, the Court finds that allowing plaintiffs to recover under civil RICO for claims that are, at their core, FLSA claims would thwart the careful and comprehensive scheme established by Congress to remedy wage and hour violations falling under the FLSA's scope. In particular, allowing plaintiffs to pursue a

civil RICO claim grounded in the same facts as plaintiffs' FLSA claim would, essentially, create a new private right of action that would allow plaintiffs to seek treble damages—instead of merely seeking unpaid wages and liquidated damages—and would render meaningless the Secretary of Labor's right to terminate any private party's suit should the Secretary decide to file a complaint.

Accordingly, having concluded that FLSA's remedial scheme is exclusive for violations falling under its purview, the key question for the Court to resolve is whether, and to what extent, plaintiffs' civil RICO claims are duplicative of their FLSA claims. As alleged in the Second Amended Complaint, defendants' scheme to defraud "consisted of illegally, willfully and systematically withholding or refusing to pay Plaintiffs and Class Members their regular *or statutorily required* rate of pay for all hours worked. . . ." (SAC ¶ 120 (emphasis added).) In addition, plaintiffs allege that defendants concealed from plaintiffs "the amount of wages to which they were entitled, the numbers of hours which they had worked, and whether defendants had included all compensable work time, *as well as their status and rights under the FLSA*." (*Id.* ¶ 123 (emphasis added).) Thus, from the face of plaintiffs' complaint, it is plain that their RICO claims rely, at least in part, on plaintiffs' statutory right to overtime pay under the FLSA. Plaintiffs' argue that their RICO claims stem not from defendants' failure to properly compensate plaintiffs for all overtime hours, but instead from defendants' mailing of deceptive paychecks and consequent "interfere[nce] with [plaintiffs'] legal rights to recover all wages due." (Pls.' Opp. at 9.) However, plaintiffs would not have any claim for mail fraud or interference with their rights if they did not have an independent right under the FLSA to

---

[7] See *infra* Section II.B.3.a for a full discussion of the FLSA's preemptive effect on duplicative state common law claims.

compensation for all overtime hours worked. Indeed, as noted *supra*, plaintiffs' complaint clearly states that the paychecks mailed by defendants were allegedly false and deceptive, in part, because they misled plaintiffs regarding "their status and rights under the FLSA." (SAC ¶ 123.) Accordingly, to the extent that plaintiffs' civil RICO claims stem from defendants' failure to pay overtime due under the FLSA, and from their concealment thereof, the Court finds that the civil RICO claims are precluded under the exclusive remedial scheme set forth in the FLSA.

The Court notes that two other district courts—including the only other court in this Circuit to address this precise issue—have similarly found that the FLSA preempts duplicative actions brought under RICO. For example, in *Choimbol v. Fairfield Resorts, Inc.*, No. 05-cv-463, 2006 WL 2631791 (E.D. Va. Sept. 11, 2006), plaintiffs brought an action alleging that defendants failed to properly compensate plaintiffs for minimum wage and overtime compensation due under the FLSA. *Id.* at *4. Plaintiffs also brought both a common law fraud claim, alleging that defendants misrepresented to plaintiffs that they were being appropriately compensated for minimum and overtime wages, and a RICO claim, based on the predicate acts of mail fraud, wire fraud, and money laundering. *Id.* In opposition to defendants' motion to dismiss, plaintiffs argued that their RICO claims should survive because "the FLSA was intended to remedy 'pedestrian' violations by employers, [while] RICO [was] designed to address the grand systematic scheme present in this instant case." *Id.* at *6. The court, however, rejected plaintiffs' argument, and noted that "[b]ut for the proscriptions of the FLSA, the Defendants['] conduct would not constitute the fraudulent scheme Plaintiffs allege." *Id.* at *7. Accordingly, because the FLSA

provides "direct relief" for the violations alleged by plaintiffs, the court held that "the FLSA preempts the assertion of RICO claims." *Id.* Likewise, in *Eldred v. Comforce Corporation*, No. 08-cv-1171, 2010 WL 812698 (N.D.N.Y. March 2, 2010), the court dismissed plaintiffs' civil RICO claims, which were based in part on "mail and wire fraud stemming from the issuance of union cards, withholding of union dues, and failure to pay prevailing wages, overtime, and work-relate travel-time." *Id.* at *10. In holding that much of plaintiffs' RICO claim was duplicative of their FLSA claim and accordingly should be dismissed, the court noted that "[t]his approach ensures that the '[a]rtful invocation of controversial civil RICO, particularly when inadequately pleaded' does not endanger the uniform administration of core concerns of the primary enforcement scheme." *Id.* (quoting *Norman v. Niagara Mohawk Power Corp.*, 873 F.2d 634, 637 (2d Cir. 1989)).[8] *But see Kutznyetsov v. W. Penn. Allegany Health Sys.*, No. 09-cv-379, 2009 WL 2175585, at

---

[8] The decision in *Petras*, 1993 WL 228014, also supports the Court's conclusion. Although *Petras* involved a common law fraud claim, instead of a RICO claim, the plaintiff's claim in *Petras* was based upon the alleged concealment of plaintiff's rights under the FLSA, *id.* at *3, which is the same basis as plaintiffs' RICO claim in this case. In *Petras*, the court held that the fraud causes of action were "nothing more than a claim that the defendants intentionally frustrated the overtime laws, a statutory violation for which Section 216(b) of the statute provides exclusive relief in the form of the unpaid overtime compensation plus liquidated damages." *Id.* Likewise, plaintiffs' RICO allegations here are, at their core, only allegations that defendants unlawfully concealed their failure to compensate plaintiffs for the wages owed to them. As explained *supra*, plaintiffs cannot use RICO to enforce their rights to overtime wages under the FLSA.

*3 (W.D. Pa. July 20, 2009) ("[B]ecause . . . the general goals of RICO and the FLSA vary, [the court does] not find that the FLSA can preempt the RICO claim in this case.").

Furthermore, other courts, including the Second Circuit, have found civil RICO claims to be precluded where another federal statute has set forth a broad remedial scheme and where the RICO claims are based on the same facts that would allow recovery under that alternative scheme. In *Norman*, 873 F.2d at 636, plaintiffs brought a RICO cause of action against defendant, alleging that defendant "engaged in a pattern of racketeering in furtherance of a scheme to conceal . . . largely unspecified construction deficiencies, excessive costs and management failures." However, in reality, plaintiffs' claims stemmed not from these unspecified deficiencies and management failures, but from defendant's retaliation against plaintiffs after plaintiffs had attempted to bring various violations and defects to the attention of defendant's management. *Id.* at 635-36. Accordingly, although plaintiffs had labeled their claims as arising under RICO, the Second Circuit noted that the claims were, in fact, harassment claims that fell directly under the scope of Section 210 of the Energy Reorganization Act. In particular, the Court noted that Section 210 not only "provides a remedy for an employee who has been discriminated against or discharged for making safety complaints" but also "creates a procedural framework for vindication of this right." *Id.* at 637. The remedy set forth in the statute, the court held, was exclusive and covered plaintiffs' RICO complaint, which "distilled to its essence, allege[d] no more than that appellants were discriminated against for having made complaints about safety." *Id.* at 637-38. In so holding, the court explained that "[a]rtful invocation of controversial civil RICO, particularly when inadequately pleaded, cannot conceal the

reality that the gravamen of the complaint herein is section 210 harassment." *Id.* at 637. Moreover, in *Danielson v. Burnside-Ott Aviation Training Cener, Inc.*, 746 F. Supp. 170 (D.D.C. 1990), *aff'd* 941 F.2d 1220 (D.C. Cir. 1991), the district court noted that courts have particularly refused to apply civil RICO where, as in this case, "a comprehensive administrative scheme exists to remedy violations of federal labor law." *Id.* at 176. In *Danielson*, the fraudulent scheme alleged by plaintiffs was the "underpayment of wages and fringe benefits due them pursuant to the [Service Contract Act ("SCA")]." *Id.* Because plaintiffs' RICO claims were "all premised on alleged violations of the SCA," the court held that the RICO claims could not proceed given the comprehensive scheme established in the SCA. *Id.* As explained by the district court, "[a]doption of plaintiffs' arguments would, in effect, allow a private right of action under the SCA with a treble damage remedy," and accordingly, "[b]ecause the Court concludes that plaintiffs' RICO claims are inextricably intertwined with wage determinations under the SCA," the court dismissed plaintiffs' civil RICO claims. *Id.* at 177. *See also Brown v. Keystone Consol. Indus., Inc.*, 680 F. Supp. 1212, 1224-26 (N.D. Ill. 1988) (plaintiff's civil RICO claim that defendants "fraudulently deprived them of their employment benefits" was preempted by the Labor Management Relations Act and the National Labor Relations Act because "the underlying conduct is wrongful only by virtue of the labor laws"); *Butchers' Union Local No. 498 v. SDC Inv., Inc.*, 631 F. Supp. 1001, 1011 (E.D. Cal. 1986) (plaintiffs' RICO claims based on violations of mail and wire fraud were preempted by National Labor Relations Act because "*but for* the proscriptions of the labor law, defendants' conduct simply would not be either mail or wire fraud . . . . Bluntly put, no matter how

you cut the complaint, the only conceivable 'fraud' is the deprivation of plaintiff's rights under the labor law." (emphasis in original)).

Accordingly, the Court concludes that, to the extent plaintiffs' civil RICO claims have merely re-cast plaintiffs' FLSA claims for unpaid overtime wages under a different label, those RICO allegations are precluded by the exclusive remedial scheme set forth in the FLSA. Plaintiffs, in opposition, point to the FLSA's Savings Clause as evidence that the FLSA provides "a non-exclusive remedy [that] . . . allows for similar claims under both federal and state law." (Pls.' Opp. at 7.) However, the Court disagrees that the language of the Savings Clause should be construed to allow plaintiffs to use civil RICO to seek treble damages for what is, in essence, a FLSA violation. Section 218(a) of the FLSA provides, in relevant part, that, "[n]o provision of this chapter or of any order thereunder shall excuse noncompliance with any Federal or State law or municipal ordinance *establishing a minimum wage higher than the minimum wage established under this chapter or a maximum work week lower than the maximum workweek established under this chapter*." 29 U.S.C. § 218(a) (emphasis added). By the plain language of this provision, the Savings Clause applies only to laws that establish either a higher minimum wage or a lower maximum workweek. In other words, the Savings Clause operates only to allow states, municipalities, or the federal government to pass more protective wage and hour laws in the labor law context. Thus, based upon the face of the statute, the Savings Clause indicates simply that Congress did not intend to preempt the entire labor law *field*—in the context of labor law statutes, the FLSA merely sets the floor for wages owed and the ceiling for hours that can be worked. However, "field preemption" and

"obstacle preemption" are different concepts. "Field preemption," which applies when "Congress has legislated so comprehensively that federal law occupies an entire field of regulation and leaves no room for state law," *New York SMSA Ltd. Partnership v. Town of Clarkstown*, 612 F.3d 97, 104 (2d Cir. 2010) (internal quotation marks omitted), is not at issue in this case. It is clear that New York and other states are free to legislate in the labor law context in order to set a higher minimum wage or a lower maximum workweek. Indeed, no one is arguing in this case that plaintiffs' claims based upon the New York Labor Law are preempted by the FLSA. Instead, the question here is one of obstacle preemption, a concept which applies, for example, "when a state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Pac. Capital Bank, N.A. v. Connecticut*, 542 F.3d 341, 351 (2d Cir. 2008) (internal quotation marks and alterations omitted). Here, the Court is analyzing RICO, a federal statute rather than a state law, which, as explained *supra* in note 6, makes the application of the term "preempt" slightly unusual in this context. Nevertheless, the concept is the same—in this case, allowing plaintiffs to pursue a RICO claim to remedy violations of their FLSA rights plainly would stand as an obstacle to enforcement of the FLSA. As explained *supra*, if plaintiffs were allowed to circumvent the remedies set forth in the FLSA and pursue a RICO cause of action instead, the provisions in the FLSA that set forth the damages that employees may seek (which do *not* include treble damages) and that allow the Secretary of Labor to terminate a plaintiff's private right of action should the Secretary choose to institute a suit would both be rendered superfluous. The Court finds that the Savings Clause should not be read to allow such an illogical

result. *Cf. Sosnowy v. A. Perri Farms, Inc.*, --- F. Supp. 2d ----, 2011 WL 488692, at *6-9 (E.D.N.Y. Feb. 10, 2011) (noting that although the Savings Clause "indicates that Congress did not intend to preempt the entire field of wage law," the Savings Clause did not operate to allow a plaintiff to pursue remedies for a breach of contract action because "through the comprehensive remedial scheme, Congress struck the intended balance between the purpose of the FLSA and the vindication of its provisions, and therefore allowing additional remedies for duplicative claims would serve as an obstacle to the enforcement of the FLSA").

Moreover, far from undermining the Court's conclusion, the Court finds that the plain language of the Savings Clause clearly supports its holding here. As already described, the Savings Clause is carefully circumscribed and operates only to allow states, municipalities, or the federal government to pass more protective wage and hour laws in the labor law context. The Clause, however, says nothing to indicate that parties are allowed to circumvent the enforcement scheme established in the FLSA in order to pursue their wage and hour violation claims under other statutes that have no specific connection to labor laws whatsoever. Clearly, Congress knew how to draft a savings clause to provide that the enforcement of certain types of laws—as in, more protective wage and hour laws— would not be preempted by the requirements of the FLSA. In other words, Congress knew how to define the boundaries of a savings clause when it so desired, and the fact that it chose to specifically limit the applicability of Section 218(a) to labor laws that were more protective than the FLSA indicates that the Savings Clause was only intended to cover those types of laws and was *not* meant to allow plaintiffs to seek protection for FLSA violations under statutes that have no specific relevance to

the labor law context. *Cf. O & G Indus., Inc. v. Nat'l R.R. Passenger Corp.*, 537 F.3d 153, 161 (2d Cir. 2008) ("[I]f Congress intended [49 U.S.C.] § 28103(b) to apply only to passenger claims, it would have included such qualifying language in the definition of the term 'claims.' Congress did not do so. . . . Because the language is unambiguous on this point, we cannot supply that which is omitted by the legislature." (footnotes, citations, and quotation marks omitted)); *Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121, 133 (2d Cir. 2008) ("If Congress had meant to assign direct liability to both the person who actually commits a copyright-infringing act and any person who actively induces that infringement, the Patent Act tells us that it knew how to draft a statute that would have this effect."). The Court declines to extend the language of Section 218(a) to allow plaintiffs to bring parallel federal and state claims alongside an FLSA action where the plain language of the statute indicates that Congress had no such extension in mind.

Thus, to the extent that the factual basis for plaintiffs' RICO claim is, ultimately, defendants' failure to properly compensate plaintiffs for all overtime hours worked, the Court concludes that plaintiffs' RICO claim is preempted. However, plaintiffs also allege that defendants withheld from plaintiffs their *regular* rate of pay for *all* hours worked. (SAC ¶ 120.) In other words, construing the complaint in favor of plaintiffs for purposes of defendants' motion to dismiss, plaintiffs' claims are not solely based on defendants' failure to comply with the FLSA's overtime compensation requirements, but also are based on defendants' alleged failure to comply with their contractual obligation to pay plaintiffs for all hours worked, including non-overtime hours that fall outside of the FLSA's scope. Accordingly, such claims

based on unpaid "straight" or "regular" time are not duplicative of the FLSA claims and, accordingly, are not preempted by the FLSA. Nevertheless, for the reasons set forth in the following subsection, the Court finds that, regardless of the type of wages that form the basis for plaintiffs' RICO claims, plaintiffs' RICO claims suffer from a variety of pleading defects and, accordingly, must be dismissed.

### b. Failure to State a Claim

#### i. RICO Standing

RICO provides a private cause of action for "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter." 18 U.S.C. § 1964(c). "From this language, courts have extracted the conditions a plaintiff must meet to satisfy RICO's standing requirements: (1) a violation of section 1962; (2) injury to business or property; and (3) causation of the injury by the violation." *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 767 (2d Cir. 1994) (internal quotation marks and citation omitted). "Standing" under RICO, for purposes of a motion to dismiss, is not a jurisdictional concept, but instead is analyzed as a merits issue under Federal Rule of Civil Procedure 12(b)(6). *See Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 116-17 & 129-30 (2d Cir. 2003) ("We hold that lack of RICO standing does not divest the district court of jurisdiction over the action, because RICO standing, unlike other standing doctrines, is sufficiently intertwined with the merits of the RICO claim that such a rule would turn the underlying merits questions into jurisdictional issues. . . . In sum, despite describing the proximate causation requirement as 'RICO standing,' such standing is not jurisdictional in nature under Fed. R. Civ. P. 12(b)(1), but is rather an element of the merits addressed under a Fed.

R. Civ. P. 12(b)(6) motion for failure to state a claim."). The Second Circuit has described RICO standing as "a more rigorous matter than standing under Article III." *Denney v. Deutsche Bank AG*, 443 F.3d 253, 266 (2d Cir. 2006).

Moreover, "as a general rule, a cause of action does not accrue under RICO until the amount of damages becomes clear and definite," and the RICO claims thus become ripe for review. *First Nationwide Bank*, 27 F.3d at 768; *see also Motorola Credit Corp. v. Uzan*, 322 F.3d 130, 135 (2d Cir. 2003) (finding that amount of damages alleged was not "clear and definite" and holding that "Plaintiffs lack statutory standing under RICO because their claims are unripe"). Under this rule, a claim will be dismissed for lack of statutory standing, "where the extent of damages are still unknown, [and therefore] a RICO injury remains speculative and unprovable." *DLJ Mortg. Capital, Inc. v. Kontogiannis*, 726 F. Supp. 2d 225, 237 (E.D.N.Y. 2010) (internal quotation marks omitted).

In addition, as to the causation element, a plaintiff "must allege that the defendant's violations were a proximate cause of the plaintiff's injury, *i.e.*, that there was a direct relationship between the plaintiff's injury and the defendant's injurious conduct." *First Nationwide Bank*, 27 F.3d at 769 (internal quotation marks omitted). Thus, it is not enough for a plaintiff to merely allege that a defendant's actions were the "but-for" cause of plaintiff's injuries; instead, the plaintiff must also allege that the alleged RICO violation was the legal or proximate cause. *Id.* (citing *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 266 (1992)). As recently explained by the Supreme Court, "proximate cause . . . requires 'some direct relation between the injury asserted and the injurious conduct alleged.' A link that is 'too remote,' 'purely contingent,' or

'indirec[t]' is insufficient." *Hemi Group, LLC v. City of New York, N.Y.*, --- U.S. ----, 130 S.Ct. 983, 989 (2010) (quoting *Holmes*, 503 U.S. at 268, 271, 274). In other words, focusing on "the directness of the relationship between the conduct and the harm. . . . the compensable injury flowing from a RICO violation necessarily is the harm caused by the predicate acts." *Hemi Group*, 130 S.Ct. at 991 (internal quotation marks and alterations omitted).

Here, plaintiffs have attempted to allege RICO violations under 18 U.S.C. §§ 1962(a), (c), and (d),[9] and have alleged mail fraud as the predicate act underlying each of those violations. (*See* RICO Case Statement ¶ 1.) As a result of defendants' alleged RICO violations, plaintiffs claim to have suffered two injuries: first, plaintiffs allege that the fraudulent mailings "conceal[ed] from employees the fact that defendants were defrauding them," which consequently "prevent[ed] employees from discovering that they were being cheated out of their wages" and thus "interfer[ed] with their ability to recover on the legal claims for unpaid wages due to statutes of limitations," and, second, plaintiffs claim that the mail fraud "made it possible for defendants to continue defrauding employees out of their wages," thus reducing plaintiffs' wages (Pls.' Opp. at 12.) For the reasons set forth herein, the Court finds that neither of these alleged injuries provides plaintiffs with statutory standing under RICO.

### (1) Interference with Plaintiffs' Right to Recover

Plaintiffs' claimed injury for interference with their right to recover for unpaid wages is not ripe for review. "Perhaps the most important consideration in determining whether a claim is ripe for adjudication is the extent to which the claim involves uncertain and contingent events that may not occur as anticipated, or indeed may not occur at all." *Lincoln House, Inc. v. Dupre*, 903 F.2d 845, 847 (1st Cir. 1990) (internal quotation marks omitted). Here, the injury plaintiffs have alleged—namely, their inability to pursue certain yet-unspecified claims—clearly is contingent upon a court actually dismissing those hypothetical claims as time-barred. However, if the facts alleged by plaintiffs are true, then they would amount to an allegation of fraudulent concealment, which could equitably toll any applicable statutes of limitations. (Indeed, plaintiffs made such an argument in Paragraph 136 of the SAC.) Thus, plaintiffs' claimed injury is entirely speculative and hinges upon events that have not yet—and may never—come to fruition. A hypothetical inability to recover under certain claims that plaintiffs *might* have pursued and that *might* have been dismissed on statute of limitation grounds does not amount to an injury that is ripe for review under RICO.[10]

---

[9]  Section 1962(a) prohibits using income received from a "pattern of racketeering activity" to acquire an interest in or to establish an enterprise engaged in or affecting interstate commerce. Section 1962(c) prohibits conducting or participating in the conduct of an enterprise through a pattern of racketeering activity, and section 1962(d) proscribes conspiring to violate the prior subsections. "[R]acketeering activity," as mentioned in subsections (a) and (c), is defined to include a number of predicate acts, including mail fraud. 18 U.S.C. § 1961(1).

---

[10] Plaintiffs clearly cannot argue that their failure to bring such claims should be excused on futility grounds, given that they have alleged myriad claims here and have, in fact, argued that equitable tolling should apply given defendants' allegedly fraudulent misrepresentations.

Other courts have reached a similar conclusion and found RICO claims to be unripe where the injury alleged was contingent upon uncertain litigation-related events. For example, in *Magnum v. Archdiocese of Philadelphia*, No. 06-cv-2589, 2006 WL 3359642 (E.D. Pa. Nov. 17, 2006), plaintiffs alleged that defendants' large-scale cover-up of child abuse in the Philadelphia Archdiocese injured plaintiffs by causing them to lose their "ability to pursue personal injury claims as a result of the running of the statute of limitations." *Id.* at *3. In holding that plaintiffs failed to state a RICO cause of action, the court noted that "determining the value of that injury for compensatory purposes would be a wholly speculative exercise." *Id.* at *6. In addition, the court explained:

> Plaintiffs' claim of injury is entirely contingent on the assumption that they would have prevailed in their individual tort claims in state court had they asserted them in a timely manner; had Plaintiffs' claims been asserted and denied on the merits, those claims would have had no monetary value and thus cannot be "property" even under Plaintiffs' theory.

*Id.* at *7. Accordingly, the court dismissed plaintiffs' RICO cause of action predicated upon the loss-of-claim theory.

Similarly, in *Circiello v. Alfano*, 612 F. Supp. 2d 111 (D. Mass. 2009), plaintiff's claimed injury was "the lost opportunity to have realized a $10 million award against [defendant] for the wrongful death of her father." *Id.* at 114. Specifically, plaintiff claimed that she relied upon defendants' fraudulent misrepresentations and consequently was "dissuaded and prevented from initiating a claim for medical malpractice." *Id.* at 113. The Court found

plaintiff's theory to be based on a "series of 'what ifs'" and accordingly dismissed the claim as too speculative to confer standing under RICO. *Id.* at 114 ("If any proposition under RICO is well-established, it is that a RICO damages claim may not be based on mere speculation."). *See also Lincoln House*, 903 F.2d at 847 ("In this case, [plaintiff's] alleged injury is clearly contingent on events that may not occur as anticipated or may not occur at all. . . . [Plaintiff] alleges only that the [defendants] have engaged in a pattern of racketeering activity to divert the assets of [a defendant] 'so that those assets might not be reached by [plaintiff], an organization which has a pending claim against [defendant] . . . . Thus, the only injury alleged by [plaintiff] is its hypothetical inability to recover from [defendant], *if* [plaintiff] obtains a judgment, in some amount, in the pending state court breach of contract action. If [plaintiff] were to lose the breach of contract action . . . [plaintiff] would have no RICO claim against [defendants]. In these circumstances, [plaintiff's] RICO claim is not now ripe for judicial resolution." (emphasis in original)).[11] The Court agrees

---

[11] The cases cited by plaintiffs on this point are distinguishable. For example, *Malley-Duff & Associates, Inc. v. Crown Life Insurance. Co.*, 792 F.2d 341, 344 (3d Cir. 1986) involved obstruction of justice claims based upon defendants' alleged interference with a lawsuit that had already been instituted—not a hypothetical cause of action that might or might not ever be filed. In addition, in *Deck v. Engineered Laminates*, 349 F.3d 1253 (10th Cir. 2003), the court stated that if plaintiff's only injury had been "prejudice to his ability to collect damages for breach of contract" because of defendants' alleged obstruction of plaintiff's suit until such time as the statute of limitations had run—which is exactly what plaintiffs have alleged here—plaintiff's RICO claim might, in fact, have been dismissed as unripe until the contract action had been resolved. *Id.* at 1260

with the reasoning of these other cases and finds that plaintiffs' alleged injury for their hypothetical inability to recover does not state a RICO claim that is ripe for adjudication.

### (2) Reduction in Wages Due to Continuation of Defendants' Alleged Scheme

Plaintiffs' other alleged injury— reduction in wages—also cannot provide standing to pursue a claim under either Section 1962(a) or Section 1962(c). To state a claim under Section 1962(a), a plaintiff must allege: "(1) that a defendant received income from a pattern of racketeering activity; (2) invested that income in the acquisition of a stake in, or establishment of, an enterprise distinct from the one from which the income was derived; and (3) that the plaintiff suffered an injury flowing from this reinvestment of racketeering income *distinct from any injury suffered because of the commission of the original predicate acts* of racketeering activity." *Leung v. Law*, 387 F. Supp. 2d 105, 120 (E.D.N.Y. 2005) (emphasis added). In other words, to establish a 1962(a) violation, the injury alleged must have resulted from the reinvestment of defendants' racketeering income, separate and apart from any injury resulting from the original predicate act. *See, e.g.*, *Ouaknine v. MacFarlane*, 897 F.2d 75, 83 (2d Cir. 1990) ("[T]he [Supreme Court] specifically stated that a 'plaintiff

only has standing if, and can only recover to the extent that, he has been injured in his business or property *by the conduct constituting the violation*.' We conclude that because the conduct constituting a violation of § 1962(a) is investment of racketeering income, a plaintiff must allege injury from the defendant's investment of the racketeering income to recover under § 1962(a)." (quoting *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985))); *Falise v. Am. Tobacco Co.*, 94 F. Supp. 2d 316, 349 (E.D.N.Y. 2000) ("For civil RICO actions alleging violations of section 1962(a), 'the plaintiff [must] allege a 'use or investment' injury that is *distinct* from the injuries resulting from predicate acts.'" (emphasis in original) (quoting *Discon, Inc. v. NYNEX Corp.*, 93 F.3d 1055, 1063 (2d Cir. 1996), *rev'd on other grounds* 525 U.S. 128 (1998))). Plaintiffs have made no such allegations here. In fact, plaintiffs have only alleged one paragraph in the complaint that even marginally addresses the receipt of racketeering proceeds, and have made no allegations whatsoever regarding the reinvestment of that income or how plaintiffs were injured as a result of that reinvestment. (*See* SAC ¶ 132 ("Each defendant received income from a pattern of conduct unlawful under RICO, in which defendants participated through continuous instances of providing Plaintiffs and Class Members with misleading documents which defendants mailed and upon which Plaintiffs and Class Members relied to their detriment.").) To the extent that plaintiffs are seeking to argue that they were injured because the reinvestment of the funds allowed defendants to continue their scheme to defraud plaintiffs,[12] this claim must fail,

---

(citing *Motorola Credit Corp.*, 322 F.3d at 135-37 and *Lincoln House*, 903 F.2d at 847). Moreover, in *Deck*, the defendant was alleged to have fraudulently induced plaintiff to enter into a settlement agreement that required plaintiff to, *inter alia*, dismiss his counterclaim against defendant. *Id.* Here, defendants clearly have not induced plaintiffs to explicitly give up any of their legal claims through any type of written agreement. Thus, neither of these cases supports plaintiffs' arguments.

---

[12]  *See* RICO Case Statement ¶ 11.b ("Defendants used the money obtained through the scheme [to] continue to operate their hospitals and health care centers, thus requiring employees to continue to work more time

as it does not present an injury distinguishable from the original wage theft. *See Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1188 (3d Cir. 1993) ("[W]e have recognized repeatedly that this type of allegation—that the use and investment of racketeering income keeps the defendant alive so that it may continue to injure plaintiff—is insufficient to meet the injury requirement of section 1962(a). In such situations, we have held that the fact that a plaintiff claims that the injury allegedly perpetrated on it would not have occurred without the investment of funds from the initial racketeering activity does not change the fact the plaintiff's alleged injury stems from the pattern of racketeering, and not from the investment of funds by the defendant."); *Falise*, 94 F. Supp. 2d at 349 ("Plaintiffs allegation that the 'reinvestment' of proceeds from the 'Tobacco Conspiracy Enterprise' back into [the enterprise] harmed the Trust by perpetuating the scheme is not presently persuasive. . . . Where reinvestment of racketeering proceeds back into the same RICO enterprise is alleged, the injuries stem proximately not from the investment, but from the predicate acts that make up the racketeering activity."); *Soberman v. Groff Studios Corp.*, No. 99-cv-1005, 1999 WL 349989, at *5 (S.D.N.Y. June 1, 1999) ("The allegations that the money was used or invested to further the same scheme are insufficient [to state a claim under § 1962(a)], since they do not allege a distinct [investment] injury.")).

Furthermore, the Court finds that plaintiffs also lack standing to bring a claim under 1962(c), insofar as their claimed injury of wage theft (as alleged in the Second Amended Complaint) could not have been, as a matter of law, proximately caused by the RICO predicate acts alleged

here. As already noted, to determine whether a plaintiff has sufficiently alleged proximate causation for RICO purposes, "courts look, *inter alia*, to whether the complaint alleges that the plaintiff has suffered an injury flowing directly from the defendants' commission of the identified predicate acts." *Leung*, 387 F. Supp. 2d at 121-22. However, "[a]n act which proximately caused an injury is analytically distinct from one which furthered, facilitated, permitted or concealed an injury which happened or could have happened independently of the act." *Red Ball Interior Demolition Corp. v. Palmadessa*, 874 F. Supp. 576, 587 (S.D.N.Y. 1995). Thus, "a predicate act cannot be deemed to have proximately caused a plaintiff's injury, even if it was an integral part of the underlying criminal scheme, unless the plaintiff's original loss could not have occurred without the commission of the predicate act." *Leung*, 387 F. Supp. 2d at 122.

As an initial matter, a plain reading of the Second Amended Complaint makes clear that the crux of plaintiffs' RICO allegations is defendants' withholding of plaintiffs' wages. (*See, e.g.*, SAC ¶ 120 ("Defendants' Scheme consisted of illegally, willfully and systematically withholding or refusing to pay Plaintiffs and Class Members their regular or statutorily required rate of pay . . . ."); *id.* ¶ 121 ("The Scheme involved depriving Plaintiffs and Class Members of their lawful entitlement to wages and overtime."); *id.* ¶ 127 ("Defendants' predicate acts were related, because they reflected the same purpose or goal (to retain wages and overtime pay due . . .); [and] results (retention of wages and overtime pay) . . . .").) Thus, the "original" injury forming the basis of plaintiffs' RICO cause of action is, simply, the retention of plaintiffs' wages. With this background in mind, it is clear that the predicate acts alleged by plaintiffs (*i.e.*, mail fraud) did no

without pay.").

more than "further, facilitate, permit, or conceal" plaintiffs' "original" injury, and were not the acts from which this injury directly flowed. In fact, plaintiffs acknowledge as much in their opposition papers, in which they stated that "by *perpetuating* the defendants' scheme, defendants' mailings *made it possible for defendants to continue defrauding* employees out of their wages." (Pls.' Opp. at 12 (emphasis added).) Indeed, it is clear that plaintiffs' original loss could have occurred independent of defendants' alleged mail fraud, as evidenced by plaintiffs' voluminous complaint, in which the reduction and withholding of plaintiffs' wages has formed the basis for an entirely independent set of claims under the FLSA and a variety of common law doctrines.

The Court's conclusion is supported by the holdings in *Red Ball* and *Leung*, cited *supra*, in which courts dismissed similar claims for lack of standing. For example, in *Red Ball*, 874 F. Supp. at 587, defendant sent interstate mailings to plaintiff that contained information setting forth the financial condition of the plaintiff company. Defendant also made several oral representations to plaintiff concerning the operation and condition of the plaintiff company. *Id.* Plaintiffs claimed that these mailings and telephone calls were false and misleading because they failed to disclose a variety of acts that the defendant had taken which harmed the company. *Id.* In holding that these predicate acts were not the proximate cause of plaintiffs' injuries, the court explained:

> By the words of the Complaint itself, had the omissions in [defendant's] mailings and telephone calls never taken place, [plaintiff] "would have been able to *more effectively* prevent *further* unlawful acts by [defendant]." (emphasis added).

> Taken at face value, this statement indicates that plaintiffs were harmed by unlawful acts which occurred irrespective of the omissions in the mailings and the telephone calls. . . . Put simply, plaintiffs assert[] that defendants are liable under RICO because [defendants] undertook a combination of unlawful and fraudulent activities against [plaintiff] . . . and then [defendant] failed to inform [plaintiff] of these activities in their interstate telephone conversations and regular correspondence via the mails. Thus reduced, plaintiffs' RICO claim is obviously beyond the appropriate ambit of RICO.

*Id.* Similarly, in this case, plaintiffs state that defendants' fraudulent mailings "perpetuated" defendants' already on-going scheme, thus making it possible for defendants to "continue" defrauding plaintiffs—based on plaintiffs' own arguments, plaintiffs could have been harmed (and allegedly were harmed) irrespective of the alleged misrepresentations in defendants' mailings. Stated otherwise, defendants' misrepresentations and omissions regarding their failure to fully compensate plaintiffs is not the proximate cause of the ultimate harm to plaintiffs, which instead originates in defendants' underlying failure to properly pay plaintiffs for all hours worked.

As an additional example, in *Leung*, 387 F. Supp. 2d at 122, plaintiff alleged that "defendants mailed fraudulent tax returns to various taxing authorities to deceive [plaintiff] about [the subject corporations'] true financial performance." The court, however, held that this predicate act of mail fraud could not be construed as the proximate cause of plaintiff's losses, which instead stemmed from the devaluation of his

ownership shares in the subject companies through the defendants' allegedly unlawful acts. *Id.* In so holding, the court noted that although "[t]hese mailings may have been necessary to the defendants' efforts to retain the property siphoned out of the corporations, [they] clearly were not an indispensible part of the theft itself." *Id.* Likewise, although the allegedly fraudulent paychecks in the current case may have been an important part of allowing defendants to retain the funds that they withheld from plaintiffs, these fraudulent mailings were not an indispensible part of the original theft of wages from plaintiffs.[13]

\* \* \*

Accordingly, the Court finds that plaintiffs lack standing to pursue their RICO claims. Although it is unclear to the Court whether this defect can be corrected, in an abundance of caution, the Court will grant plaintiffs leave to re-plead this claim should they wish to do so.

---

[13] Because plaintiffs lack standing to bring a claim under either Section 1962(a) or Section 1962(c), plaintiffs' Section 1962(d) claim also must necessarily fail, because to establish a conspiracy violation under § 1962(d), a plaintiff first must adequately state a claim under §§ 1962(a), (b), or (c). *See First Capital Asset Mgmt. v. Satinwood, Inc.*, 385 F.3d 159, 164 (2d Cir. 2004) ("[B]ecause Plaintiffs' RICO conspiracy claims are entirely dependent on their substantive RICO claims, we also concur in the . . . dismissal of the RICO conspiracy claims."); *Citadel Mgmt., Inc. v. Telesis Trust, Inc.*, 123 F. Supp. 2d 133, 156 (S.D.N.Y. 2000) ("[A] RICO conspiracy claim cannot stand where, as here, the elements of the substantive RICO provisions are not met.").

*ii.  Failure to Plead Fraud with Particularity*

With respect to plaintiff's allegations of mail fraud, plaintiff must allege "(1) the existence of a scheme to defraud, (2) defendant's knowing or intentional participation in the scheme, and (3) the use of interstate mails or transmission facilities in furtherance of the scheme." *S.Q.K.F.C., Inc. v. Bell Atlantic TriCon Leasing Corp.*, 84 F.3d 629, 633 (2d Cir. 1996). Furthermore, when alleging fraudulent activities as predicate acts for a RICO claim, a plaintiff must satisfy the particularity requirements of Rule 9(b). *Moore v. PaineWebber, Inc.*, 189 F.3d 165, 172-73 (2d Cir. 1999). Therefore a RICO plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Anatian v. Coutts Bank (Switz.) Ltd.*, 193 F.3d 85, 88 (2d Cir.1999) (internal quotations omitted).

Here, plaintiffs' allegations of mail fraud in the Second Amended Complaint are wholly conclusory. For example, plaintiffs have failed to identify which defendants caused each allegedly fraudulent statement to be spoken, written, or mailed; what the content of the allegedly fraudulent misrepresentation was; or when the communication was made. *See McLaughlin v. Anderson*, 962 F.2d 187, 191 (2d Cir. 1992). Instead, plaintiffs merely allege that unspecified defendants "repeatedly" mailed payroll checks "on a regular basis . . . in the last 10 years." (SAC ¶ 122.) Plaintiffs make no allegations whatsoever regarding which hospitals or individual defendants were responsible for mailing these paychecks, and instead lump together the named defendant hospitals, the individual defendants, and their dozens of affiliated

health care centers as the "defendants" responsible for mailing these payroll checks. (*Id.* ¶¶ 21, 122.) Moreover, plaintiffs provide no particular allegations regarding the content of these allegedly deceptive payroll checks, and rely only upon the vague and conclusory statement that these paychecks "misled Plaintiffs and Class Members about the amount of wages to which they were entitled, the number of hours which they had worked, and whether defendants had included all compensable work time. . . ." (*Id.* ¶ 123.) As the Second Circuit has noted, "conclusory allegations that defendant's conduct was fraudulent or deceptive are not enough." *Decker v. Massey-Ferguson Ltd.*, 681 F.2d 111, 114 (2d Cir. 1982); *see also Karagozian v. Coty US, LLC*, No. 10-cv-5482 (RMB), 2011 WL 536423, at *4 (S.D.N.Y. Feb. 10, 2011) (where complaint alleged only that defendants intentionally placed fraudulent tax forms in the mail during each year of plaintiff's employment and that such forms damaged plaintiffs shifting various tax burdens to plaintiff, complaint did not state a RICO claim because it failed to plead with particularity "specific statements which were made, how they were false, and when they were made (and sent)"); *Leung*, 387 F. Supp. 2d at 114 (holding that "blanket accusations" in complaint that "name[d] whole documents, each of which encompasses numerous discrete statements, and allege[d], in vague and sweeping language, that each of these documents contained one or more false statements," were "clearly insufficient to meet the particularity requirements of Rule 9(b)"). Moreover, plaintiffs' vague allegation that the alleged misstatements were made "repeatedly" over the course of ten years is not sufficient under Rule 9(b) to state a claim for mail fraud. *See, e.g.*, *Eldred*, 2010 WL 812698, at *11 ("[Plaintiffs] allege that '[defendant's] project managers and others'

'repeatedly' made 'numerous' and 'various' statements 'to many if not all of the class plaintiffs' 'over the course of many years.' [Plaintiffs] fail, however, to isolate any particular act or representation made by specific [defendant] personnel to any individual class plaintiff on any particular date."); *Alnwick v. European Micro Holdings, Inc.*, 281 F. Supp. 2d 629, 640 (E.D.N.Y. 2009) ("[The complaint] merely alleges that [the fraudulent statements] were made 'in the Fall and Winter of 1996 and the first months of 1997.' This vague window of time is insufficient to satisfy the pleading standards of Rule 9(b)." (collecting cases)). Likewise, courts have also found that complaints have failed to satisfy the particularity requirements of Rule 9(b) where, as here, they only "vaguely attribute[d] the alleged fraudulent statements to 'defendants.'" *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1175-76 (2d Cir. 1993) (noting that the court's "conclusion that [plaintiffs] failed to satisfy Rule 9(b) demands as a corollary that these allegations cannot serve as predicate acts" under RICO); *see also Alnwick*, 281 F. Supp. 2d at 640 (allegations of fraud did not satisfy Rule 9(b) where complaint "lump[ed] [defendants] together and fail[ed] to specify what each defendant said"); *McNamara v. City of New York*, No. 05-cv-6025 (SJ) (RML), 2007 WL 1062564, at *4 (E.D.N.Y. March 30, 2007) ("Plaintiff merely accuses handfuls of defendants of engaging in an alleged enterprise without identifying each defendants['] role in and relationship to the enterprise. Therefore, Plaintiff fails to meet the requirement under Rule 9(b) that allegations of fraud must connect to each individual defendant.").

In addition, as to the elements of the mail fraud claim, plaintiffs have failed to allege how the purportedly fraudulent paychecks furthered defendants' scheme. As explained by the court in *Cavallaro v.*

*UMass Memorial Health Care Inc.*, No. 09-cv-40152-FDS, 2010 WL 3609535 (D. Mass. July 2, 2010) in dismissing a RICO claim that was nearly identical to the claim brought here:

> Plaintiffs have failed to show how defendants furthered their allegedly fraudulent scheme by mailing the paychecks in question. According to plaintiffs, the mailed paychecks fraudulently omitted time that they had actually worked, and thus concealed from them the fact that they were not being fully compensated. But if the paychecks were as plaintiffs allege, they did not further defendants' fraudulent scheme; to the contrary, they made the scheme's discovery more likely. . . . Under plaintiffs' version of events, the paychecks did not accurately reflect the number of hours worked, although they did accurately reflect the number of hours for which plaintiffs were paid. . . . [H]ere, the plaintiffs . . . know better: they know how many hours they have worked and how much money they have been paid. Merely by looking at the face of their paychecks, the plaintiffs can ascertain whether they are being underpaid. And because those paychecks put them on notice of the alleged fraudulent scheme, plaintiffs have failed to state a cause of action under § 1961(c).

*Id.* at *3-5. Relying upon *Cavallaro*, several district courts in the Second Circuit have dismissed complaints that were virtually identical to the complaint in this case. *See Sampson*, 2011 WL 579155, at *6 ("[I]f plaintiffs were repeatedly not paid for time worked in violation of the contract, as plaintiffs allege, the conclusory allegation that the payroll checks constituted a fraudulent scheme to conceal that fact will not support the RICO claim. If plaintiffs are aware of their hours worked, the payroll checks would put plaintiffs on notice of any fraudulent scheme, not conceal it."); *Nakahata*, 2011 WL 321186, at *5 ("[A]s the [*Cavallaro* court] observed in dismissing a nearly identical complaint, the mailing of the paychecks, if they did anything 'serve[d] to expose, not further, the alleged fraud.'"); *Wolman*, 2010 WL 5491182, at *5-6 (same).

Furthermore, plaintiffs have failed to allege with particularity that defendants had specific intent to defraud plaintiffs. "Although Rule 9(b) permits intent to be averred generally, the plaintiff must supply '[a]n ample factual basis' giving rise to a 'strong inference' of fraudulent intent, not mere speculation and conclusory allegations." *Nakahata*, 2011 WL 321186, at *3, 5 (quoting *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir. 1990)) (holding that "the provision of inaccurate paychecks and vague promises to pay employees for their work are insufficient to constitute fraud, particularly with regard to intent"). Plaintiffs here have alleged nothing beyond an unsupported, conclusory statements that "[a]t all relevant times . . . defendants acted with malice, intent, knowledge, and in reckless disregard of Plaintiffs' and Class Members' rights." (SAC ¶ 128; *see also id.* ¶ 120 ("Defendants' Scheme consisted of . . . *willfully* . . . withholding or refusing to pay Plaintiffs . . . . (emphasis added).) Moreover, the only allegation made regarding motive is the statement that defendants' goal was to "retain wages and overtime pay due" to plaintiffs "for the economic benefits of defendants and members of the enterprise." (*Id.* ¶ 127; *see also id.* ¶ 120 ("[D]efendants devised, intended to devise, and carried out a scheme to cheat Plaintiffs and Class Members out of

their property and to convert Plaintiffs' and Class Members' property, including their wages and/or overtime pay . . . .").) Although "[m]otive often involves the potential for economic benefit," *Buyers & Renters United to Save Harlem v. Pinnacle Grp. N.Y. LLC*, 575 F. Supp. 2d 499, 509 (S.D.N.Y. 2008), plaintiffs here have provided no factual allegations beyond these conclusory statements to support an inference of scienter. Indeed, as alleged in the Second Amended Complaint, "[t]he only 'motive' ascribed to the Defendants is a generalized profit motive that could be imputed to any company,' [which] . . . has been consistently rejected as a basis for inferring fraudulent intent." *Brookdale Univ. Hosp. & Med. Center, Inc. v. Health Ins. Plan of Greater N.Y.*, No. 07-cv-1471 (RRM) (LB), 2009 WL 928718, at *6 (E.D.N.Y. March 31, 2009).

Accordingly, the Court finds that plaintiffs have failed to allege mail fraud with sufficient particularity and, as such, plaintiff's RICO claims are dismissed without prejudice.

### iii.  Failure to Plead a RICO Enterprise

A RICO enterprise under Section 1961(4) includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). An association-in-fact enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct" which is "proved by evidence of ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *United States v. Turkette*, 452 U.S. 576, 583 (1981). Where a complaint alleges an association-in-fact enterprise, courts in this Circuit look to the "hierarchy, organization, and activities" of

the association to determine whether "its members functioned as a unit." *First Capital Asset Mgmt. v. Satinwood, Inc.*, 385 F.3d 159, 174-75 (2d Cir. 2004) (citations and quotation marks omitted).

The Second Circuit has made clear that "the person and the enterprise referred to must be distinct," and, therefore, "a corporate entity may not be both the RICO person and the RICO enterprise under section 1962(c)." *Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*, 30 F.3d 339 (2d Cir. 1994). However, "[t]his does not foreclose the possibility of a corporate entity being held liable as a defendant under section 1962(c) where it associates with others to form an enterprise that is *sufficiently distinct from itself.*" *Id.* at 344 (emphasis added). Thus, "a defendant may be a RICO person and one of a number of members of the RICO enterprise." *Id.* (quotation marks omitted). Furthermore, an employee of a corporation is legally distinct from the corporation itself and therefore can function as a RICO person where the corporation is the alleged RICO enterprise. *See Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 163 (2001).

Here, plaintiffs allege that the RICO "enterprise" is the "North-Shore Long Island Jewish Health System" (also a named defendant), which is a "healthcare consortium" "engaged in the operation of hospitals," and which consists of the named defendants and their health care centers and affiliates. (SAC ¶¶ 21-22; RICO Case Statement ¶ 6.a.) Plaintiffs also claim that "[e]ach defendant is a 'person' within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c)." (SAC ¶ 130.) Although the dozens of health care facilities and affiliates listed in the SAC (*see id.* ¶¶ 19-20) are not technically named as defendants in the case, plaintiffs refer to the North Shore-Long Island Jewish Health System (hereinafter

"LIJ") *and* its health care centers and affiliates collectively as "defendants" in the SAC. (*Id.* ¶ 21.) These defendants, according to plaintiffs, have a "common ownership," (*id.* ¶ 31), and are operated, either directly or indirectly, by LIJ. (*Id.* ¶¶ 32-34.)

The Court finds that there is no distinction between the RICO "persons" alleged in the complaint and the RICO "enterprise." Specifically, although it is not clear whether the health care facilities and affiliates were, in fact, "subsidiaries" of LIJ, there is no allegation that the centers, affiliates, or individual defendants (who were officers of LIJ) were acting as anything other than agents of LIJ. Indeed, plaintiffs acknowledged that LIJ and the other defendants shared a common ownership and that LIJ was the entity ultimately responsible for operating its locations through its various health care centers and affiliates. The distinctness requirement may not be circumvented "by alleging a RICO enterprise that consists merely of a corporate defendant associated with its own employees or agents carrying on the regular affairs of the defendant." *Riverwoods Chappaqua Corp.*, 30 F.3d at 344. *See also Greenman-Perdesen, Inc. v. Berryman & Henigar, Inc.*, No. 09 Civ. 0167 (TPG), 2009 WL 2523887, at *6 (S.D.N.Y. Aug. 18, 2009) ("[T]o the extent that plaintiffs allege that [the corporate defendant B & H] itself is the RICO enterprise, they cannot claim that B & H also violated RICO. Similarly, to the extent that plaintiffs allege that the RICO enterprise was formed by the combination of B & H with its employees, they cannot show that the RICO enterprise was sufficiently distinct from B & H itself."); *Physicians Mut. Ins. Co. v. Greystone Servicing Corp., Inc.*, No. 07 Civ. 10490 (NRB), 2009 WL 855648, at *7 (S.D.N.Y. March 25, 2009) ("[P]laintiffs allege that GSC is the RICO 'enterprise,'

while Greystone & Co. and the individual defendants are the RICO 'persons.' . . . However, plaintiffs also allege that GSC, Greystone & Co. and the individual defendants were 'at all relevant times, the agents, servants, partners, aider and abettor, co-conspirator and/or alter ego of each other' . . . and that 'GSC and Greystone & Co. were affiliated companies and shared common ownership, directors, managers and employees.' . . . The complaint thus fails to ditinguish GSC's and Greystone & Co.'s roles in the allegedly wrongful activities, indicating instead that those roles overlapped significantly. [T]he facts as alleged in the complaint do not reflect that Greystone & Co. and GSC are sufficiently separate such that GSC can be considered a distinct RICO 'enterprise.'"); *In re Parmalat Sec. Litig.*, 479 F.Supp.2d 332, 346-47 (S.D.N.Y. 2007) ("[T]he Bank's inclusion of 'affiliates and subsidiaries located around the world,' 'culpable employees, directors and officers,' and Parmalat's counsel Zini do not distinguish the enterprise from the person. Nor does the reference to the 'variety of third-party entities' change anything. The counterclaims refer to them as 'dummy entities' and explain how they were 'used [by Parmalat] to conceal the losses generated by its operating subsidiaries.' As they thus were instrumentalities of Parmalat, these entities do not render the enterprise distinct from the person."); *Manhattan Telecomms. Corp. v. DialAmerica Mktg., Inc.*, 156 F. Supp. 2d 376, 383 n.4 (S.D.N.Y. 2001) ("[I]n its original complaint, plaintiff alleged that the RICO enterprise consisted only of [the corporate defendant] and the Individual Defendants . . . thereby running afoul of the distinctness requirement.").

Here, plaintiffs have alleged, in essence, that the enterprise was formed by the combination of LIJ with its individual officers and with hospitals, health care

centers, and affiliates that it operated. These allegations clearly are insufficient to show that LIJ associated with others to form an enterprise that was "sufficiently distinct from itself," *Riverwoods Chappaqua Corp.*, 30 F.3d at 344, and, accordingly, plaintiffs' RICO cause of action must be dismissed for failure to state a claim.

* * *

In sum, the Court finds that plaintiffs' RICO cause of action (to the extent it survives preemption) has been insufficiently plead in a variety of respects. Thus, to the extent that this claim is not preempted by the FLSA, the Court dismisses this cause of action without prejudice.

### 3. STATE COMMON LAW CLAIMS

Plaintiffs have alleged a number of state common law claims, seeking both "unpaid overtime hours under the FLSA . . . [and] unpaid straight-time wages for work performed under 40 hours in a week." (Pls.' Opp. at 20; *see also* SAC ¶ 159 ("Plaintiffs and Class Members regularly worked hours both under and in excess of forty per week and were not paid for all of those hours.").) For the reasons set forth herein, the Court finds that the FLSA preempts the state common law claims that are based upon defendants' alleged failure to fully compensate plaintiffs for all overtime hours worked. However, the common law claims that are based upon the alleged failure to properly compensate plaintiffs for "straight time" wages are not duplicative of the FLSA cause of action, and therefore are not preempted. Nonetheless, of the remaining state-law claims, the Court finds that, as pleaded in the Second Amended Complaint, a number of them have been insufficiently pled and, accordingly, should be dismissed with leave to re-plead.

#### a. FLSA Preemption

As set forth in great detail *supra*, the FLSA sets forth a broad and exclusive enforcement scheme to remedy wage and hour violations in the labor law context. Accordingly, a number of courts have held that where a state common law claim is based upon the same facts as a FLSA cause of action, the duplicative state-law claim is preempted by the FLSA and must be dismissed. *See, e.g.*, *Anderson*, 508 F.3d at 192-94 (finding state-law contract, negligence, and fraud claims to be preempted where they "essentially require[d] the same proof as claims asserted under the FLSA itself" and these claims therefore stood as "an obstacle to the accomplishment of the full purposes and objectives of the FLSA" (internal quotation marks and citation omitted)); *Sosnowy*, 2011 WL 488692, at *9 ("This Court finds that through the comprehensive remedial scheme, Congress struck the intended balance between the purpose of the FLSA and the vindication of its provisions, and therefore allowing additional remedies for duplicative claims would serve as an obstacle to the enforcement of the FLSA."); *Lopez v. Flight Servs. & Sys., Inc.*, No. 07-cv-6186 (CJS), 2008 WL 203028, at *7 (W.D.N.Y. Jan. 23, 2008) (dismissing state-law claims as preempted under the FLSA where they all pertained "to Defendants' alleged failure to pay Plaintiffs in accordance with the FLSA"); *Perez v. Jasper Trading, Inc.*, No. 05-cv-1725 (ILG) (VVP), 2007 WL 4441062, at *4 (E.D.N.Y. Dec. 17, 2007) ("As the plaintiffs' negligence claims . . . are ultimately based on the same factual premises as their FLSA claims—i.e., the defendants' failure to pay overtime compensation—they are duplicative of and preempted by the FLSA . . . ."); *Chen v. St. Beat Sportswear, Inc.*, 364 F. Supp. 2d 269, 292-93 (E.D.N.Y. 2005) (rejecting plaintiffs' argument that they pled

negligence claims in the alternative to their FLSA claims and finding negligence claim to be preempted where it was "founded upon the same facts as and therefore are duplicative of the FLSA claims"); *Petras*, 1993 WL 228014, at *2 ("Courts have consistently held that [Section 216(b) of the FLSA] is the exclusive remedy for enforcing rights created under the FLSA. . . . 'It is true that nowhere in the statute is it provided that Section 216(b) provides the sole means of recovery for an employee. . . . On its face, however, a clearer case for implied intent to exclude other alternative remedies by the provision of one would be difficult to conceive.'" (quoting *Lerwill v. Inflight Motion Pictures, Inc.*, 343 F. Supp. 1027, 1029 (N.D. Cal. 1972))).

As an initial matter, in connection with their common law claims, plaintiffs acknowledge that they "do claim entitlement for unpaid overtime hours under the FLSA." (Pls.' Opp. at 20.) Plaintiffs, however, argue that these common law claims "provide independent claims and methods of recovery" and are asserted "in the alternative" to plaintiffs' FLSA claims. (*Id.*) The Court disagrees. It is clear from the Second Amended Complaint that, contrary to plaintiffs' contention, plaintiffs are using their state common law claims, in part, as a vehicle to enforce their FLSA right to overtime compensation for time worked in excess of forty hours per week. (*See, e.g.*, SAC ¶ 159 ("Plaintiffs and Class Members regularly worked hours both under *and in excess of forty per week* and were not paid for all of those hours.") (emphasis added); *id.* ¶ 174 ("[R]ather than incur additional labor costs by paying non-exempt hourly-paid employees for all of the hours that they worked, defendants required Plaintiffs and Class Members to work hours under *and in excess of forty* without receiving any compensation for those hours.") (emphasis added); *id.* ¶ 199 ("[D]efendants had and

continue to have *a legal obligation to pay* Plaintiffs and Class Members all earnings and *overtime due*.") (emphasis added).) These allegations are clearly duplicative of plaintiffs' FLSA allegations and do not arise, as plaintiffs argue, from any violations that are "independent" of defendants' obligations under the FLSA.[14] In fact, plaintiffs cite to Paragraph 159,[15] quoted *supra*, in support of *both* their FLSA claim *and* their state common law claims, thus clearly demonstrating the co-extensive nature of these claims. (*Compare* Pls.' Opp. at 5-6 *with id.* at 20.)

As explained *supra* in connection with plaintiffs' civil RICO claim, to allow plaintiffs to pursue duplicative state-law claims and thus circumvent the remedial scheme established by the FLSA would render superfluous the requirement in Section 216(c) that a party's private right terminate upon commencement of an action by the Secretary of Labor. Consequently, allowing state common law claims to proceed based on the same facts as a party's FLSA claims would present an obstacle to enforcement of the FLSA by allowing

---

[14] The Fourth Circuit in *Anderson* rejected an analogous argument advanced by plaintiffs in that case. Specifically, the *Anderson* plaintiffs "attempted to distinguish their contract claim from an FLSA claim on the ground that the contract claim [arose] from an affirmative promise to pay all wages due under the FLSA." 508 F.3d at 193 n.11. The Fourth Circuit, however, found this argument "unavailing, since [defendant] was required to comply with the FLSA whether it promised to or not." *Id.*

[15] The Court notes that, in their opposition papers, plaintiffs cited to what was then Paragraph 153 of their First Amended Complaint. Because plaintiffs added additional information in their Second Amended Complaint, the paragraph numbers shifted, and Paragraph 153 became Paragraph 159.

plaintiffs to thwart Congress' preference, as evidenced in Section 216(c), to have FLSA violations be prosecuted by the Department of Labor, if and when the Secretary determines that such action is appropriate.

Plaintiffs, in opposition, urge the Court to adopt the reasoning of the Ninth Circuit, which has concluded that while the FLSA's remedial scheme is "comprehensive," it is not "exclusive" and it therefore does not preempt state-law claims relating to wage and hour violations. *See Williamson v. Gen. Dynamics Corp.*, 208 F.3d 1144, 1151 (9th Cir. 2000). The Court finds the Ninth Circuit's reasoning unpersuasive in the circumstances of this case. As an initial matter, *Williamson* involved a common law fraud claim that was based upon conduct *not* within the scope of the FLSA, and thus is distinguishable from the instant case where plaintiffs' state common law claims are partially duplicative of plaintiffs' FLSA claims. In any event, both *Williamson* and the Ninth Circuit's recent decision in *Wang v. Chinese Daily News, Inc.*, 623 F.3d 743 (9th Cir. 2010),[16] relied upon the FLSA's Savings Clause in concluding that the FLSA "does not provide an exclusive remedy." *Williamson*, 208 F.3d at 1151; *Wang*, 623 F.3d at 760 ("In *Williamson* . . . [w]e held field preemption inapplicable because FLSA explicitly permits states and municipalities to enact stricter wage and hour laws."). However, the plain language of the Savings Clause makes clear that it relates only to labor law *statutes* that explicitly provide

greater wage and hour protection—it says nothing about a party's ability to pursue general *common law* claims that have no specific relevance to the labor law context. In addition, as described *supra* in Section II.B.2.a, the Court does not find that the language of the Savings Clause operates to save plaintiffs' claims here, to the extent that those claims are duplicative of their FLSA claims and serve as an obstacle to enforcement of the FLSA. Thus, this Court agrees with the numerous other courts that have found the FLSA's civil enforcement scheme to be exclusive and, accordingly, concludes that FLSA preempts any state common law claims that are duplicative of plaintiffs' FLSA cause of action.[17] *Cf.*

---

[16] *Wang* involved claims brought under a state statute that "'borrows' violations of other laws and treats these violations . . . [as] independently actionable." 623 F.3d at 758. Thus, in addition to the reasons cited *supra*, the Court finds *Wang* inapposite insofar as it involved a statutory claim that is plainly distinguishable from the state common law claims asserted by plaintiffs here.

[17] Plaintiffs also cited *Freeman v. City of Mobile, Alabama*, 146 F.3d 1292 (11th Cir. 1998) in support of their argument that their common law claims are not preempted. *Freeman*, however, is consistent with the Court's conclusion here. Specifically, *Freeman* merely stands for the proposition that an employer may contractually agree to pay more than required by the FLSA, and that any claims to enforce such contractual obligations are not preempted by the FLSA. *Id.* at 1298 ("[A] contract may give employees rights to overtime compensation beyond those required by the FLSA (*i.e.*, the FLSA does not preempt state law contract provisions that are more generous than the FLSA demands." (citations omitted)). Clearly, such contractual claims would not be duplicative of any FLSA claims, because they are based upon obligations that arise separate and apart from an employer's obligation to pay statutory overtime in accordance with the FLSA. Here, the Court has held that plaintiffs' common law claims are preempted only insofar as they are duplicative of their FLSA claims—that is, only to the extent that they are based upon defendants' failure to pay plaintiffs' for the overtime compensation they were owed under the FLSA. To the extent that plaintiffs' common law claims are based on defendants' duty to fully compensate plaintiffs for "straight time" owed under an employment contract or under

*Herman*, 172 F.3d at 144 (noting that the FLSA's "comprehensive remedial scheme . . . strongly counsels against judicially engrafting additional remedies" and holding that "the FLSA's remedial scheme is sufficiently comprehensive as to preempt" employers from using state common law to pursue contribution or indemnification claims for a violation of the FLSA); *see also Sosnowy*, 2011 WL 488692, at *9 (discussing *Herman*).

However, this conclusion does not end the Court's inquiry, because plaintiffs are not merely using their common law claims to seek unpaid overtime wages that defendants are obligated to pay under the FLSA, but also are seeking to recover "straight time" pay that defendants' allegedly withheld from plaintiffs for fours worked under forty hours per week. Defendants' obligation to compensate plaintiffs for this work did not arise from their obligations under the FLSA, but instead arose from plaintiffs' alleged employment contracts. Accordingly, because plaintiffs' common law claims seeking "straight time" pay are not duplicative of their FLSA claims, they are not preempted by the FLSA and should not be dismissed on this ground.[18] *See Sosnowy*,

some other non-statutory obligation, the Court has held that such claims are not preempted. Accordingly, the Court's holding is supported, rather than undermined, by the Eleventh Circuit's decision in *Freeman*.

[18] Plaintiffs also allege that defendants failed to pay them for certain hours worked at "applicable premium pay rates." The Court notes that it is not entirely clear from plaintiffs' complaint whether their "straight time" pay claims include these allegations for "premium pay," or whether the "premium pay" claims arise separate from the "straight time" pay claims. In any event, to the extent that these premium pay rates were set by plaintiffs' alleged employment contracts and not by the minimum overtime pay standards set

2011 WL 488692, at *4 ("To the extent that the state common law claims seek recovery for claims that are unavailable under the FLSA they are not preempted because an employer may contractually agree to compensate employees for time that is not mandatorily compensable under the FLSA." (internal quotation marks and alterations omitted)). As set forth below, however, several of these claims are insufficiently pled and therefore must be dismissed with leave to re-plead.

**b. Non-Preempted Common Law Claims**

Plaintiffs have brought nine common law causes of action for breach of implied oral contract, breach of express oral contract, breach of implied covenant of good faith and fair dealing, *quantum meruit*, unjust enrichment, fraud, negligent misrepresentation, conversion, and estoppel. For the reasons set forth below, the Court finds that, with the exception of the conversion and unjust enrichment claims, these state-law claims should be dismissed.

First, plaintiffs have failed to state a claim for fraud under Rule 9(b) for the same reasons discussed in connection with plaintiffs' RICO claims. *See Nakahata*, 2011 WL 321186, at *6. Second, plaintiffs have also failed to plead either a breach of express contract or a breach of implied contract because they failed to "allege the essential terms of the parties' purported contract 'in nonconclusory language,' including the specific provisions of the contract upon which liability is predicated." *Sirohi v. Trustees of Columbia Univ.*, No. 97-cv-7912, 1998 WL 642463, at *2 (2d Cir. April 16, 1998) (quoting *Sud v. Sud*, 621 N.Y.S.2d 37, 38 (App. Div. 1995)); *see also*

forth in the FLSA, the premium pay claims also are not be duplicative of their FLSA claims and, thus, are not preempted.

*Nakahata*, 2011 WL 321186, at *6.[19] Third, given that plaintiffs' contractual claims have been insufficiently pled, the Court finds that plaintiffs' breach of implied covenant of good faith and fair dealing claim, which is based upon the same conduct giving rise to the contract claims, also cannot survive. *See Blessing v. Sirius XM Radio Inc.*, --- F.Supp.2d ----, 2010 WL 4642607, at *12 (S.D.N.Y. 2010) ("Under New York law, a cause of action for breach of the implied covenant of good faith and fair dealing should be dismissed where it is 'duplicative of the insufficient breach of contract claim.'" (quoting *Jacobs Private Equity, LLC v. 450 Park LLC*, 803 N.Y.S.2d 14, 15 (App. Div. 2005) and citing *Triton Partners LLC v. Prudential Secs., Inc.*, 752 N.Y.S.2d 870, 870 (App. Div. 2003)).[20] Fourth,

plaintiffs have failed to state a cause of action for negligent misrepresentation because they have not alleged a "special relationship" sufficient to support such a claim. *See Kwon v. Yun*, 606 F. Supp. 2d 344, 356 (S.D.N.Y. 2009) ("As courts have routinely held that the employer-employee relationship does not constitute a special relationship sufficient to support a claim for negligent misrepresentation, plaintiff's negligent misrepresentation claim is not viable as a matter of law."). Fifth, because plaintiffs have set forth no more than vague and conclusory allegations regarding what services they provided to defendants or what the reasonable value for these services was, they have failed to state a claim for *quantum meruit*. *See Singerman v. Reyes*, 659 N.Y.S.2d 762, 763 (App. Div. 1997). Finally, plaintiffs' claim for estoppel fails because estoppel, as pled by plaintiffs, is not a distinct cause of action but instead is an equitable bar to defendants' assertion of a statute of limitations defense. *See Nakahata*, 2011 WL 321186, at *6. Plaintiffs, however, may assert equitable estoppel at an appropriate point in the

---

[19] Because the Court is dismissing the breach of express contract and breach of implied contract claims as insufficiently pled, the Court need not address defendants' argument that these claims are duplicative of each other. However, the Court notes that "[a]t the pleading stage, [a] [p]laintiff is not required to guess whether it will be successful on its contract, tort, or quasi-contract claims." *St. John's Univ., N.Y. v. Bolton*, --- F.Supp.2d ----, 2010 WL 5093347, at *30 (E.D.N.Y. 2010). Thus, as a general matter, a plaintiff is entitled to plead express contract, implied contract, unjust enrichment, and other quasi-contract claims in the alternative. *Id.* at *30-31.

[20] The Court notes that even if the contract claims were to survive, there would still be grounds to dismiss plaintiffs' breach of implied covenant claims as duplicative of the contract claims. *See Blessing*, 2010 WL 4642607, at *12 ("Plaintiffs concede that the same conduct gives rise to both the claims for breach of contract and the claims for breach of the implied covenant of good faith and fair dealing. Pl.'s Mem. 24. However, they argue that the two theories may be litigated in the alternative. *Id.* Under Second Circuit precedent, where, as here, the conduct allegedly violating the implied covenant is also the predicate for breach of covenant of an

express provision of the underlying contract, the claim for breach of the implied covenant will be dismissed." (internal quotation marks omitted)); *Fellows v. CitiMortgage, Inc.*, 710 F. Supp. 2d 385, 407 (S.D.N.Y. 2010) ("New York law does not . . . recognize a separate cause of action for breach of the implied covenant of good faith and a breach of contract on the same facts."); *ICD Holdings S.A. v. Frankel*, 976 F. Supp. 234, 243-44 (S.D.N.Y. 1997) ("A claim for breach of the implied covenant will be dismissed as redundant where the conduct allegedly violating the implied covenant is also the predicate for breach of covenant of an express provision of the underlying contract." (internal quotation marks omitted)). Thus, if plaintiffs choose to replead, they should make clear how their breach of implied covenant claim arises from something other than defendants' alleged breach of the employment contracts.

litigation, should defendants choose to assert a statute of limitations defense. *See Tierney v. Omnicom Grp.*, No. 06 Civ. 14302 (LTS) (THK), 2007 U.S. Dist. LEXIS 50435, at *29-30 (July 11, 2007) ("Plaintiff's remaining causes of action invoke the doctrines of waiver, estoppel, unclean hands, and specific performance. Defendant is correct in arguing that none of these doctrines are actually causes of action. Waiver, estoppel, and unclean hands are affirmative defenses. . . . . Therefore, Defendant's motion to dismiss Plaintiff's claims based on waiver, estoppel, and unclean hands is granted, but without prejudice to Plaintiff's appropriate use of these doctrines in the course of this litigation." (internal citations omitted)).

Plaintiffs' other common law claims, however, survive defendants' motion to dismiss. As to the conversion claim, defendants' only argument for dismissal is that this claim is duplicative of the contract claims. However, because the existence of a contract is plainly in dispute, plaintiffs are entitled to plead their conversion claim in the alternative to their breach of contract claims. *See also Picture Patents, LLC v. Aeropostale, Inc.*, No. 07 Civ. 5567 (JGK), 2009 WL 2569121, at *3 (S.D.N.Y. Aug. 19, 2009) ("Because there is a dispute over the existence of a contract between Picture Patents and IBM, conversion and unjust enrichment can be pleaded as alternative theories to breach of contract."). As to the unjust enrichment claim, defendants did not make any arguments regarding why this claim should be dismissed, and the Court therefore need not address this claim.

### 4. ERISA

Plaintiffs have further brought two causes of action under ERISA. First, plaintiffs have brought a cause of action pursuant to 29 U.S.C. § 1132(a)(3), alleging that defendants violated Section 209 of ERISA by failing to keep accurate records of "all time worked" by plaintiffs, and thus failing to keep records that were legally sufficient to determine the benefits owed to plaintiffs. (SAC ¶¶ 211-12.) Second, plaintiffs allege that defendants breached their fiduciary duties under ERISA by failing to credit plaintiffs "with all of the hours of service for which they were entitled to be paid" and by failing to even investigate "whether such hours should be credited." (*Id.* ¶ 118.)

Defendants contend, in the first instance, that plaintiffs have failed to exhaust administrative remedies prior to pursuing these claims in federal court and that, accordingly, both of these claims should be dismissed. Plaintiffs do not contest that they failed plead exhaustion of their administrative remedies, but instead argue that this failure should be excused because they were not required to plead exhaustion for the types of claims that they seek to bring. In the alternative, defendants argue that the Court should dismiss both claims for failure to state a claim. For the reasons that follow, the Court finds plaintiffs' recordkeeping claim must be dismissed for failure to plead exhaustion. As to plaintiffs' breach of fiduciary duty claim, the Court is denying defendants' motion to dismiss this claim, but will allow defendants to renew this motion after the parties have conducted limited discovery on the issue of how benefits are determined under the controlling ERISA plans.

### a. Exhaustion of Administrative Remedies

The Second Circuit has recognized the "firmly established federal policy favoring exhaustion of administrative remedies in ERISA cases." *Kennedy v. Empire Blue Cross & Blue Shield*, 989 F.2d 588, 594 (2d

Cir. 1993) (internal quotation marks omitted). The doctrine of exhaustion of administrative remedies rests on the principle "'that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted.'" *Id.* at 592 (quoting *Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 50-51 (1938)). The purpose of the requirement is to "help reduce the number of frivolous lawsuits under ERISA; to promote the consistent treatment of claims for benefits; to provide a nonadversarial method of claims settlement; and to minimize the costs of claims settlement for all those concerned." *Id.* at 594 (internal quotation marks omitted).

However, where a plaintiff's claims are statutory-based rather than plan-based, the plaintiff need not satisfy the exhaustion requirement. In determining whether a claim is statutory- or plan-based, courts look to whether a plaintiff is seeking equitable relief for a violation of ERISA that arises separate and apart from the terms of the plan or, alternatively, whether the plaintiff is ultimately seeking monetary relief for misapplication of the terms of the plan. *See, e.g.*, *DePace v. Matsushita Elec. Corp. of Am.*, 257 F. Supp. 2d 543, 558-59 (E.D.N.Y. 2003) ("District courts in the Second Circuit have routinely dispensed with the exhaustion prerequisite where plaintiffs allege a statutory ERISA violation. . . . Plaintiffs' complaints of fraudulent inducement in this case are not based on a misinterpretation or misapplication of the terms of the pension plan. . . . Thus . . . the issue is *not* an alleged violation of the terms of a pension plan, but an alleged violation of ERISA itself." (internal quotation marks omitted) (emphasis in original)); *Gray v. Briggs*, No. 97 CIV. 6252 (DLC), 1998 WL 386177, at *7 (S.D.N.Y. July 7, 1998) (where defendants were charged with breaching their fiduciary duties by, *inter*

*alia*, investing plan funds unwisely and not solely in the plan participants' interests, plaintiffs need not exhaust claims because "there is no exhaustion requirement in ERISA suits alleging a statutory violation rather than a denial of benefits").

In addition, there is an exception to the administrative exhaustion requirement where a claimant makes a "clear and positive showing" that pursuing available administrative remedies would be futile because requiring exhaustion under those circumstances would eviscerate the purposes behind the requirement. *See Kennedy*, 989 F.2d at 594 (internal quotation marks omitted). "In cases where the plan fiduciary has acted in bad faith or in breach of its fiduciary duties, federal courts have invoked the futility doctrine and waived exhaustion as a precondition for judicial review under ERISA." *DePace*, 257 F. Supp. 2d at 560; *accord Smith v. Champion Int'l Corp.*, 573 F. Supp. 2d 599, 608 (D. Conn. 2008) ("Allegations of bad faith or breach of fiduciary duties may be sufficient to establish futility.").

*i. Recordkeeping Claim*

Plaintiffs allege in their first ERISA cause of action that defendants violated Section 209 of ERISA, 29 U.S.C. § 1059(a)(1), by failing to keep accurate records of "all time worked" by plaintiffs. (SAC ¶ 212.) Plaintiffs have brought this claim pursuant to Section 502(a)(3), 29 U.S.C. § 1132(a)(3), which provides that, *inter alia*, a plan participant may bring a civil action: "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." As to damages, plaintiffs claim that they are only seeking equitable

relief, namely, an award crediting plaintiffs for all hours worked. (*See* SAC *ad damnum* clause ¶ (b); Pl.'s Opp. at 28 ("[P]laintiffs are not seeking to recover unpaid benefits under any benefit plan. Here, plaintiffs are asserting violations of substantive provisions of ERISA and are seeking equitable relief; specifically, a crediting of all hours worked.").)

The Court finds that, although plaintiffs have attempted to cast their claim as one seeking equitable relief under the "catch-all" provision of ERISA (Section 502), plaintiffs' claim is inextricably intertwined with the benefits that they will receive under the plan and, as such, should be construed as plan-based claim seeking monetary damages. Specifically, plaintiffs have alleged that defendants have violated Section 209 of ERISA, which requires employers to keep records "sufficient to determine the benefits due or which may become due to [their] employees." 29 U.S.C. § 1059(a)(1). The statute does not define what constitutes "sufficient" records. Instead, to know what records are "sufficient" to determine benefits due, one must refer to the language of the applicable ERISA plan to determine how benefits are calculated. If benefits are based upon hours worked, then the records should reflect all hours worked by employees; alternatively, if benefits are based upon wages paid, then the records should reflect all wages paid to employees. Plainly, then, plaintiffs' claim that defendants did not keep sufficient records hinges on an interpretation of the language of the ERISA plans. Such a claim should be pursued, in the first instance, with the plan administrators who "have expertise in interpreting the terms of the plan itself." *DePace*, 257 F. Supp. 2d at 557; *see id.* at 559 (noting that "administrative procedures and remedies provided for in the [ERISA] plans are designed to deal with erroneously denied benefits or misapplication of the terms of the plan").

Moreover, plaintiffs cannot avoid the fact that, ultimately, their claim is one for monetary relief. Indeed, this conclusion is demonstrated by the fact that if plaintiffs are successful on their claim to be credited for all hours worked (assuming *arguendo* that the plan requires such crediting), this crediting of hours will result in a recalculation of plaintiffs' benefits, which, in turn, will result in a monetary gain to plaintiffs. Such a claim should be brought under Section 502(a)(1)(B), not Section 502(a)(3), and cannot be brought before plaintiffs have exhausted their administrative remedies. *Cf. Frommert v. Conkright*, 433 F.3d 254, 269-70 (2d Cir. 2006) (concluding there was "no need . . . [to] allow equitable relief under § 502(a)(3)" where plaintiff's claim for "recalculation of their benefits consistent with the terms of the Plan" was ultimately a claim for monetary damages that fell "comfortably within the scope of § 502(a)(1)(B)"). Indeed, based upon claims that were nearly identical to those raised in this case (and were brought by the same plaintiffs' counsel as in this case), the court in *Barrus v. Dick's Sporting Goods, Inc.*, 732 F. Supp. 2d 243 (W.D.N.Y. 2010) found that this recordkeeping claim was, in actuality, "a claim for benefits [that] [plaintiffs] claim[ ] to be owed because [their] 401(k) account was allegedly shorted as a result of [defendant's] failure to pay . . . certain amounts of overtime." *Id.* at 258-59 (citation omitted). The court concluded that "[i]n that vein, a claim for benefits from a functioning plan can only be brought under 29 U.S.C. § 1132(a)(1)(B) and is not a claim for equitable relief, but rather one for damages." *Id.* at 259 (internal quotation marks omitted). Accordingly, plaintiffs were required to plead exhaustion of administrative remedies under the plan. *Id.*

This Court agrees with the decision in *Barrus* and finds that, because plaintiffs were required to plead exhaustion of administrative remedies with regard to their recordkeeping claim but have failed to do so, this claim must be dismissed without prejudice.

### ii. Breach of Fiduciary Duty

In contrast to plaintiffs' recordkeeping claim, this Court finds that plaintiffs were not required to plead exhaustion of their breach of fiduciary duty claims. As an initial matter, at least one court has found that breach of fiduciary duty claims are statutory-based claims[21] to which the exhaustion requirement does not apply. *See Gray*, 1998 WL 386177, at *7 (where defendants were charged with breaching their fiduciary duties by, *inter alia*, investing plan funds unwisely and not solely in the plan participants' interests, plaintiffs need not exhaust claims because "there is no exhaustion requirement in ERISA suits alleging a statutory violation rather than a denial of benefits"). *Cf. Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 110 (1989) ("ERISA explicitly authorizes suits against fiduciaries and plan administrators *to remedy statutory violations*, including breaches of fiduciary duty. . . ." (emphasis added)).

---

[21] In their cause of action for breach of fiduciary duty, plaintiffs referenced ERISA's Section 504(a)(1), 29 U.S.C. § 1104(a)(1), which sets forth the duties that fiduciaries have under the statute. Section 502(a)(3) provides plan participants or beneficiaries with a private right of action to sue for breach of those fiduciary duties. *See Devlin v. Empire Blue Cross & Blue Shield*, 274 F.3d 76, 89 (2d Cir. 2001). Although defendants challenged plaintiffs' use of Section 502(a)(3) to bring a recordkeeping violation claim, defendants do not dispute the use of this provision to pursue a breach of fiduciary duty claim.

Furthermore, in any event, "[i]n cases where the plan fiduciary has acted in bad faith or in breach of its fiduciary duties, federal courts have invoked the futility doctrine and waived exhaustion as a precondition for judicial review under ERISA." *See DePace*, 257 F. Supp. 2d at 560 (citing *Ludwig v. NYNEX Service Co.*, 838 F. Supp. 769, 781-82 (S.D.N.Y. 1993) and *Riggs v. A.J. Ballard Tire & Oil Co.*, Nos. 91-2130, 91-2219, 1992 WL 345584, at *2 (4th Cir. Nov. 19, 1992)). Here, plaintiffs allege that defendants breached their duties by failing to credit plaintiff for all hours worked, an allegation which at its core is based upon defendants' allegedly fraudulent and illegal pay practices. "If, drawing all inferences in the plaintiffs' favor, one assumes that the allegations of wrongdoing are true, then internal remedies indeed may have proven futile." *Gray*, 1998 WL 386177, at *7. Accordingly, the Court finds that plaintiffs are excused for failing to plead exhaustion of their administrative remedies for their breach of fiduciary duty claim.

### b. Failure to State a Claim for Breach of Fiduciary Duty

Plaintiffs claim that defendants breached their duty "to act prudently and solely in the interest of the Plans' participants by failing to credit them with all of the hours of service for which they were entitled to be paid . . . or to investigate whether such hours should be credited." (SAC ¶ 118.) Defendants contend, however, that they were not acting in a "fiduciary capacity" in deciding whether to credit plaintiffs for hours worked and that, accordingly, their ERISA fiduciary obligations were never triggered in this case. Specifically, defendants' argument is based upon the language of the applicable ERISA plan documents, which, according to defendants, pegs benefits owed not to "hours worked"

but instead to "wages actually paid." Thus, defendants argue that the decision whether to credit employees for "all hours worked" is not a fiduciary decision under the terms plan, but is instead a business decision that does not involve the administration of an ERISA plan or the investment of the plan's assets. The Court finds that the parties must engage in limited discovery regarded the terms of the controlling plan documents before the Court is able to determine whether plaintiffs have failed to state a claim for breach of fiduciary duty under ERISA. Accordingly, defendants' motion to dismiss this cause of action is denied at this juncture.

As defendants correctly note, ERISA's fiduciary duties are only triggered when employers are acting in a "fiduciary capacity," as that term is defined in the statute. Specifically, "a person or corporation is a plan fiduciary 'to the extent . . . he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets . . . , or . . . he has any discretionary authority or responsibility in the administration of such plan.'" *Flanigan v. Gen. Elec. Co.*, 242 F.3d 78, 87 (2d Cir. 2001) (quoting 29 U.S.C. § 1002(21)(A)). "Under this definition, a person has fiduciary status only 'to the extent' that he has or exercises the described authority or responsibility." *Id.* (internal quotation marks and alterations omitted). Accordingly, "[i]n every case charging breach of ERISA fiduciary duty . . . the threshold question is not whether the actions of some person employed to provide services under a plan adversely affected a plan beneficiary's interest, but whether that person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint." *Pegram v. Herdrich*, 530 U.S. 211, 226

(2000). The Second Circuit has held that where a decision is, "at its core, a corporate business decision, and not one of a plan administrator" the employer was not acting as a fiduciary in making such a decision, and accordingly cannot be held liable for breaching its ERISA fiduciary duties. *Flanigan*, 242 F.3d at 88 (decision whether to spin-off a division along with its pension plan was a business decision that did not trigger fiduciary duties).

As an initial matter, the Court notes that had plaintiffs argued that defendants breached their fiduciary duties simply because of their failure to pay plaintiffs for all hours worked, they clearly would have failed to state a claim. *See LePage v. Blue Cross & Blue Shield of Minn.*, No. 08-cv-584, 2008 WL 2570815, at *5-6 (D. Minn. June 25, 2008) ("Setting compensation levels is a business decision or judgment made in connection with the on-going operation of a business. . . . [Defendant's] decision not to pay Plaintiffs overtime does not pertain to the administration of the 401(k) Plan; rather it is a business decision and, though the decision may have impacted Plaintiffs' benefits under the Plan, it does not state a claim for breach of fiduciary duty under ERISA." (internal quotation marks omitted)); *Ballaris v. Wacker Siltronic Corp.*, No. 00-cv-1627-KI, 2002 WL 926272, at *2 (D. Or. Feb. 7, 2002) (dismissing breach of fiduciary duty claim based on failure to pay wages and failure to maintain sufficient records because the "decision concerning whether to pay wages for changing time has only an extremely indirect connection to the administration of the ERISA plan" and, thus, employer was not acting as an ERISA fiduciary in making this decision); *accord Barrus*, 2010 WL 3075730, at *11-12 (relying on *LePage* and dismissing breach of fiduciary duty claim because although "[t]he decision to credit wages . . . has implications for the

retirement plan. . . . "[i]n determining the wage policy, Defendants were not acting as plan fiduciaries"). *Cf. Perdue Farms, Inc. v. Travelers Cas. & Surety Co. of Am.*, 448 F.3d 252, 261 (4th Cir. 2006) ("In enacting ERISA, Congress' primary concern was with the mismanagement of funds accumulated to finance employee benefits and the failure to pay employees benefits from accumulated funds. But while ERISA serves these important congressional objectives, it was not designed to address every conceivable aspect of an employee's monetary rights, and it is not primarily concerned with hourly wages and overtime pay, the domain of the FLSA and its state counterparts. As the Supreme Court has instructed, 'the danger of defeated expectations of wages for services performed [is] a danger Congress chose *not* to regulate in ERISA.' For this reason, the distinction between 'wage' compensation (not regulated by ERISA) and 'benefit' compensation (regulated by ERISA) must be sensitively drawn . . . ." (internal quotation marks and citations omitted) (emphasis in original)).

In this case, plaintiffs have instead asserted that defendants' breach is based not upon the underlying failure to pay but upon the failure to "credit" plaintiffs under the ERISA plans with all hours worked and the failure to investigate whether such hours were credited. (*See* Pl.'s Opp. at 31 n.13 ("[P]laintiffs' ERISA claims do not arise out of decisions determining wage policies, but decisions made as a fiduciary to not credit the Plans with all hours worked.").) The Second Circuit had not yet determined whether these failures would constitute a breach of fiduciary duty under ERISA. A number of district courts, however, have grappled with this issue and have reached conflicting conclusions. For the reasons set forth herein, the Court finds the reasoning of the cases cited by defendants to be

persuasive, but finds that it does not have sufficient information regarding the terms of the plans to determine whether dismissal is warranted here.

By way of example, in *Mathews v. ALC Partner, Inc.*, No. 08-cv-10636, 2009 WL 3837249 (E.D. Mich. Nov. 16, 2009), plaintiffs' "principal claim"—as in the current case—was that defendants "failed to pay [p]laintiffs for all the hours they worked" in violation of the FLSA. *Id.* at *1. In addition, plaintiffs brought "ERISA claims predicated on [defendant's] failure to pay the [p]laintiffs, alleging that [defendant] failed to credit the additional hours worked (but not compensated for) to their accounts in the ERISA benefit plans . . . ." *Id.* As a general matter, the court agreed with defendants that "the decision whether to pay employees was a business decision, and not a[n] ERISA fiduciary decision subjecting the employer to fiduciary status for those decisions." *Id.* However, the court also noted that "if [the applicable] retirement plan determined an employee's ERISA benefits based on the number of hours worked or wages *earned*, and not merely on wages actually *paid*, then the decision whether to credit hours worked—even unpaid hours—would be a fiduciary decision under ERISA." *Id.* (emphasis in original). In other words, a fiduciary obligation to credit hours would be triggered if the plans required such hours to be credited because benefits were pegged to hours worked or wages earned. Accordingly, the court looked to the language of the plan documents to determine whether they tied ERISA benefits to wages earned or, alternatively, to wages actually paid. *Id.* at *3. In a two-part analysis, the court concluded first that the plan documents defined benefits "in terms of employee 'Compensation.'" *Id.* at *3-4 (citing plan documents that set forth the amounts employers shall contribute to the

plan).  Second, because the plan documents defined an employee's benefits by reference to that employee's compensation, the court looked to the definition of "compensation" as set forth by the plans.  *Id.* at *4-5.  Upon review, the court concluded that the plan documents clearly defined compensation "in terms of wages paid, so that plan benefits too are tied to wages actually paid."  *Id.* at *4.  Accordingly, the court concluded that:

> This means that the allegations of [defendant's] failure to maintain records of actual hours worked by employees, or to credit the actual number of hours worked towards the 401(k) plan do not state a claim for breach of fiduciary duty because [defendant] was not acting as an ERISA "fiduciary" in this respect— its decision not to credit employees for hours actually worked was based solely on its decision not to pay its employees for all hours actually worked, which was a business decision, and *not* an ERISA fiduciary decision.  The decision did not subject [defendant] to ERISA fiduciary liability.

*Id.* at *6 (emphasis in original).  Other courts, under nearly identical factual circumstances, have taken a similar approach to that taken by the court in *Mathews*.  Specifically, these courts have found that where an ERISA plan defines benefits in terms of compensation, and where compensation is tied to wages actually paid, employers are not obligated to credit employees for "all hours worked," and thus, the failure to credit those hours does not constitute a breach of fiduciary duty under ERISA.  *See Kuznyetsov v. W. Penn Allegheny Health Sys., Inc.*, No. 09-cv-379, 2010 WL 597475, at *5-7 (W.D. Pa. Feb. 16, 2010) (dismissing breach of fiduciary duty claim based on failure "to

credit retirement plans with all hours worked through meal breaks" where the plan documents "tie[d] ERISA benefits to compensation paid and not to hours worked" and therefore defendants "violated neither their recording nor fiduciary duties under ERISA because those obligations related to 'Compensation' that was paid, not hours allegedly worked by Plaintiffs but not paid" (internal quotation marks and citations omitted)); *Henderson v. UPMC*, No. 09-187J, 2010 WL 235117, at *4 (W.D. Pa. Jan. 11, 2010) (relying upon *Mathews* and dismissing breach of fiduciary duty claim based on failure to credit retirement plan with all hours worked because under the terms of the controlling plans "Defendants' recording and fiduciary obligations under the Plans extended not to hours allegedly worked by Plaintiff but to the wages she was paid"); *accord Camesi v. Univ. of Pittsburgh Med. Cntr.*, No. 09-cv-85J, 2010 WL 235123, at *1 (W.D. Pa. Jan. 11, 2010).  Thus, because the applicable plans did not require contributions to be made based upon hours actually worked, a decision not to credit for all hours worked must be considered a "business decision" that falls outside the scope of the applicable ERISA plan and therefore does not trigger the employers' fiduciary obligations.  As described by the court in *LePage*, 2008 WL 2570815:

> The crux of Plaintiffs' argument is that [defendant] had a fiduciary duty to credit them for unpaid overtime.  But Plaintiffs were never actually paid overtime.  And under the terms of the 401(k) Plan, Eligible Earnings do not include compensation that should have been paid.  Thus, [defendant] followed the terms of the Plan when it did not make contributions based upon overtime hours for which Plaintiffs received no actual compensation.  So there are

no records to correct because they properly reflect the compensation actually paid to the Plan participants. And [defendant's] decision not to pay Plaintiffs overtime does not pertain to the administration of the 401(k) Plan; rather it is a business decision and, though the decision may have impacted Plaintiffs' benefits under the Plan, it does not state a claim for breach of fiduciary duty under ERISA. Inescapably then, Plaintiffs' ERISA claims are not based on any "duty with respect to the plan," 29 U.S.C. § 1104; rather, they are based solely on the claim that [defendant], in its role as employer, should have paid them overtime. As such, Plaintiffs have failed to state a legally cognizable claim with respect to the retirement plan at issue.

*Id.* at \*6 (internal citation and footnote omitted). *See also Barrus*, 732 F. Supp. 2d at 258 (applying *LePage* to claims identical to those raised in the instant case and holding that although decision to credit wages "has implications for the retirement plan" that decision is not a fiduciary decision involving the administration of an ERISA plan or the investment of an ERISA plan's assets); *Maranda v. Grp. Health Plan, Inc.*, No. 07-cv-4655 (DSD/SRN), 2008 WL 2139584, at \*2 (D. Minn. May 20, 2008) ("[O]nce an employer has established a pension plan, it is under an obligation to provide benefits according to the terms of that plan. Under the plain language of the Plan, a participant's eligible earnings are the 'total of all compensation paid' to the individual during the Plan year. Eligible earnings do not include compensation that should have been paid. Therefore, the Plan Committee had no obligation to make contributions based upon overtime hours for which plaintiffs received no actual

compensation and was indeed following the terms of the Plan when it did not make such contributions. . . . Plaintiffs' primary claim is that Group Health misclassified them as exempt employees. Any such misclassification, however, does not concern the Plan, and plaintiffs have not alleged that the Committee was responsible for the classification. Rather, plaintiffs assert only a FLSA claim. Therefore, the court dismisses plaintiffs' ERISA claims." (internal quotation marks and citations omitted)); *accord Zipp v. World Mortg. Co.*, 632 F. Supp. 2d 1117, 1124-25 (M.D. Fla. 2009) ("As did the *LePage* court, this Court finds that inquiry begins and ends with the conclusion that the ERISA claims are not legally cognizable. The business decision whether to classify employees as 'exempt' or 'nonexempt' for FLSA overtime purposes may have an impact on an ERISA plan, but that does not render the claims based on that classification decision ERISA claims. . . . And, with regard to crediting of compensation, the terms of the WISE Plan define compensation as 'amounts *paid* by an Employer to an Employee,' not amounts earned; thus, by crediting the Plan based on actual compensation paid—which is what Plaintiff Walker alleges Defendants did—Defendants were acting in accordance with the Plan terms." (internal citations and footnote omitted) (emphasis in original)); *Steavens v. Elec. Data Sys. Corp.*, No. 07-cv-14536, 2008 WL 3540070, at \*4 (E.D. Mich. Aug. 12, 2008) ("Just as in *LePage* and *Maranda*, Plaintiffs assert that Defendant breached its fiduciary duty to them in violation of ERISA by failing to account for *unpaid* overtime in administering the Plans. But under both Plans, Defendant had no obligation to credit Plaintiffs with unpaid overtime because, as the *Maranda* court noted, Plaintiffs' earnings 'do not include compensation that *should have been paid*.' As the

administrator of the Plans, Defendant was obligated to adhere to the provisions of each Plan so long as they were not inconsistent with ERISA, which Plaintiffs have not alleged." (internal citation omitted) (emphasis in original)).

Applying these cases to the instant case, if the Court assumes *arguendo* that defendants are correct that the plans at issue here did not tie benefits to "all hours worked," then defendants, of course, would have no fiduciary obligation to credit plaintiffs with those hours. Consequently, all plaintiffs would be left with is a claim that is based not upon an obligation arising from the terms of an ERISA plan, but instead upon a business decision regarding whether and how to pay plaintiffs. As noted *supra*, compensation and wage policy decisions fall outside the scope of ERISA and therefore cannot form the basis for an ERISA cause of action. *Cf. Ballaris*, 2002 WL 926272 at *2 ("ERISA does not require 'day-to-day corporate business transactions, which may have a collateral effect on prospective, contingent employee benefits, be performed solely in the interest of plan participants.' . . . [Defendant's] decision concerning whether to pay wages for changing time has only an extremely indirect connection to the administration of the ERISA plan. . . . Consequently, [defendant] was not acting as an ERISA fiduciary in this regard." (quoting *Hickman v. Tosco Corp.*, 840 F.2d 564, 566 (8th Cir. 1988))).

Moreover, defendants would also have no obligation to investigate whether employees had legal claims for additional compensation or were not being credited for "all hours worked." Where the plan itself imposes no obligation to credit for such hours or to base benefits determinations on compensation that might be owing to employees, plan administrators do not have an obligation to double-check whether employers are fulfilling their statutory and contractual payment obligations to employees. *See Steavens*, 2008 WL 3540070, at *4 ("The problem with Plaintiffs' argument . . . is that it is unworkable under ERISA. . . . Plaintiffs seek to impose a fiduciary duty on Defendant to investigate its business decisions in order to avoid the possibility . . . that a plan participant would be deprived of pension credits if an employer illegally withheld wages. But the fact is that setting compensation levels is a business decision or judgment made in connection with the on-going operation of a business, and both legal and illegal business decisions can have negative impacts on benefits plans. . . . Congress did not enact ERISA to govern the propriety of any decisions made in the capacity as an employer. The propriety of those decisions is governed by other federal statutes." (internal quotation marks and citations omitted)); *LePage*, 2008 WL 2570815, at *5-7 (rejecting plaintiffs' argument that defendant had a "fiduciary duty to double-check [the business decision regarding how to classify employees] and evaluate whether employees had some legal claim to additional compensation" because, *inter alia*, "[s]uch a far-reaching duty would send the administration of the plan into gridlock and dramatically increase the cost of administering the plan. And the Supreme Court has repeatedly warned that Congress did not intend that ERISA be 'a system that is so complex that administrative costs, or litigation expenses, unduly discourage employees from offering . . . benefit plans in the first place.'" (quoting *Varity Corp. v. Howe*, 516 U.S. 489, 497 (1996))). To impose such an obligation to investigate would expand fiduciary duties under ERISA to require that fiduciaries not only deal with decisions involving plan management and administration, as specified in 29 U.S.C.

§ 1002(21)(A), but also "oversee employers' business decisions to ensure that those decisions did not deprive any employee of a wage that should have been paid." *Steavens*, 2008 WL 3540070, at *5. The Court is not willing to impose such an obligation where Congress did not clearly provide for it in the statute.

Plaintiffs, however, urge the Court to adopt the reasoning of a competing line of cases holding that failure to credit employees for all hours worked does constitute a breach of fiduciary duties under ERISA. The Court does not find these cases to be persuasive. For example, in *Gerlach v. Wells Fargo & Co.*, No. 05-cv-0585, 2005 U.S. Dist. LEXIS 46788 (N.D. Cal. June 13, 2005), the court allowed plaintiffs' breach of fiduciary claim to proceed because, *inter alia*, under the defendant's interpretation of the applicable plan, "a Plan participant could earn wages that qualify, under the terms of the Plan, as certified compensation, but could be deprived of the corresponding pension credits if Defendant illegally withheld those wages." *Id.* at *7. However, as noted by the court in *Steavens*, violations of wage and hour laws should be remedied under the FLSA, *not* under ERISA. *See Steavens*, 2008 WL 3540070, at *4 ("Why, then should a fiduciary not be required to oversee all business decisions regardless of their legality? The reason is that Congress did not enact ERISA to govern the propriety of any decisions made in the capacity as an employer. The propriety of those decisions is governed by other federal statutes."). Indeed, the *Gerlach* court acknowledged that the "central allegation" of plaintiffs' complaint was that defendant "violated the FLSA by not paying Plaintiff overtime wages for overtime work." *Gerlach*, 2005 U.S. Dist. LEXIS 46788, at *7-8. Under such circumstances, the FLSA should serve as the primary vehicle for remedying illegal wage policies and practices. *Cf. Perdue*

*Farms, Inc.*, 448 F.3d at 261 ("[ERISA] was not designed to address every conceivable aspect of an employee's monetary rights, and it is not primarily concerned with hourly wages and overtime pay, the domain of the FLSA and its state counterparts."); *Henderson*, 2010 WL 235117, at *3 ("[T]he undersigned questions generally the wisdom of interpreting ERISA as a supplemental form of relief for alleged FLSA violations. As Defense counsel aptly observes, '[o]ne can [only] imagine the turmoil, expense and uncertainty that would be created if pension plan administrators were charged by the courts with the additional duty of investigating the pay of all participants to ensure that they are being paid in compliance with all federal, state and local laws.'"). The other cases cited by plaintiffs provided virtually no legal analysis or analysis of the applicable plan language in support of their conclusion that similar breach of fiduciary duty claims should be allowed to proceed, and, as such, this Court declines to follow the reasoning of these cases. *See Stickle v. Sciwestern Market Support Center, L.P.*, No. 08-cv-083-PHX-MHM, 2008 WL 4446539, at *19 (D. Ariz. Sept. 30, 2008) (noting only that "crediting hours is a fiduciary function" and that plaintiffs "asserted this claim against the Plan and the alleged Plan administrator," and accordingly finding that plaintiffs asserted sufficient facts to overcome motion to dismiss); *Rosenburg v. Int'l Bus. Machines Corp.*, No. 06-cv-0430 PJH, 2006 WL 1627108, *5 (N.D. Cal. June 12, 2006) (acknowledging that case was a "close call" and that the court was "not entirely persuaded that either of the two approaches is correct for this case" but nonetheless holding that because "whether IBM was wearing its employer or plan administrator 'hat' is at least in part a factual issue, it cannot be decided as a matter of law at this stage of the litigation"); *In re Farmers Ins.*

*Exchange Claims Representatives' Overtime Pay Litig.*, No. MDL 33-1439 (B), 2005 WL 1972565, at *5 (D. Or. Aug. 15, 2005) (explaining only that "[p]laintiffs draw a very fine line between business and fiduciary decisions in pressing this novel theory" but that "[a]fter reviewing all the parties' arguments on this issue . . . I am persuaded that plaintiffs' second claim states a claim for relief").

Accordingly, the Court agrees with the cases cited by defendants that *if* the controlling plan documents reveal that benefits are tied to compensation actually paid—rather than to hours worked or compensation earned through hours worked—then plaintiffs have failed to state an ERISA cause of action. However, the Court has not been provided with sufficient information from the plan documents to make this determination.[22]   As indicated *supra*, before dismissing plaintiffs' ERISA claim, the Court must engage in a two-part analysis of the applicable plan documents to determine: (1) whether the plans define benefits in terms of "compensation," and, if benefits are tied to "compensation," (2) whether compensation is defined in terms of hours worked, wages earned, or wages actually paid.   Here, defendants have submitted plan documents that are relevant to the second inquiry, but they have not submitted excerpts relevant to the threshold question of whether the plans define benefits in terms of "compensation."   Accordingly, the parties must engage in limited discovery to determine how the controlling plans determine benefits before the Court is able

to rule on defendants' motion to dismiss this cause of action.[23] [24]

## 5. LMRA PREEMPTION

Finally, defendants move to dismiss plaintiffs' Second Amended Complaint on the ground that all of plaintiffs' claims are preempted by the Labor Management Relations Act ("LMRA").   Specifically, defendants argue that because plaintiffs' claims will require the interpretation of a

---

[22] Although the Court typically may not look beyond the complaint in ruling on a motion to dismiss, the Court may consider the plan documentation submitted by defendants here, because the plaintiffs' claims are based upon the ERISA plans and the plan documents plainly are integral to plaintiffs' complaint.

[23] The Court notes that the court in *Mathews* also allowed the parties to engage in limited discovery to determine the identity and content of the controlling plan documents after plaintiffs contested that the plan documents submitted by defendants were not actually the governing ones and that additional plan documents might exist. Here, plaintiffs have objected to consideration of the plan documents on the ground that the Court has only been provided with excerpts, rather than the complete text, of the applicable plans.

[24] Defendants also moved to dismiss the ERISA claims against defendants Dowling and Cabral on the grounds that plaintiffs did not allege that either Dowling or Cabral had fiduciary responsibilities under the ERISA plans for recordkeeping or crediting benefit payments. (*See* Defs.' Mem. of Law at 33.)  However, the Second Amended Complaint clearly alleges that defendants (defined to include the individual defendants) "while acting as fiduciaries exercising discretion over the administration of the Plans, breached their duties to act prudently and solely in the interests of the Plans' participants by failing to credit them with all of the hours of service for which they were entitled to be paid . . . or to investigate whether such hours should be credited.  Under ERISA, crediting hours is a fiduciary function, independent of the payment of wages, necessary to determine participants' participation [sic] vesting accrual of rights."  (SAC ¶ 118.)  The Court finds that, at the motion to dismiss stage, this paragraph is sufficient to allege that the individual defendants were acting in their capacities as fiduciaries.

collective bargaining agreement ("CBA"), these claims are preempted by Section 301 of the LMRA, which, according to defendants, "preempts the field with respect to claims 'substantially dependent on analysis of a collective-bargaining agreement.'" (Defs.' Mem. of Law at 34 (quoting *Caterpillar Inc. v. Williams*, 482 U.S. 386, 395 (1987)).

According to defendants, "[m]any, if not most" of LIJ's employees are unionized, and, thus, their terms of employment are governed by CBAs. (Defs.' Mem. of Law at 34.) Even assuming *arguendo* that defendants are correct that plaintiffs' claims will require interpretation of a CBA and thus are preempted, and even if "many" LIJ employees are unionized, it is not clear which of the named plaintiffs or class members are unionized, if any. Accordingly, it is not possible to determine based upon the pleadings which of the named plaintiffs and class members might have claims that require interpretation of a CBA, and the Court, therefore, must deny defendants' motion to dismiss at this juncture, without prejudice.

However, defendants are correct that plaintiffs cannot avoid LMRA preemption merely by "artfully pleading" their complaint to avoid mention of the CBAs. *See, e.g.*, *Karnes v. Boeing Co.*, 335 F.3d 1189, 1192-93 (10th Cir. 2003) ("[B]ecause plaintiffs often attempt to avoid federal jurisdiction under § 301 by artfully pleading their claims, federal courts look beyond the allegations of the complaint to determine whether the wrong complained of actually arises in some manner from a breach of the defendants' obligations under a CBA." (internal quotation marks and alterations omitted)); *Milne Employees Ass'n v. Sun Carriers*, 960 F.2d 1401, 1409-10 (9th Cir. 1991) ("To determine whether federal jurisdiction is properly exercised over a state

law claim brought by unionized employees, a federal court necessarily examines the collective bargaining agreement to determine whether the state law claims are 'artfully pleaded' claims which actually allege breach of contract or require interpretation of the collective bargaining agreement's terms."). Indeed, Section 301 of the LMRA is one of the few federal statutes recognized as having "the requisite extraordinary preemptive force to support complete preemption," such that state-law claims coming within its scope "are transformed, for jurisdictional purposes, into federal claims." *Sullivan v. Am. Airlines*, 424 F.3d 267, 272 (2d Cir. 2005). Thus, plaintiffs are directed to file an amended complaint that includes specific factual allegations that state which, if any, of the named plaintiffs are unionized and, accordingly, which of the named plaintiffs are subject to the terms of a CBA.

### III. MOTION FOR EXPEDITED NOTICE

Plaintiffs have also moved for expedited notice to the class regarding the FLSA claims. However, because the FLSA claims are dismissed for the reasons stated *supra*, plaintiffs' motion for expedited notice is denied with leave to renew at a later date. *See Nakahata*, 2011 WL 321186, at *7 (dismissing motion for expedited discovery, collective action, and class action status as moot in light of dismissal of FLSA claims).

### IV. CONCLUSION

For the foregoing reasons, defendants' motion to dismiss is granted in part and denied in part. Specifically, plaintiffs' FLSA claims—construed only as claims regarding overtime and not as claims regarding "straight time" or "gap time" pay—are dismissed without prejudice for failure to state a claim. Likewise, plaintiffs'

NYLL claim is dismissed without prejudice for failure to state a claim.

Plaintiffs' RICO cause of action is denied with prejudice to the extent that this claim is based upon defendants' failure to pay plaintiffs overtime, and thus is duplicative of plaintiffs' FLSA claim. However, to the extent that the RICO cause of action is based upon defendants' alleged failure to pay plaintiff for "straight time" wages, this claim is not preempted by the FLSA. Nevertheless, this remaining RICO cause of action is dismissed without prejudice for failure to state a claim.

As to plaintiffs' state common law claims, these claims are dismissed with prejudice as preempted by the FLSA to the extent that they seek overtime wages and thus are duplicative of the FLSA claim. The surviving common law claims are construed as seeking only unpaid "straight time" pay. However, plaintiffs' breach of implied oral contract, breach of express oral contract, breach of implied covenant of good faith and fair dealing, *quantum meruit*, fraud, and negligent misrepresentation claims are dismissed without prejudice for failure to state a claim. Plaintiffs' estoppel claim is dismissed because, as pled by plaintiffs, "estoppel" is not a distinct cause of action but instead is an equitable bar to defendants' assertion of a statute of limitations defense. Plaintiffs, however, may assert equitable estoppel at an appropriate point in the litigation, should defendants choose to assert a statute of limitations defense.

Regarding plaintiffs' ERISA claims, the claim for failure to keep accurate records is dismissed without prejudice for failure to plead exhaustion of administrative remedies. As to the breach of fiduciary duty claim, the Court is denying defendants' motion to dismiss this claim, but will allow defendants to renew this motion after the parties have conducted limited discovery on the issue of how benefits are determined under the controlling ERISA plans. Defendants' motion to dismiss on the grounds of LMRA preemption is also denied at this juncture without prejudice. Finally, plaintiffs' motion for expedited notice is denied without prejudice to renewal at a later date, if plaintiffs choose to re-plead their FLSA claims and are able to sufficiently plead a cause of action.

As noted by the court in *Nakahata*, 2011 WL 321186 "[t]he very fact that this boilerplate complaint has been used, with identically vague and conclusory allegations, in more than a dozen actions in New York and elsewhere is a vivid demonstrative of how not to plead." *Id.* at *6. If plaintiffs choose to re-plead, their Third Amended Complaint "should not take a blunderbuss approach of alleged wrongs, multiple defendants who are not employers, and random citation of inapplicable statutes." *Id.* Instead, plaintiffs should state more than conclusory statements unsupported by specific factual allegations and should structure their complaint within the boundaries of the Court's decision here.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Date:  March 16, 2011
        Central Islip, NY
                    *    *    *

Plaintiffs are represented by J. Nelson Thomas, Esq. and Michael J. Lingle, Esq. of Thomas & Solomon LLP, 693 East Avenue, Rochester, New York 14607. Defendants are represented by Anthony J. D'Auria, Esq. of Winston & Strawn LLP, 200 Park Avenue, New York, New York 10166.