# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------- x

CLAUDIA DESILVA, GREGG LAMBDIN, : 
KELLY IWASIUK, EILEEN BATES-BORDIES, : Case No. 10-cv-1341 (PKC)(WDW)
MARGARET HALL, AND BRENDA GAINES, :
*on behalf of themselves and all other employees* :
*similarly situated,* :
    :
    Plaintiffs, :
    :
    -against- :
    :
NORTH SHORE-LONG ISLAND JEWISH :     **MEMORANDUM OF LAW IN**
HEALTH SYSTEM INC., NORTH SHORE-LONG:   **SUPPORT OF DEFENDANTS'**
ISLAND JEWISH HEALTH CARE, INC., :     **MOTION TO DECERTIFY**
PENINSULA HOSPITAL CENTER, FOREST :   **PLAINTIFFS' CONDITIONALLY**
HILLS HOSPITAL, FRANKLIN HOSPITAL, : **CERTIFIED COLLECTIVE ACTION**
GLEN COVE HOSPITAL, HUNTINGTON :
HOSPITAL ASSOCIATION, LONG ISLAND :
JEWISH MEDICAL CENTER, LONG ISLAND :
JEWISH HOSPITAL, ZUCKER HILLSIDE :
HOSPITAL, NORTH SHORE UNIVERSITY :
HOSPITAL, PLAINVIEW HOSPITAL, :
SCHNEIDER CHILDREN'S HOSPITAL, :
SOUTHSIDE HOSPITAL, STATEN ISLAND :
UNIVERSITY HOSPITAL, SYOSSET :
HOSPITAL, MICHAEL J. DOWLING, JOSEPH :
CABRAL, AND NORTH SHORE-LONG ISLAND:
JEWISH HEALTH SYSTEM 403B PLAN, :
    :
    Defendants. :

---------------------------------------------------------- x

# TABLE OF CONTENTS

PAGE(S)

I.  INTRODUCTION ................................................................................................ 1

II. FACTS ............................................................................................................... 5

    A.  The North Shore-LIJ Health System ("NS-LIJ") ................................... 5

    B.  Plaintiffs .................................................................................................. 10

III. PROCEDURAL HISTORY ............................................................................... 14

IV. STANDARD OF REVIEW ............................................................................... 15

V.  ARGUMENT .................................................................................................... 15

    A.  Plaintiffs Cannot Establish the Elements of Their FLSA Claims on a Collective Action Basis. ........................................................................... 18

        1.  Whether a Plaintiff Has Been Compensated for All Time Worked is an Individualized Inquiry. ...................................................... 18

        2.  Whether NS-LIJ Knew or Should Have Known That Each Plaintiff Worked Through some or All of Their Meal Breaks is an Individualized Inquiry. ..................................................................... 21

        3.  Whether Time Spent on an Interrupted or Shortened Meal Break is Compensable Under the FLSA is an Individualized Inquiry. ................. 23

        4.  A Collective Action is Ill-Suited to Determine Whether Each Plaintiff Worked Over 40 Hours for Each Week in a Pay Period.......................... 24

        5.  Even Determining Whether a Person Falls Within the Collective Action Definition is an Individualized Inquiry. ...................................... 25

    B.  NS-LIJ Has Individualized Defenses to Plaintiffs' Claims that Cannot Be Resolved Through a Collective Action. ................................................ 26

        1.  Whether a Plaintiff Is Classified as Exempt, and Therefore Ineligible for FLSA Overtime Pay, is an Individualized Inquiry. ................................ 27

        2.  Whether the Statute of Limitations Bars Some or All of Each Plaintiff's Claims is an Individualized Inquiry. ........................................ 28

        3.  Whether a Plaintiff's Claim is *de minimis* is an Individualized Inquiry... 29

        4.  Unionized Plaintiffs are Subject to Additional Individualized Defenses. 30

            a.  Whether the Labor Management Relations Act Bars Each Unionized Plaintiff's Claim is an Individualized Inquiry.............30

            b.  Whether a Plaintiff Exhausted Her Worked Meal Break Claim By Grieving to the Union is an Individualized Inquiry. .....................32

            c.  Regardless of Whether the Plaintiff Received Compensation, the Result of a Grievance May Provide Additional Individualized Defenses of Res Judicata or Double Recovery. .............................33

i

C.    Fairness and Procedural Considerations Require Not Certifying Plaintiffs' Collective Action. .............................................................................................. 34

1.    Proceeding as a Collective Action Would Violate NS-LIJ's Due Process Right to Defend Against Each FLSA Violation. ...................................... 35

2.    Plaintiffs Do Not Have a Manageable Trial Plan for Proceeding as a Collective Action. ................................................................................... 38

3.    Proceeding as a Collective Action Would Violate NS-LIJ's Due Process Because Questions of Individual Damage Calculations Will Overwhelm Common Questions .................................................................................. 41

4.    Plaintiffs and Their Counsel Have Proven Themselves Inadequate to Proceed on Behalf of the Collective Action. ............................................. 42

a.    The Named Plaintiffs' Credibility Problems Make Them Poor Representatives. ...........................................................................42

b.    Plaintiffs' Counsel Has Engaged in Misconduct. ..........................43

VI.    CONCLUSION.......................................................................................................... 44

## **TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Alexander v. Caraustar Indus., Inc.*
  11-cv-01007, 2013 WL 1123615 (N.D. Ill. Mar. 19, 2013) ...................................................37

*Allis-Chalmers Corp. v. Lueck*
  471 U.S. 202 (1985) ...........................................................................................................31

*Anderson v. Mt. Clemens Pottery Co.*
  328 U.S. 680 (1946) ....................................................................................................19, 29

*Armour & Co. v. Wantock*
  323 U.S. 126 (1944) ...........................................................................................................24

*Blaney v. Charlotte-Mecklenburg Hosp. Auth.*
  No. 3:10-CV-592-FDW-DSC, 2011 WL 4351631 (W.D.N.C. Sept. 16, 2011).................3, 23

*Brock v. Superior Care, Inc.*
  840 F.2d 1054 (2d Cir.1988).............................................................................................29

*Calderon v. King Umberto, Inc.*
  892 F. Supp. 2d 456 (E.D.N.Y. 2012) ...............................................................................29

*Camilotes v. Resurrection Health Care Corp.*
  286 F.R.D. 339 (N.D. Ill. 2012)................................................................................. passim

*Cason v. Vibra Healthcare*
  No. 10-10642, 2011 WL 1659381 (E.D. Mich. May 3, 2011) ...........................................3, 23

*Caterpillar Inc. v. Williams*
  482 U.S. 386 (1987)............................................................................................................30

*Chambers v. NASCO, Inc.*
  501 U.S. 32 (1991)..............................................................................................................37

*Comcast v. Behrend*
  133 S.Ct. 1426 (2013)....................................................................................................17, 41

*Creely v. HCR Manorcare, Inc.*
  2013 WL 377282 (N.D. Ohio 2013).........................................................................26, 29, 37

*Daniels v. 1710 Realty LLC*
  497 F. App'x 137 (2d Cir. 2012) .......................................................................................19

*Ellis v. Common Wealth Worldwide Chauffeured Transp. of NY, LLC*
   No. 10-CV-1741 DLI JO, 2012 WL 1004848 (E.D.N.Y. Mar. 23, 2012)..............................22

*Fengler v. Crouse Health Found., Inc.*
   595 F. Supp. 2d 189 (N.D.N.Y. 2009) .................................................................................23

*Friedman-Katz v. Lindt & Sprungli (USA), Inc.*
   270 F.R.D. 150 (S.D.N.Y. 2010) .........................................................................................42

*Frye v. Baptist Mem'l Hosp., Inc.*
   No. CIV. 07-2708, 2010 WL 3862591 (W.D. Tenn. Sept. 27, 2010)..................................3, 23

*Frye v. Baptist Mem'l Hosp., Inc.*
   495 Fed. App'x 669 (6th Cir. 2012) ....................................................................................23

*Giles v. City of New York*
   41 F. Supp. 2d 308 (S.D.N.Y. 1999)....................................................................................33

*Hoffmann v. Sbarro, Inc.*
   982 F. Supp. 249 (S.D.N.Y. 1997) ......................................................................................42

*Holzapfel v. Town of Newburgh, N.Y.*
   145 F.3d 516 (2d Cir. 1998)..............................................................................................3, 24

*Hoops v. Keyspan Energy*
   822 F. Supp. 2d 301 (E.D.N.Y. 2011) .................................................................................31

*Ilano v. H&R Block Eastern Enterprises*
   No. 1:09-cv-22531-CMM, slip op. (S.D. Fla. Nov. 4, 2010) ...............................................28

*In re FedEx Ground Package Sys., Inc., Employment Practices Litig.*
   662 F. Supp. 2d 1069 (N.D. Ind. 2009) ...............................................................................42

*Jacobs v. New York Foundling Hosp.*
   483 F. Supp. 2d 251 (E.D.N.Y. 2007) .................................................................................15

*Jason v. Falcon Data Com, Inc.*
   2011 WL 2837488 (E.D.N.Y. 2011)....................................................................................35

*Johnson v. Big Lots Stores, Inc.*
   561 F. Supp. 2d 567 (E.D. La. 2008) ...............................................................................15, 44

*Kline v. Wolf*
   702 F.2d 400 (2d Cir. 1983)................................................................................................43

*Kuebel v. Black & Decker Inc.*
   643 F.3d 352 (2d Cir. 2011)............................................................................................16, 21

*Lindow v. United States*
  738 F.2d 1057 (9th Cir.1984) ..................................................................................30

*Lugardo v. Prima Pasta & Cafe, Inc.*
  11-CV-1222 MKB, 2013 WL 1386160 (E.D.N.Y. Apr. 4, 2013) ..........................................19

*Lundy v. Catholic Health Sys. of Long Island Inc.*
  711 F.3d 106 ............................................................................................................18

*Mullins v. City of New York*
  653 F.3d 104 (2d Cir. 2011)......................................................................................27

*Myers v. Hertz Corp.*
  624 F.3d 537 (2d Cir. 2010).................................................................................15, 27

*Nakahata v. New York-Presbyterian Healthcare Sys., Inc.*
  No. 10CIV2661(PAC), 2011 WL 321186 (S.D.N.Y. Jan. 28, 2011) ....................................31

*Pacheco v. Boar's Head Provisions Co.*
  671 F. Supp. 2d 957 (W.D. Mich. 2009) ....................................................................38

*Phelan v. Local 305 of United Ass'n of Journeymen, & Apprentices of Plumbing & Pipefitting Indus.*
  973 F.2d 1050 (2d Cir. 1992)....................................................................................34

*Pruell v. Caritas Christi*
  09-cv-11466, Dkt. 141, Slip Op. at 1-2 (D. Mass. May 31, 2013) ..................................4, 37

*Ramos v. Baldor Specialty Foods, Inc.*
  687 F.3d 554 (2d Cir. 2012)......................................................................................27

*Reich v. S. New England Telecomm's Corp.*
  121 F.3d 58 (2d Cir. 1997)....................................................................................23, 29

*Savino v. Computer Credit, Inc.*
  164 F.3d 81 (2d Cir. 1998)........................................................................................42

*Singh v. City of New York*
  524 F.3d 361 (2d Cir. 2008)......................................................................................29

*White v. Baptist Mem'l Health Care Corp.,*
  699 F.3d 869 (6th Cir. 2012) ....................................................................................23

*White v. Baptist Mem'l Health Care Corp.*
  No. 08-2478, 2011 WL 1883959 (W.D. Tenn. May 17, 2011) ..................................... passim

*Wolman v. Catholic Health Sys. of Long Island, Inc.*
  853 F. Supp. 2d 290 (E.D.N.Y. 2012) ....................................................................21, 22

*Young v. Cooper Cameron Corp.*
   586 F.3d 201 (2d Cir. 2009).........................................................................27

*Zivali v. AT&T Mobility, LLC*
   784 F. Supp. 2d 456 (S.D.N.Y. 2011)............................................. passim

STATUTES

29 U.S.C. § 207(a)(1)...............................................................................16, 18

29 U.S.C. § 216(b)............................................................................................15

29 U.S.C. § 255..................................................................................................28

OTHER AUTHORITIES

29 C.F.R. § 541.700(a).....................................................................................27

29 C.F.R. §§ 785.11 & 785.12.......................................................................21

29 C.F.R. § 785.47.............................................................................................30

## I.      INTRODUCTION

This case is one of over a dozen formulaic attacks launched under the Fair Labor Standards Act ("FLSA") by a single law firm against healthcare systems across the Northeast.  In each, the named and opt-in plaintiffs (collectively "Plaintiffs") have alleged that these healthcare providers routinely force them to work through their meal breaks, and avoid paying for any resulting overtime by using so-called "auto-deduct" timekeeping functions.  But, as Plaintiffs' counsel have been reminded by several district courts and the Sixth Circuit, the use of an "auto-deduct" mechanism that pays to the schedule and excludes a 30-minute meal period is not *per se* unlawful.  In each of these cases—and certainly here in the case of the entities comprising North Shore-Long Island Jewish Health System ("Defendants" or "NS-LIJ")—the stated policy is to pay for all hours worked.  And as Plaintiffs admitted in their depositions, NS-LIJ has protocols in place to ensure that employees are paid properly when they work through meal breaks.  For the unionized Plaintiffs, an extra mechanism exists: the grievance process, where the unions vigorously protect their members' rights to proper meal break compensation.  So even on its face, Plaintiffs' case theory appears far-fetched—especially because NS-LIJ paid over $550,000,000 for overtime work during the period relevant to Plaintiffs' FLSA claim.[1]

Ultimately, there is no way to fairly decide the truth or falsity of Plaintiffs' theory on a collective action basis for multiple reasons, including, but not limited to, the following:

- ***Each Plaintiff must rely on his or her particular evidence to prove an FLSA claim.*** Nothing short of personal accounts and documents can show (1) whether a Plaintiff worked over 40 hours in a given workweek, (2) whether the work was done at the behest or benefit of NS-LIJ, and (3) whether NS-LIJ knew of the uncompensated overtime work.  But a collective action demands presentation of only generalized evidence about a hypothetical Plaintiff.  Indeed, the accumulated data from the

---

[1] *See Zivali v. AT&T Mobility, LLC*, 784 F. Supp. 2d 456, 467 (S.D.N.Y. 2011) (defendant's payment of "more than $412 million in overtime compensation between 2006 and 2010 . . . strongly suggests" that managers "routinely honored plaintiffs' requests" for overtime).

various timekeeping practices used over the relevant time period do not reveal instances of uncompensated worked meal breaks—but they do reveal hundreds of millions of dollars in overtime pay that was undoubtedly paid out, in part, due to worked meal breaks that *were* compensated.

- **Calculating a Plaintiff's FLSA-compensable time, and determining whether it was in fact compensated, is an intensive inquiry.** Most Plaintiffs worked fewer than 37.5 hours per week, but FLSA overtime does not "kick in" until the employee has worked over 40 hours in the week. Yet, by collective bargaining agreement or local practice, many of these Plaintiffs were "overtime eligible" for hours over 37.5.

  Consequently, in any week where a Plaintiff claims that she worked through, for example, 5 meal breaks, *with* her supervisor's knowledge and *without* compensation, the trier of fact, while evaluating the credibility of both the Plaintiff and her supervisor, must examine the timekeeping records—the overwhelming majority of which are manual, paper records—and determine (1) how many worked meal breaks she reported through her department's established protocol in that week; (2) whether her supervisor or timekeeper accounted for those worked meal breaks properly when they created the "master timesheet" that was submitted to payroll; (3) whether she was paid any overtime that week (and why); and (4) whether she worked over 40 hours in total that week, and if so, how many overtime hours over 40 did she work that she wasn't compensated for (if any). This exercise must be repeated for *every* person, for *every* week, and for *every* meal break claimed to be both worked and uncompensated.

- **Many Plaintiffs are classified exempt, and thus not entitled to overtime.** NS-LIJ classified 547—about half of the Plaintiffs—as exempt from, and thus ineligible for, overtime under the FLSA for their entire employment with NS-LIJ. To the extent that any Plaintiff challenges his or her exempt status, such a challenge must rest on individualized inquiry because their duties differ from person to person, location to location; they even differ for the same person over periods of time.

- **The statute of limitations bars many claims, but must be analyzed on a case-by-case basis.** Many Plaintiffs' claims are barred because they fall outside of the FLSA statute of limitations, which runs for two years for most claims, and three years for "willful" violations. When a Plaintiff opted in, for what period of time the she seeks relief, and whether the violation is "willful" are not questions reducible to a single "yes or no" answer across the class—but they are necessary to determining whether a claim is time barred.

- **Some work during meal breaks may not be compensable.** If a Plaintiff worked mere minutes of overtime, such work may constitute a *de minimis* FLSA violation that does not require compensation as a matter of law. Nor is a missed meal break compensable if the employee worked it for his own benefit and not his employer's, or

2

if the work was performed primarily to "inflate [his] earnings."[2]

- ***Unionized plaintiffs present additional, individualized inquiries.*** For the claims of the unionized Plaintiffs, NS-LIJ is entitled to show that (1) the Labor Management Relations Act bars their claims here because construing the terms of a collective bargaining agreement is necessary; or (2) the Plaintiff was required to grieve his claim according to the CBA's terms; or (3) if he did and was compensated, that his claim is barred as double recovery, or if he lost, that his claim may be barred by *res judicata*.

As explained below, this case *must* be decertified.   So far, not one plaintiff facing a decertification motion in a healthcare system FLSA "auto-deduct" case has prevailed.[3]  This case should be no different.

In a similar case, one court articulated the fundamental flaws with treating these auto-deduct cases as collective actions:

> As is no doubt evident, the [plaintiffs'] experiences concerning their meal breaks are diverse.  In truth, whether Plaintiffs missed a meal break and reported it varies from assignment to assignment and from [plaintiff] to [plaintiff].   Attempting to generalize a [plaintiff's] experience using a representative sample would be a highly inaccurate method of determining the validity of Plaintiffs' claims.   ***It is senseless to proceed as a collective action when Plaintiffs' experiences regarding missed meals vary from day to day, and from individual to individual.***  Even more troubling is that [the defendant] will not have an opportunity to meaningfully cross examine opt-in Plaintiffs concerning their meal breaks, which will produce unfairness on both sides.

*Camilotes v. Resurrection Health Care Corp.*, 286 F.R.D. 339, 354 (N.D. Ill. 2012) (internal citation omitted; alteration in original).   These concerns ring true here.   The opportunity to individually cross-examine these Plaintiffs is crucial because, inter alia, as class discovery has

---

[2] *Holzapfel v. Town of Newburgh, N.Y.*, 145 F.3d 516, 523 (2d Cir. 1998).

[3] *See, e.g.*, *Blaney v. Charlotte-Mecklenburg Hosp. Auth.*, No. 3:10-CV-592-FDW-DSC, 2011 WL 4351631 at *6 (W.D.N.C. Sept. 16, 2011); *White v. Baptist Mem'l Health Care Corp.*, No. 08-2478, 2011 WL 1883959, at *10 (W.D. Tenn. May 17, 2011), *aff'd* 699 F.3d 869 (6th Cir. 2012); *Cason v. Vibra Healthcare*, No. 10-10642, 2011 WL 1659381 at *3 (E.D. Mich. May 3, 2011); *Frye v. Baptist Mem. Hosp.*, No. CIV. 07-2708, 2010 WL 3862591 at *5 (W.D. Tenn. Sept. 27, 2010); *see also Zivali*, 784 F. Supp. 2d at 462-64; *Camilotes*, 286 F.R.D. at 354.

demonstrated, their affirmations that were signed under penalty of perjury and *which the Court expressly relied upon when granting conditional certification*, are just plain false.

That Plaintiffs' deposition testimonies impugned their written declarations should be no surprise to Plaintiffs' counsel: just three months ago, Thomas & Solomon was monetarily sanctioned, and their clients' collective action claim was stricken for engaging in the identical conduct.  In that case, the plaintiffs "submitted [thirteen] affirmations which [we]re virtually identical" and which included allegations that the plaintiffs "'ha[d] personal knowledge' of various specifics pertaining to the Hospital System's 'centralized payroll process,' 'centralized automatic pay deduction policy,' and 'centralized timekeeping policies.'" Order and Op., *Pruell v. Caritas Christi*, 09-cv-11466, Dkt. 141, Slip Op. at 1-2 (D. Mass. May 31, 2013).  But these statements were false—as the plaintiffs admitted in their depositions.  *Id.* at 2.  Here, Plaintiffs overstepped in an even more egregious way:  not only did they admit in deposition that they have no foundation for dozens of statements in their declarations, but many admit that they were paid for worked meal breaks, or weren't prevented from taking meal breaks, or were responsible for relieving others so those people could take meal breaks—all in direct contradiction to their statements under oath in their previously filed affirmations.  Nearly 200 contradictions are detailed in Exhibits 93 and 94 in the Compendium of Evidence.  Had Plaintiffs not submitted these perjured declarations, we probably would not be here today—more than a year later— because this case would not have been conditionally certified.  For engaging in the same inexcusable conduct as the plaintiffs in *Pruell*, Plaintiffs here should face the same fate: decertification.

## II.    FACTS

### A.  The North Shore-LIJ Health System ("NS-LIJ")

NS-LIJ is the nation's third-largest secular non-profit health care system and employs approximately 46,000 individuals at over 400 locations, which include five tertiary hospitals, three specialty care hospitals, seven community hospitals, one affiliate hospital, nearly 400 ambulatory physician practices and three skilled nursing facilities.[4]  Together, they serve needs such as specialty care, ambulatory care, urgent care, rehabilitation, and diagnostic imaging, among others.[5]

NS-LIJ's written policies are *"to ensure that pay received by health system employees accurately reflects each employee's time worked"* and *"to provide eligible health system employees with an opportunity to take rest periods and meal breaks during the course of a workday."*[6]  Yet its facilities have always had "discretion to independently establish their own tailored . . . practices on meal and rest breaks, overtime authorization, and timekeeping within the requirements of state and federal law."[7]   Notwithstanding NS-LIJ's recent efforts to

---

[4] Santiago Dec. ¶¶  2,3.

[5] Santiago Dec. ¶ 4, Ex. 1.

[6] Santiago Dec. ¶¶ 8-9, Exs. 5,6 NS094991 (Overtime Policy), NS094989 (Meal Time and Rest Periods Policy).

[7] Bosco Dec. ¶ 5; *see also* Salvo (Glen Cove) Dep. 56:13-57:1 (prior to Kronos implementation, managers had some discretion in choosing a timekeeping method for their department, but it had to be consistent with FLSA and hospital policies); Bardolf Dec. ¶¶ 5-6 (recently acquired facilities "have substantially maintained their diverse pre-existing human resource and timekeeping practices" and "Corporate Human Resources does not dictate practices regarding meal and rest breaks, overtime authorization and timekeeping at the various facilities"); Springstead (SIUH) Dec. ¶¶ 3, 4 ("SIUH independently developed its own timekeeping and meal and rest break policies [that] it retains," which are to "pay employees in accordance with the . . . FLSA"); Wiggins (PAANS) Dec. ¶ 9 ("Directors and managers at each practice have discretionary authority to implement timekeeping policies within the requirements of the law and the Health System's policies.").

standardize its timekeeping and payroll services, many facilities still use older methods.[8, 9]

The NS-LIJ facilities have, consistent with their discretion, developed various methods for allocating break time. For example, some facilities give their employees the option to combine unpaid 30-minute meal breaks with one or two 15-minute rest breaks.[10] Other locations

---

[8] Citations in footnotes to any of Plaintiffs' sworn statements are indicated in bold and named plaintiffs' statements are in bold and italicized.

[9] *E.g.*, **Bates-Bordies Dep.** 115:12-116:3, 117:6-20 (describing Southside's practice of fingerprint scanning for time entries upon arrival and departure); ***Gaines Dep.*** 75:11-25 (when she acted as nurse superviser at LIJMC, she called the nurse's office to report once all nurses had arrived); **Perniciaro Dep.** 17:10-19:21 (filled out a "daily activity" sheet); **Hayes Dep.** 127:17-128:8 (signed in and recorded scheduled shift hours in a binder, and then recorded any hours worked beyond scheduled shift on a separate form); **Casaceli Dep.** 144:4-25 (as a per diem RN at Manhasset, she used three different methods of recording her hours worked over time: paper timesheets; forms where she would write when she started her shift and when she finished completing all work duties; and fingerprint scanning); Bosco Dep. 153:16-154:3 (Home Health Aides use "Santrax," a telephone system); Goldberg (Plainview and Syosset) Dep. 9:16-10:7 (employees use timecards, not Kronos); Weisenbach (Lenox Hill) Dep. 29:21-25, 31:11-22 (some employees use time clocks or paper timesheets, and other employees do not record their time at all as it is assumed that they work their scheduled shift); Wiggins (PAANS) Dep. 13:11-14:7, 19:15-20:3 (PAANS facilities use several different timekeeping methods: time clocks where employees punch in and punch out; sign in sheet/sign out sheets; Kronos (could be biometric, time stamp, and/or badge swipe); and employees e-mailing supervisors when they come and go); Bosco Dec. II ¶ 4 (Plainview, Syosset, and Forest Hills currently use ANSOS for scheduling and timekeeping). *See also* Krock Dec. ¶¶ 10-14, 25.

[10] ***Gaines Dep.*** 108:13-109:1 (aides on floor 5N at LIJMC given a one-hour combined break that could be divided or used "any way they wanted"); **Casaceli Dep.** 130:8-131:10 (could combine one 30-minute break and two 15-minute breaks); **Correa-Tiernan Dep.** 132:5-7 (same); **Viola Dep.** 39:11-23, 113:14-22 (same); Fisher (Franklin/Forest Hills) Dec. ¶ 16 (department directors have discretion whether to allow employees to combine meal and rest breaks); Goldberg (Plainview and Syosset) Dec. ¶ 22 (department directors develop their own policies and practices for combining meal and rest breaks, but some CBAs dictate whether and how employees may combine meal and rest breaks; RNs at Plainview may combine one or both of their rest breaks with their meal break with the consent of their supervisor, but RNs at Syosset who are scheduled to work 12.5 hours may combine only one of their rest breaks with their meal break with the consent of their supervisor); Bentson (NSUH) Dec. ¶ 15 (in smaller units, a long-standing practice for RNs is to combine their meal period with one rest break; in larger units, employees may not be allowed to combine their breaks because it may prevent other employees from taking their breaks).

are stricter about how an employee must take his or her break time.[11]  Similarly, the facilities

also give employees varying control over when they take breaks.  For example, in some facilities

and/or departments, meal breaks are expressly scheduled,[12] yet in others, the employees figure

out meal breaks amongst themselves depending on the day's circumstances.[13]  At some

locations, departmental or facility administrators have changed practices during the relevant time

period.[14]

    NS-LIJ also has policies and procedures in place to ensure that employees receive pay

properly.  All employees must review their facility's timekeeping policies and participate in

---

[11] **Yang Dep.** 150:18-151:5 (employees at Forest Hills may not combine meal and rest breaks or take comp time for missed breaks); **Sesso Dep.** 73:6-10 (could not combine paid and unpaid breaks); Cenac (Zucker Hillside) Dec. ¶ 10 (employees who work in the Access Services Department are generally not permitted to combine meal and rest breaks).

[12] **Bharat Dep.** 154:6-155:3 (charge nurse put together a daily meal break schedule); *id.* 154:16-155:6 (the purpose of making a meal break schedule was so that "somebody [was] always there.");  **Haas Dep.** 72:8-13, 73:4-11 (there was a schedule for meal breaks in the neonatal ICU; first lunch was from 11:30 a.m. to 12:30 p.m. and second lunch was from 12:30 p.m. to 1:30 p.m.); **Kohler Dep.** 44:22-45:20 (as a charge nurse she scheduled meal and rest breaks to ensure everyone has an opportunity to take them); *Iwasiuk Dep.* 161:4-162:8, 162:25-163:12 (supervisors wrote the meal break schedule on a dry erase board); Hermann (LIJMC) Dep. 41:18-42:13 (times for meal breaks are posted daily on assignment sheets for nurses, and employees are expected to take their meal breaks during their assigned times); Weisenbach (Lenox Hill) Dep. 17:21-23 (ambulatory care representatives' meal breaks are scheduled); Bentson (NSUH) Dec. ¶ 14 ("Meal breaks are always scheduled to some degree, but the units maintain flexibility to reschedule breaks as needed; *Lambdin Dep.* 187:4-15 (supervisor assigned staggered meal periods to allow duty-free meal breaks); Pascuzzo (Cohen) Dec. ¶ 18 ("In the Nursing Department, the supervisor assigns all employees one of three meal times in the middle of their shifts to take their meal break.  An employee who believes he or she will not be able to take a meal break at the scheduled time informs the supervisor, who then switches that employee's meal time with that of another employee."); Finkelstein (Hungtington) Dec. ¶ 10 (creates work schedules to ensure coverage for meal and rest breaks).

[13] **Viola Dep.** 38:17-39:10 (nurses at SIUH "work it out amongst ourselves"); *Hall Dep.*188:16-21, 276:18-21 (at NSUH nurses coordinated with each other to cover meal periods and breaks); *Gaines Dep.* 20:12-21:2 (explaining that LIJMC nurses would "schedule their lunches themselves"); Doyle (Post-Acute Svcs.) Dec. ¶ 18 (Home Care Network "Field employees (Field RNs, Occupational Therapists, Physical Therapists and Speech Pathologists) are largely autonomous in that they have authority to schedule their own work days and meal breaks.").

[14] *See, e.g.*, **Casaceli Dep.** 109:25-113:15 (describing changing practices at NSUH).

timekeeping training.[15]   Supervisors are trained to give employees opportunities for meal and

rest breaks, and to ensure employee time worked is employee time paid, including how to ensure

proper pay when meal periods are worked—in whole or in part.[16]   But even the method of

---

[15] **Perniciaro Dep.** 190:15-192:1 (North Shore Home Care agencies had orientations where employees learned about timekeeping); **Viola Dep.** 78:22-80:3, 87:20-88:15 (received location-specific training about meal breaks and timekeeping policy from Home Health Agency and SIUH Department of Medicine); **Casaceli Dep.** 86:16-88:21 (received training on timekeeping when she first started); ***Iwasiuk Dep.*** 107:20-108:9, 109:8-15 (admitting that she knew she needed to read, understand, and follow the policies in the handbook which included information regarding accurately recording time worked); Goldberg (Plainview and Syosset) Dep. 33:14-34:2 (employees at Plainview and Syosset are trained on timekeeping by the particular manager or timekeeper during orientation); Fisher (Franklin/Forest Hills) Dep. 58:11-20 (at Forest Hills' new employee orientation, employees review timekeeping practices and procedures); Duke (NSUH) Dep. 40:9-41:14, 46:3-13 (employees are trained at departmental orientation and throughout their employment about timekeeping; when employees change departments or facilities, they are reoriented about timekeeping); Weisenbach (Lenox Hill) Dep. 59:1-16 (department orientations cover where schedules are located, how to notify a manager of overtime worked, and how to request time off); Sabatino (Post Acute Care) Dep. 52:18-53:6 (Employees are instructed to notify their supervisor for missed meal breaks when they are oriented and periodically throughout the year there are presentations and refreshers on payroll practices and the FLSA); Wiggins (PAANS) Dec. ¶ 6 (employees participate in department-specific orientation that includes training on timekeeping and meal and rest breaks); Ross (Hospice Care) Dec. ¶ 6-7 (during orientation, employees receive training on meal breaks and timekeeping); Finkelstein (Huntington) Dec. ¶ 5-6 (during orientation, employees are "provided with information regarding the specific policies of the department, time and attendance policies, and policies regarding work hours, meal breaks, and rest breaks."); Quartier (Huntington) Dep. 52:12-53:10 (employees instructed on timekeeping policies and procedures during orientation).

[16] **Yang Dep.** 90:18-91:5 (as assistant director of nursing, informed nurse managers and patient directors that they were authorized to sign an employee's timecard to approve overtime for missed meal or rest breaks); ***Gaines Dep.*** 108:13-109:13 (when she was oriented for learning how to do scheduling, the director or nursing supervisor directed her to schedule aides' a one-hour break); **Bharat Dep.** 195:22-196:3 (describing nurse manager as stating that nurses must take meal breaks); **Correa-Tiernan Dep.** 149:19-151:20 (department head instructed her to record missed meal break in log book and was paid for it); Salvo (Glen Cove) Dep. 54:2-56:7 ("Managers receive a management orientation" where "[t]hey are made aware of the policies and procedures, including those that pertain to timekeeping."  Managers also have one-on-one meetings with Human Resources to discuss general expectations that employees' time be managed, recorded, and that there is an expectation at Glen Cove that employees be paid for all hours worked); Norr (Zucker Hillside) Dep. 46:14-49:11 (managers receive annual training on meal breaks and overtime rules, including how employees get paid if they work through a meal break); Wiggins (PAANS) Dep. 41:19-42:1, 46:21-47:22; Cohen (LIJMC) Dec. ¶ 13 ("Under

8

recording time can vary: some departments' systems reflect use of a meal period override code and others merely reflect the accurate total hours worked, with the resulting proper pay.[17]   At all levels, systemwide and departmental trainings reaffirm the importance of taking meal breaks.[18]   Some NS-LIJ departments require specific recording of start and stop times for meal breaks;[19] others have procedures to log missed or interrupted meal breaks so that the total time worked is accurately recorded.[20]   These measures have proven effective—NS-LIJ paid out 13,346,575

relevant policy, if a supervisor is informed that an employee worked through lunch, then the supervisor is expected to approve such overtime"); Wiggins (PAANS) Dec. ¶ 10.

[17] Bosco Dec. ¶ 5.

[18] Sabatino (Post Acute Care) Dec. I ¶ 14 ("When I attend management meetings at Post Acute Care facilities, I remind managers/supervisors to follow relevant policies regarding meal and rest breaks."); *see also* **Bharat Dep.** 195:22-196:3 (describing nurse manager as stating that nurses must take meal breaks); **Correa-Tiernan Dep.** 149:19-151:20 (department head instructed her to record missed meal break in log book and was paid for it).

[19] *Iwasiuk Dep.* 198:3-22 (punched in and out for meal periods while employed as an RN at Southside Hospital); Sabatino (Post Acute Care) Dec. II ¶ 14 (At CEMS, EMTs and Paramedics report to work by calling a dispatcher, "and the dispatcher logs the employee on to the Computer Added Dispatch system ("CAD").  CAD records the exact time that employees report in for work and when they report for lunch."); Weisenbach (Lenox Hill) Dep. 35:20-36:5 (ambulatory care employees record time out and in for meal breaks).

[20] **Green Dep.** 116:9-25 (describing LIJMC physician assistant practice of maintaining log book for reporting missed meal breaks); **Sesso Dep.** 61:11-22 (nurses in Southside's ER used a log book to record overtime or missed meal breaks); **Viola Dep.** 111:16-25 (was instructed to report missed meal period to assistant director of nursing); *Iwasiuk Dep.* 132:6-12 (describing how she would fill out a slip stating that she missed her meal break so she could be paid for it); **Kohler Dep.** 50:24-51:15 (fills out a form to request pay for a missed meal period; prior practice was to get supervisor to sign timecard to approve missed meal period payment); **Barrett Dep.** 40:22-41:24 (when informed by nurse that she is working through a meal break, supervisor will determine whether nurse can take the meal break later, and if not, then the nurse would be paid for that time); Weisenbach (Lenox Hill) Dep. 15:24-16:10, 64:9-65:2 (employees in the dietary department report missed meal breaks to their supervisor verbally, while other departments use an overtime slip); Goldberg (Plainview and Syosset) Dep. 15:25-16:7 (verbal, email, or written note); Sabatino (Post Acute Care) Dep. 47:25-49:8, 52:2-14 (can notify supervisor verbally, by email, or in writing, or could tell their supervisor's boss, the timekeeper, human resources on-site, human resources at the Home Care facility where Sabatino is, or payroll); Hermann (LIJMC) Dep. 21:6-16 (if a nurse works during their meal period, it would be noted on a change sheet and the nurse is paid for it); Wiggins (PAANS) Dep. 37:13-38:3 (where an employee is unable to take their meal break he/she would notify his/her supervisor to be paid for that time; there is no one method for doing so across all PAANS facilities).

overtime hours, totaling $551,746,848, between March 24, 2007 and February 24, 2013.[21]

### B. Plaintiffs[22]

On March 8, 2012, the Court conditionally certified a collective action of all "[h]ourly employees involved in direct patient care responsibilities whose scheduled hours include a deduction for an unpaid meal break and who would have had to report performing work during meal breaks in order to be paid for such work."[23]  Of the 17,779 people who received notice, only 4.6 percent chose to opt in (although an additional 138 people had opted-in *pre*-notice).[24]

The opt-in Plaintiffs work or worked in 395 departments in 39 business units at 59 locations.[25]  They hold or held 235 different positions during the claim period.[26]  They work in positions as varied as Telemetry Technician, Cook's Helper, field nurse, RN case manager, and emergency medical technician, are composed of union and non-union members, work on and off site, and have varying degrees of patient responsibility.[27]  And even those who perform direct patient care often have very different tasks involving varying levels of patient interaction,

---

[21] Krock Dec. ¶ 58.9.3.

[22] Because some Plaintiffs have withdrawn consent (*see* Krock Dec. ¶¶ 7, 22) and because some Plaintiffs have no data in NS-LIJ's system (*see* Krock Dec. ¶¶ 57.1, 57.2),  the statistics presented here may vary slightly from the current opt-in list.  For the purposes of this brief, and adopting Dr. Krock's analysis, NS-LIJ relies on the February 6, 2013 list of opt-in Plaintiffs and employment data collected through the dates as described in Dr. Krock's declaration, minus those for whom Dr. Krock located no data.  Krock Dec. ¶ 7.  As Dr. Krock notes, minor variations in the class list do not affect his conclusions.  Krock Dec. ¶ 7.

[23] Dkt. 212.

[24] Krock Dec. ¶¶ 61, 62.

[25] Krock Dec. ¶¶ 12, 14, 26.

[26] *Id.* ¶ 24.

[27] *Hall Dep.* 185:9-16, 329:25-330:4 (had direct patient care duties when working as off-site field nurse for Home Care and on-site nurse manager at Manhasset, but not when working as floor nurse at Manhasset); **Abrams-Brown Dep.** 19:1-20:22, 31:8-10 (as non-unionized RN case manager, did not provide direct patient care); **Hayes Dep.** 73:25-74:2 (at SIUH, started as an non-unionized per diem EMT, then became a unionized part-time EMT); Krock Dec. ¶ 24.

person-to-person and week-to-week.[28]

Because Plaintiffs work in different job positions in different departments, they schedule their meal breaks differently.[29]  They also record their time differently.  Plaintiffs testified that some employees punch a time clock, recording the times they started work, left for a meal period, returned from a meal period, and ended work.[30]  Others who punch a time clock may record only the times they started and ended work for the day.[31]  For some of these, if they

---

[28] *Hall Dep.* 329:25-330:23 (as field nurse, amount of time spent on direct patient care versus non-direct patient care "varied day to day" based on number of patient visits, type of patient visits, and whether patient had additional needs); **Viola Dep.** 35:7-11, 36:5-7, 36:18-37:17 (staff nurse who,  every other week, took on charge nurse responsibilities of hearing and reporting complaints from other employees); **Green Dep.** 57:4-21 (physician's assistant's direct patient care duties include ordering tests, making diagnosis, and treating patients).

[29] **Bharat Dep.** 154:6-155:3 (charge nurse in the post-op surgery unit put together a daily meal break schedule); *DeSilva Dep.* 115:1-116:12 (admitting that she has the ability to schedule 30 minutes in her day to take a meal break); *Compare Gaines Dep.* 20:2-21:2 (describing LIJMC nurse overnight shift as 12.5 hours, 3 times a week, where nurses determine their own meal breaks) *with id.* at 29:8-30:7 (as a supervisor at LIJMC, she scheduled time for aides to take lunch during their 8-hour shift); **Haas Dep.** 72:8-13, 73:4-11 (there was a schedule for meal breaks in the neonatal ICU; first lunch was from 11:30 a.m. to 12:30 p.m. and second lunch was from 12:30 p.m. to 1:30 p.m.); **Kohler Dep.** 45:11-46:5 (as a charge nurse she schedules breaks to ensure everyone has an opportunity to take them); *Iwasiuk Dep.* 161:4-162:8, 162:25-163:12 (supervisors wrote the meal break schedule on a dry erase board); **Viola Dep.** 38:17-39:10 (nurses at SIUH "work it out amongst ourselves"); **Hall Dep.** 188:16-21, 276:18-21 (at NSUH nurses coordinated with each other to cover meal periods and breaks); **Perniciaro Dep.** 78:4-25 (from 2004-2005 the time she took lunch would vary), 124:4-14 (as a nurse liaison, it was up to her to decide when she wanted to take a meal break); Hermann (LIJMC) Dep. 41:18-42:13 (times for meal breaks are posted daily on assignment sheets for nurses, and employees are expected to take their meal breaks during their assigned times); Doyle (Post-Acute Svcs.) Dec. ¶ 18 (Home Care Network "Field employees (Field RNs, Occupational Therapists, Physical Therapists and Speech Pathologists) are largely autonomous in that they have authority to schedule their own work days and meal breaks.").

[30] *Iwasiuk Dep.* 198:3-22 (punched in and out for meal periods while employed as an RN at Southside Hospital); Weisenbach (Lenox Hill) Dep. 35:20-36:5 (ambulatory care employees record time out and in for meal breaks).

[31] **Yang Dep.** 67:9-68:1 (RNs punch in then they arrive and punch out when they leave with a timecard); **Bharat Dep.** 100:3-101:2 (records time by clocking in when she begins working and out when ready to leave).

11

worked through part or all of their meal period, they handwrite a notation on the punch card;[32] others notify a supervisor who makes the notation for the employee.[33]   Notification to the supervisor can come for some on an ad hoc, informal basis,[34] while others make a notation on a sign-in sheet,[35] time log,[36] or fill out an exception form.[37]

Still other employees record their time on handwritten time sheets[38]—either accounting

---

[32] **Kohler Dep.** 51:10-15 (supervisor signed timecard to approve missed meal period payment); **Yang Dep.** 89:19-90:7 (nurses note missed meal break on timecard, and as the assistant director of nursing, Ms. Yang signed the timecards to authorize missed meal break pay).

[33] **Yang Dep.** 87:23-88:7 (employees notify supervisors of missed meal break, and supervisors sign their timecard indicating no meal break); **Fisher Dep.** 44:19-24 (same); Norr (Franklin) Dec. ¶ 20 (managers indicate approval on the sign-in log for overtime from missed meal breaks or working beyond scheduled shift).

[34] Sabatino (Post Acute Care) Dep. 47:25-49:8, 52:2-14 (can notify supervisor verbally, by email, or in writing, or could tell their supervisor's boss, the timekeeper, human resources on-site, human resources at the Home Care facility where Sabatino is, or payroll); Weisenbach (Lenox Hill) Dep. 15:24-16:10, 64:9-65:2 (employees in the dietary department report missed meal breaks to their supervisor verbally while other departments use an overtime slip); Goldberg (Plainview and Syosset) Dep. 15:25-16:7 (employees can notify their supervisor or a timekeeper verbally, via email, or by written note); Wiggins (PAANS) Dep. 37:13-38:3 (where an employee is unable to take their meal break he/she would notify his/her supervisor to be paid for that time; there is no one method for doing so across all PAANS facilities); Esposito (SIUH professional corporations) Dec. ¶ 17 (Ocean View Management has written policy requiring employees who are unable to obtain pre-approval for overtime to notify their department head on the next business day, and are compensated for working through a meal break or beyond a scheduled shift even if approval was not obtained in advance).

[35] Kao (NSUH) Dec. ¶ 15 ("the Pharmacy Department has no separate form for noting overtime. It is noted on the sign-in sheets, and the supervisor signs or initials the entry.  The timekeeper then knows to enter the additional time on the payroll time sheet.")

[36] **Green Dep.** 116:9-25 (describing LIJMC physician assistant practice of maintaining log book for reporting missed meal breaks); **Sesso Dep.** 61:11-22 (nurses in Southside's ER used a log book to record overtime or missed meal breaks); Finkelstein (Huntington) Dec. ¶ 12 (employees record additional work time in log book).

[37] *Iwasiuk Dep.* 132:6-12 (describing how she would fill out a slip stating that she worked through her meal break so she could be paid for it); **Kohler Dep.** 100:3-16 (fills out a form to request pay for a missed meal period); Hermann (LIJMC) Dep. 14:19-15:6, 58:20-59:9 (timekeepers made changes on a daily basis in ANSOS time-keeping system to adjust work time in ANSOS if they received a change sheet noting that an employee worked through his or her meal break.).

[38] Weisenbach (Lenox Hill) Dep. 35:20-36:5 (ambulatory care employees record time out and in for meal breaks).

precisely for the time in/out for meal periods, or writing down the net hours worked, or in and out times, for each day, not including their meal breaks.[39]   Most, but not all, of the above systems require a supervisor to transpose the net hours worked, as recorded by the employees, onto a "master time sheet" for the unit or department each week.[40]

Many plaintiffs receive overtime pay beyond what the FLSA requires—under their union contract or as an employment benefit.[41]   Even some employees who are exempt from and thus

---

[39] **Perniciaro Dep.** 22:17-23:20 (describing how she filled out a time sheet daily with her in and out times); Ross (Hospice) Dep. 34:7-35:2; 54:13-57:11 (each employee writes down the number of hours and minutes he or she work each day and employees are paid based on the number of hours and minutes the employee writes down on the time sheet); Doyle (Post-Acute Svcs.) Dec. ¶ 34 (Each biweekly pay period, Home Care Network clerical employees (for all agencies except Region Care Nursing) transfer information from field employees' Daily Activity Vouchers to a sign in sheet, which notes the total hours employees worked each day.  [] Time keepers, who are generally clerical employees, manually transcribe information recorded on the daily sign in sheets to paper time sheets on a biweekly basis.  Time sheets contain information regarding the total hours worked each day and the total amount of overtime worked each pay period.").

[40] Goffin (SIUH) Dec. ¶ 14 (after supervisor reviews and approves time entries in log book, the supervisor directs the payroll coordinator to enter recorded work time into payroll program for processing); Goldberg (Plainview and Syosset) Dep. 30:14-19 (information from timecards is transferred to a paper time sheet and given to payroll); Weisenbach (Lenox Hill) Dep. 23:13-25:19 (timesheets are gathered and placed on a larger official timesheet by a manager or supervisor who submits the larger timesheet to payroll); Wiggins (PAANS) Dec. ¶ 15; *see* Salvo (Glen Cove) Dep. 37:16-39:3 (a big payroll timesheet is submitted to payroll which corporate payroll uses to process employees' checks).

[41] **Green Dep**. 30:17-23 (explaining that he is paid at time-and-a-half for work over 37.5 hours in a week); Finkelstein (Huntington) Dec. ¶ 7 ("Prior to December 15, 2012, Overtime was considered any work time over 7.5 hours in a single work day.  After December 15, 2012, work hours were only considered Overtime if the employee worked more than 37.5 hours in a single workweek); Wiggins (PAANS) Dec. ¶ 8 (non-exempt employees are paid premium overtime when they work hours exceeding their full-time schedule in one work week (*i.e.*, 35, 37.5, or 40 hours); exempt employees who are eligible to receive premium overtime pay are paid overtime when they work more than their full-time schedule in a biweekly payroll period (*i.e.*, 70, 75, or 80 hours)); Quartier (Huntington) Dec. ¶ 15 (nonunion non-exempt employees are paid for overtime after 37.5 hours); Cohen (LIJMC) Dec. ¶ 15 (under the CBA with SEIU, certain employees are paid premium overtime for work in excess of 37.5 hours in a week; others are paid premium overtime for work in excess of 35 hours in a week); Kao (NSUH) Dec. ¶ 4 (overtime after 37.5 hours);  Goldberg (Plainview and Syosset) Dec. ¶ 18 (Full-time, nonunion employees are paid overtime when their weekly hours exceed 37.5.  Part-time, nonunion employees are entitled to daily overtime when they exceed the number of hours in their daily

not legally entitled to statutory overtime are paid premium pay for working beyond their scheduled hours.[42]  Indeed, NS-LIJ has classified 547 of the 1,051 opt-in Plaintiffs as exempt throughout their entire employment during the relevant time period.[43]

## III.   PROCEDURAL HISTORY

Plaintiffs filed the Third Amended Complaint on April 11, 2011 alleging eleven claims, including violations of the FLSA, RICO, ERISA, New York State Labor Law and common law.[44]  Only the FLSA and state labor law claims remain.[45]  Plaintiffs filed a motion to conditionally certify under the FLSA approximately one month later, which the Court granted.[46] Before notice was even sent out, a number of Plaintiffs—138 to be precise—already opted in, perhaps as a result of Plaintiffs' counsel's earlier unauthorized and materially inaccurate notice as discussed *infra* in Part V.C.4.a.  Notice was sent to 17,779 individuals.  Altogether, 1,064 people opted in through February 6, 2013.[47]  At least 13 have since withdrawn their consent to be Opt-in Plaintiffs as of March 27, 2013, and many of these had been people who had opted-in

---

scheduled shifts.); Cenac (Zucker Hillside) Dec. ¶ 12 (Full-time' SEIU Local 1199 employees who are scheduled to work 5 days a week are paid daily overtime if they work over 7 or 7.5 hours a day").

[42] Goldberg (Plainview and Syosset) Dep. 41:14-43:18 (clinical practice coordinators are exempt and overtime eligible; social workers are exempt and overtime eligible, they sign in only, and if they work beyond their shift, they communicate with their supervisor about the additional time worked); Wigging (PAANS) Dec. ¶ 3 (exempt employees are eligible for premium pay when they work beyond their scheduled hours); Pascuzzo (Cohen) Dec. ¶ 8 (employees classified as exempt but eligible for overtime are entitled to premium overtime if they work in excess of 37.5 hours per week).

[43] Krock Dec. ¶ 58.9.1.

[44] Dkt. 163.

[45] *Id.* at 51-52, 56; Mem. and Order, Dkt. 210, at 17 (Mar. 7, 2012).

[46] Dkt. 164, Dkt. 212.

[47] The parties dispute the number of proper opt-in plaintiffs, given that many of the opt-in notices were late filed.  Dkt. 230 (Order setting 60-day deadline for opt-ins to file consent, which expired on February 5, 2013); *see, e.g.*, Dkts. 296, 297, 302, 303, 308, 311.  For the purposes of this motion only, North Shore-LIJ assumes that all putative opt-in plaintiffs are opt-in Plaintiffs; however, Dr. Krock's analysis is based on the 1,051 opt-ins described above.  Plaintiffs' counsel moved to withdraw as counsel for an additional 13 due to their refusal to participate in discovery. *See* Dkt. 339, 343-1.

pre-notice, leaving no more than 1,051 opt-ins.[48]

## IV.   STANDARD OF REVIEW

The Second Circuit applies a two-step framework for FLSA collective action certification—conditional certification, followed by discovery and then final (de)certification. *Myers v. Hertz Corp.*, 624 F.3d 537, 554-55 (2d Cir. 2010).  Now, "[a]t [this] second stage," the Court  must "determin[e] whether the plaintiffs who have opted in are in fact 'similarly situated' to the named plaintiffs."  *Id.* at 555; *see* 29 U.S.C. § 216(b).  "[A] more heightened scrutiny" applies now, "[w]hen the case is in its later stages." *Jacobs v. New York Foundling Hosp.*, 483 F. Supp. 2d 251, 265 (E.D.N.Y. 2007); *see Zivali v. AT&T Mobility, LLC*, 784 F. Supp. 2d 456, 460 (S.D.N.Y. 2011).

This Court considers three factors to determine whether plaintiffs are "similarly situated": "(1) disparate factual and employment settings of the individual plaintiffs; (2) defenses available to defendants which appear to be individual to each plaintiff; and (3) fairness and procedural considerations counseling for or against [collective action treatment]."  *Zivali*, 784 F. Supp. 2d at 460 (quotations and citations omitted); *see Jacobs*, 483 F. Supp. 2d at 265 (same).  "These three factors are not mutually exclusive, and there is considerable overlap among them." *Johnson v. Big Lots Stores, Inc.*, 561 F. Supp. 2d 567, 574 (E.D. La. 2008).

## V.   ARGUMENT

As with every other hospital "auto-deduct" case that has been de-certified at this stage, *e.g.*, *Camesi*, *Camilotes*, *Taylor*, and *Kuznyetsov* (among others), nothing about this purported collective action hints at a case triable on common evidence.  Simply put, Plaintiffs' claims are too factually specific for Plaintiffs to be similarly situated.  To prove an FLSA claim, each Plaintiff must show, for each pay period, (1) that she worked overtime beyond 40 in a workweek,

---

[48] Krock Dec. ¶¶ 61, 62.

(2) that she was not compensated for that overtime work, and (3) that NS-LIJ knew or should have known that she was working off the clock.  *Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 361 (2d Cir. 2011); *see* 29 U.S.C. § 207(a)(1).  Each of these elements requires intensively examining the facts of each supposedly worked meal break—facts which cannot possibly be proven at one trial for 1,051 opt-ins and over 131,204 work weeks.[49]  Whether a Plaintiff has worked over 40 hours, whether the work was compensable FLSA overtime, and whether NS-LIJ knew of the overtime work are all inquiries that require personal accounts and documents, not the generalized, prototypical evidence of a collective action.

NS-LIJ's defenses are no less individualized.  First, a significant majority of the opt-in Plaintiffs' claims will fail because NS-LIJ has properly classified them as exempt, and therefore ineligible for FLSA overtime.  To the extent they challenge their exempt status, that challenge must rest on individualized inquiry because their duties differ from location to location.

Second, others' claims will be barred because they fall outside of the FLSA statute of limitations, which runs for two years for most claims, but three years for willful violations. When a Plaintiff opted in, for what period of time the Plaintiff seeks relief, and whether the violation is "willful" are not questions reducible to a single "yes or no" answer across the class— but they are necessary to determining whether a claim is time barred.

Third, if a Plaintiff worked mere minutes of overtime, such work may constitute a *de minimis* FLSA violation that does not require compensation.

Fourth, for the claims of the unionized Plaintiffs, NS-LIJ is entitled to show that, (1) the Labor Management Relations Act bars suit here because construing the terms of a collective bargaining agreement (CBA) is necessary; (2) the Plaintiff was required to grieve his claim

---

[49] Krock Dec. ¶ 58.8.1.

according to the CBA's terms, and (3) if he did and was compensated, that his claim is barred as double recovery, or if he lost, that his claim may be barred by res judicata.

Furthermore, fairness and procedural considerations require decertification. NS-LIJ must be able to test whether each Plaintiff was factually and legally entitled to overtime pay and whether she actually received it, on a weekly basis. Many of the deposed Plaintiffs have made sworn statements in their declarations and/or interrogatory responses that materially contradicted their deposition testimony. Others made statements in their declarations under oath, only to admit at deposition that they had no basis with which to know whether the written statement was true or false. NS-LIJ has a due process right to test the credibility of each Plaintiff's claims, but, lumped together, the factfinder will be unable to consider the merits of their cases separately.

Practically speaking, presenting (and defending) this case at trial would be a logistical and evidentiary impossibility. To prove each claim, given the differences that exist and the inappropriateness of sampling collective action liability, Plaintiff would have to put on evidence for each of the 1,051 opt-in Plaintiffs, because no sample could appropriately reflect a week-by-week analysis of whether each Plaintiff worked, recorded, and was paid overtime. And anything less would compromise NS-LIJ's ability to defend itself. The same arguments apply to damages—*i.e.*, NS-LIJ has a right to have any damages assessed tied to the liability it faces. But if the case is tried collectively and some amount is awarded collectively, then, some Plaintiffs will be overcompensated while others are undercompensated. As the Supreme Court's recent holding in *Comcast v. Behrend*, 133 S. Ct. 1426 (2013), demonstrates, this "close enough" tactic is insufficient.

Lastly, the Plaintiffs and their counsel have demonstrated that they are not up to the task of proceeding with this action on behalf of 1,051 opt-ins. For the named Plaintiffs' part, their

credibility puts the entire class at risk of having their claims jeopardized for reasons apart from the merits.   As for counsel, as will be explained further below, their dilatory tactics are inexcusable.   Accordingly, decertification is warranted here.

### A.   Plaintiffs Cannot Establish the Elements of Their FLSA Claims on a Collective Action Basis.

#### 1.   Whether a Plaintiff Has Been Compensated for All Time Worked is an Individualized Inquiry.

Requiring an employee to work through a meal period is not an FLSA violation, unless both the employer failed to compensate for the time worked—and the missed meal period caused the employee to work over 40 hours in the workweek.   29 U.S.C. § 207(a)(1); *Lundy v. Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106, 114 (2d Cir. 2013).   To determine whether each Plaintiff was paid for all time worked, the trier of fact must, at a minimum, consider several pieces of evidence for each workweek in which overtime is claimed: (1) the Plaintiff's trial testimony of the time worked, (2) the employee's paystub, (3) the employee's timecard, and (4) the trial testimony of others who, along with the Plaintiffs, shared responsibility for accurate timekeeping, including supervisors or other employees who document time.   Just considering the number of payroll and timekeeping mechanisms used by NS-LIJ locations, this is no easy task. *See supra* (describing methods of recording time).   Because each week of underpaid overtime constitutes a separate violation, the jury would have to repeat this task for *each week*.   *Lundy*, 711 F.3d at 114 ("[I]n order to state a plausible FLSA overtime claim, a plaintiff must sufficiently allege 40 hours of work *in a given workweek* as well as some uncompensated time in excess of the 40 hours." (emphasis added)).   But Plaintiffs' own cookie cutter interrogatory responses admit that that they have no idea how to even accurately produce the first piece of evidence:

> [I]t is unduly burdensome for plaintiff to identify and itemize each
> shift worked without proper compensation as requested by
> defendants. On its face, defendants' request seeks a day-by-day
> accounting of every shift worked without proper compensation by
> plaintiff during the relevant time period which would require a
> listing of several hundred shifts with a level of particularity that
> plaintiff cannot and is not required to provide.**[50]**

Plaintiffs are only half right: such detail may be impossible. But it is required—at least unless Plaintiffs prove NS-LIJ's records are inaccurate and otherwise present a **credible** case that they worked uncompensated overtime. *See Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946) (requiring employee to "produce[] sufficient evidence to show the amount and extent of [unpaid] work as a matter of just and reasonable inference"); *Daniels v. 1710 Realty LLC,* 497 F. App'x 137, 139 (2d Cir. 2012) ("[T]here must be at least some credible evidence that he performed overtime work."); *Lugardo v. Prima Pasta & Cafe, Inc.*, 11-CV-1222 MKB, 2013 WL 1386160 (E.D.N.Y. Apr. 4, 2013). Neither speculation nor vague assertions constitute a credible case. *See Daniels*, 497 F. App'x at 139.**[51]**

There are three additional wrinkles that complicate this analysis. *First*, a Plaintiff may have received compensatory time off for the worked meal break, rather than overtime pay—as was the practice at certain departments within certain NS-LIJ hospitals.**[52]** In these cases, the pay

---

**[50]** Plaintiffs Bates-Bordies, Bharat, Correa-Tiernan, Green, Sesso, Lambdin, and Perniciaro provided an identical response to the same Interrogatory No. 10. *See also* **Bharat Dep.** 159:15-160:1 (cannot give an estimate of the number of times she worked through her meal period and knows of no document that exists that would help her refresh her memory); **Viola Dep.** 135:17-136:8 (same); **Kohler Dep.** 51:22-52:17 (same); **Abrams-Brown Dep.** 81:6-81:11 (same); **Casaceli Dep.** 184:17-185:22 (same).

**[51]** Moreover, as Dr. Krock explained, individuals are unlikely to be able to give reliable accounts from memory, given that missing a meal break is a relatively inconsequential event. Krock Dec. ¶¶ 83-90. In fact, it is likely that Plaintiffs would overestimate the number of missed meal breaks. *Id.* ¶ 88.

**[52]** Sabatino (Post Acute Care) Dec. I ¶ 11 (at Stern CECR and Orzac CECR "Department Directors have discretion to determine on a case by case basis . . . whether to allow employees to leave early in exchange for shortened meal breaks."), Dec. II ¶ 12 (same for CEMS Department Directors), Dec. II ¶ 18 (if an EMT or Paramedic's meal break cannot be rescheduled, "the EMT

stubs would reflect no overtime even though a Plaintiff had been appropriately compensated. *Second*, after receiving a paycheck, an employee noticing a lack of overtime may have complained to the appropriate NS-LIJ supervisor, Human Resources, or their Union representative, and received the overtime compensation on a later paycheck.[53] Again, there is no way, absent painstakingly individualized inquiry, Plaintiff by Plaintiff, to know whether such payment was rendered. *Third*, a Plaintiff may have typically combined two unpaid 15-minute rest breaks with one 30-minute paid break together to take an hour-long break, only to have half an hour treated as unpaid time.[54] If he missed half of his hour-long break, he would still have been appropriately compensated.

The individualized nature of this inquiry is highlighted by the Plaintiffs' own deposition testimony. For example, Plaintiff Correa-Tiernan testified that "[e]very time [she has] recorded missed meal, [she has] been paid for the 30 minutes that [she] missed." Correa-Tiernan Dep.

---

or Paramedic would have the choice to either leave early or be paid for such time."); Bentson (NSUH) Dec. ¶ 14 (if employees miss a meal break, "in some units, employees are permitted to leave early if it will not disrupt the staffing needs of the unit"); Salvo (Glen Cove) Dec. ¶ 15 ("In the rare circumstances where employees in departments with direct patient care responsibility cannot take their meal break at any time during their shifts, they are paid premium overtime, or sometimes allowed to leave early."); Cenac (Zucker Hillside) Dec. ¶ 10 ("Although Department Directors also have discretion to allow employees to leave early in exchange for shortened meal breaks, they usually only do so to accommodate an employee's specific request.").

[53] **Kohler Dep.** 100:3-101:11 (when paycheck did not reflect pay for missed meal breaks, told the payroll clerk and it was fixed); **Yang Dep.** 73:8-75:7 (found underpayments on paychecks, raised those issues with timekeeper, and all discrepancies were resolved); ***Lambdin Dep.*** 177:23-178:14 (reported paycheck errors to his manager, and "we resolved the problem every time"); Weisenbach (Lenox Hill) Dep. 54:22-55:8 ("the union would just tell me every time someone's pay is shorted and we fix it"); Sabatino (Post Acute Care) Dep. 85:20-86:2 (former employee who submitted verified past time sheets showing missed meal breaks was reimbursed for the originally unpaid time).

[54] Whether a location or department allows combining paid and unpaid breaks has been a significant, individualized difference identified in other cases. *Cf. Camilotes*, 286 F.R.D. at 347. *See **Gaines Dep.**.* 108:13-109:1 (aides on floor 5N at LIJMC given a one-hour combined break that could be divided or used "any way they wanted"); **Casaceli Dep.** 130:8-131:10 (could combine one 30-minute break and two 15-minute breaks); **Correa-Tiernan Dep.** 132:5-7 (same); **Viola Dep.** 39:11-23, 113:14-22 (same).

115:7-10.  And Christopher Hayes said he believed he worked through meal periods without pay, but then when confronted at deposition with records to the contrary, said he would drop his case if that were true.[55]  Plaintiffs like Ms. Correa-Tiernan and Mr. Hayes have no claims for relief, yet in a collective action trial, could otherwise receive damages they never incurred for a violation that they admit never happened.

> ### 2.   Whether NS-LIJ Knew or Should Have Known That Each Plaintiff Worked Through Some or All of Their Meal Breaks is an Individualized Inquiry.

The FLSA does not punish employers who had no reason to know that their employees were due additional pay.  29 C.F.R. §§ 785.11 & 785.12; *Kuebel*, 643 F.3d at 361 ("To establish liability under the FLSA on a claim for unpaid overtime, a plaintiff must prove that he performed work for which he was not properly compensated, and that the employer had actual or constructive knowledge of that work."); *Wolman v. Catholic Health Sys. of Long Island, Inc.*, 853 F. Supp. 2d 290, 301 (E.D.N.Y. 2012) ("[I]t is the failure to compensate an employee who worked ***with the employer's knowledge*** through an unpaid meal break . . . that potentially violates the FLSA." (emphasis added)).  Plaintiffs cannot possibly meet their burden to show ***on a classwide basis*** whether NS-LIJ knew or should have known that each Plaintiff worked during meal breaks without receiving premium pay.  There could hardly be a question more individualized in a 1,051-Plaintiff trial than whether a particular employee notified his or her employer of a failure to pay for a given week.[56]  *See Camilotes*, 286 F.R.D. at 352.

---

[55] **Hayes Dep.** 25:22-26:11

[56] Discovery demonstrates how enmeshed these inquiries can be.  For example, Opt-in plaintiff Perniciaro said she does not recall complaining to supervisory staff about not getting a full meal break as a nurse liaison.  **Perniciaro Dep.** 105:11-16.  She also never complained to HR or payroll.  ***Id.*** 148:18-149:5.  By contrast, Bharat alleges that she spoke to a nurse manager about the issue, and in fact, that her "whole shift"—entirely nameless—filled out an "unsafe staffing" report "every morning."  **Bharat Dep.** 37:19-39:3.  Lonnie Green says that he spoke to his North Shore supervisor about breaks.  **Green Dep.** 94:23-95:8; 116:9-12. Kelly Iwasiuk said that she

NS-LIJ's position is perhaps best described by Plaintiff Correa-Tiernan: "When they're notified they'll pay it. But if they're not notified, they don't know how to pay it."[57] Exactly right. And that is all the FLSA requires.

Of course, whether a Plaintiff reported his worked meal breaks is not even itself a "yes" or "no" inquiry. For example, a Plaintiff may have reported, and been paid for, 90% of his or her worked meal breaks, but now claims that NS-LIJ knew or should have known of the other 10%. But it is not readily evident why, in the absence of testimony about specific supervisors' actual knowledge. Yet, if this collective action is not decertified, that Plaintiff's claims cannot be fairly challenged by contradictory evidence—at least not in the course of a manageable trial.

That many NS-LIJ facilities use a timekeeping system that conforms the time paid to the schedule—absent a reason to do otherwise—is irrelevant. Indeed, as courts in this District have concluded, an auto-deduct practice complies with the FLSA. *See Ellis v. Common Wealth Worldwide Chauffeured Transp. of NY, LLC*, No. 10-CV-1741 DLI JO, 2012 WL 1004848, at *9-10 (E.D.N.Y. Mar. 23, 2012); *Wolman v. Catholic Health Sys. of Long Island, Inc.,* 853 F. Supp. 2d 290, 301 (E.D.N.Y. 2012), *aff'd in part, rev'd in part sub nom.*, *Lundy*, 711 F.3d 106 (such policies are not "*per se* illegal" and "an employer's failure to 'ensure' that its employees are not working during unpaid meal breaks does not make the use of an automatic meal

---

complained "a good majority of the time" about not getting overtime. ***Iwasiuk Dep.*** 133:20-134:17. Young Yang unilaterally decided not to report all hours worked, but all work hours that she chose to report were paid. As a nursing supervisor, when others reported overtime to her, she investigated and generally approved all requests, and she instructed nurse managers and patient directors to do the same. **Yang Dep.** 90:18-92:2, 99:8-101:11.

[57] **Correa-Tiernan Dep.** 195:22-196:1. In fact, Correa-Tiernan's supervisor affirmed that Correa-Tiernan has recorded more than 195 hours of overtime, including missed meal periods, resulting in at least $8,063.90 in additional pay since March 2004. Finkelstein (Huntington) Dec. ¶ 16.

deduction policy illegal.").[58] Nor can Plaintiffs show that NS-LIJ had a consistent practice of violating the stated policy—*i.e.*, that they failed to pay for overtime worked when the employee notified the employer. As described by *White*, and incorporated by other courts:

> Where an employer's formal policy is to compensate employees for all time worked, courts have generally required a showing that the employer's common or uniform practice was to ***not follow its formal, written policy***. . . . There must be a showing that enforcement of the automatic deduction policy created a policy-to-violate-the-policy. . . . At [stage II], to support a 'shifting the burden' theory capable of binding the [opt-ins] together, ***there must be 'substantial evidence' that [the employer], in fact, shirked its FLSA responsibilities.***

*White*, 2011 WL 1883959 at *9-10 (citations and internal quotations omitted; emphasis added)*; see Ellis*, 2012 WL 1004848 at *9-10; *Camesi*, 2011 WL 6372873 at *4; *Frye*, 2010 WL 3862591 at *5. Whether a Plaintiff notified NS-LIJ of time worked beyond their schedule, and how NS-LIJ handled the Plaintiff's report, is a quintessentially individualized inquiry.

### 3.   Whether Time Spent on an Interrupted or Shortened Meal Break is Compensable FLSA Time is an Individualized Inquiry.

Because only time spent predominantly for the employer's benefit is compensable, the trier of fact must also consider, on a Plaintiff-by-Plaintiff, week-by-week basis, ***why*** he or she worked through some or all of each meal break. *Reich v. S. New England Telecomm's Corp.*, 121 F.3d 58, 64-65 (2d Cir. 1997).

For instance, if the employee worked into or through a meal period, but "was motivated

---

[58] *See also White*, 699 F.3d at 873 (6th Cir. 2012) ("An automatic meal deduction system is lawful under the FLSA."); *Frye v. Baptist Mem'l Hosp., Inc.*, 495 Fed. App'x 669, 673 (6th Cir. 2012); *Camesi*, 2011 WL 6372873 at *4 (describing "prevailing view" and "growing consensus" "of federal courts . . . reject[ing] the notion that collective action treatment of automatic deductions is warranted under an FLSA 'burden-shifting' theory"); *Zivali*, 784 F. Supp. 2d at 462-63; *Blaney*, 2011 WL 4351631 at *6; *Cason v. Vibra Healthcare*, 2011 WL 1659381 at *3 (E.D. Mich.); *Saleen*, 649 F. Supp. 2d at 940; *Fengler v. Crouse Health Found., Inc.,* 595 F. Supp. 2d 189, 195 (N.D.N.Y. 2009); *Camilotes*, 286 F.R.D. at 350; Dept. of Labor Fact Sheet No. 53 at 3 (informing employees that software deducting meal breaks comport with FLSA) (*available at* http://www.dol.gov/whd/regs/ compliance/whdfs53.pdf).

primarily by his or her own pleasure" or, "if the time was expended primarily to inflate the employee's earnings," then the time worked is not compensable.  *Holzapfel v. Town of Newburgh, N.Y.*, 145 F.3d 516, 523 (2d Cir. 1998).  For example, one Plaintiff candidly admitted that it was her choice to not take a meal break: "What would I do with lunch? Go and spend extra money buying it?"[59]  Determining which meal breaks were worked through, and why, and which missed or interrupted breaks were not recorded, and why,  requires comparing the testimony of Plaintiffs with their time records and the responsive testimony of specific supervisors.  *See Armour & Co. v. Wantock*, 323 U.S. 126, 133 (1944) ("Whether time is spent predominantly for the employer's benefit or for the employee's is a question dependent upon all the circumstances of the case.").[60]

### 4.  A Collective Action is Ill-Suited to Determine Whether Each Plaintiff Worked Over 40 Hours for Each Week in a Pay Period.

To prove any violation, each Plaintiff must show that he or she worked more than 40 hours in a workweek (*i.e.*, actually earned overtime).   But as shown by the analysis of Defendants' expert economist and statistician, Joseph A. Krock, Phd. ("Dr. Krock"), the vast majority of Plaintiffs' claimed violations fail to satisfy even this basic test.  For the 759 of the 1,051 Plaintiffs for which Dr. Krock has PeopleSoft data, the pay data—reflecting what NS-LIJ believes to be the correct number of hours worked—indicates that they were paid for fewer than

---

[59] *Hall Dep.* 208:21-209:20

[60] For example, a few months ago, Plaintiff Green's manager reviewed the worked meal break log book and noted Green had recorded a worked meal break.  Kurcz Dec. ¶ 11.  When Kurcz asked Green about the meal break, Green said he had been busy with six patients.  *Id.*  But when Kurcz reviewed the patient load for that day, he learned that Green had five patients, not six—all of whom had been already admitted.  *Id.*  Therefore, Green was responsible for performing physical examinations only, a task which takes about 20-25 minutes apiece.  *Id.*  According to Kurcz, Green then admitted that he had finished with those patients early in the morning, and that "he had time to eat" and that "he made a mistake in not taking a meal break."  *Id.*  Such factual development—demonstrating that Green has no claim to overtime for that day—hardly can be performed from the 20,000 foot view that a collective action demands.  But without such analysis, liability findings are mere guesses, not judgments based on facts and evidence.

37.5 hours of work in a week *89 percent* of the time.[61]  Therefore, for each of those weeks, even if those employees skipped a half-hour meal break every workday, 5 days a week, they still would not be entitled to FLSA overtime.[62]

Separating the wheat from the chaff is no easy task.  Because Plaintiffs' claims necessarily rely on an argument that NS-LIJ's records ***do not*** properly reflect actual hours worked, a trial requires each Plaintiff's specific testimony detailing precisely what hours were worked and not paid.  NS-LIJ would respond by providing documentation reflecting the hours the Plaintiff worked and calling the Plaintiff's supervisors to testify—all from the 395 departments in which the opt-in Plaintiffs worked.[63]  Complicating matters further, some opt-in Plaintiffs worked in *multiple* locations at various times throughout the claim period.[64]  Each Plaintiff then will have to explain which overtime hours were correctly recorded—and which were not.  In sum, the jury must engage in a classic individualized inquiry: determining who has the more believable story in a "he said, she said" trial for each person, each week.

### 5.   Even Determining Whether a Person Falls Within the Collective Action Definition is an Individualized Inquiry.

The collective action, as conditionally certified, includes only "[h]ourly employees . . . whose scheduled hours include a deduction for an unpaid meal break . . . ."  But even figuring out whether someone has been subject to a meal deduction can be ascertained only by personal

---

[61] Krock Dec. ¶ 58.8.1.  More precisely, this data divides the biweekly work time by two to obtain the weekly work time.

[62] Krock Dec. ¶ 58.8.1.  Dr. Krock analyzed 131,204 workweeks of the 759 Plaintiffs between March 24, 2007 and January 19, 2013.  Plaintiffs were paid for 37.5 hours or less for 116,780 weeks.

[63] *See* Fisher (Franklin/Forest Hills) Dep. 49:16-50:9 (recently discovered that physician's assistants have been overpaid the last couple of years because they are paid for 12.5 hours for a 12.5 hour shift, even though they were taking meal breaks that are supposed to be unpaid); *see also* **Green Dep.** 119:22-120:23 (describing supervisor's practice of approving some, but not all, missed meal breaks listed in logbook); Krock Dec. ¶ 14.

[64] *See* **Viola Dep.** 202:13-18 (worked both at SIUH and at Home Health Agency); ***Hall Dep.*** 98:3-14, 127:7-16 (nurse at NSUH and Home Care).

questioning, not by classwide determinations.  As Plaintiff Green admitted, at least before 2012, "in [his] job, there was never 30 minutes deducted for a meal break" from his paycheck.[65] Plaintiff Christopher Hayes always received paid 30-minute meal breaks pursuant to a CBA.[66] And there are likely more in the same boat.[67]  *Cf. Creery*, 2013 WL 377282 at *8 (noting that "Plaintiff's right to compensation hinges on their individual experiences," even where all were subject to auto-deduct policy, because they "worked under different managers who may have implemented Defendants' policy in different ways.").

### B.   NS-LIJ Has Individualized Defenses to Plaintiffs' Claims that Cannot Be Resolved Through a Collective Action.

When the employer's defenses are highly individualized as to each Plaintiff, as they are here, "this factor weighs heavily against proceeding . . . as [an FLSA] collective action." *Zivali*, 784 F. Supp. 2d at 467-68.  Even putting aside a general rebuttal to Plaintiffs' claims, NS-LIJ has at least four additional defenses requiring individualized factual scrutiny: (1) that many Plaintiffs are properly classified as exempt under the FLSA, and therefore are not entitled to receive statutory overtime pay; (2) that the statute of limitations bars some claimed violations; (3) that at least some of Plaintiffs' claimed violations are *de minimis*, and thus not compensable violations; and (4) for some unionized Plaintiffs, (i) that the Labor Management Relations Act preempts their claims because the subject matter of the FLSA claims—*e.g.*, how to report a worked meal break—is covered by their CBAs, (ii) that their CBA requires them to grieve and arbitrate a complaint of unpaid overtime before filing suit; and (iii) that a resolved grievance may result in an offset under the doctrine of double recovery, or bar a federal claim under res judicata.

---

[65] **Green Dep.** 101:4-10; *see also id.* at 111:8-16 (noting that Green was paid for meal break, "whether [he] took it or not").
[66] Goffin (SIUH) Dec. ¶¶ 4, 9, 15, 18; **Hayes Dep.** 25:22-26:11.
[67] **Kohler Dep.** 129:14-21 (testifying that "auto deduct" and "auto deduct policy" do not mean anything to her).

**1.   Whether a Plaintiff Is Classified as Exempt, and Therefore Ineligible for FLSA Overtime Pay, is an Individualized Inquiry.**

By definition, exempt employees are ***not eligible*** for overtime. *E.g.*, *Ramos v. Baldor Specialty Foods, Inc.*, 687 F.3d 554, 556 (2d Cir. 2012) ("Plaintiffs thus fall within the FLSA's executive exemption and are not entitled to FLSA overtime pay."); *Young v. Cooper Cameron Corp.*, 586 F.3d 201, 204 (2d Cir. 2009) ("'employee[s] employed in a bona fide . . . professional capacity' are exempt from the FLSA's overtime requirements.") (citations omitted).   Yet the majority of the conditionally certified FLSA class are or were classified as exempt under the FLSA.[68]

Plaintiffs have not challenged NS-LIJ's classification.   But to the extent they do, as the Second Circuit and this Court have oft held, determining whether a person has been properly classified is a factually intensive, person-by-person inquiry. *Myers*, 624 F.3d at 549 (2d Cir. 2010) (holding that "cases confirm that the exemption inquiry requires examination of the 'dut[ies] that the employee' actually 'performs'").   An exemption analysis often requires scrutiny of factors well beyond an employee's stated job duties to ascertain whether she falls within one of the FLSA's various categories.   *E.g.*, *Mullins v. City of New York*, 653 F.3d 104, 106-07 (2d Cir. 2011); 29 C.F.R. § 541.700(a) ("Factors to consider when determining the primary duty of an employee include, but are not limited to, the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.")[69]   These differences can only be investigated based on personal

---

[68] Krock Dec. ¶ 58.9.1.
[69] *Compare* **Kohler Dep.** 159:13-160:8 (exercises independent judgment on a daily basis with each patient), **Correa-Tiernan Dep.** 184:13-185:9 (same), **Perniciaro Dep.** 166:10-167:14

testimony, and are ill-suited for an all-or-nothing determination.

## 2. Whether the Statute of Limitations Bars Some or All of Each Plaintiff's Claims is an Individualized Inquiry.

Yet another fact-intensive inquiry is the applicability of the statute of limitations.  The FLSA limits Plaintiffs to pursuing claims for premium pay that was owed two years (or, if the violation was "willful," three years) prior to consenting to this litigation.  29 U.S.C. § 255.  Because Plaintiffs have filed their consents on a variety of dates and claim violations for a number of weeks, the court would have to sort out the extent to which the claims are time-barred.  In other words, when the statute of limitations begins to run for each individual depends on, among other things, the date he/she opted in.

Based on the data alone, at least 138 Plaintiffs' claims are barred—even if NS-LIJ is subject to a three year statute of limitations—a fact which itself sets these 138 apart from the rest of the putative collective class.[70]  Indeed, even some named Plaintiffs, like Eileen Bates-Bordies, fall in this category: she filed her consent to join the lawsuit on April 9, 2010—more than three years after she stopped working for NS-LIJ.[71]  If NS-LIJ's actions are deemed not willful across the board, another 112 Plaintiffs will be barred recovery.[72]  A third option, and the one that demonstrates the most individualized inquiry, is that although NS-LIJ will argue that *no* violations were willful (because, to the extent any violations occurred, NS-LIJ did not recklessly disregard its obligations under the FLSA), there could be particularized facts in some Plaintiffs' cases creating a closer case.  Order Granting Def.'s Mot. for Decert., Dkt. 145, *Ilano v. H&R Block Eastern Enterprises*, No. 1:09-cv-22531-CMM, slip op. at 7 (S.D. Fla. Nov. 4, 2010) ("Of

---

(same), **Bharat Dep.** 238:25-241:4 (same), *and* **Hall Dep.** 402:17-403:9 (same) *with* **Iwasiuk Dep.** 309:12-20 (analyzed patient treatment according to the doctor's orders).
[70] Krock Dec. ¶ 58.1.1.
[71] *See* Dkt. 10-2.
[72] Krock Dec. ¶¶ 58.1.1-58.1.2.

the individuals who have opted into the conditionally certified class, there is an undetermined number that would require individualized consideration regarding whether they are time-barred under the explicit provisions of the FLSA. . . .  Because some of Plaintiffs would be seeking to proceed under the three-year period, this Court would be required to determine, on an individual basis, whether Defendant's actions were willful."); *see Calderon v. King Umberto, Inc.*, 892 F. Supp. 2d 456, 462 (E.D.N.Y. 2012) (describing violation as willful "only if the employer knowingly violates or shows reckless disregard for the provisions of the Act." (*quoting Brock v. Superior Care, Inc.,* 840 F.2d 1054, 1062 (2d Cir.1988)).  For example, because NS-LIJ's policy is to pay for all hours worked, *see supra* at 5, an errant supervisor's refusal to record a worked meal break on a timesheet *might* yield a different statute of limitations for that claimant, compared to a supervisor who merely committed an error on the timesheet.  *Cf. Creely v. HCR Manorcare, Inc.*, 2013 WL 377282 at *7 (N.D. Ohio 2013) (decertifying auto-deduct collective action because "while some managers provided follow-up training to Plaintiffs [regarding the use of auto-deduct], others are accused of actively discouraging Plaintiffs from submitting missed punch forms").  In light of NS-LIJ's written policy to pay for all hours worked, determining digressions from that policy will certainly present individualized inquiry that affects which claims are willful and thus governed by a 3 year statute of limitations.

### 3.   Whether a Plaintiff's Claim is *de minimis* is an Individualized Inquiry.

Moreover, the FLSA does not require payment for an unpaid interruption or shortening of a break if it only occurred for a *de minimis* period of time.  "The *de minimis* doctrine permits employers to disregard, for purposes of the FLSA, otherwise compensable work '[w]hen the matter in issue concerns only a few seconds or minutes of work beyond the scheduled working hours.'"  *Singh v. City of New York*, 524 F.3d 361, 370-71 (2d Cir. 2008) (quoting *Anderson*, 328 U.S. at 692); *Reich*, 121 F.3d at 64 (excluding from FLSA liability "infrequent interruptions of a

short duration"); *see also* 29 C.F.R. § 785.47.  So for example, if a page to a nurse led to a two-minute phone call, or even a six to eight minute interruption, a fact finder could determine the interruption was *de minimis*, and thus not compensable time.  *See, e.g.*, *Lindow v. United States*, 738 F.2d 1057, 1063-64 (9th Cir.1984) (holding that average of seven to eight minutes of pre-shift activity was *de minimis*).[73]   The nature of such interruptions is unquestionably an individualized inquiry.  *Zivali*, 784 F. Supp. 2d at 468 ("The extent to which work was *de minimis*, however, will necessarily vary widely according to the particular situation of each individual plaintiff.").

### 4.   Unionized Plaintiffs are Subject to Additional Individualized Defenses.

At least 312 Plaintiffs are or have been members of one or more of several unions within NS-LIJ.[74]   The collective bargaining agreements governing these Plaintiffs not only set them apart from their non-union colleagues, but because the CBA terms vary, also from one another.

### a.   Whether the Labor Management Relations Act Bars Each Unionized Plaintiff's Claim is an Individualized Inquiry.

As NS-LIJ argued in its motion to dismiss, Section 301 of the Labor Management Relations Act ("LMRA") precludes adjudication because each unionized Plaintiff's claims are "substantially dependent on analysis of a collective-bargaining agreement."[75]   *Caterpillar Inc. v. Williams*, 482 U.S. 386, 394 (1987) (citation omitted).  "[W]hen resolution of a . . . claim is substantially dependent upon analysis of the terms of an agreement made between the parties in a

---

[73] *Iwasiuk Dep.* 217:6-15 (interruptions could be one minute, ten minutes, or the entire break); **Kohler Dep.** 124:4-12 (meal break interruptions vary in duration and may be as short as 30 seconds); **Correa-Tiernan Dep.** 137:8-14 (sometimes paged during lunch break and may take five minutes or less to call the person back and determine there is no immediate need).
[74] Krock Dec. ¶ 60.
[75] The Court does not need to determine that NS-LIJ's pre-emption defense is meritorious; at this stage, the fact that it may apply to only some of the putative plaintiffs is enough to warrant decertification.  Memorandum and Order, Dkt. 210, at 15 ("Thus, this preemption issue – namely, whether the claims require interpretation, rather than merely consultation with, the CBAs – cannot be resolved at the motion to dismiss stage.").  *See also* Dkt. 168-14, at 24-30.

labor contract, that claim must either be treated as a § 301 claim, or dismissed as pre-empted by federal labor contract law." *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 220 (1985); *Nakahata v. New York-Presbyterian Healthcare Sys., Inc.*, No. 10CIV2661(PAC), 2011 WL 321186, at *4 (S.D.N.Y. Jan. 28, 2011); *Hoops v. Keyspan Energy*, 822 F. Supp. 2d 301, 307 (E.D.N.Y. 2011) (holding that statutory FLSA claim cannot be adjudicated until unionized employee obtains a ruling through the CBA dispute resolution procedure on his contractual right to receive shift differential pay).[76]

The CBAs at issue here cover, among other things, the duration and compensability of meal breaks.[77] Just a sample of the CBA provisions demonstrates their importance to determining whether or not each unionized Plaintiff was paid appropriately:

- Some CBAs instruct employees to record their time and meal breaks in a specific manner, which affects whether NS-LIJ had constructive knowledge of any off-the-clock worked meal breaks.[78]

---

[76] *See, e.g.,* Gordon Dec. ¶¶ 15, 40, Ex. 13 (SIUH and Federation of Nurses/UFT FNHP/AFT, AFL-CIO CBA, Article 9(C), RNs working alternative work schedule entitled to overtime at 1.5 times their regular rate of pay for work exceeding 11.5 hours in a day or 34.5 hours in a week during weeks in which three shifts are scheduled, and for work in excess of 11.5 hours in a day or 46 hours in a week that four shifts are scheduled); Ex. 38 (Syosset and NYSNA CBA, Appendix K, Section 4, full-time flex schedule RNs receive overtime at 1.5 times their regular rate for all hours worked beyond their scheduled hours during a bi-weekly period, and part-time flex schedule RNs eligible to receive overtime only when working more than 37.5 hours in a week).

[77] *See, e.g.,* Gordon Dec. ¶¶ 7, 9, 27, Ex. 5 (Franklin and NYSNA CBA, Article 8.01, "Employees will have meal periods as follows: [for] areas that require report [i.e., handing off patients to the oncoming shift,] the meal period will be one hour; [for] areas that do not require report[, the meal period] will be one-half (1/2) hour"); Ex. 7 (Huntington and Huntington Hospital Nurses' Ass'n RN CBA, Article 6(E), "Missed meal periods… shall be compensated at the overtime rate."); Ex. 25 (Forest Hills & 1199 SEIU CBA, Appendix A, employees working 12 hour shifts receive one twenty minute unpaid meal period and a total of fifty minutes' paid rest break time).

[78] Gordon Dec. ¶ 10, Ex. 8 (Huntington Hospital and Huntington Hospital Nurses Ass'n Licensed Practical Nurse CBA, Article 5.A, "Employees shall be compensated for missed meal periods at time and one half provided the employer is put on notice of the lack of opportunity to take a meal period."); Quartier (Huntington) Dec. ¶ 21 ("[unionized] RNs and LPNs who work through their meal breaks are entitled to overtime pay provided that they notify the Hospital of

- Because some CBAs define compensable time more broadly than the FLSA,[79] the trier of fact must recalculate the time worked during each pay period that was FLSA-compensable—an inquiry that requires individualized accounts of the duties performed during for each period (subject to a Plaintiff's likely lost memory).[80]

- Some CBAs permitted employees to combine their 15-minute rest breaks to create a second, half-hour break.[81]  For Plaintiffs who took advantage of this option, a trier of fact must determine the relationship between compensation and the worked meal break if they received one of their two 30-minute breaks that day, then they were properly paid.

Because these CBA and job position specific inquiries bear on a factfinder's analysis at an individual level,  the LMRA should bar those Plaintiffs' claims here.  But even if does not bar *all* unionized Plaintiffs, that the LMRA may bar *some* is sufficient—and in fact, more indicative of—the individualized inquiry here.

### b.  Whether a Plaintiff Exhausted Her Worked Meal Break Claim By Grieving to the Union is an Individualized Inquiry.

Whether a unionized Plaintiff exhausted as required by his or her CBA is yet another individualized inquiry.   This examination requires scrutinizing union records and

---

the fact that they did not have an opportunity to take a meal break."); Springstead (SIUH) ¶ 21 ("Employees within the Nursing Department who are SEIU 1199 members and work outside their scheduled shifts or through their meal break request overtime by filling out a from entitled "1199 Overtime Approval Form.").  *See also* Dkt. 168-14 at 20-22 (explaining how CBA provisions bear on NS-LIJ's knowledge of worked meal breaks).

[79] Gordon Dec. ¶¶ 13-15, Exs. 11, 12, 13 (Staten Island and Federation of Nurses/UFT FNHP/AFL-CIO CBAs, Article 8(E), operating and recovery room RNs who are required to be on-call off hospital premises shall receive a rate of pay equal to three-fourths of their regular compensation rate); Ex. 26 (Lenox Hill & NYPNU CBA, Article XI(3)(a), employees who are on-call while off-site from employer premises receive a rate of pay equal to three-fourths of their regular pay).

[80] *See e.g.,* **Bharat Dep.** 159:15-160:22; **Yang Dep.** 124:22-125:10; *Hall Dep.* 168:11-169:3; 206:7-25; **Sesso Dep.** 160:5-162:13; *Iwasiuk Dep.* 311:3-312:14; **Viola Dep.** 135:17-136:8; **Kohler Dep.** 51:22-52:17; 150:6-17; 172:8-173:4.

[81] *See, e.g.,* Gordon Dec. ¶¶ 3, 7, Ex. 1 (Franklin and 1199 SEIU CBA, Article XI(1)(b), "…where Employees currently take a 45-minute unpaid meal break and a single 15-minute paid break, such Employees may continue their pattern of breaks by combining one of their two 15-minute paid breaks with their 30-minute unpaid meal break."); Ex. 5 (Franklin and NYSNA CBA, Article 7.14, "employee… will be entitled to two (2) rest periods of fifteen (15) minutes each… [and] may request that these breaks be added to his/her meal period").

communications with union personnel.  As described in greater detail below, some Plaintiffs have availed themselves of the grievance process to seek unpaid compensation.  Why any particular Plaintiff has chosen to wait until this suit, given that the unions at NS-LIJ have negotiated and championed missed meal period issues in the past, presents a credibility problem for that Plaintiff.

### c. Regardless of Whether the Plaintiff Received Compensation, the Result of a Grievance May Provide Additional Individualized Defenses of *Res Judicata* or Double Recovery.

No matter the result, NS-LIJ has additional defenses against Plaintiffs who did grieve their claims as their contracts required.  If a Plaintiff lost, depending on the strength of his representation, he might be barred from proceeding on the same claim again under the doctrine of *res judicata*.  *Giles v. City of New York*, 41 F. Supp. 2d 308, 314 (S.D.N.Y. 1999).  Of course, whether the Plaintiff really had a "full and fair opportunity to litigate the dispute" requires examining the substance of the proceedings.  *Id.* ("Under the right circumstances, a union's arbitration of an issue could give its members a full and fair opportunity to press that issue.").  In fact, the unions are so willing to protect their constituent employees that they wrote a letter informing employees that they did <u>not</u> support this lawsuit.[82]  And even if not precluded, the results of the arbitration could still bear on a Plaintiff's credibility—particularly if theories shift or memories change.  *Giles*, 41 F. Supp. 2d at 314 (where the interests of the union and the individual plaintiff conflict, a union arbitration . . . "'may be admitted into evidence ... [with] weight to be accorded ... in the court's discretion with regard to the facts and circumstances of each case.'").

On the other hand, if a Plaintiff was compensated through the grievance process, NS-LIJ

---

[82] Compendium Ex. 95, New York State Nurses' Association's April 2010 article, "Contact NYSNA about wage and OT violations:  Letters Soliciting Legal Services Not Endorsed by NYSNA."

would argue that any award here would be offset by the doctrine of double recovery.  *E.g.*, *Phelan v. Local 305 of United Ass'n of Journeymen, & Apprentices of Plumbing & Pipefitting Indus.*, 973 F.2d 1050, 1063 (2d Cir. 1992) (reducing trial backpay award where NLRB proceeding provided damages for same injuries).   Indeed, it is clear that the unions vigorously seek favorable results,[83] and succeed where a mistake was made.[84]   But even just the threshold inquiry—whether a Plaintiff received compensation—is an individualized question.   Beyond that, for the Court to determine whether a damages award would really be double recovery, it must examine whether the arbitration could have awarded damages other than those sought in this case.  *Id.*   These analyses are not just individualized, but also require an intensive scrutiny of documents and testimonial evidence well beyond what anything short of a trial (*e.g.*, a survey) could capture.   A collective action is ill-suited for nuanced review.

### C. Fairness and Procedural Considerations Require Decertifying Plaintiffs' Collective Action.

The third factor of the FLSA collective action inquiry—fairness and procedural considerations—also weighs in favor of rejecting certification here.   "In determining 'fairness and procedural considerations,' courts consider whether a collective action would lower costs to the plaintiffs through the pooling of resources, efficiently resolve common issues of law and fact,

---

[83] *See* Compendium Ex. 95 (describing NYSNA practice of  pursuing "wage[] and meal break" claims as "mandatory subjects of collective bargaining"); **Kohler Dep.** 116:16-24 (as "a union employee, I feel like I have somebody who has my back"); Fisher (Franklin/Forest Hills) Dep. 56:19-57:1 ("[W]e're in a union environment so if an employee is not getting paid for time worked generally we hear it from the union immediately.").

[84] Barrett (Southside) Dec. ¶ 4, Ex. 2 (four RN's submitted grievance for unpaid overtime and missed meal period occurring, and hospital investigated and resolved with backpay); Weisenbach (Lenox Hill) Dep. 53:7-54:10 (nurses filed a grievance about getting paid straight time instead of overtime for attending a training; the hospital investigated and a settlement was reached in arbitration; the hospital is in the process of compensating all training attendees), 54:22-55:8 (After RN contacted union about not getting compensated time and a half for a meal break, "[t]he union leadership called me.  I spoke with her manager and we paid her."); Springstead (SIUH) Dep. 38:5-25 (grievance regarding part-time employees not getting paid for their 15-minute rest break was investigated and resolved with back pay).

and coherently manage the class in a manner that will not prejudice any party." *Jason v. Falcon Data Com, Inc.*, 2011 WL 2837488 at *4 (E.D.N.Y. 2011).  For at least four reasons, subjecting NS-LIJ to a trial here would be unfair: (1) it would violate NS-LIJ's due process right to present a defense against each alleged FLSA violation; (2) Plaintiffs have not and cannot present a manageable trial plan for proceeding as a collective action; (3) it would also violate NS-LIJ's due process right to pay to each opt-in Plaintiff only the amount of damages she is due; and (4) Plaintiffs and their counsel have demonstrated that they are unfit to represent the 1,051 Plaintiffs spanning 59 locations.

### 1. Proceeding as a Collective Action Would Violate NS-LIJ's Due Process Right to Defend Against Each FLSA Violation.

Because the merit of the Plaintiffs' claims vary, and because a collective action determination by its nature does not take a week-by-week, individual by individual approach, any attempt to determine liability collectively would violate NS-LIJ's due process right to present its full defense, including cross-examining the evidence against it.  *See Zivali*, 784 F. Supp. 2d at 469 ("[r]esolution of the many fact-specific issues in this case would essentially require [1,051] mini-trials in which each individual plaintiff could present evidence that he or she in fact failed to receive proper overtime compensation—evidence that would then be subject to cross-examination and similar challenge by the defendant.").  Plaintiffs themselves acknowledge that their claims are varied and unique: whether people took their meal break "varied from person to person and day to day" and, for interrupted meal breaks, "[e]very day is different" and "[e]very situation is different."[85]  As the *White* court held, "[d]ifferences in the

---

[85] **Bharat Dep.** 209:2-5, 215:16-22.  *See also* **Correa-Tiernan Dep.** 52:18-53:5, 55:2-6 (admitting that her daily job duties and number of hours worked "vary day to day" "[d]epending on the needs of patients[,] "the number of patients[,]" and "how many respiratory therapists there are on duty"); *Iwasiuk Dep.* 217:6-18 (there was variance in the length of meal break interruptions and when those interruptions occurred); **Kohler Dep.** 124:4-124:11 (interruptions

Opt-in Plaintiffs' job duties are highly relevant to their claims that they worked during meal breaks without compensation because their job duties dictated whether and why they experienced missed or interrupted meal breaks."   *White*, 2011 WL 1883959 at *7.   Though the proposed collective action only includes employees "involved in direct patient care responsibilities," their day-to-day responsibilities vary based on their job, where they work, what shift they work (morning, afternoon, or night) and the workload.[86]   Thus, the difference between, for example, the duties of a nurse and a physician's aide might make a difference in whether they are interrupted, and if so, how frequently and for how long.[87]   For these reasons, the Plaintiffs' estimates of the frequency of worked meal breaks are varied,[88]   and cross-examination of each

---

varied from 30 seconds to 15 minutes); **Abrams-Brown Dep.** 66:22-67:5 (whether to take a meal period depending on the patient census and the number of patients leaving the hospital that day); **Casaceli Dep.** 133:1-134:1 (meal period was only interrupted twice; otherwise, "[i]f I was able to take a break, it was usually an uninterrupted break").

[86] *See, e.g.*, **Kohler Dep.** 40:24-42:14, 95:1-7 (Kohler is the designated charge nurse on 3-5 shifts every 4 weeks, and when she is the designated charge nurse, she is more likely to miss her own meal break because she covers for other nurses so that they can  their meal breaks); **Sesso Dep.** 82:23-83:11 (her decision to take a meal break was based on patient care needs, which varied night to night); **Correa-Tiernan Dep.** 99:15-21 (describing day shift as busier than night shift); **Abrams-Brown Dep.** 58:22-59:4 (taking meal period depended on the patient census on the hospital floors); **Bharat Dep.** 56:13-57:6 (describing day and night shift duties as different), 72:18-22 (acknowledging that the duties of a home care nurse and a nurse working in the telemetry PCU department are "[v]ery different").

[87] ***Bates-Bordies Dep.*** 210:6-16 (laboratory technologists who draw blood on patients could be interrupted by patient care emergencies, whereas laboratory technologists who work in the lab are "probably not" interrupted); **Kohler Dep.** 55:19-56:11 (more likely to work overtime and miss meal breaks on days when she is assigned to the sick-baby unit than when she is assigned to the well-baby unit).

[88] *Compare* ***Iwasiuk Dep.*** 99:14-20; 299:3-18 (as a nurse at Huntington she worked through 90% of her meal breaks, but as a nurse at Southside she never worked through any meal periods); ***Gaines Dep.*** 34:9-17 (took a lunch break maybe once in a two-week period); **Perniciaro Dep.** 79:1-7 (from 2004-2005 often did not take a 30-minute lunch because she was interrupted by pages); **Bharat Dep.** 163:17-164:13 (missed 2/3 of meal breaks, and 80-100% of meal breaks taken were interrupted); ***DeSilva Dep.*** 115:1-6 (stating that she has never stopped working during the middle of her day to take a meal break); **Haas Dep.** 86:13-87:16 (took some type of meal break in the break room 80% percent of the shifts she worked); **Abrams-Brown Dep.** 80:16-20 (missed 80% of meal breaks); ***Lambdin Dep.*** 71:7-11 (missed or interrupted meal

Plaintiff is essential here.

Cross-examination is crucial for another reason as well: in discovery, the Plaintiff-declarants who submitted declarations in support of conditional certification admitted their statements under oath in their declarations are false. They admit that other statements they made under oath—referring to "all policies," "all hospitals," "all employees," and the like—are false because they have no foundation. For the Court's benefit, literally many dozens of contradictions are summarized in Compendium Exhibits 93 and 94. Although the Court did not consider the Plaintiffs' credibility when conditionally certifying the class, now at "stage 2," the Plaintiffs' declarations should be called what they are—trumped up, speculative, and *false*. *E.g.*, *Creely*, 2013 WL 377282 at *8 (decertifying "auto-deduct" case at stage 2 based in part on "demonstrated inconsistencies among and within opt-in Plaintiff's testimony"). Plaintiffs' perjured statements are not just a reprehensible abuse of the judicial process; they form the basis for a well-founded dismissal. Order and Op., *Pruell v. Caritas Christi*, 09-cv-11466, Dkt. 141 (D. Mass. May 31, 2013) (striking collective action claim brought by plaintiffs represented by Thomas & Solomon and imposing monetary sanctions where plaintiffs filed "affirmations which are virtually identical but for a few minor details" and plaintiffs testified at deposition that "many of the statements were plainly false"); *Alexander v. Caraustar Indus.*, *Inc*., 11-cv-01007, 2013 WL 1123615 at *2 (N.D. Ill. Mar. 19, 2013) (dismissing case where "plaintiffs have perjured themselves by making repeated, knowingly false statements under oath in pre-deposition sworn declarations") (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44-45 (1991)).

The trier of fact should have the opportunity of considering the credibility of each named Plaintiff and opt-in against that of managers and nurses from the same department who have

---

period 3-4 times per month); **Casaceli Dep.** 108:10-16 (stating that on 10-15% of her shifts she would take a 30-minute duty free meal period).

testified differently regarding, for example: departmental meal period and time-recording procedures; the frequency of worked meal breaks; supervisory knowledge of worked meal periods and Plaintiffs' conduct.  *See, e.g., Pacheco v. Boar's Head Provisions Co.*, 671 F. Supp. 2d 957, 964-65 (W.D. Mich. 2009) (court denied certification of plaintiffs' allegations of a common policy not to pay time worked because it was "concerned about the contradictions between Plaintiffs' . . . testimony, because they show 'the importance of cross-examination of each plaintiff' and suggest the 'need for separate mini-trials to resolve each individual's claim.'") (citation omitted).  Thus, collective action treatment is inappropriate.

Even when the Plaintiffs would tell the truth to the best of their recollection, their recollection is likely to be inaccurate.  As Dr. Krock explains, the events in question—mere half-hours of allegedly worked time extending back as far as 2007—are just too insubstantial for most people to remember with any confidence.[89]   And even without the self-interested financial motive, Plaintiffs are likely to overestimate these routine life events.[90]   The adversarial process—not a one-size-fits-all checkbox—is the right, constitutionally-mandated mechanism to test the Plaintiffs' evidence.[91]

### 2.  There is No Manageable Trial Plan for Proceeding as a Collective Action.

Closely related to NS-LIJ's right to defend itself against actual (*i.e.*, not hypothetical claims) is the Plaintiffs' inability to create a manageable trial plan.  As in *Camesi, Camilotes* and *White* (among others), Plaintiffs have not and cannot develop a trial plan that will account for the individualized inquiries necessary, the disparity in attributes among the opt-in plaintiffs, and the

---

[89] Krock Dec. ¶¶ 78, 81.
[90] Krock Dec. ¶¶ 83-90.
[91] *See* **Bharat Dep.** 159:15-160:1 (cannot give an estimate of the number of times she worked through her meal period and knows of no document that exists that would help her refresh her memory); **Viola Dep.** 135:17-136:8 (same); **Kohler Dep.** 51:22-52:17 (same); **Abrams-Brown Dep.** 81:6-81:11 (same); **Casaceli Dep.** 184:17-185:22 (same).

variety of policies and procedures held by different locations (and in some cases, different departments in the same locations). *Camilotes*, 286 F.R.D. at 354 ("Generically stating that unspecified mechanisms may exist is not sufficient to allay the Court's manageability and fairness concerns, especially given the plethora of individualized factual issues in this case."); *Camesi*, 2011 WL 6372873 at *9 ("Although Plaintiffs' counsel generally suggest that the various individualized inquiries could be handled through representative testimony, bifurcation or subclassification, they offer no meaningful explanations of how this could be accomplished."); *White*, 2011 WL 1883959 at *14.

Essentially, Plaintiffs are left with only four potential options to try this case on a classwide basis: the Court must either (1) hear testimony from all 1,051 Plaintiffs (not to mention NS-LIJ's responding witnesses); (2) rely on a sample; (3) rely on a survey; or (4) rely on the data. The first option is not possible, and given the inquiries required for determining an FLSA violation, the other three do not fare any better.

First, sampling. As already mentioned, given the individualized inquiry required to establish an FLSA, sampling liability does not satisfy due process.[92] It also does not satisfy basic statistics, because "statistical analysis does not provide a method for identifying the liability status of non-sampled collective class members," or in short, because there is no representative case.[93] *Zivali*, 784 F. Supp. 2d at 468 ("The testimony of the plaintiffs is not representative and cannot fairly be extrapolated to the 4,100 individuals who have opted into this

---

[92] By way of example, of the 788 opt-in Plaintiffs for whom NS-LIJ has PeopleSoft data, there are 682 different combinations of job description, location, business unit, and department. Krock Dec. ¶ 59. An appropriate sample would have to reflect at least these differences, and thus could be no smaller than 682 people. *Id*.
[93] Krock Dec. ¶ 70.

action.").[94]

Given the many metrics the jury must consider—job position, location, business unit, and department, to name only a few—it would be manifestly unfair to NS-LIJ to allow the presentation of representative evidence.  *Camilotes*, 286 F.R.D. at 354.[95]  In fact, the 961 Plaintiffs for whom Dr. Krock analyzed pay, time, and HR data fell into **682** separate combinations of just those four factors.  Krock Dec. ¶¶ 59.  Essentially, to be representative, a sample would need to be the entire population—which of course, is not a sample at all.[96]  It would be impossible for the Court to conduct a manageable trial that reflects even these basic fundamental differences among the Plaintiffs, let alone the other individualized issues already mentioned.

Next, consider a written survey submitted to each Plaintiff.  That too fails, because the number of questions each Plaintiff would have to answer, the necessity of tailoring different surveys to different job positions, and the potential changes over time periods would render such a survey complex and overly burdensome.[97]  Indeed, it is hard to imagine how this hypothetical survey is any better than deposition or trial testimony.  The answer: it's not.  Nor does surveying give NS-LIJ the ability to challenge the statements Plaintiffs make in their surveys.  And, as discussed above, Plaintiffs are willing to say a lot on paper that crumbles during interrogation.

Finally, the data.  By its nature, data is limited—and those missing pieces are individualized inquiries.  For instance, the electronic timekeeping and payroll data does not show whether a person actually worked through a meal period and was not compensated, why a meal

---

[94] Krock Dec. ¶ 73 ("The determination of liability for each Opt-In Plaintiff would be so specific that it is impossible to project that person's liability experience to any other Opt-In Plaintiff.").
[95] Krock Dec. ¶¶ 59, 93.
[96] Krock Dec. ¶¶ 70-71.
[97] Krock Dec. ¶¶ 77-82.

period was worked through, or whether an employee was otherwise compensated, to name but a few holes.[98]   Obtaining the backstory requires testimony—of the 1,051 Plaintiffs, their supervisors, and other employees.   One can hardly imagine a better description of an unmanageable trial.

> **3.   Proceeding as a Collective Action Would Violate NS-LIJ's Due Process Because Questions of Individual Damage Calculations Will Overwhelm Common Questions.**

Nor can Plaintiffs establish a damages model that would adequately compensate class members without engaging in the same liability-related individualized inquiries NS-LIJ has already demonstrated are fatal to maintaining a collective action here.  *See Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1434-35 (2013) (holding Rule 23 certification proper only where measure of damages was tied to theory of liability).  Though it had been earlier accepted that individualized damages inquiries might not bar certification, the law under *Comcast* is now otherwise:

> [I]t is clear that, under the proper standard for evaluating certification, respondents' model falls far short of establishing that damages are capable of measurement on a classwide basis. Without presenting another methodology, respondents cannot show Rule 23(b)(3) predominance: Questions of individual damage calculations will inevitably overwhelm questions common to the class.

*Id.* at 1433. As Dr. Krock explains, there is no "average" harm among the Plaintiffs (just as there is no "average" liability).[99]  Plaintiff thus cannot present a method of ascertaining damages for each Plaintiff that is any less individualized than the FLSA liability inquiry itself.  Determining damages requires detailed examination of how many of Plaintiff's alleged violations the Court finds supported, then weaving a forensic tale to determine how much had been paid to the

---

[98] Krock Dec. ¶ 53.
[99] Krock Dec. ¶ 76.

Plaintiff already, including of course any compensatory time or alternative arrangement.  With such a complicated task at hand, only individual trials on individual claims will result in correct allocations of liability and damages (or lack thereof).

### 4.  Plaintiffs and Their Counsel Have Proven Themselves Inadequate to Proceed on Behalf of the Collective Action.

"[T]he Court has an equitable interest in ensuring that [opt-in plaintiffs] are adequately represented."  *E.g.*, *Hoffmann v. Sbarro, Inc.*, 982 F. Supp. 249, 263 (S.D.N.Y. 1997); *see also In re FedEx Ground Package Sys., Inc., Employment Practices Litig.,* 662 F. Supp. 2d 1069, 1082 (N.D. Ind. 2009) (finding named plaintiffs inadequate).  Here, both the named Plaintiffs and their counsel are poor stewards on behalf of the opt-in Plaintiffs.  As discussed above, the named Plaintiffs have suffered significant hits to credibility.  And for counsel's part, the law firm simply has been unable to perform its advocate's role throughout the litigation, which has caused Magistrate Judge Boyle to question their adequacy and caused Judge Crotty to issue a scathing opinion criticizing Thomas & Solomon's improper notice.

### a.  The Named Plaintiffs' Credibility Problems Make Them Poor Representatives.

The named Plaintiffs who have been deposed have revealed a consistent inability to present a credible case.  *See supra.*  In the analogous Rule 23 context, such failing of "honesty and trustworthiness" has led to decertification.  *See Savino v. Computer Credit, Inc.,* 164 F.3d 81, 87 (2d Cir. 1998) (holding plaintiff to be inadequate class representative because he "repeatedly changed his position . . . about [] letters that form[ed] the very basis of his lawsuit"); *Friedman-Katz v. Lindt & Sprungli (USA), Inc.,* 270 F.R.D. 150, 159 (S.D.N.Y. 2010) (finding plaintiff was an inadequate class representative where she lied about how many other lawsuits she had been party to and her relationships with class counsel and did not come "partially clean" "until after she repeated her false interrogatory statements under oath and was then confronted

42

with evidence that proved her answers were false.").

Even a cursory review of the deposition testimony shows that the deposed Plaintiffs are "subject to sharp attack" on "issue[s] critical to" the case—a standard the Second Circuit has applied to reject a class representative.  *Kline v. Wolf,* 702 F.2d 400, 403 (2d Cir. 1983); *see Savino*, 164 F.3d at 87.  The Court need not look beyond Exhibits 93 and 94 of the Compendium of Evidence, which highlights the Plaintiffs perjured statements.  A collective action should not be formed – nor maintained – in the face of such overwhelming instances of perjury.  *See Pruell*, 09-cv-11466, Dkt. 141.

### b.  Plaintiffs' Counsel Has Engaged in Misconduct.

Thomas & Solomon LLP has brought over a dozen lawsuits in the Second Circuit alone against healthcare systems alleging that their use of so-called "auto-deduct" timekeeping functions violated the FLSA by denying pay for worked meal breaks.  Their tactics in these cases—and in this case in particular—have involved misrepresentation heaped upon misrepresentation.

At the outset, counsel sent out a woefully defective website solicitation and unauthorized class notice in similar cases, as well as to thousands of NS-LIJ employees through an unofficial mailing list.  Back in 2010, Plaintiffs' counsel stated in the notice and on its website that:

> the judge has concluded that employees have made a modest factual showing that they routinely worked through their meal periods to attend to patient needs. There was a practice of applying the automatic thirty minute meal break deduction to those employees when they worked through part or all of their meal breaks.

Dkt. 172, Pl.'s Opp. To Mot. for Expedited Notice, at 34.   The Court strongly

admonished counsel, describing the statement as "false," "deceptive," and "misleading." *Id.*[100] And the data now bears out the potential effect of their fraudulent activity: Of the 138 Plaintiffs who joined before notice was sent out, 29 have since withdrawn their Consent to Join.[101]

As already discussed, plaintiffs' counsel has allowed the plaintiffs to submit declarations that materially contradicted their deposition testimony. Any reasonable investigation by counsel would have uncovered the extent to which the declarations it submitted were false. Not only were these declarations used during conditional certification, but the same baseless allegations of a common policy permeated the Third Amended Complaint as well. Counsel has proven itself not up to the task of representing such a large, varied collective action.

## VI.  CONCLUSION

The dangers of wrongful certification—only to be regretted at trial—are apparent. In *Big Lots*, the court ultimately decertified an FLSA collective action ***after trial,*** before ruling on the merits, because "[i]t would be an injustice to proceed to a verdict on the merits that results in a binding classwide ruling based on such disparate evidence."  561 F. Supp. 2d at 577, 587-88. Caught between a rock and a hard place, "the Court reache[d] the inescapable conclusion that the all or nothing posture . . . [would] make[] ruling on the merits fundamentally unfair." *Id.* If it ruled for Plaintiffs, "it would have to do so on the basis of proof that is not representative of the whole class" and thus find liability "in a magnitude that is not likely to be warranted in reality." *Id.* at 588. And if it ruled for the Defendant, "all of plaintiff's claims"—even the meritorious ones—"would be extinguished." *Id.* That same logic applies here.

---

[100] This transcript was previously provided to Judge Bianco, but does not appear on the docket. We reattach it as Exhibit 96 to the Compendium of Evidence.

[101] Krock Dec. ¶ 62; Dkts. 314, 323, 335, 337, 342, 344, 347, 348, 349, 353.

For all the foregoing reasons, NS-LIJ respectfully requests that the Court decertify the conditional FLSA collective action.

August 2, 2013                              Respectfully submitted,

                                           /s/ Amanda C. Sommerfeld

                                           Amanda C. Sommerfeld
                                           ASommerfeld@winston.com
                                           **WINSTON & STRAWN LLP**
                                           333 S. Grand Avenue
                                           Los Angeles, California 90071-1543
                                           (213) 615-1700

                                           Joan B. Tucker Fife
                                           JFife@winston.com
                                           **WINSTON & STRAWN LLP**
                                           101 California Street
                                           San Francisco, CA 94111-5802
                                           (415) 591-1000

                                           Anthony D'Auria
                                           ADauria@winston.com
                                           **WINSTON & STRAWN LLP**
                                           200 Park Avenue
                                           New York, New York 10166
                                           (212) 294-6700

                                           Attorneys for Defendants