# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------- x

CLAUDIA DESILVA, GREGG LAMBDIN,  :
KELLY IWASIUK, EILEEN BATES-BORDIES,  : Case No. 10-cv-1341 (PKC)(WDW)
MARGARET HALL, AND BRENDA GAINES,  :
*on behalf of themselves and all other employees*  :
*similarly situated*,  :
:
           Plaintiffs,  :
:
      -against-  :
:
NORTH SHORE-LONG ISLAND JEWISH  : **DEFENDANTS' MEMORANDUM**
HEALTH SYSTEM INC., NORTH SHORE-LONG: **OF LAW IN OPPOSITION TO**
ISLAND JEWISH HEALTH CARE, INC.,  : **PLAINTIFFS' MOTION FOR**
PENINSULA HOSPITAL CENTER, FOREST  : **RULE 23 CERTIFICATION**
HILLS HOSPITAL, FRANKLIN HOSPITAL,  :
GLEN COVE HOSPITAL, HUNTINGTON  :
HOSPITAL ASSOCIATION, LONG ISLAND  :
JEWISH MEDICAL CENTER, LONG ISLAND  :
JEWISH HOSPITAL, ZUCKER HILLSIDE  :
HOSPITAL, NORTH SHORE UNIVERSITY  :
HOSPITAL, PLAINVIEW HOSPITAL,  :
SCHNEIDER CHILDREN'S HOSPITAL,  :
SOUTHSIDE HOSPITAL, STATEN ISLAND  :
UNIVERSITY HOSPITAL, SYOSSET  :
HOSPITAL, MICHAEL J. DOWLING, JOSEPH  :
CABRAL, AND NORTH SHORE-LONG ISLAND:
JEWISH HEALTH SYSTEM 403B PLAN,  :
:
          Defendants.  :

-------------------------------------------------------- x

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................1

II.     RULE 23 CERTIFICATION STANDARDS ...................................................3

III.    ARGUMENT ......................................................................................................4

    A.      The Proposed Class Is Not Ascertainable Because Plaintiffs' New "Failsafe" Class Definition Impermissibly Conditions Each Person's Class Membership on a Determination of NS-LIJ's Liability...........................................5

    B.      Plaintiffs Have Not Shown That Their Proposed Class Contains Enough People to Render Joinder Inappropriate.................................................................8

    C.      Plaintiffs' Claims Are Fundamentally Individualized Inquiries—And Thus Common Issues Do Not Exist, Let Alone Predominate. .......................................10

        1.      Because NS-LIJ's Common Policy is to Pay for All Time Worked, Any Deviations from that Policy are Inherently Situational.....................11

            a.      NS-LIJ's Common Policy and Consistent Practice is to Pay for All Time Worked. ...................................................11

            b.      Plaintiffs' Purported Common Questions Are An Attempt to Mask Individualized Inquiries That Result From Managers' Exercise of Their Discretion. .......................................15

                i.      Plaintiffs Are Attacking Individual Managers' Exercises of Their Discretion to Approve Specific Employees' Requests for Overtime Pay................................15

                ii.     Even if Plaintiffs Were Truly Challenging NS-LIJ's Policy—and Not Just Manager's Discretion—A Policy Permitting NS-LIJ to Verify That Employees Actually Worked the Time in the System is Entirely Legal. ...............18

        2.      Resolving the Merits of Plaintiffs' Inquiry—Whether or Not a Plaintiff Was Properly Paid—Is an Individualized Inquiry.......................20

            a.      Even If Some Individuals Worked Uncompensated Time, NS-LIJ's Knowledge of that Work Is An Individualized Inquiry..........................................................................23

            b.      Plaintiffs' Attempt to Forego Individualized Testimony By Relying on Incompetent, Inadmissible, and Irrelevant Evidence Should Be Rejected Because It Provides No Way to Determine Whether and Which Plaintiffs Worked Unpaid Hours—or in What Amounts. ...........................................26

                i.      KRONOS's "Unapproved Hours" Category Only Reflects that Unscheduled Time Was Recorded and Not Approved During the Payroll Period..............................27

ii.   The Cressman Affirmation Reaches Incorrect Expert Conclusions Based on Unreliable Data. ................................30

iii.  The NDNQI Survey Data Provides At Best a One-Day Snapshot that the Survey Respondents Missed Certain Meal Breaks, and Says Nothing About Whether They Were Compensated. ..............................................................32

iv.  The Twenty-Seven Opt-in Plaintiffs' Vague Interrogatory Responses Are, as the Plaintiffs Themselves Admitted at Deposition, Not Reliable. ...............32

v.   Plaintiffs' New Declarations Are Vague and Speculative, and At Best Reflect Only the Declarants' Individual Experiences With Their Specific Managers. ........33

3.   Even if Plaintiffs Were Correct That Common Issues Exist They Do Not Predominate Over the Many Fact-Intensive, NYLL Individualized Inquiries. ..............................................................34

4.   Plaintiffs Cannot Overcome *Comcast*'s Requirement that Damages be Tied to Liability on a Classwide Basis. ....................................................35

D.   The Plaintiffs are Unrepresentative of the Putative Class. ....................................37

1.   The Plaintiffs Are Unlike the Putative Class Members, and Accordingly, Their Claims Are Not Typical. ............................................37

2.   The Plaintiffs Are Not Adequate Representatives Because They Lack Credibility and, By Their Own Admission, Do Not Know the Circumstances Governing the Rest of the Class. ......................................39

a.   Plaintiffs Do Not Understand Their Own Case or the Facts Underlying Their Claims. ............................................................39

b.   Plaintiffs Have Impugned Their Own Credibility By Submitting Written Testimony That Materially Conflicts With Their Deposition Testimony. ...........................................40

E.   Thomas & Solomon Cannot Adequately Represent the Putative Class Because They Have Committed Sanctionable Conduct by Submitting False Declarations, Sent Out a Misleading Class Notice, and Improperly Testified Here. .......................................................................................................41

F.   Plaintiffs Present No Manageable Method for Trying this Case, and Thus a Class Action is an Inferior Method of Resolving Plaintiffs' Disputes. .................43

1.   Plaintiffs Cannot Present an Appropriately Sized, Statistically Valid Representative Case. ...................................................................................43

2.   Surveying, or Any Other Shortcut Method, Will Inadequately Proxy for the Necessary Testimony By Representative Class Members. ............44

       G.      Plaintiff's Stage II Certification Request is Confusing, and is Improper. .............44

IV.    CONCLUSION.........................................................................................................45

# TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Am. Pipe & Constr. Co. v. Utah*,
   414 U.S. 538 (1974).................................................................................8

*Amgen, Inc. v. Conn. Ret. Plans and Trust Funds*,
   133 S. Ct. 1184 (2013)............................................................................27

*Babineau v. Fed. Exp. Corp.*,
   576 F.3d 1183 (11th Cir. 2009) ........................................................25, 26

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
   222 F.3d 52 (2d Cir. 2000).............................................................38, 39, 41

*Briceno v. USI Servs. Grp., Inc.*,
   2012 WL 4511626 (E.D.N.Y. Sept. 28, 2012) ......................................38

*Bridge v. Phoenix Bond & Indem. Co.*,
   553 U.S. 639 (2008)................................................................................36

*Brown v. Kelly*,
   609 F.3d 467 (2d Cir. 2010)......................................................................4

*Camesi v. Univ. of Pittsburgh Med. Ctr.*
   2011 WL 6372873 (W.D. Pa. Dec. 20, 2011)........................1, 10, 12, 32

*Camilotes v. Resurrection Health Care Corp.*,
   286 F.R.D. 339 (N.D. Ill. 2012)..............................................................32

*Carrera v. Bayer Corp.*,
   -- F.3d --, 2013 WL 4437225 (3d Cir. Aug. 21, 2013) ......................6, 44

*Chao v. Gotham Registry, Inc.*,
   514 F.3d 280 (2d Cir. 2008).......................................................19, 20, 24

*Colozzi v. St. Joseph's Hospital Health Center*,
   275 F.R.D. 75 (N.D.N.Y. 2011)..............................................................10

*Comcast v. Behrend*,
   133 S. Ct. 1426 (2013)..................................................................10, 35, 37

*Creely v. HCR ManorCare, Inc.*,
   920 F. Supp. 2d 846 (N.D. Ohio 2013)...................................................10

*Demarco v. Edens,*
    390 F.2d 836 (2d Cir. 1968)................................................................8

*Diaz v. Electronics Boutique of Am., Inc.,*
    2005 WL 2654270 (W.D.N.Y. Oct. 17, 2005) ........................................18

*Fernandez v. Wells Fargo Bank,*
    No. 12-cv-7193, slip op. (S.D.N.Y. Aug. 28, 2013) .............................36

*Gardner v. W. Beef Properties, Inc.,*
    2011 WL 6140518 (E.D.N.Y. Sept. 26, 2011) ......................................38

*Hamelin v. Faxton-St. Luke's Healthcare*
    247 F.R.D. 385 (N.D.N.Y. 2011).........................................................10

*In re Flag Telecom Holdings, Ltd. Sec. Litig.,*
    574 F.3d 29 (2d Cir. 2009)..................................................................39

*In re Frontier Ins. Grp., Inc. Sec. Litig.,*
    172 F.R.D. 31 (E.D.N.Y. 1997) ..........................................................39

*In re Initial Pub. Offerings,*
    471 F.3d 24 (2d Cir. 2006)................................................................4, 6

*In re Salomon Analyst Metromedia Litig.,*
    544 F.3d 474 (2d Cir. 2008)................................................................27

*In re Visa Check/MasterMoney Antitrust Litig.*
    280 F.3d 124 (2d Cir. 2001) ...............................................................35

*In re Vitamin C Antitrust Litig.,*
    279 F.R.D. 90 (E.D.N.Y. 2012) ............................................................6

*Kellar v. Summit Seating Inc.,*
    664 F.3d 169 (7th Cir. 2011) .........................................................24, 25

*Kline v. Wolf,*
    720 F.2d 400 (2d Cir. 1983)................................................................41

*Kuznyetsov v. W. Penn Allegheny Health Sys., Inc.,*
    2011 WL 465760 (W.D. Pa. Feb. 4, 2011).........................................32

*Kuznyetsov v. W. Penn Allegheny Health Sys., Inc.*
    2011 WL 6372852 (W.D. Pa. Dec. 20, 2011)..................................1, 10

*Lujan v. Cabana Management, Inc.,*
    284 F.R.D. 50 (E.D.N.Y. 2012) ..........................................................27

*Lundy v. Catholic Health Sys. of Long Island*
  711 F.3d 106 (2d Cir. 2013)........................................................................4, 41

*MacGregor v. Farmers Ins. Exchange*,
  2011 WL 2981466 (D.S.C. July 22, 2011) ................................................18

*Marcus v. BMW of N. Am., LLC*,
  687 F.3d 583 (3d Cir. 2012)............................................................................8

*Maywalt v. Parker & Parsley Petroleum Co.*,
  67 F.3d 1072 (2d Cir. 1995).........................................................................39

*Mazzei v. Money Store*,
  288 F.R.D. 45 (S.D.N.Y. 2012) .................................................................6, 8

*McLaughlin v. Am. Tobacco Co.*,
  522 F.3d 215 (2d Cir. 2008)...................................................................36, 44

*Meyers v. Crouse Health Sys., Inc.*,
  274 F.R.D. 404 (N.D.N.Y. 2011)................................................................10

*Moskowitz v. La Suisse, Societe D'Assurances sur la Vie*,
  282 F.R.D. 54 (S.D.N.Y. 2012) ..................................................................39

*Newton v. City of Henderson*,
  47 F.3d 746 (5th Cir. 1995) .........................................................................12

*Pagan v. Abbott Labs, Inc.*
  287 F.R.D. 139 (E.D.N.Y. 2012).................................................................40

*Philip Morris Inc. v. Nat'l Asbestos Workers Med. Fund*,
  214 F.3d 132 (2d Cir. 2000)............................................................................7

*Pruell v. Caritas Christi*,
  09-cv-11466, Dkt. 141 (D. Mass. May 31, 2013)................................41, 42

*Randleman v. Fid. Nat'l Title Ins. Co.*
  646 F.3d 347 (6th Cir. 2011) .........................................................................6

*Savino v. Computer Credit, Inc.*,
  164 F.3d 81 (2d Cir. 1998)............................................................................41

*Seward v. Int'l Bus. Machines Corp.*,
  2013 WL 142006 (S.D.N.Y. Jan. 2, 2013) .................................................18

*Siles v. ILGWU Nat'l Ret. Fund*,
  783 F.2d 923 (9th Cir. 1986) ..........................................................................9

*Taylor v. Pittsburgh Mercy Health Sys., Inc.*
  2012 WL 1739821 (W.D. Pa. May 16, 2012)....................................................1, 10

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*,
  546 F.3d 196 (2d Cir. 2008)..........................................................................3

*United States v. City of New York*,
  276 F.R.D. 22 (E.D.N.Y. 2011) .....................................................................4

*Wal-Mart Stores, Inc. v. Dukes*,
  131 S. Ct. 2541 (2011) ......................................................................... passim

*Zivali v. AT&T Mobility, LLC*,
  784 F. Supp. 2d 456 (S.D.N.Y. 2011)...........................................................19

STATUTES

29 U.S.C. §§ 201-19 ...........................................................................................4

29 U.S.C. § 255(a) ..............................................................................................4

N.Y. Lab. Law. § 663(1).................................................................................4, 36

N.Y. Lab. Law § 663(3)........................................................................................4

OTHER AUTHORITIES

29 C.F.R. § 785.48(a)..............................................................................25, 30, 31

1 McLaughlin on Class Actions § 4:2 (9th ed.).....................................................7

1 McLaughlin on Class Actions § 5:68 (9th ed.)..................................................43

Rule 11 .................................................................................................5, 41, 42, 45

Rule 23 ..................................................................................................... passim

Rule 23(a) ..............................................................................................3, 4, 37, 43

Rule 23(a)(1) ........................................................................................................8

Rule 23(b) ........................................................................................................3, 4

Rule 23(b)(3).........................................................................................................3

## I.      INTRODUCTION

This case is about whether North Shore Long Island Jewish Health System ("NS-LIJ") properly paid each of over 32,000 employees since March 2004.  For more than two years, Plaintiffs have proceeded as they alleged in their Third Amended Complaint and in their Motion for Conditional Certification—on a theory that NS-LIJ owed them overtime for missed and interrupted meal breaks.  After a similar, FLSA collective action certification theory was rejected in so many other of Thomas & Solomon's cases,[1] they now argue for the first time that NS-LIJ's requirement that managers approve any unscheduled work time before transmitting to payroll *per se* violates the Fair Labor Standards Act ("FLSA") and New York Labor Law ("NYLL"). Plaintiffs cite only one case for this sweeping proposition, and it does not actually support their theory.  Indeed, the law is to the contrary: it is the ***non-payment*** of ***worked*** overtime, not an employer's choice of method for translating worked time into paid time, that can violate the law.

After receiving over 300,000 pages of documents, having access to their over 1000 Opt-In clients, and over 300 boxes filled with hardcopy pay and timekeeping records at Winston & Strawn's New York office and additional documents on-site at many locations, deposing 18 managers and administrators, and changing their theory of the case, Plaintiffs rely on only five scintillas of evidence to support class certification: (1) the Affirmation of Plaintiffs' counsel here, Sarah Cressman, which inappropriately conveys unreliable and wrong expert-witness-style statistical analysis of complex computer system data; (2) a survey of nurses that requests information about their meal break experiences for *one shift* on *one day*, providing at best a momentary, unrepresentative snapshot; (3) 35 self-selected Plaintiffs' own interrogatory responses, which they recanted and contradicted at deposition; (4) two KRONOS technical

---

[1] *Camesi v. Univ. of Pittsburgh Med. Ctr.*, 2011 WL 6372873 (W.D. Pa. Dec. 20, 2011); *Kuznyetsov v. W. Penn Allegheny Health Sys., Inc.*, 2011 WL 6372852 (W.D. Pa. Dec. 20, 2011); and *Taylor v. Pittsburgh Mercy Health Sys., Inc.,* 2012 WL 1739821 (W.D. Pa. May 16, 2012).

manuals that instruct users on the function of approving (and disapproving) unscheduled hours, which Plaintiffs try to exalt as NS-LIJ policies; and (5) fourteen new, cookie-cutter declarations that state little more than vague allegations of uncompensated time and that managers and supervisors needed to approve worked overtime before it was paid.  When subjected to the appropriately required "rigorous analysis," none of this evidence satisfies Plaintiffs' burden of proving that certification is warranted.

Even if Plaintiffs' new theories were supported by evidence, they do not withstand scrutiny.  For both the non-KRONOS and KRONOS subclasses, Plaintiffs can present no common evidence for the Court to determine classwide liability because the timekeeping and payroll inquiry is so fact-intensive.  Whether an employee clocked in early or not, clocked out late or not, missed a meal break or not, and was appropriately compensated requires answering no fewer than 23 different questions necessary to determining whether a NYLL violation has occurred.  *See infra* at 20-21.  These employees work(ed) at different places, with different managers, and different timekeeping records.  The policies governing how they take their breaks are different.  And because they hold many job positions, the reasons that a meal break was missed or that a shift was extended vary as well—in ways that may affect whether the time is compensable.  Finally, whether NS-LIJ actually knew of each person's uncompensated, allegedly worked time is not something that can be resolved in one stroke.

Perhaps the principal death knell to Plaintiffs' theory is that, when all is said and done, NS-LIJ managers, not policies, make weekly determinations about whether an employee's timekeeping records accurately reflect time worked.  If a manager decided not to approve certain time punches, he may have done so correctly (e.g., when an employee punched in and socialized before starting work, forgot to clock out, or worked late one day and took compensatory time the

next) and consistent with NS-LIJ's policy to pay for time worked , or in the rare and inadvertent case, incorrectly. But, whether wrong or right, these decisions are made by people, not documents. And as the Court said in *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011),the exercise of discretion cannot add up to a common policy; it is indeed the precise opposite. And Plaintiffs' claims otherwise ring particularly hollow in light of NS-LIJ's managers' authorization of ***over $715 million*** in overtime paid to NS-LIJ employees since 2004.

Plaintiffs' KRONOS subclass is not any more viable than its non-KRONOS subclass. Plaintiffs have not, as they have claimed, proven that NS-LIJ has knowledge of KRONOS-tracked, unapproved, unpaid overtime. Plaintiffs' critical error stems from relying on the misnamed category "unapproved hours." A more accurate name is "unscheduled hours," because any time that is recorded outside the pre-entered, pre-approved shift ends up in this line-item for managers to consider and approve. Some managers rubberstamp all unapproved hours; others verify that the time was actually worked, and then approve. But, unless approved within the same payroll period, it ***always*** remains in KRONOS as "unapproved hours"—demonstrating only that an employee clocked in or out outside his or her schedule. It says nothing about whether that person actually worked the time, whether a manager later approved it, or whether that employee was paid for it in a later payroll period or received compensatory time. In short, even if Plaintiffs could prove objectively that "unapproved hours" occurred on a given day, they would still have to prove their violations through individualized evidence. Plaintiffs' smoking gun is just a burned out cigarette.

Because Plaintiffs fail to satisfy any of the Rule 23(a) prongs and the Rule 23(b) predominance requirement—let alone all of them—the Court must deny certification.

## II.    RULE 23 CERTIFICATION STANDARDS

To succeed on class certification under Rule 23(b)(3), Plaintiffs must demonstrate by a

preponderance of the evidence that "the claims meet the preconditions of Rule 23(a) of numerosity, commonality, typicality, and adequacy[,]" *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 201-02 (2d Cir. 2008), that the class membership satisfies a "requirement of ascertainability," *In re Initial Pub. Offerings*, 471 F.3d 24, 30 (2d Cir. 2006), that "the questions of law or fact common to class members predominate over any questions affecting only individual members," and that "a class litigation is superior to other available methods for fairly and efficiently adjudicating the controversy." *See Brown v. Kelly*, 609 F.3d 467, 476 (2d Cir. 2010); *United States v. City of New York*, 276 F.R.D. 22, 29 (E.D.N.Y. 2011).  And the Court has a duty to undertake a "rigorous analysis" to assure itself that all of the requirements of Rule 23(a) and one prong of Rule 23(b) are satisfied, even if such analysis involves considerations affecting the merits.  *Wal-Mart*, 131 S. Ct. at 2551.  Plaintiffs satisfy none.

## III.   ARGUMENT

Plaintiff's proposed Rule 23 class is not certifiable—under either the FLSA or NYLL—for at least six reasons.[2]  *First*, Plaintiffs have interjected a liability determination into the class definition, which creates an impermissible "failsafe" class that would protect otherwise-bound class members from an adverse ruling.  *Second*, Plaintiffs have demonstrated that the subclasses are only *potentially* numerous because the pool of employees is large, and this is insufficient as a matter of law.  *Third*, Plaintiffs have not shown that whether putative class members worked overtime each week, whether NS-LIJ knew about it, and whether they were paid correctly each

---

[2] The relevant law under the NYLL and FLSA is similar, with two main differences. While the FLSA has only a two (or sometimes, three) year statute of limitations, the NYLL gives Plaintiffs six years to bring their claims.  *Compare* 29 U.S.C. § 255(a) *with* N.Y. Lab. Law § 663(3).  Also, the FLSA regulates only payment of overtime while the NYLL also governs the payment of "gap time"—or in essence, the payment of any unpaid wages.  29 U.S.C. §§ 201-19; N.Y. Lab. Law § 663(1); *Lundy v. Catholic Health Sys. of Long Island*, 711 F.3d 106, 116, 118 (2d Cir. 2013).

week are questions that will generate common classwide answers, let alone that these issues predominate over the individualized inquiries. *See Wal-Mart*, 131 S. Ct. at 2551. *Fourth*, the Plaintiffs are not proper class representatives because their claims are subject to individual defenses—thus making their claims atypical—and because they lack credibility and knowledge about their case, rendering them inadequate. *Fifth*, Thomas & Solomon should not be certified as class counsel because they committed a Rule 11 violation by submitting false declarations to get a class conditionally certified, sent out a false and deceptive class notice in this case *before* any conditional certification motion was even filed, and submitted perjurious declarations in other similar cases also. *Finally*, Plaintiffs have presented no evidence that trial on a classwide basis is manageable; to the contrary, sampling and surveying would be inappropriate and inadequate.

### A.  The Proposed Class Is Not Ascertainable Because Plaintiffs' New "Failsafe" Class Definition Impermissibly Conditions Each Person's Class Membership on a Determination of NS-LIJ's Liability.

In their Third Amended Complaint, and again at the FLSA conditional certification stage, Plaintiffs argued that they were not compensated for missed meal breaks based on NS-LIJ's "timekeeping system [which] *automatically* deducts time from employees' paychecks each day for meals, breaks, and other reasons." Third Am. Compl., Dkt. 163 ¶ 100; *see also* Pl.'s Cond. Cert. Br. at 2, 6. Based on that theory, Judge Bianco conditionally certified an FLSA collective action of all "[h]ourly employees involved in direct patient care responsibilities whose scheduled hours include a deduction for an unpaid meal break and who would have had to report performing work during meal breaks in order to be paid for such work."[3] Having now

---

[3] Dkt. 212.

abandoned the false affirmations on which that theory and the court's order were based,[4] Plaintiffs now seek to define a new class of all NS-LIJ hourly employees who meet the following criteria: they (1) were subject to an "approval policy"; (2) denied compensation for work that was performed; (3) during a meal period or pre-/post-shift; (4) where that time was not approved for payment by a manager, **and** (5) either (i) used KRONOS; or (ii) worked at Manhasset, Southside, Huntington, Plainview, Syosset, or in LIJ's Nursing Department before KRONOS was introduced. *See* Cert. Br. at 4.

However, an appropriate class definition must avoid "numerous individualized determinations of class membership" so that it is "administratively feasible" for a court to determine whether a particular individual is a member of the class without "mini-trials." *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 45 (2d Cir. 2006); *see Carrera v. Bayer Corp.*, -- F.3d --, 2013 WL 4437225, at *5 (3d Cir. Aug. 21, 2013) ("A plaintiff does not satisfy the ascertainability requirement if individualized fact-finding or mini-trials will be required to prove class membership."). Indeed, the "rigorous analysis" of the ascertainability requirement "provides due process by requiring that a defendant be able to test the reliability of the evidence submitted to prove class membership." *Carrera*, 2013 WL 4437225 at *4.

Here, not only have Plaintiffs set up multistep prerequisites for class membership, but those prerequisites are merits determinations that render the class unascertainable. *In re Vitamin C Antitrust Litig.*, 279 F.R.D. 90, 116 (E.D.N.Y. 2012) ("class is . . . not ascertainable [because] determining class membership would 'require a mini-hearing on the merits of each case'"). To determine whether an employee is a putative class member, the Court must engage in numerous

---

[4] Mar. 8, 2012 Hr'g Tr., at 6:15-7:5, 7:19-8:1, and 8:12-16. This transcript is not available on the docket, so is attached as Exhibit 162 to the Compendium of Evidence in Support of Defendants' Opposition to Plaintiffs' Motion for Rule 23 Certification ("Rule 23 Opp. Comp.").

fact intensive, merit-based inquiries, including whether NS-LIJ denied an employee compensation for work it knew was performed.  Such a class definition is a "fail-safe class" because it "'shields the putative class members from receiving an adverse judgment.'"  *Mazzei v. Money Store*, 288 F.R.D. 45, 55 (S.D.N.Y. 2012) (citations omitted); *see Randleman v. Fid. Nat'l. Title Ins. Co.*, 646 F.3d 347, 352 (6th Cir. 2011) (finding that fail-safe class definition was "an independent ground for denying class certification").

Because class membership is tied to a merits inquiry, no one knows who is "in" the class and who will be bound by a judgment until the merits are decided at the trial.  If the class representatives prevail at trial, then the putative class members satisfying all the criteria of the class definition become class members and prevailing parties at the same time, just in time to collect their damages.  If the class representatives lose at trial, the "denied compensation for work performed" prerequisite for class membership fails, and consequently, the defense judgment doesn't bind anyone but the Plaintiffs.

This presents two problems.  *First*, a fail-safe class definition deprives NS-LIJ of due process.  1 McLaughlin on Class Actions § 4:2 (9th ed.) ("[I]t would violate a defendant's due process rights to proceed with an unascertainable class if absent class members would not be bound by a judgment adverse to the plaintiffs while the defendant would be bound by a judgment adverse to the defendant.") (collecting cases); *see, e.g.*, *Philip Morris Inc. v. Nat'l Asbestos Workers Med. Fund*, 214 F.3d 132, 135 (2d Cir. 2000).  But Rule 23 was specifically amended to avoid such gamesmanship:

> A recurrent source of abuse under the former Rule [23] lay in the potential that members of the claimed class could in some situations await developments in the trial or even final judgment on the merits in order to determine whether participation would be favorable to their interests. If the evidence at the trial made their prospective position as actual class members appear weak, or if a

7

> judgment precluded the possibility of a favorable determination, such putative members of the class who chose not to intervene or join as parties would not be bound by the judgment. This situation—the potential for so called "one-way intervention"—aroused considerable criticism . . . . The 1966 amendments were designed . . . to assure that members of the class would be identified before trial on the merits and would be bound by all subsequent orders and judgments.

*Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 546 (1974).

And *second*, a fail-safe class definition renders the case "unmanageable because the members of the class could only be known after a determination of liability." *Mazzei*, 288 F.R.D. at 55. From a practical perspective, NS-LIJ could not prepare for or proceed at trial without admitting liability to certain class members simply because of the way the class definition is constructed. For example, from NS-LIJ's point of view, because it properly pays its employees—and so none of its employees fall into the class definition—NS-LIJ could not list class members who would receive notice without abandoning its defenses. Similarly, if NS-LIJ wanted to call a class member at trial as a witness, it could not select an employee without conceding that the person was "denied compensation for work performed." These problems strike at the heart of what a trial would look like, and Plaintiffs offer no solution. Thus, Plaintiffs fail to present an ascertainable or manageable class.

### B.  Plaintiffs Have Not Shown That Their Proposed Class Contains Enough People to Render Joinder Inappropriate.

Closely related to the ascertainability problem is a numerosity problem. Because a predicate to class membership is a finding of liability, Plaintiffs have not actually shown the putative class's size.[5] At best, Plaintiffs offer up the pool of employees who might be class members if they can establish that NS-LIJ owed them overtime. *See* Cert. Br. at 24 (surmising

---

[5] Plaintiffs' numerosity argument relies almost entirely on Sarah Cressman's faulty conclusions about the "overtime hours" line item. *See* Cert. Br. at 23.

that 10% of the potential pool might have unapproved overtime).  But Plaintiffs have a burden to prove, rather than speculate, that the class is large enough to render joinder impracticable. Rule 23(a)(1); *Demarco v. Edens*, 390 F.2d 836, 845 (2d Cir. 1968).  Pointing to the number of NS-LIJ employees is insufficient.  *See, e.g.*, *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 596 (3d Cir. 2012) (refusing to certify where Plaintiff relied on BMW's status as a national car company, without "show[ing] sufficient circumstantial evidence specific to the products, problems, parties, and geographic areas actually covered by the class definition to allow a district court to make a factual finding."); *Siles v. ILGWU Nat'l. Ret. Fund*, 783 F.2d 923, 930 (9th Cir. 1986) ("Siles's only evidence of numerosity was that 31,000 employees covered by the plan lost their jobs in 1974 and 1975. There is no evidence regarding how many of these employees did not receive a pension, how many worked ten years in covered employment, or how many did not work a year in covered employment after 1976.").  Accordingly, Plaintiffs have not shown numerosity.[6]

Plaintiffs' scant evidence from their own proposed class members is telling as well.  In support of their motion, Plaintiffs submitted ***fourteen*** affirmations on their newly constructed approval-policy theory, despite representing over 1000 FLSA Opt-In plaintiffs.[7]  In fact, with respect to the FLSA collective action, 52 plaintiffs withdrew their consent rather than participate in the suit, and ten other Opt-In plaintiffs are subject to terminating sanctions.[8]  Certainly, if NS-LIJ's policy not to pay overtime were really so widespread, Plaintiffs should have been able to amass far more testimonials during the past two years.

---

[6] To the extent Dr. Krock calculated the pool from which the subclass would be drawn, he could do so only by making certain invalid assumption on conditions that the data do not speak to (e.g., that all were subject to an approval policy and worked uncompensated overtime).  *See* Krock Rule 23 Dec. ¶ 56-57.

[7] And, as discussed in Part III.D, regarding typicality, these alleged experiences are contradicted and not shared with the affirmants' co-workers.

[8] Dkt. 319.

### C.  Plaintiffs' Claims Are Fundamentally Individualized Inquiries—And Thus Common Issues Do Not Exist, Let Alone Predominate.

Under *Wal-Mart*, "[c]ommonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury[,]'" and not just "a violation of the same provision of law." 131 S. Ct. at 2551.  Thus, Plaintiffs' claims "must depend upon a common contention . . . of such a nature that it is capable of classwide resolution—which means that the determination of its truth or falsity will resolve an issue that is central to the validity of each of the class claims in one stroke." *Id.* at 2551.  On the issue of commonality, Plaintiffs barely acknowledge *Wal-Mart*, and completely ignore *Comcast v. Behrend*, 133 S. Ct. 1426 (2013).[2]

After the "rigorous analysis" *Wal-mart* requires (and not the "permissive[]" or "not demanding" inquiry Plaintiffs advance, *see* Cert. Br. at 24, 26), the Court should find that Plaintiffs have not proven that issues "capable of classwide resolution" exist, let alone that they predominate.  *First*, Plaintiffs have not demonstrated that NS-LIJ has a common policy of anything other than paying for all time worked, and instead only point to individual FLSA Opt-In plaintiffs' experiences that cannot be extrapolated to the whole class.  *Second*, whether a putative class member has been subject to a NYLL violation is an individualized inquiry that turns on

---

[2] Plaintiffs' brief frequently cites to a trinity of cases where the same judge in all three cases granted Rule 23 certification near simultaneously. *Colozzi v. St. Joseph's Hosp. Health Center*, 275 F.R.D. 75 (N.D.N.Y. 2011), *Hamelin v. Faxton-St. Luke's Healthcare*, 247 F.R.D. 385 (N.D.N.Y. 2011), and *Meyers v. Crouse Health Sys., Inc.*, 274 F.R.D. 404 (N.D.N.Y. 2011). These cases were decided before *Wal-Mart* and *Comcast*.  Various orders were appealed and the parties appear to be in the process of settling. However, since *Wal-Mart*, every certification motion brought by Thomas & Solomon in a hospital overtime case has failed.  *Camesi v. Univ. of Pittsburgh Med. Ctr.*, 2011 WL 6372873 (W.D. Pa. Dec. 20, 2011); *Kuznyetsov v. W. Penn Allegheny Health Sys., Inc.*, 2011 WL 6372852 (W.D. Pa. Dec. 20, 2011); and *Taylor v. Pittsburgh Mercy Health Sys., Inc.*, 2012 WL 1739821 (W.D. Pa. May 16, 2012).  Moreover, one other court has expressly criticized the logic of these cases. *See, e.g.*, *Creely v. HCR ManorCare, Inc.*, 920 F. Supp. 2d 846, 856 (N.D. Ohio 2013) (disagreeing with *Colozzi* and *Hamelin* "because they appear to discount the importance of (1) disparate factual employment settings of individual plaintiffs, and (2) how an auto-deduct policy's implementation may vary depending on the managers who implement them.").

fact-bound questions and microanalysis of the actions taken by managers and employees alike. The answers to these questions cannot be distilled from, or substantially advanced by, documentary evidence alone.   Indeed Cressman's own affirmation essentially concedes this because, much as she tried, she could not show definitively by the electronic data that any Opt-In Plaintiff, much less a putative class member, was not paid for all hours worked.  *Third*, even if Plaintiffs had presented common questions, the significant individualized issues outweigh those questions.  *Finally*, Plaintiffs do not explain how damages could be awarded on a classwide basis without indulging in the same individualized inquiries that govern liability.

### 1. Because NS-LIJ's Common Policy is to Pay for All Time Worked, Any Deviations from that Policy are Inherently Situational.

#### a. NS-LIJ's Common Policy and Consistent Practice is to Pay for All Time Worked.

NS-LIJ has one, unequivocal uniform written pay policy: to pay its employees for all time worked.  In no uncertain terms, NS-LIJ commands its managers **"to ensure that pay received by health system employees accurately reflects each employee's time worked"** and "to provide eligible health system employees with an opportunity to take rest periods and meal breaks during the course of a workday."[10]  And managers and employees—including FLSA Opt-In Plaintiffs—confirm this written policy is regularly implemented.

Upon hire, NS-LIJ trains its managers that "it is LIJ's policy to pay for all hours worked, including overtime."[11]  This expectation—to pay for all hours worked—predated KRONOS.[12]

---

[10] Santiago Dec. ¶ 8-9, Exs. 5 & 6, NS094991 (Overtime Policy), NS094989 (Meal Time and Rest Periods Policy); *see also Garofalo Dec.* ¶ 20 ("LIJ's policy is to pay for all time worked, and it has been my experience that I have been paid for all time worked.").

[11] *Daley Dec.* ¶ 8 ("I was told when I was hired that it is LIJ's policy to pay for all hours worked, including overtime."); *Id.* ¶ 20 ("I was told that I was expected and required to approve all overtime worked in Kronos.").

[12] *Tadlock Dec.* ¶ 12 ("The other supervisors in my department and I have been trained regarding the Hospital's policy to pay all employees for all time worked, including work beyond an

And it remains part of their training today, now that KRONOS has been largely but not completely implemented systemwide.[13]

Based on that training, managers approve all overtime worked—again, regardless of whether it was submitted through KRONOS,[14] or, in the pre-KRONOS days, submitted on a variance form, verbally communicated, e-mailed, or otherwise reported.[15]  But unless a manager knows that an employee has worked time outside of her schedule, the manager assumes that the employee has worked her scheduled hours only. That assumption, of course, is perfectly legal. *See* Decert Br. at 22-23, 23 n.58 (collecting citations from Department of Labor, Sixth Circuit, and numerous district courts, including this one); *Newton v. City of Henderson*, 47 F.3d 746, 749 (5th Cir. 1995) (holding employer's "ability to investigate whether or not Newton was truthfully filling out the City's payroll forms" did not constitute constructive knowledge of worked overtime because employers have a "right to require an employee to adhere to its procedures for claiming overtime"); *see also Camesi*, 2011 WL 6372873 at *4.

To ensure that employees know of NS-LIJ's expectation that they report unscheduled, worked hours so that NS-LIJ can pay for them, managers, like Meredith Colon at LIJ Hospital's Labor and Delivery Department, regularly meet with employees to "remind[] them that they need to record and report all hours worked, including time outside of the schedules, so that they will

---

employee's scheduled shift or during a meal break."); Barrett (Southside) Dec. ¶ 24 ("Employees must be and are paid for all overtime worked, even if such time is not ultimately approved. Accordingly, we [Human Resources personnel] regularly guide managers to pay employees for all overtime worked.  We tell managers/supervisors to counsel employees who do not comply with the overtime approval policy."); Salvo (Glen Cove) Dep. 54:2-56:7 (managers have one-on-one meetings with Human Resources to discuss expectation that employees' time be managed, recorded and that there is an expectation that employees be paid for all hours worked).

[13] *Daley Dec.* ¶ 20 (was told that she was expected and required to approve all overtime worked in Kronos); *Tadlock Dec.* ¶ 12 (manager was trained on Southside's policy to pay employees for all time worked, including overtime); Decert. Br. at 6 n.9 (collecting methods of recording time).

[14] *Tadlock Dec.* ¶ 12; *Daley Dec.* ¶ 20.

[15] *Tadlock Dec.* ¶ 12; *Daley Dec.* ¶ 20.

be paid for it."[16]  What she tells them speaks volumes: "[I]f they work overtime, all they need to do is verbally tell a supervisor that they worked the time, and they will be paid."[17]  Of course, Colon is not the only manager who routinely reminds employees to record all time they work outside the schedule.[18]  In fact, as one RN states, her manager "specifically reminded [her] to record that [she] worked through [her] meal period when [the manager] has seen [her] do so."[19]

These reminders do not fall on deaf ears.  NS-LIJ's employees know that NS-LIJ will and does pay for all time worked, and that mechanisms are in place to report their time worked outside their schedules.[20]  And they frequently use these procedures to report their overtime hours.[21]

Finally, as over 120 declarations submitted by NS-LIJ and many Opt-In Plaintiffs' own deposition testimony shows, so long as employees raise their hands to report time worked, NS-

---

[16] Colon (LIJMC) Dec. ¶ 7.

[17] *Id.*  NS-LIJ's 30(b)(6) witnesses confirm that overtime is paid so long as a supervisor is notified.  Plaintiffs' contention that overtime must be "approved" to be paid is not supported by the very evidence they rely on.  NS-LIJ has prepared a chart of each of the ways in which Plaintiffs have mischaracterized this and other evidence.  *See* Sommerfeld Dec. ¶ 27, Ex. 160.

[18] *See Garofalo Dec.* ¶ 12 (was told to record hours worked beyond scheduled hours "so that I will be paid for the time"); *Daley Dec.* ¶ 21 ("I regularly tell all the employees on my staff that they are expected to take their meal breaks; *see also* Charles (Orzac) Dec. ¶ 5, 12 ("I encourage all of my staff to take their meal breaks . . . [and] that they are not permitted to do any work before they clock in or after they clock out."); Campagnola (Glen Cove) Dec. ¶ 2 ("I also ensure employees understand and adhere to Hospital policies and practices, and I respond to employees' questions about . . . timekeeping."); *see also* **Correa-Tiernan Dep.** 149:19-151:20 (department head instructed her to record missed meal break in log book and was paid for it).

[19] *Carlsen Dec.* ¶ 14; *see also* Charles (Orzac) Dec. ¶ 5 ("I encourage all of my staff to take their full meal and rest breaks").

[20] *See, e.g., Argueta Dec.* ¶ 8,9; *Garofolo Dec.* ¶ 11, 12; *Castro Dec.* ¶ 11; *Bailey, J. Dec.* ¶ 7, 9; *Carlsen Dec.* ¶ 10; *Gorman Dec.* ¶ 11; *Gause Dec.* ¶ 12; *Wyllins Dec.* ¶ 9, 11; *Rubino Dec.* ¶ 12, 13, 15.

[21] *See, e.g., Argueta Dec.* ¶ 8 (overtime form); *Castro Dec.* ¶ 9-10 ("variance" form); *Clark Dec.* ¶ 13, 18 (overtime on punch card); *Garofalo Dec.* ¶ 12 (record on paper); *Kerner Dec.* ¶ 14 (puts overtime into Ansos system); *Maltese Dec.* ¶ 18 (overtime form and advises manager); *Meadows Dec.* ¶ 18 (informs supervisor and Nursing Office and overtime recorded in book); *Mehryari Dec.* ¶ 18 ("no lunch" notation on timecard); *Munzer Dec.* ¶ 13 (records on board and form).

LIJ pays for it.[22]   These employees hold a panoply of job positions and work or worked at a number of locations—negating any claim of a common, widespread policy of underpayment.[23]

FLSA Opt-in Plaintiff Young Yang's story is particularly informative.  Her career has consisted of working in Forest Hills, Manhasset, and North Shore-LIJ; she started as a staff nurse and worked her way up to Assistant Director of Nursing.[24]   As Assistant Director of Nursing, she actually implemented the very policy that Plaintiffs say doesn't exist: she "inform[ed] nurse managers that [she] expected them to approve and sign . . . timecards when somebody worked through a meal break[,]" and "instruct[ed] patient directors to do the same."[25]   She recalled no complaints that "nurse managers[,] patient directors[,] or the assistant director of nursing [were] not approving overtime pay," and she herself "generally approved overtime requests that came to [her]."[26] At the time of deposition, Yang believed that "employees who worked on [her] shift who worked through meal breaks were paid for working through meal breaks."[27]   Yang's experience is not uncommon among NS-LIJ managers.  And it shows that NS-LIJ had no uniform policy to deprive its employees of the overtime they worked.

---

[22] *See, e.g., Argueta Dec.* ¶ 8 ("I have never been denied pay for overtime hours worked when I have notified my manager about it either verbally or by using the form."); *Bailey, J. Dec.* ¶ 8 ("On occasion, I have not been able to tell [a] supervisor in advance of working overtime.  In these cases, I have asked for approval after the fact, and have never been denied."); *see also Desir Dec.* ¶ 13; *Garofolo Dec.* ¶ 17, 18, 20; *Gause Dec.* ¶12; *Wyllins Dec.* ¶ 9, 11; *Hurst Dec.* ¶ 17; *Rubino Dec.* ¶ 17; *Argueta Dec.* ¶ 11; *Anderson Dec.* ¶ 16; *Munzer Dec.* ¶ 13, 20.

[23] *See, e.g., Carlsen Dec.* ¶ 6 (RN at Plainview); *Garofalo Dec.* ¶ 6 (RN at LIJMC); *Castro Dec.* ¶ 6 (clerk/typist at Syosset); *Gorman Dec.* ¶ 6 (X-Ray Technician at Syosset); *Hurst Dec.* ¶ 6 (Secretary at Plainview); *Bailey, J. Dec.* ¶ 6 (Unit Secretary at Syosset); *Alvarado Dec.* ¶ 6 (Medical Lab Technologist at Southside); *Arpino Dec.* ¶ 5 (Food Services Worker at NSUH); *Connor Dec.* ¶ 5 (Registrar at Huntington); *Rene Dec.* ¶ 5 (Patient Escort at Syosset); *Henley Dec.* ¶ 6 (Pharmacy Technician at Plainview); *Berry Dec.* ¶ 5 (Medical Technologist at Huntington); *Desir Dec.* ¶ 5 (Linen Collector at Huntington).

[24] Yang Dep. at 19:25-25:5.

[25] *Id.* at 90:18-25.

[26] *Id.* at 91:25-92:8.

[27] *Id.* at 93:3-7.

### b. Plaintiffs' Purported Common Questions Are An Attempt to Mask Individualized Inquiries That Result From Managers' Exercise of Their Discretion.

Because NS-LIJ's policy is to pay for all hours worked (including overtime), Plaintiffs struggle to name a common "policy" to challenge through the class action mechanism. They identify two purportedly common issues: (1) "whether North Shore-LIJ's policy of delegating to its managers the task of approving overtime is in compliance with the law," and (2) "whether North Shore-LIJ's policy of paying only for approved overtime, rather than all time worked, complies with the law[.]" Cert Br. at 27. Neither is factually or legally supported.

### i. Plaintiffs Are Attacking Individual Managers' Exercises of Their Discretion to Approve Specific Employees' Requests for Overtime Pay.

Without identifying a formal document, Plaintiffs claim that NS-LIJ maintains a policy of giving its managers and timekeepers discretion not to approve overtime for time worked. Plaintiffs' argument was squarely rejected by the Supreme Court in *Wal-mart*. Nor, even if it were cognizable, would it be factually supported.

In *Wal-mart*, the Supreme Court held that a "corporate policy . . . of ***allowing discretion*** by local supervisors" "is just the opposite of a uniform employment practice that would provide the commonality needed for a class action . . . [because] it is a policy ***against having*** uniform employment practices." 131 S. Ct. at 2554. This statement is no less true here. That Plaintiffs say they are "challenging a corporate policy, as distinguished from the subjective determinations of individual managers not linked to any central policy[,]" does not make it so. *See* Cert Br. at 26. One need look no further than Plaintiffs' own handful of submitted declarations, which point to no administrative directive, no memoranda, no meeting minutes, no presentation that establishes what they claim to be NS-LIJ's common policy. *See infra* at III.C.2.v. Really, Plaintiffs ***are*** challenging whether and why a manager on any given day decided to approve and

pay for time that may or may not have been time worked.  They admit as much in their brief: "[I]n order for hourly employees to be paid for hours worked outside of their regularly scheduled shifts and during unpaid automatically deducted meal periods, ***a manager must decide*** which, if any, of that time should be paid and then enter whatever amount of time worked will be paid in Kronos."  Cert. Br. at 9 (emphasis added).  To the extent that a manager mistakenly did not approve time that was actually worked, that error is not attributable to any formal policy or de facto practice of NS-LIJ.   And determining whether such an error occurred requires individualized testimony.

Plaintiffs' failure of proof of a common policy is striking.  For the proposed subclass of employees who were not on KRONOS, Plaintiffs present absolutely no evidence of a corporate policy regarding pay for time worked.  This is not surprising, because before KRONOS, other than the unified directive to pay for all time worked, NS-LIJ's various facilities had discretion to adjust their timekeeping and scheduling practices.[28]   What Plaintiffs are left with are a handful of affirmations that essentially claim if believed, only that certain managers might have denied an unspecified amount of overtime pay over an unspecified amount of time for an unspecified amount of work untied to particular workdays, or even workweeks.[29]

For the proposed subclass of employees on KRONOS, Plaintiffs' evidence of a corporate

---

[28] Bosco Dec. ¶ 5; *see also* Salvo (Glen Cove) Dep. 56:13-57:1 (before Kronos implementation, managers had discretion to choose a timekeeping method for their department, so long as it was consistent with FLSA and hospital policies); Bardolf Dec. ¶ 5-6 (recently acquired facilities "have substantially maintained their diverse pre-existing human resource and timekeeping practices" and "Corporate Human Resources does not dictate practices regarding meal and rest breaks, overtime authorization and timekeeping at the various facilities"); Wiggins (PAANS) Dec. ¶ 9 ("Directors and managers at each practice have discretionary authority to implement timekeeping policies within the requirements of the law and the Health System's policies.").

[29] Cressman Rule 23 Aff. ¶ 30, Ex. AA (*Bramante Dec.* ¶ 5; *Balen Dec.* ¶ 5; *Bergmann Dec.* ¶ 5; *Britton Dec.* ¶ 5; *Bormann Dec.* ¶ 5; *Cummins Dec.* ¶ 5; *Conway Dec.* ¶ 5; *Davis Dec.* ¶ 5; *Houck Dec.* ¶ 5; *Kurot Dec.* ¶ 5; *Marchione Dec.* ¶ 5; *Reeves Dec.* ¶ 5; *Romero Dec.* ¶ 5; *Sanders Dec.* ¶ 5).

"policy" consists of two documents: a myTime training manual and a Guide titled How To Approve Unapproved Overtime, and, more specifically, an example in the Guide that shows that managers "may approve 'all, **some** or none of the overtime.'"  Cert. Br. at 8;  *see* Exs. B & C to Cert. Br.  But neither of these tools are "policies"; rather, they are operations manuals that explain how NS-LIJ's KRONOS software functions.  They certainly do not replace NS-LIJ's written policy to pay for all hours worked. And even as training guides, both convey the importance of approving overtime, so long as the employee *works* the time:

- "If an employee **works** overtime, you need to approve it in order for the employee to be paid correctly.  You can approve any unapproved overtime that an employee **works**."  Ex. B to Cert Br. at 38 (emphasis added); and

- "If an employee **works** more than their regularly scheduled hours, you will see the extra time worked listed under the 'Unapproved OT' column . . . ***You need to approve it in order for the employee to be paid correctly.***"  Ex. C. to Cert Br. at NS00000159 (emphasis modified).

As NS-LIJ showed above, Plaintiffs cannot show that NS-LIJ's policies and training are *de facto* ignored.  *See supra* at Part III.C.1.a.  In fact, NS-LIJ's substantial overtime payments demonstrate just the opposite.  Since March 2004—the beginning of the putative class period—NS-LIJ has paid out $715,292,353 for 17,610,923 hours of overtime to its employees.[30]  But under Plaintiffs' theory that NS-LIJ systematically deprived its employees of overtime pay, these numbers should each be zero—or at least a lot closer to zero.

Even Plaintiffs' and Opt-in Plaintiffs' deposition testimony shows that any improper denial of overtime was person specific.  Many of them admit that they were paid for some but not all missed meal breaks.[31]  Thus, individual putative class members' stories reflect that whether overtime was paid depended on the actions of their specific manager.  And under *Wal-mart*, ***that*** is not the commonality that Rule 23 demands.

---

[30] Krock Rule 23 Dec. ¶ 60.5.
[31] **Correa-Tiernan Dep.** 129:15-19; **Green Dep.** 116:9-120:23, 124:12-125:5, 182:17-183:14; **Iwasiuk-Sesso Dep.** 93:1-95:23; **Kohler Dep.** 50:24-51:21.

ii. **Even if Plaintiffs Were Truly Challenging NS-LIJ's Policy—and Not Just Manager's Discretion—A Policy Permitting NS-LIJ to Verify That Employees Actually Worked the Time in the System is Entirely Legal.**

Plaintiffs' other argument—that there exists a common question about whether NS-LIJ's practice of reviewing and verifying recorded hours instead of a practice of "paying only for . . . all time worked" is legal—sets up a false dichotomy because it assumes NS-LIJ's overtime approval practice does not pay for all time worked. The opposite is true: as already explained above, NS-LIJ's own policy documents and the declarations from a significant number of putative class members reflect that managers are directed to approve all time that is truly worked.[32] Ultimately, Plaintiffs' theory is premised on the erroneous position that an employer has *no right to verify* that time captured in a timekeeping system (or claimed by an employee) was actually worked time, before paying it.

Policies allowing managers to approve timekeeping entries before submitted to payroll are perfectly legal. *See, e.g.*, *Seward v. Int'l Bus. Machines Corp.*, 2013 WL 142006 (S.D.N.Y. Jan. 2, 2013) (holding that policy requiring second-line manager to approve overtime to be legal); *Diaz v. Electronics Boutique of Am., Inc.*, 2005 WL 2654270, *4 (W.D.N.Y. Oct. 17, 2005) (finding that plaintiffs' allegations that "overtime work must be approved and, thus, [employer] had a policy of not paying for overtime work . . . [were] insufficient to suggest that all [employees] were subject to a policy of requiring but not compensating employees for overtime work."); *see also MacGregor v. Farmers Ins. Exchange*, 2011 WL 2981466, *3 (D.S.C.

---

[32] *See* supra at n.11; *Daley Dec.* ¶ 8 ("I was told when I was hired that it is LIJ's policy to pay for all hours worked, including overtime."); *Id.* ¶ 20 ("I was told that I was expected and required to approve all overtime worked in Kronos."); *Tadlock Dec.* ¶ 12 ("The other supervisors in my department and I have been trained regarding the Hospital's policy to pay all employees for all time worked, including work beyond an employee's scheduled shift or during a meal break. I always follow this policy by approving all overtime hours in Kronos that employees actually work and tell me they worked (either in writing or orally), and I have informed the supervisors in my department that I expect them to do the same.").

July 22, 2011) *reconsideration denied*, 2012 WL 1533644 (D.S.C. Apr. 30, 2012) ("Requiring supervisor approval for work hours [and] automatically deducting lunch breaks . . . do not violate the FLSA without more").[33]   And in one case addressing a ***pre***-approval policy (which is ***not*** what NS-LIJ has here),[34] the Court found no FLSA violation on grounds relevant here:

> There is no legal requirement that employers maintain time clocks, *see* 29 C.F.R. § 785.48, that hours worked be contemporaneously recorded, or that employees be permitted to enter their own adjustments to a time record without verification by management. Thus, MyTime is a lawful timekeeping system as long as it allows for the complete and accurate recording of all time worked by Mobility employees.

*Zivali v. AT&T Mobility, LLC*, 784 F. Supp. 2d 456, 461 (S.D.N.Y. 2011).

As a matter of logic, a practice of verifying the time reported as worked time before sending it along to payroll cannot itself be illegal because it does not establish, or even further, a determination of whether a NYLL violation occurred.  Because Plaintiffs have to establish that they worked uncompensated, compensable time, an employee who was paid all the overtime due to her has no claim—regardless of whether or not that time had to be approved by a manager.

Plaintiffs point to only one case—*Chao*—for their theory that "approval for pay policies violate the FLSA."   Cert. Br. at 5-6 (citing *Chao v. Gotham Registry, Inc.*, 514 F.3d 280 (2d Cir. 2008)).  But *Chao* says nothing of the sort.  Rather, citing settled bedrock employment law cases, *Chao* stands for the obvious: that when an employee works beyond his or

---

[33] The rationale of the "hospital autodeduct" cases disposes of Plaintiffs' contention that a practice of approving time for overtime pay violates state and federal law.  Like automatic deduction practices, requiring managers to review and verify recorded time outside the schedule indulges the same presumption that, absent contrary evidence, an employee works his or her scheduled hours.  Both provide employees a way to record a deviation, and both ensure that payment is for time worked.  And any deviation from NS-LIJ policy and the law by a supervisor is a fact-bound mistake that can be determined only by analyzing individualized facts.

[34] Although Plaintiffs appear to be attacking NS-LIJ's post-shift, manager verification policy, they also vaguely refer to a pre-approval policy—at least for their legal citations.  *See* Cert. Br. at 28 ("Courts have found wage and hour claims based on a pre-approval policy, such as the policy at issue here, particularly suitable for class certification.")

her shift—whether authorized or not—an employer has a duty to pay *if the employer knows of the work*. *Chao*, 514 F.3d at 288-90.  And the defendant in *Chao*, a nurse staffing agency, *knew* its nurses were working more than scheduled because it attempted to negotiate premium pay on those contracts with its hospital clients.  514 F.3d at 284.  When it failed, it paid the nurses only straight time pay for their known but unauthorized overtime work.  *Id*. Thus, the only question there was whether the employer had a duty to pay overtime after "promulgating a rule requiring its employees to obtain prior approval for any work that would result in overtime and informing them that, absent such approval, they would be paid straight-time wages for the ensuing overtime." *Id.* at 288; *see id.* at 284.  That's a far cry from Plaintiffs' question here: whether a policy permitting managers to review and verify whether time was actually worked before sending the time sheets to payroll violates the NYLL.

### 2. Resolving the Merits of Plaintiffs' Inquiry—Whether or Not a Plaintiff Was Properly Paid—Is an Individualized Inquiry.

Whether a Plaintiff is entitled to overtime pay (or indeed, any compensation) is a complex, multifaceted inquiry that must account for a wide variety of individualized factors.  *See* Decert Br. at 18-33.  In the missed meal break context, NS-LIJ identified at least 11 questions that show that Plaintiffs' case turns on a Plaintiff-by-Plaintiff analysis:

1. Whether a Plaintiff worked time outside her schedule;
2. Whether the Plaintiff was paid for her time on the paycheck covering the week for which the outside-of-schedule work was performed;
3. Whether the Plaintiff received another form of compensation (*e.g.*, compensatory time off or permission to leave early);
4. Whether the Plaintiff was paid for the time during a subsequent week;
5. Whether the Plaintiff combined two unpaid 15-minute rest breaks with one 30-minute paid break together to take an hour-long break, only to (correctly) have half an hour treated as unpaid time.
6. Whether NS-LIJ had constructive or actual knowledge of the Plaintiff's break;
7. Whether the Plaintiff's time worked was *de minimis*;
8. Whether the Plaintiff worked the extra time to inflate her earnings;
9. Whether the Plaintiff was a properly classified, exempt employee;
10. Whether the statute of limitations barred the Plaintiff's claim; and

11. Whether, for a unionized Plaintiff, her claim was procedurally barred.

*Id.*; *see also* Krock Decert. Dec. ¶ 41.[35]  And there are even more questions now that the pre- and post- shift work has been added to the mix:

12. Did the employee work before his or her scheduled start time?
13. Did the employee work after the end of his scheduled end time?
14. Was the employee engaged in personal activities after clocking in but before beginning work?
15. Was the employee engaged in personal activities before clocking out but after ceasing work?
16. If the employee was working before or after his scheduled shift, did the employee's supervisor or someone in a position of authority know that he worked before or after his shift, or is there any reason the employer should have known that he worked before or after his shift?
17. Was the employee compensated in any way for working before or after his shift?
18. Did the employee receive non-monetary compensation (early release, compensatory time, etc.) for working before or after his shift?
19. Was the employee actually compensated for time worked before or after the shift on the paycheck for that period?
20. Was the employee actually compensated for time worked before or after the shift on a subsequent payroll period?
21. Did the employee follow the proper procedures for requesting pay for working before or after the shift?
22. Did the employee grieve or arbitrate the allegedly unpaid time, and if so, was the employee paid for it?
23. Is the allegedly unpaid time outside the statute of limitations?

It is of no moment that these same twenty-three questions—which include inquiries relevant to both Plaintiffs' claims and NS-LIJ's defenses—apply to each individual, because "what matters to class certification is the capacity of a classwide proceeding to generate common **answers**."  *Wal-Mart,* 131 S. Ct. at 2551 (emphasis added).  There is no reason to expect that 32,000, or even 320, putative class members will have the same responses each work week.

---

[35] NS-LIJ's expert statistician, Joseph A. Krock, Ph.D., submitted two declarations, one in support of Defendants' Motion to Decertify Conditionally Certified Collective Action (attached to Decert. Comp., Ex. 97), and the other in support of Defendants' Opposition to Class Certification (attached to Rule 23 Opp. Comp., which is filed concurrently with this memorandum of law).  Dr. Krock's declarations are referred to, respectively, as "Krock Decert. Dec." and "Krock Rule 23 Dec."

21

They work in different locations (68 business units),[36] have vastly different job responsibilities

(they fall within 2,515 job codes),[37] schedule their breaks differently,[38] belong to different unions

(or do not belong to one at all),[39] and have different policies for reporting overtime.[40]   For

---

[36] Krock Decert. Dec. ¶ 12, 14, 26; Krock Rule 23 Dec. ¶ 66; *Desir Dec.* ¶ 5 (Huntington); *Wyllins Dec.* ¶ 6 (Plainview); *Bailey, J. Dec.* ¶ 6 (Syosset); *Argueta Dec.* ¶ 6 (Southside); *Garofalo Dec.* ¶ 6 (LIJMC).

[37] Krock Rule 23 Dec. ¶ 66. Some but not all putative class members and Opt-In Plaintiffs have direct patient-care responsibilities. *See, e.g., Hurst Dec.* ¶ 6 (Unit Secretary reviews time and attendance); *Colatosti Dec.* ¶ 6-7 (Payroll Coordinator reviews time and attendance); *Berry Dec.* ¶ 6 (Lab Technician analyzes blood and urine and conducts chemicals tests); *Connor Dec.* ¶ 6 (Registrar registers patients and books appointments); *Desir Dec.* ¶ 6 (Linen Collector picks up linens and assists with housekeeping duties); *Figueroa Dec.* ¶ 6, *Munzer Dec.* ¶ 5 (Lab Assistant and Phlebotomist draws blood and logs specimens in the computer); *Valdes Dec.* ¶ 6 (duties have included housekeeping, getting money at the bank, handling mail, picking up death certificates, and moving furniture); *Arpino Dec.* ¶ 5 (Food Services Worker takes on different positions, including cooking at the grill, cleaning the cafeteria, and working the cashier); *Bretania Dec.* ¶ 5 (Ward Clerk transcribes medical records); *Guardado Dec.* ¶ 5 (Dietary Aide cleans and gives out food to patients); *Henley Dec.* ¶ 6 (Pharmacy Technician fills prescriptions and delivers medication); *Rene Dec.* ¶ 5 (Patient Escort transports patients); *Sparks Dec.* ¶ 5 (Ward Clerk performs clerical duties); *Tudisco Dec.* ¶ 6 (Lithotripter Technologist operates a machine that breaks up kidney or urethral stones and scrubs and assists the urologist); *Tuseo Dec.* ¶ 6 (Security Officer controls parking, drives buses, transports specimens, and provides security).

[38] **Bharat Dep.** 154:6-155:3 (charge nurse in the post-op surgery unit put together a daily meal break schedule); ***DeSilva Dep.*** 115:1-12 (admitting that she has the ability to schedule 30 minutes in her day to take a meal break); **Haas Dep.** 72:8-13, 73:4-11 (breaks are scheduled); **Kohler Dep.** 45:11-46:5 (schedules breaks to ensure everyone has an opportunity to take them); ***Iwasiuk Dep.*** 161:4-162:8 (supervisors wrote the meal break schedule on a dry erase board); ***Hall Dep.*** 188:16-21 (at NSUH nurses coordinated with each other to cover meal periods and breaks); **Perniciaro Dep.** 78:4-25 (from 2004-2005 breaks were not scheduled), 124:4-14 (as a nurse liaison, it was up to her to decide when she wanted to take a meal break); *Alvarado Dec.* ¶ 19 (meal breaks are scheduled); *Anderson Dec.* ¶ 21 (no schedule for meal breaks); *Tomasevic Dec.* ¶ 16 (meal breaks are always scheduled); *Weekes Dec.* ¶ 17 (nurse manager schedules meal breaks); Hermann (LIJMC) Dep. 41:18-42:13 (times for meal breaks are posted daily on assignment sheets for nurses, and employees are expected to take their meal breaks during their assigned times); Doyle (Post-Acute Svcs.) Dec. ¶ 18 (Home Care Network "Field employees (Field RNs, Occupational Therapists, Physical Therapists and Speech Pathologists) are largely autonomous in that they have authority to schedule their own work days and meal breaks.").

[39] Krock Decert. Dec. ¶ 60 (not all Opt-In Plaintiffs are members of unions).

[40] *Alvarado Dec.* ¶ 17 (notifies supervisor either before or after working overtime, and notes it in a marble notebook kept in the department); *Anderson Dec.* ¶ 19 (notifies manager of overtime and, to record the overtime, clocks out when she actually leaves); *Bailey, E. Dec.* ¶ 10 (completes overtime slip and submits it to Nursing Administration); *Baisden Dec.* ¶ 17 (noted

example, even the RNs, Assistant Nurse Managers, Patient Care Associates, and unit receptionists under LIJ Nurse Manager Rosemarie Daley's supervision have differently constructed schedules, each of which is tailored to the position and affects answers to the 23 questions.[41]  As the Supreme Court has cautioned, "a class cannot be certified on the premise that [the defendant] will not be entitled to litigate its statutory defenses to individual claims." *Wal-mart,* 131 S. Ct. at 2561.  Yet, that is precisely what will happen here if these individualized inquiries are ignored.

As discussed below, Plaintiffs are wrong that (a) NS-LIJ's knowledge of each minute each class member might have worked during a meal period or pre-/post- shift may be proven here on a classwide basis; and (b) that the court can determine whether employees actually worked any uncompensated overtime without each person's own testimony.

### a. Even If Some Individuals Worked Uncompensated Time, NS-LIJ's Knowledge of that Work Is An Individualized Inquiry.

Whether NS-LIJ had actual or constructive knowledge of a particular employees' specific uncompensated, worked time is a question for which there is no single "yes or no" answer. Decert Br. at 21-23.  Even putting aside that each piece of evidence that Plaintiffs rely on to demonstrate constructive knowledge fails to meet the challenge, Plaintiffs' contention that NS-LIJ had a duty of omniscience is fundamentally flawed.

---

overtime hours on the punch card she used to clock in); *Bernard Dec.* ¶ 14 (head secretary in Environmental Services Department notes overtime for employees on a time card and separate sheet); *Cunningham Dec.* ¶ 17 (orally notifies supervisor of overtime, punches out on her time card to reflect actual hours worked, and the supervisor initials the time card); *Tomasevic Dec.* ¶ 14 (calls manager on cell phone to tell them he needs to work overtime); *Weekes Dec.* ¶ 16 (notifies manager) *Rodriguez Dec.* ¶ 17 (when he works beyond his scheduled shift, he writes the overtime in two books kept in the unit office); *Connor Dec.* ¶ 11 (writes on timecard); *Castro Dec.* ¶ 14 (notes exception hours on "variance sheet"); *Kelly Dec.* ¶ 12 (writes exception time in daily schedule log book); *Hurst Dec.* ¶ 9 (records exception hours on an unscheduled work hours form); *Munzer Dec.* ¶ 9 (marks overtime on department board).
[41] *Daley Dec.* ¶ 14-17.  Daley also allows her employees to take comp time, but does not adjust Kronos to reflect it.  *Id.* ¶ 21.

A nearly identical case in the Seventh Circuit—citing approvingly the case Plaintiffs primarily rely on (*Chao*)—identifies the logical mistake Plaintiffs make here. *See Kellar v. Summit Seating Inc*., 664 F.3d 169, 177-78 (7th Cir. 2011). In *Kellar*, the plaintiff argued that her employer should have known that she had performed pre-shift work based on her time cards, which reflected early clock-ins. Not so, said the Court, because most of her fellow employees "were in the habit of punching in early and then socializing until their work shifts began." *Id.* at 177. Thus, her employer would not be on notice of the out-of-schedule work, absent some other indication that the punch truly reflected the time work was commenced. *Id.*

So too here. NS-LIJ of course knows that nurses work overtime because, in accordance with the company's longstanding practices, employees who actually work overtime raise their hand prolifically using one of NS-LIJ facilities' many mechanisms for recording overtime—*e.g.*, by speaking directly to a manager, e-mailing, or filling out an "unscheduled work hours" or variance form.[42] And NS-LIJ employees are paid for that time—to the tune of over **$715 million** for roughly 17.6 million hours from June 26, 2004 through January 19, 2013 according to

---

[42] *Bailey J. Dec.* ¶ 8 (notifies supervisor orally); *Argueta Dec.* ¶ 8 (tells supervisor orally or, if supervisor is unavailable, fills out a form); *Rubino Dec.* ¶ 13 (writes hours beyond schedule on a sheet and orally tells supervisor); *Daley Dec.* ¶ 20 (RNs on surgical floor of LIJMC notify assistant nurse manager or nurse manager directly); *Tadlock Dec.* ¶ 10-11 (employees are not required to get pre-approval to work overtime; they record the additional time in Kronos and notify Tadlock either verbally or in writing so that they are paid); *Castro Dec.* ¶ 9-14 (uses a variance sheet to report overtime hours worked beyond scheduled hours); Charles (Orzac) Dec. ¶ 8 (RNs only clock out when they are recording overtime); Campagnola (Glen Cove) Dec. ¶ 7 (physical therapy employees at Glen Cove note deviations from scheduled shift on a sign-in sheet); Colon (LIJMC) Dec. ¶ 10 (employees can report work outside of schedule by telling Colon verbally, by email, or writing on a paper record); Barrett (Southside) Dep. 16:24-18:10 (nurses inform management that they have worked exception hours by speaking directly with a supervisor, emailing a supervisor or filling out a form); Wiggins (PAANS) Dep. 37:13-38:3 (no one method for recording exception time at PAANS facilities); Goldberg (Plainview and Syosset) Dep. 14:22-16:7 (verbal, written or email notification of exception hours); Hermann (Cohen) Dep. 58:20-59:9 (nurses record exception hours on a change sheet).

Peopleosft.[43]  But, as in *Kellar*, NS-LIJ also knows that employees often clock in immediately on arrival before shift, and then socialize with their colleagues until their shift begins and before performing any work (or conversely, stay to socialize after they are done working but before clocking out as they walk out of the hospital).[44]  Such time is plainly not compensable.  *See* 29 C.F.R. § 785.48(a) ("[Wh]ere time clocks are used, employees who voluntarily come in before their regular starting time or remain after their closing time, do not have to be paid for such periods provided, of course, that they do not engage in any work.  **Their early or late clock punching may be disregarded.**" (emphasis added)); *infra* at 29-30.  And, if an employee who normally comes in fifteen minutes early to drink coffee in the cafeteria instead starts working early, NS-LIJ would not know she actually worked outside of her scheduled hours unless the employee used her department's established mechanism for reporting overtime and to get paid.  But that analysis may not be the same for every employee, every facility, every position, or every department.  This is a quintessentially fact-bound inquiry.  *See Babineau v. Fed. Exp. Corp.*, 576

---

[43] Krock Rule 23 Dec. ¶ 60.5; North Shore submits over 120 declarations from employees who state that they understood NS-LIJ expected them to let their supervisors or timekeepers know, according to whatever protocol governed them, that they had worked time outside their schedule.  They also say that when they do so, they are paid for the time worked.  *See, e.g.*, *Castro Dec.* ¶ 11-13; *Carlsen Dec.* ¶ 10 (knows she must notify manager if she works beyond scheduled shift so that she will be paid for all hours worked).

[44] *Hurst Dec.* ¶ 9, 13 (employees socialize after clocking in or before clocking out, which may reflect time socializing and not time worked); *Garofolo Dec.* ¶ 14; *Gause Dec.* ¶ 9; *Wyllins Dec.* ¶ 11; *Moreira Dec.* ¶ 9(b) (describing employee who socializes after her shift ends but before clocking out); *Bouchereau Dec.* ¶ ("The timestamps in Kronos reflect only when an employee badges in and out.  However, the employee may be doing a number of things in between the timestamps, and some of that time may be spent on personal things such as getting a cup of coffee, socializing with colleagues, making personal phone calls, or other nonwork activities."); *see Amitrano* (LIJMC) Dec. ¶ 11 (I have an employee who . . . gets to the hospital about 45 minutes early.  They come in and have their coffee and sit in the lounge. Then 15 minutes before the start of their shift, they clock in but not actually start working until their shift starts. This is pretty common, people coming in and clocking in early but not actually starting work until their shift starts."); Pellicone (Feinstein) Dec. ¶ 11 (employee conducts personal business after shift ends but before clocking out).

F.3d 1183, 1193 (11th Cir. 2009) (rejecting predominance where "the court would still have to conduct individualized inquiries into whether each employee voluntarily arrived early or stayed late and whether he engaged in any work").

Of course, certain putative class members may have informed a manager of their worked overtime.  And if the rare case exists where that employee had not been paid, she would be able to demonstrate not only constructive but actual knowledge on the part of NS-LIJ.  Figuring out whether or not such a report was made is not a classwide inquiry, but instead depends on interviewing managers and reviewing an employee's individual contacts with timekeeping and payroll staff.  And at least according to one FLSA Opt-in Plaintiff, "When they're notified, they'll pay it.  But if they're not notified, they don't know how to pay it."[45]

> **b. Plaintiffs' Attempt to Forego Individualized Testimony By Relying on Incompetent, Inadmissible, and Irrelevant Evidence Should Be Rejected Because It Provides No Way to Determine Whether and Which Plaintiffs Worked Unpaid Hours—or in What Amounts.**

Plaintiffs have no way of identifying when an individual worked and was not compensated, and even their 14 affirmations offer no guidance.  Even if the Plaintiffs were right that NS-LIJ had no right to verify that time outside the schedule was actually worked before approving it for payment (contrary to case law), the NYLL inquiry still would require a comparison of pay stubs, time records, employee testimony, and manager testimony—nothing short of a trial—to weed out those employees who the policy never harmed (and thus suffered no violation). That is, even if putative class members were governed by an illegal policy, to support a NYLL violation, they still need to show that they worked overtime that was not approved and

---

[45] **Correa-Tiernan Dep.** 195:22-196:1; *see also,* **Kohler Dep.** 103:24-104:6 (paid for all overtime she noted on the overtime form); ***Lambdin Dep.*** 150:24-151:12 (every time he recorded overtime in the log book, he was paid for it); **Yang Dep.** 90:18-92:2, 99:6-101:11 (unilaterally decided not to report all hours worked but those that she did record were paid.  As a nursing supervisor, when others reported working exception hours to her, she investigated and generally approved all requests, and she instructed other supervisors to do the same).

not otherwise compensated.  Thus, even under Plaintiffs' theory, individualized inquiries are still required.  Plaintiffs' request for certification hinges on only five pieces of "evidence"[46]—none of which are reliable or useful, singularly or in the aggregate, to connect all the dots of the NYLL inquiry: (1) the KRONOS "unapproved hours" line-item, which does not, as Plaintiffs argue, necessarily reflect unpaid time worked; (2) counsel's declaration, which Plaintiffs use to support their fundamentally flawed data analysis; (3) the NDNQI statistics, which Plaintiffs try to use to show NS-LIJ's "constructive knowledge of Plaintiffs' alleged violations"; (4) certain Plaintiffs' and Opt-In Plaintiffs' interrogatory responses, which as discovery has demonstrated, are not consistent with reality; and (5) Plaintiffs' fourteen new, but overly general and thus uninformative, declarations from Opt-Ins.  But to certify a class, Plaintiffs must present the Court with sufficient, admissible evidence.  *In re Salomon Analyst Metromedia Litig.*, 544 F.3d 474, 486 n.9 (2d Cir. 2008) *abrogated in part on other grounds*, *Amgen, Inc. v. Conn. Ret. Plans and Trust Funds*, 133 S. Ct. 1184 (2013); *Lujan v. Cabana Management, Inc.*, 284 F.R.D. 50, 64 (E.D.N.Y. 2012).

### i. KRONOS's "Unapproved Hours" Category Only Reflects that Unscheduled Time Was Recorded and Not Approved During the Payroll Period.

Specific to the KRONOS subclass, Plaintiffs make much ado about the "unapproved hours" line item in the KRONOS Time Detail Reports because it sounds ominous.  *See* Cert Br. at 16.  It's not.  This line item includes any time recorded by an employee outside of hours (if any) already set in KRONOS as his schedule—**regardless of whether the time is later paid.**[47]

---

[46] Although Plaintiffs complain about an abbreviated discovery period, they do not explain what further discovery they would have sought from NS-LIJ.  And in fact, the record shows that the class certification discovery schedule was more in line with Plaintiff's proposal than NS-LIJ's.

[47] *Hurst Dec.* ¶ 13 ("Because the Kronos records do not necessarily accurately reflect the work hours that an employee worked and may include some additional time that an employee spends doing non-work related activities (like talking to friends after a shift ends), not all punched time

So if an employee punched out an hour past her shift, the time might fall into the "unapproved hours" line item.[48]  And if the manager approves the time after the payroll period closes, the time stays in the "unapproved hours" line item forever.[49]  This is admittedly counterintuitive, but it does not amount to a NYLL violation.  It amounts to nothing more than the peculiar functioning of KRONOS, which is a timekeeping, not a payroll system.

There is another reason why relying on "unapproved hours" is unreliable.  During the KRONOS roll-out, to ensure that employees were paid correctly and that KRONOS would not affect an employee's overall pay, NS-LIJ required some employees to record their time in both KRONOS and the pre-KRONOS legacy system.[50]  The employees were paid based on the legacy system data, not the KRONOS entries, during this "parallel period."[51]  That means that while in transition, many employees racked up "unapproved hours," but these were problems only on

---

outside of an employee's scheduled shift is approved in Kronos."); *Bouchereau Dec. ¶ 8;* Frascati Dec. ¶ 5, 6.

[48] Frascati Dec. ¶ 5, 6.

[49] *Id.; see also Colatosti Dec.* ¶ 13 ("The unapproved overtime category in Kronos captures any hours recorded outside of an employee's scheduled shift.  It therefore may not be reflective of actual time worked for which the employee was not compensated because it only indicate[s] the times the employee was on premises.  To determine the hours an employee actually worked requires a reconciliation between the schedule, Kronos timestamps, and any forms completed by an employee that indicate they actually worked the hours recorded."); *Daley* (LIJMC) ¶ 20 ("[A]nytime an employee records time outside their scheduled shift in Kronos, the time outside the scheduled shift is put in an 'unapproved hours' category in Kronos.  I review and approve the hours in that category.  I approve all of the time in that category recorded by the PCAs and unit receptionists, whether it was actually worked or not.  I also review and approve all overtime worked by the RNs.  I have told the RNs that they should record anytime they spend working beyond their scheduled shifts, even if it is just 15 or 30 minutes, and I have approved increments of 15 and 30 minutes of overtime in Kronos for RNs."); *see also Moreira* (Southside) Dec. ¶ 9 ("[T]he 'unapproved hours' category is not a reflection of overtime hours that my employees have actually worked and that has not been approved.  Instead, there are several reasons why one of my employees may have hours categorized as Unapproved Overtime when in fact the employee has been fully compensated for all hours worked."); *Tadlock* (Southside) Dec. ¶ 12; Frascati Dec. ¶ 9.

[50] Frascati Dec. ¶ 8.

[51] *Id.*

28

paper because KRONOS records did not affect an employee's actual paycheck.[52]  This type of fact-intensive scrutiny illustrates exactly why class certification is inappropriate.

There are also reasons why time that has **not** actually been worked ends up as "unapproved hours"; in those situations, a manager's decision not to approve overtime is an appropriate exercise of an employer's right to ensure that it pays only for hours worked.[53]  For example, Mary Moreira is a Nurse Manager in the Labor and Delivery Department and the Neonatal Intensive Care Unit at Southside Hospital who supervises, approves time records, and submits payroll for 83 unionized nurses and nurse aides.[54]  In her declaration, she describes two employees, one of whom has worked the "unapproved hours" (the "Timeshifter"), and one of whom has not (the "Socializer").[55]  The Timeshifter, for personal reasons, "often ask[s] if she can work late one night in exchange for leaving early on a subsequent day within the same period"—*i.e.*, receive "comp time."[56]  If Mary grants the Timeshifter's request but does not have time to update KRONOS, she tells the Timeshifter to clock out on the first night when she is done working.[57]  As Mary knows, this creates "unapproved hours."[58]  Then, on the second day,

---

[52] *Id.*

[53] **Yang Dep**. 99:8-101:11 (As a nursing supervisor, she investigated and generally approved all overtime requests, and she instructed other nurse managers and patient directors to do the same); *Hurst Dec.* ¶ 8 (supervisor investigates late punches to determine whether they reflect time worked or not); *Amitrano Dec.* ¶ 9 (investigates late punches in Kronos to see whether the late punch occurred because the employee was actually working); Hermann (Cohen) Dep. 36:10-37:23 ("If an employee does not get approval to badge out after their scheduled shift, they are still paid for the time worked.  An inquiry would be made by the budget analyst because there would be no notation in Kronos authorizing the time. The budget analyst would meet with the manager and if need be, talking to the employee.").

[54] *Moreira Dec.* ¶ 2, 6, 7.

[55] *Compare id.* ¶ 9(a) to ¶ 9(b).

[56] *Id.* ¶ 9(a).

[57] *Id.*

[58] *Id.*

Mary lets the Timeshifter leave early and records the punch-out at her ordinary time.[59]  To make sure the Timeshifter is not overpaid, Mary does not approve the first night's "unapproved hours."[60]  There is nothing illegal or wrong about Mary's conduct, because the Timeshifter did not actually work the hours reflected in the KRONOS Unapproved Hours line item.

Nor did the Socializer.  This employee likes to stay well after her shift ends in the staff lounge to talk with other coworkers—perhaps ones on their meal breaks.[61]  She's not performing any work during that time.[62]  The Socializer then punches out when she is ready to leave the hospital, often after the 16-minute mark.[63]  In KRONOS, this shows up as .25 hours of unapproved overtime.[64]  But because it wasn't working time, no one, including the Socializer herself, expects this time to actually be paid.[65]  Nor must it be.  *See* 29 C.F.R. § 785.48(a).

### ii.  The Cressman Affirmation Reaches Incorrect Expert Conclusions Based on Unreliable Data.

Plaintiffs' counsel, Sarah Cressman, submitted an affirmation purporting to convert and analyze complex electronic timekeeping and payroll data that NS-LIJ produced, and which related to the Opt-in Plaintiffs.  From her incorrect analysis of KRONOS records, she renders incorrect conclusions about whether and to what extent NS-LIJ did not pay certain Opt-in Plaintiffs for so-called "unapproved hours" and for time worked through meal breaks.  NS-LIJ has objected to and contemporaneously moved to strike her declaration because it contains improper expert conclusions, and because, in violation of ethical rules, Plaintiffs' counsel Sarah

---

[59] *Id.*; *see also Daley Dec.* ¶ 21 (when employees miss a meal break, Daley gives them comp time by allowing them to leave early or to later take a longer meal break); *Id.* ¶ 10 (before Daley became Nurse Manager, if she missed a meal period, her supervisor would add time into ANSOS or allow her to take comp time by leaving early).

[60] *Moreira Dec.* ¶ 9(a).

[61] *Id.* ¶ 9(b).

[62] *Id.; see also Hurst Dec.* ¶ 9; Pellicone (Feinstein) Dec. ¶ 11.

[63] *Id.*

[64] *Id.*

[65] *Id.*

Cressman has inserted herself as a witness. *See* Mot. to Strike Cressman Aff.  Therefore, the Court should strike paragraphs 47 through 81 of her affirmation.

Dr. Joe Krock, a statistician and economist, explains that from the top down, Cressman's data conversion, reasoning, and conclusions are all fundamentally flawed.  *First*, Krock concludes that Cressman did not properly convert the KRONOS data into the format she then analyzed.[66]  And as Krock explains, bad data leads to bad results.[67]  *Second*, Krock shows that the methodologies Cressman applies are not statistically valid, and in many cases, were not even replicable.[68]  *Third*, Krock concludes that Cressman makes invalid assumptions about the data when other, alternative interpretations are not just possible, but indeed demonstrably correct.[69]

From these three errors, the fourth naturally follows:  Cressman's conclusions are entirely unreliable, and therefore must be rejected.[70]  And even if they had been reliable, it would matter little in the grand scheme because Cressman's data sample was incredibly small; it represents a mere 1% of the pool of putative class members.[71]

Even if Cressman's expert analysis was statistically sound, it still does not show that NS-LIJ has a common policy of not paying overtime.  Rather, the most one can conclude is that some people, some of the time, are denied some unspecified overtime pay for some unspecified hours worked.  Cressman does not explain how to separate out those who were deprived overtime pay from those who were fully compensated.  In the face of over $ 715 million dollars that NS-LIJ has paid out in overtime during the putative class period, such aberrances do not show a widespread, uniform NYLL violation.

---

[66] Krock Rule 23 Dec. ¶ 14.
[67] *Id.* ¶ 69.
[68] *Id.* ¶ 9-20.
[69] *Id.* ¶ 46-49.
[70] *Id.* ¶ 22.1.
[71] *Id.* ¶ 22.3.

### iii. The NDNQI Survey Data Provides At Best a One-Day Snapshot that the Survey Respondents Missed Certain Meal Breaks, and Says Nothing About Whether They Were Compensated.

Three courts have been asked to consider NDNQI data to show a hospital system's constructive knowledge of unpaid overtime based on missed or interrupted meal breaks.  Each court has rejected the invitation.  *See Camilotes v. Resurrection Health Care Corp.,* 286 F.R.D. 339, 352-353 (N.D. Ill. 2012) (explaining that NDNQI results were not shown to be representative of class); *Camesi v. Univ. of Pittsburgh Med. Ctr.*, 2011 WL 6372873 at \*11 n.10 (W.D. Pa. Dec. 20, 2011) (finding Plaintiffs' citation to the NDNQI Survey "unreliable"); *Kuznyetsov v. W. Penn Allegheny Health Sys., Inc.*, 2011 WL 465760 at \*2 (W.D. Pa. Feb. 4, 2011) ("There is no way for this Court to infer from the NDNQI report . . . that any of the 38 Plaintiffs at issue had unrecorded work time. To do so would be pure speculation.").  The NDNQI survey is taken at numerous hospitals, and asks nurses only whether they worked through their **last** meal break—providing at best a transitory glimpse.[72]  As Dr. Krock explains, no statistician would consider this survey to substitute for a properly designed and executed study to obtain valid, accurate, representative answers.[73]  Further, the NDNQI survey does not ask, and thus cannot speak to, whether the nurses were compensated for working through a meal break—the crux of Plaintiffs' case.

### iv. The Twenty-Seven Opt-in Plaintiffs' Vague Interrogatory Responses Are, as the Plaintiffs Themselves Admitted at Deposition, Not Reliable.

The Plaintiffs rely heavily on Cressman's analysis of the twenty-seven Opt-In Plaintiffs' interrogatory responses for a number of their key conclusions, such as the conclusions that these Cressman-selected Opt-in Plaintiffs missed 87.8% of their meal breaks and performed an

---

[72] Cressman Rule 23 Aff. ¶ 72, Ex. LL (NS00243368).
[73] Krock Rule 23 Dec. ¶ 52-55.

average of 3.5 hours of uncompensated work per week.[74]  *See* Cert Br. at 18.  The problem is that these numbers are falsely constructed, as the Cressman-selected Opt-in Plaintiffs themselves have admitted during deposition, and as a proper analysis reveals.[75] Because these interrogatory responses are no more reliable than the false affirmations submitted in support of Plaintiffs' initial FLSA class certification discussed below, they too should be discarded.

### v. Plaintiffs' New Declarations Are Vague and Speculative, and At Best Reflect Only the Declarants' Individual Experiences With Their Specific Managers.

After having years to prepare for Rule 23 certification, and with over 1000 Opt-In Plaintiffs at their disposal, Plaintiffs have little to show from the putative class members. Plaintiffs collected a mere fourteen declarations which say little more than that "additional time worked outside of [their] scheduled shift[s] was not paid unless it was approved by management or a supervisor,"[76] and that these select individuals allege that they did not receive overtime compensation based on the decisions of their specific managers.[77] Not one describes a

---

[74] Cressman Rule 23 Aff. ¶ 69-71; NS-LIJ served discovery on 70 potential FLSA Opt-In plaintiffs and the Plaintiffs.  NS-LIJ does not concede that this was a statistically representative sample. Sommerfeld Dec. ¶ 29.

[75] *See* Decert. Comp., Exs. 93, 94; Krock Rule 23 Dec. ¶ 50-51.

[76] Cressman Rule 23 Aff. ¶ 38, Ex. AA (*Baker Aff.* ¶ 3; *Bergmann Aff.* ¶ 3; *Borman Aff.* ¶ 3; *Bramante Aff.* ¶ 3; *Britton Aff.* ¶ 3; *Commins Aff;* ¶ 3; *Conway Aff.* ¶ 3; *Davis Aff.* ¶ 3; *Houck Aff.* ¶ 3; *Kurot Aff.* ¶ 3; *Marchione Aff.* ¶ 3; *Reeves Aff.* ¶ 3; *Romero Aff.* ¶ 3; *Sanders Aff.* ¶ 3).

[77] Cressman Rule 23 Aff. ¶ 38, Ex. AA (*Kurot Aff.* ¶ 4 (alleging that her nurse manager's lack of concern over alleged missed meal breaks); *Marchione Aff.* ¶ 4 (unnamed supervisor told him he would not be paid for work performed after his shift unless it was for more than 30 minutes); *but see Castro Dec.* ¶ 15-16 ("I worked with Peter Marchione [in the Radiology Department at Syosset and] understand that [he] claims that management in the radiology department told him that he could not be paid for work performed after his scheduled shift unless it was more than 30 minutes.  I have never heard this from any of the managers in my department and I have been paid for less than 30 minutes that I have worked beyond my scheduled shift."); *Gause Dec.* ¶ 15 ("I have never heard Peter Marchione [sic] or any other employee in my department complain that they have not been paid for all of the hours that they have actually worked."); *Rubino Dec.* ¶ 19 ("I know that my former co-worker, Christine Bramante, claims that she has not been paid for all of her work.  That has not been my experience.  Christine Bramante never spoke with me about not getting paid for all hours worked."); Colon (LIJMC) Dec. ¶ 12 ("I believe that Joelle

systemwide, or even hospitalwide policy.  They identify no document or other communicated position to thwart employees' attempts to receive overtime.  They also don't describe why they were paid for some overtime.  But as discussed above, under *Wal-mart*, the exercise of individual discretion is not an actionable policy.  *See supra* at Part III.C.1.b.i.  Accordingly, Plaintiffs' declarations prove NSLIJ's point—there is no commonality, and individual issues predominate.

As NS-LIJ has already explained, "unapproved hours" in KRONOS is not necessarily worked time—for example, when an NS-LIJ employee socialized with coworkers after clocking in but before the shift starts or before clocking out but after the shift ends.[78]  But Plaintiffs' declarations do not describe when and under what conditions their supposed uncompensated time was worked, or how they know a manager did not approve it.  Because the declarations assert vague violations rather than concrete facts, they should be rejected.  Perhaps most importantly, these self-selected declarations reflect nothing more than 14 people's own claims.  But, despite Cressman's efforts to show otherwise, they do not indicate anyone else's circumstances.

### 3. Even if Plaintiffs Were Correct That Common Issues Exist They Do Not Predominate Over the Many Fact-Intensive, NYLL Individualized Inquiries.

Even if the Court found Plaintiffs' issues to be common (they are not), and even if it resolved both of them against NS-LIJ (it should not), the NYLL inquiry is barely impacted, much less resolved.  Plaintiffs still need to establish (1) that each class member worked time outside the schedule (and how much), (2) that the manager "disapproved" that worked time, (3)

---

Jean was a RN at LIJ in the PACU.  I don't remember her ever complaining about not getting paid for all hours worked."); Colon (LIJMC) Dec. ¶ 13 ("Christina Bramante was an RN in L&D at LIJ.  I understand she is claiming that LIJ was aware that she worked overtime, but did not approve or pay her for that overtime.  I know that anytime she worked in my department, if she made me aware that she worked overtime, I approved it and paid for it.").

[78] *See Moreira Dec.* ¶ 9(b) (socializing employee clocks out after socializing, leaving 'unapproved hours' in Kronos).

whether the employee's time per week exceeded the NYLL 40-hour threshold (in order to determine whether it was straight time or overtime), (4) that the employee did not receive compensation in a subsequent week or as compensatory time off, (5) that NS-LIJ had knowledge of the uncompensated time, and many, many of the other inquiries listed above at Part III.C.2 in order to prove his or her NYLL violation.  Indeed, Plaintiff's legal theories will not "generate common answers **apt to drive the resolution of the litigation**," *Wal-Mart*, 131 S. Ct. at 2551, and thus fail to provide common, let alone predominant, certifiable issues.

### 4.   Plaintiffs Cannot Overcome *Comcast*'s Requirement that Damages be Tied to Liability on a Classwide Basis.

*Comcast* provides yet another reason why this Court must deny class certification: Plaintiffs offer no way to determine damages without resorting to the same individualized inquiries that plague the liability phase.  *See* 133 S. Ct. at 1433.  The Supreme Court squarely held that "a model purporting to serve as evidence of damages in th[e] class action must measure only those damages attributable to that theory."  *Id.*  But to connect the liability for a labor law violation to the damages owed, the Court would have to consider each class member's circumstances.

The Plaintiffs ignore *Comcast* entirely by citing pre-*Comcast* law for the proposition that "the court should find predominance, even if some 'individualized damages issues' exist," "[i]f common issues predominate as to liability."  *See* Cert. Br. at 36.  They repeat their reliance on the "damages distinction"—irrelevant under *Comcast*—when they argue that "there are numerous management tools available. . . to adeptly deal with any management concerns with respect to damages."  *Id.* at 38-39 (citing  *In re Visa Check/MasterMoney Antitrust Litig.,* 280 F.3d 124, 139-40 (2d Cir. 2001)).  Yet, they cite not one.

These cases are now in doubt, and Plaintiffs' refusal to confront the current state of the

law is revealing.  If Plaintiffs prevailed on the merits, it is unclear how the Court could award damages to class members without seeking evidence on how many meal breaks a class member missed, and how much pre- and post- shift work the class member alleged was worked, but not paid, and whether the hour to be compensated was an hour over 40 in a particular week.  As one court recently held in denying Rule 23 class certification, "even in plaintiffs' own description of events, their representations concerning compensation and the recording of time are qualified.  According to plaintiffs, they sometimes received overtime pay, but sometimes did not.  ***They propose no method for ascertaining damages on a class-wide basis.***"  *Fernandez v. Wells Fargo Bank*, No. 12-cv-7193, Dkt. 65, Slip Op. at 26-27 (S.D.N.Y. Aug. 28, 2013).  So too here.  And any sort of "average harm" scheme falls flat on its face, for it will by definition overcompensate some and undercompensate others.  *See McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 231 (2d Cir. 2008), *abrogated in part on other grounds*, *Bridge v. Phoenix Bond & Indem. Co.,* 553 U.S. 639 (2008) (finding class uncertifiable where "[r]oughly estimating the gross damages to the class as a whole and only subsequently allowing for the processing of individual claims would inevitably alter defendants' substantive right to pay damages reflective of their actual liability").

Indeed, this is particularly problematic under NYLL—which allows a plaintiff to recover for "gap time" as well as worked overtime.  N.Y. Lab. Law § 663(1).  Not only would the Court need to determine how many unpaid hours occurred each week for each individual, but in order to set appropriate compensation, the Court would also have to determine, for each week and for each person, whether the unpaid hours should be compensated at the regular pay rate or at the overtime rate.  This requires figuring out not just how many uncompensated hours were worked in a week, but also how many compensated hours were worked, and at what rate of pay.  Simply put, Plaintiffs' bid for class certification cannot survive *Comcast*.

36

### D.  The Plaintiffs are Unrepresentative of the Putative Class.

#### 1.  The Plaintiffs Are Unlike the Putative Class Members, and Accordingly, Their Claims Are Not Typical.

Plaintiffs are correct that "the commonality and typicality requirements of Rule 23(a) tend to merge." *Wal-Mart*, 131 S. Ct. at 2551 n.5.  Here, neither is met.  Nor would certification fulfill the purpose of the typicality prong—to ensure that "the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence."  *Id.*

At the outset, the fact-bound nature of the inquiry, as described *supra* at Part III.B.2, makes the Plaintiffs different from the putative class members.  Here are some examples:

- Gaines, Lambdin, and Hall were never governed by timekeeping software that automatically deducted any time from their time sheets.[79]

- Not one has "unapproved hours" reflected in Kronos.[80]

- Four were classified as exempt from overtime during some or all of the class period.[81]

- Two were represented by a union.[82]

- They collectively never worked at over ten facilities they seek to represent, and have affirmatively said they have no idea what happens at those locations.[83]

---

[79] *Gaines Dep.* 125:14-21 (never heard of or used Kronos); *Lambdin Dep.* 144:11-24 (handwrote time in a loose-leaf binder); *Hall Dep.* 116:20-117:17, 130:9-16 (never recorded time worked).

[80] Cressman Rule 23 Aff. ¶ 78, Ex. MM.  Neither do Opt-Ins Green or Casaceli.  *Id.*

[81] Krock Decert. Dec. ¶ 58.9.1, Ex. 15.

[82] *Bates-Bordies Dep.* 112:3-5; *Iwasiuk Dep.* 104:6-10.

[83] *See Bates-Bordies Dep.* 111:3-13 (assumed other hospitals' policies and practices were the same as Southside); *Iwasiuk Dep.* 43:3-44:14, 286:8-18 (acknowledging that what she claims to know about other facilities is "just an assumption" backed with no personal knowledge); *Lambdin Dep.* 200:4-22 (Affirmation's reference to "the Hospital System" meant only NSUH at Manhasset); *Hall Dep.* 376:16-385:4 (admitting she has no personal knowledge of policies outside NSUH at Manhasset or Home Care).; *DeSilva Dep.* 127:20-22, 169:23-173:16 (never worked at any NS-LIJ hospital; does not know about policies or practices outside of Home Care).

- In fact, none ever worked at Plainview and Syosset—two facilities identified in Subclass II.[84]

- Each worked in a position with direct patient responsibility.  To the extent that the job duties of other putative class members—*e.g.,* custodians, secretaries, accountants, etc.—differ, the Plaintiffs have no basis to provide evidence.[85]

    The Plaintiffs have another problem establishing typicality; they also are "subject to unique defenses which threaten to become the focus of the litigation." *Briceno v. USI Servs. Grp., Inc.*, 2012 WL 4511626, *7 (E.D.N.Y. Sept. 28, 2012) (quoting *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.,* 222 F.3d 52, 59 (2d Cir. 2000)).  Some of the Plaintiffs have statute of limitations problems on at least some of the relief they claim.[86]  Others who are unionized are subject to other additional defenses—whether the Labor Management Relations Act preempts the asserted claims, whether a class member satisfied any exhaustion duty imposed upon him, and whether the grievance process gives rise to *res judicata* or a claim of double recovery.  *See* Decert Br. at 30-34.  Yet still others are classified exempt, and thus not even entitled to overtime.[87]  To the extent they argued they have been misclassified, the Court has before found that such claims defeat commonality and typicality. *E.g.*, *Gardner v. W. Beef Properties, Inc.*, 2011 WL 6140518 (E.D.N.Y. Sept. 26, 2011), *report and recommendation adopted as modified sub nom. White v. W. Beef Properties, Inc.,* 2011 WL 6140512 (E.D.N.Y. Dec. 9, 2011). Because of the individualized nature of Plaintiffs' NYLL claims and the Plaintiffs' own unique,

---

[84] ***Bates-Bordies Dep.*** 24:6-10, 24:25-25:2 (Southside); ***Gaines Dep.*** 10:11-17  (LIJMC and Home Care); ***DeSilva Dep.*** 133:13-136:9 (Franklin); ***Lambdin Dep.*** 24:6-14 (NSUH at Manhasset); ***Hall Dep.*** 34:5-10 (NSUH at Manhasset and Home Care); ***Iwasiuk Dep.*** 23:16-21, 25:21-26:6 (Southside and Huntington).

[85] *Compare **Bates-Bordies Dep.*** 24:6-10, 24:25-25:2 (nurse); ***Gaines Dep.*** 16:14-17:19 (nurse); ***DeSilva Dep.*** 133:13-136:9 (nurse); ***Lambdin Dep.*** 23:21-24:5 (nurse clinician); ***Hall Dep.*** 97:21-98:2, 127:12-16 (nurse); *and **Iwasiuk Dep.*** 41:9-11 (nurse) *with Castro Dec.* ¶ 6 (clerk/typist); *Gorman Dec.* ¶ 6 (x-ray technician); *Gause Dec.* ¶ 6 (x-ray technician); *Hurst Dec.* ¶ 6 (secretary); *Bailey, J. Dec*. ¶ 6 (secretary); *Colatosti Dec.* ¶ 6 (payroll coordinator);

[86] Krock Decert. Dec. ¶ 58.1.3 (Plaintiff Bates-Bordies' claim runs from April 9, 2007, but Southside Hospital terminated her the previous year on August 31, 2006).

[87] Krock Decert. Dec. ¶ 58.9.1, Ex. 15.

differentiating circumstances, the Plaintiffs will not adequately represent the absent class members.

### 2. The Plaintiffs Are Not Adequate Representatives Because They Lack Credibility and, By Their Own Admission, Do Not Know the Circumstances Governing the Rest of the Class.

There are other good reasons the Plaintiffs will be poor representatives—namely, that they do not understand their own case and have contradicted themselves on key issues. Plaintiffs are inadequate class representatives if they "[1] display an alarming unfamiliarity with the suit, [2] display an unwillingness to learn about the facts underlying their claims, **or** [3] are so lacking in credibility that they are likely to harm their case." *In re Frontier Ins. Grp., Inc. Sec. Litig.*, 172 F.R.D. 31, 47 (E.D.N.Y. 1997) (emphasis added); *e.g.*, *Moskowitz v. La Suisse, Societe D'Assurances sur la Vie*, 282 F.R.D. 54, 72 (S.D.N.Y. 2012); *see Baffa v. Donaldson, Lukin & Jenrette Sec.*, 222 F.3d 52, 61 (2d Cir. 2000)). The "motivation behind requiring representative plaintiffs to demonstrate great familiarity with the case is a fear that the representatives, during pretrial discovery and at trial, will give misleading and contradictory testimony with regard to basic issues in the case that might make their claims subject to unique defenses." *Baffa*, 222 F.3d at 61 (quotations omitted). That fear has become a reality here, where Plaintiffs are deficient in all three respects—the first two of which NS-LIJ addresses together.

### a. Plaintiffs Do Not Understand Their Own Case or the Facts Underlying Their Claims.

Though a significant part of this case involves the operation of timekeeping and payroll systems, Plaintiffs have admitted that they know nothing about NS-LIJ's systems—even though they averred under oath otherwise. This is an independent basis for denying class certification. *Maywalt v. Parker & Parsley Petroleum Co.*, 67 F.3d 1072, 1077–78 (2d Cir. 1995) (*quoted in In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 42 (2d Cir. 2009)).

For example, Eileen Bates-Bordies relied on her own speculation: she "assume[d] everybody works the same," and that "[t]he policies and procedures are pretty much standard across the network, [she] would hope."[88]   But after naming only a handful of the NS-LIJ facilities she remembered, she admitted she did not know about "these other hospitals' timekeeping practices, how people record their time," "what their meal break policies are[,]" "other hospitals' employees' hours of work," whether "employees at other hospitals take their meal breaks[,]" or "whether the employees at the other hospitals get paid for all hours worked."[89] And the other Plaintiffs, under the scrutiny of deposition, responded similarly.[90]

The extent of Plaintiffs' ignorance of their own case extends beyond knowledge of other facilities, and in fact includes the core issues.  For example, Bates-Bordies admitted that she ha[d] no clue "what autodeduct means"—despite using the term in her own declaration.[91] Statements like these reflect that the Plaintiffs will not fairly and adequately protect the interests of the absent class members.  *Pagan v. Abbott Labs, Inc.*, 287 F.R.D. 139, 150 (E.D.N.Y. 2012).

> ### b.   Plaintiffs Have Impugned Their Own Credibility By Submitting Written Testimony That Materially Conflicts With Their Deposition Testimony.

The deposed Plaintiffs—including the Plaintiffs—have contradicted themselves on key case issues.  Because their credibility has been destroyed, they cannot inspire the confidence the Court should demand to represent others.  Exhibits 93 and 94 in Defendants' Compendium of

---

[88] *Bates Bordies Dep.* 111:3-20.

[89] *Bates-Bordies Dep.* 202:13-203:18.

[90] *See Iwasiuk Dep.* 43:3-44:14, 286:8-18 (acknowledging her knowledge of other facilities is based on "just an assumption" backed with no personal knowledge); *Lambdin Dep.* 200:4-22 (Affirmation's reference to "the Hospital System" meant only NSUH at Manhasset); *Hall Dep.* 376:16-385:4 (admitting she has no personal knowledge of policies outside NSUH at Manhasset or Home Care); *DeSilva Dep.* 127:20-22, 169:23-173:16 (never worked at any of the hospitals within NS-LIJ; does not know about policies or practices outside of Home Care).

[91] *Bates-Bordies Dep.* 190:14-20; *see Bates-Bordies Aff.* ¶ 3 (Dkt. 101-2, pp. 83-92; Dkt. 166-3, pp. 23-33).

Evidence In Support of Defendants' Motion to Decertify Plaintiffs' Conditionally Certified

Collective Action ("FLSA Decert. Comp.") list a parade of conflicts between the Plaintiffs'

deposition testimony, declarations, and interrogatory responses.  These conflicts alone warrant a

denial of class certification.  *See Savino v. Computer Credit, Inc.*, 164 F.3d 81, 87 (2d Cir. 1998)

(affirming inadequacy of class representative who "repeatedly changed his position . . . about []

letters that form[ed] the very basis of his lawsuit"); *Kline v. Wolf*, 720 F.2d 400, 403 (2d Cir.

1983) (class representative who was "subject to sharp attack" on "issue[s] critical to" his case

was inadequate).  Especially because these contradictions have risen to the level of sanctionable

conduct, as discussed in NS-LIJ's Rule 11 Motion, decertification is appropriate.

### E.   Thomas & Solomon Cannot Adequately Represent the Putative Class Because They Have Committed Sanctionable Conduct by Submitting False Declarations, Sent Out a Misleading Class Notice, and Improperly Testified Here.

No one disputes that Thomas & Solomon are experienced in prosecuting these so-called

hospital "auto-deduct" cases: they have filed over a dozen in just this Circuit. *See Lundy*, 711

F.3d at 110.  But experience alone does not make counsel adequate; Plaintiffs' counsel must also

demonstrate that they are "qualified" and "able to conduct the litigation." *Baffa,* 222 F.3d at 60.

In fact, Plaintiffs' counsel's experience proves to be their downfall.

The most concerning evidence of Plaintiffs' counsel's inadequacy is their submission of

false putative class members' affirmations in violation of Rule 11.  They have done so twice:

first, in *Pruell v. Caritas Christi*, and now here.  In *Pruell*, counsel was monetarily sanctioned

(and collective and class allegations were struck) for submitting declarations containing false

allegations that the plaintiffs "'ha[d] personal knowledge' of various specifics pertaining to the

Hospital System's 'centralized payroll process,' 'centralized automatic pay deduction policy,'

and 'centralized timekeeping policies.'"  Order and Op., *Pruell v. Caritas Christi*, No. 09-cv-

11466, Dkt. 141, Slip Op. at 1-2 (D. Mass. May 31, 2013); *see* Decert Br. at 42-44.  There, like

here, the declarations were proven false at deposition.  *Pruell*, Slip Op. at 2; *see also* FLSA

Decert. Comp., Exs. 93, 94.

Thomas & Solomon have repeated the same conduct from *Pruell* in this case..  On July

30, NS-LIJ sent Thomas & Solomon a letter asking them to withdraw their false, boilerplate

declarations which they used to support conditional certification.[92]  Plaintiffs did not, and NS-LIJ

initiated the process of setting a Rule 11 briefing schedule.[93]  Plaintiffs then took a strange

position: that they had withdrawn the affirmations (an action tantamount to admitting that they

were false to begin with) simply by promising not to rely on them going forward.  *See* Dkt. 360.

At present, the affirmations remain in the record, and Plaintiffs have not stricken the collective

and class allegations of their Third Amended Complaint, or withdrawn the FLSA conditional

certification that was premised on the "withdrawn" affirmations.  NS-LIJ's Rule 11 briefing, sets

forth the full extent of Plaintiffs' improper conduct.

Plaintiff's counsel's inadequacy does not stop there.  Thomas & Solomon also sent out an

unauthorized and deceptive class notice in a case similar to the one here.  *See* Decert. Br. at 43-

44.  And it was not only sent to all of the employees in the other case—it went to all NS-LIJ

employees in *this* case too—informing them that the Court had already found in Plaintiffs' favor

and conditionally certified a class.  Finally, during the discovery period in this case, Magistrate

Judge Boyle expressed frustration with Plaintiffs' counsel's inability to prosecute this case—and

in particular, to digest and analyze the electronic records.  4/11/13 Tr. at 27:10-25 (Dkt. 329).[94]

Judge Boyle's comments were prophetic.  Instead of proving their case through proper,

---

[92]  Sommerfeld Dec. ¶ 28, Ex. 161.
[93] Dkt. 359.
[94] At that same hearing, Judge Boyle told Plaintiff's counsel that he was "concerned about [their] clients and to "[t]hink about breaking this case down" because he didn't "know if [they] can handle it"—a statement he said he had never made in 17 years of service.  *Id.* at 37:6-10 (Dkt. 329).

competent expert testimony, Plaintiffs' counsel violated the ethical rules by injecting themselves into the proceedings by performing their own (materially incorrect) data analysis.  *See supra* at Part III.C.3.b.ii.  But, as explained in NS-LIJ's motion to strike the Cressman Affirmation, that data analysis could only be properly performed by an expert. *See* Def.'s Mtn. to Strike Cressman Aff. 8-14.  Indeed, Plaintiffs' counsel recognized as much when, in response to the Court's concern about whether they had the resources to try the case, they told Judge Boyle that they had an expert to analyze the electronic timekeeping data.  4/11/13 Tr. at 24:17-20 (Dkt. 329) ("COURT: . . . What are you doing as far as IT expertise? Your firm.  MS. CRESSMAN: Your Honor, we have an expert that we have retained for e-discovery issues.").  Also as Judge Boyle predicted, Plaintiff's counsel has "bit off too much," and thus, Plaintiffs have demonstrated their inadequacy. *See id.* at 37:10 (Dkt. 329).

### F.   Plaintiffs Present No Manageable Method for Trying this Case, and Thus a Class Action is an Inferior Method of Resolving Plaintiffs' Disputes.

Even if Plaintiffs could show predominance and satisfy Rule 23(a), they still could not possibly present a plan to the Court that would allow it to try this case fairly, at least not without perhaps thousands of mini-trials.  1 McLaughlin on Class Actions § 5:68 (9th ed.) ("[W]hen individual issues predominate over common issues, . . . the resulting need for 'mini-trials' within the class action . . . pos[es] significant manageability concerns, making class treatment a less 'fair and efficient' method than other techniques for adjudication of the controversy.").

### 1.   Plaintiffs Cannot Present an Appropriately Sized, Statistically Valid Representative Case.

That the FLSA and NYLL require a complex, multifaceted inquiry when determining whether an employee has not been appropriately paid for work allegedly performed is not just a predominance problem; it is also a manageability problem because this Court will have to hold an actual trial where it makes real determinations based on an incomplete set of evidence—

43

evidence that will not take into account a particular manager's or employees' actions.

Even if the inquiry were "susceptible to classwide resolution," the Plaintiffs could not present a representative case because they cannot construct a manageable sample. Based on the size of the class and the number of attributes to be considered, no reasonably sized sample could capture the various baseline differences among the class members. To reflect just two relevant attributes—location and job description—plaintiffs must present over *11,000* witnesses.[95]

> ### 2. Surveying, or Any Other Shortcut Method, Will Inadequately Proxy for the Necessary Testimony By Representative Class Members.

Nor, in the absence of truly representative evidence, could this Court otherwise try this case without clearing the manageability hurdle.  As Dr. Krock explained, a survey would need to be detailed and precise, for it would need to "sequentially guide the [employee] through the entirety of her career" and "delve into the specifics of the individual's [job] [p]osition, including . . . the supervisors present, the hours/shifts worked, the nature of the [p]osition, other hours worked in each week, the [w]ork [l]ocation, etc."[96]  Even under perfect circumstances, this survey would be cumbersome.  Of course, people's memories fade or become inaccurate, which is more likely to lead to an overestimate of liability.[97]  A sample will not provide the kind of accuracy that a trial demands, nor would it protect NS-LIJ's right to challenge evidence asserted against it. *See Carrera*, 2013 WL 4437225 at *4 ("A defendant in a class action has a due process right to raise individual challenges and defenses to claims, and a class action cannot be certified in a way that eviscerates this right or masks individual issues.") (citing *McLaughlin,* 522 F.3d at 231–32).

> ### G.  Plaintiff's Stage II Certification Request is Confusing, and is Improper.

---

[95] Krock Rule 23 Dec. ¶ 66.
[96] Krock Decert. Decl. ¶ 78.
[97] Krock Decert. Decl. ¶ 81-90.

Plaintiffs' Stage II certification request is an affront to the Court as a waste of the judicial process.  After NS-LIJ spent millions in response to the conditional certification order, Plaintiffs simply abandon their original collective action definition, and in the process, more than 384 now opted-in Plaintiffs, including Plaintiffs Hall and Desilva.[98]  Much like Plaintiffs' attempt to "withdraw" their declarations merely by not re-asserting them here,[99] Plaintiffs' attempt at a "do-over" by redefining their FLSA collective action class—a class that has already been conditionally certified—is not appropriate.

Perhaps the biggest problem with Plaintiff's Step II certification is that, for this class definition, Plaintiffs have never gone through Step I certification.  Based on their declarations that have now been proven fraudulent, Plaintiffs convinced Judge Bianco to certify a collective action of "[h]ourly employees involved in direct patient care responsibilities whose scheduled hours include a deduction for an unpaid meal break and who would have had to report performing work during meal breaks in order to be paid for such work."[100] Now, Plaintiffs walk away from that definition, instead trying to impose the same subclasses on the FLSA collective action that they seek for the Rule 23 action.  But unlike an opt-out class, those Opt-In Plaintiffs are here, at least until the Court decertifies.  In any event, Plaintiffs' Stage II (or, more precisely, Stage I-do-over) fails for the same reasons that their Rule 23 class should not be certified and that their original FLSA collective action should be decertified.

## IV.    CONCLUSION

For the foregoing reasons and those included in our Motion for Decertification, NS-LIJ respectfully requests that the Court deny Plaintiff's Motion for Rule 23 and FLSA Certification.

---

[98] Krock Rule 23 Dec. ¶ 59.3.
[99] Pls.' Aug. 26, 2013 Ltr. in Opp. to Def.'s Rule 11 Mot. Br. Schedule, Dkt. 360.
[100] Dkt. 212.

September 3, 2013                                       Respectfully submitted,


                                                           /s Amanda C. Sommerfeld

                                                       Amanda C. Sommerfeld
                                                       ASommerfeld@winston.com
                                                       **WINSTON & STRAWN LLP**
                                                       333 S. Grand Avenue
                                                       Los Angeles, California 90071-1543
                                                       (213) 615-1700

                                                       Joan B. Tucker Fife
                                                       JFife@winston.com
                                                       **WINSTON & STRAWN LLP**
                                                       101 California Street
                                                       San Francisco, CA 94111-5802
                                                       (415) 591-1000

                                                       Anthony D'Auria
                                                       ADauria@winston.com
                                                       **WINSTON & STRAWN LLP**
                                                       200 Park Avenue
                                                       New York, New York 10166
                                                       (212) 294-6700

                                                       Attorneys for Defendants