UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

CLAUDIA DESILVA, *et al*.,
*on behalf of themselves and all other employees*
*similarly situated,*

Plaintiffs,

-against-

NORTH SHORE-LONG ISLAND JEWISH
HEALTH SYTEM, INC., *et al*.,

Defendants.

-----------------------------------------------------------------x

<u>**MEMORANDUM & ORDER**</u>

10-CV-1341 (PKC) (WDW)

PAMELA K. CHEN, United States District Judge:

Plaintiffs bring this putative class and collective action against Defendant North Shore–

Long Island Jewish Health System, Inc. and associated organizations ("Defendants" or "LIJ") for

failure to pay wages and overtime compensation in violation of the Fair Labor Standards Act, 29

U.S.C. §§ 201 *et seq*. ("FLSA") and parallel provisions of the New York Labor Law ("NYLL").

On March 8, 2012, Judge Bianco, then-presiding,[1] conditionally certified the matter as an FLSA

collective action and authorized notice to potential individual plaintiffs. (Dkt. 212.)  After notice

issued, 1,196 Plaintiffs[2] opted in to the action.  (Dkt 392-1 ("Pl. Cert. Mem.") at 3.)  Following

discovery, on the basis of a voluminous evidentiary record, LIJ moved, on October 14, 2013, to

decertify the collective action.  On the same date, Plaintiffs moved for Rule 23 class certification,

---

[1]    This case was reassigned to the undersigned on May 7, 2013.

[2]    The parties dispute the number of proper opt-in plaintiffs.  Plaintiffs assert that 1,196
employees have opted in to this lawsuit.  (Pl. Cert. Mem. at 3.)  Defendants contend that 1,051
plaintiffs have opted in.  (Dkt. 388-1 at 14-15.)  The difference is negligible with respect to
collective and class certification, and the Court adopts Plaintiffs' figure, 1,196, for purposes of
this motion only.

in addition to final FLSA collective action approval. (Dkt. 392.) Each party also submitted a motion to strike a supporting document offered by the opposing party, and in addition, Defendants moved for sanctions against Plaintiffs and their counsel. (Dkts. 389-391.) The Court held oral argument on the motions on December 12, 2013.

After a thorough review of the vast record and careful consideration of the parties' arguments, the Court concludes that Plaintiffs have failed to demonstrate that they are similarly situated to the degree necessary to maintain an FLSA collective action. In the time since this action was initially filed, mounting precedent supports the proposition that LIJ's timekeeping system and system-wide overtime compensation policies are lawful under the FLSA. Given the evolving caselaw, in order to maintain a collective action, Plaintiffs are required to demonstrate that LIJ's lawful policies are or were consistently and systematically violated in such a way that would be possible to generalize across the 1,196 opt-in Plaintiffs in this case. Plaintiffs have failed to do so. In fact, discovery has borne out the opposite. The record demonstrates that Plaintiffs work or worked in a wide variety of departments at a vast array of locations and held a diverse collection of positions. As a result, Plaintiffs' job duties differed and their compensation—or lack thereof—for overtime work performed during meal breaks likewise differed accordingly. Analyzing each Plaintiff's unique employment situation would require the kind of individualized inquiry that is antithetical to collective action treatment. *See, e.g., Zivali v. AT & T Mobility, LLC*, 784 F. Supp. 2d 456, 459 (S.D.N.Y. 2011) (citing *Hinojos v. Home Depot, Inc.,* 06–CV–00108, 2006 WL 3712944, at *3 (D. Nev. Dec. 1, 2006). Moreover, Defendants offer a number of plausible, highly individualized defenses in an attempt to combat Plaintiffs' varied factual allegations. Accordingly, the Court finds that the presentation of purportedly representative evidence would hinder, rather than advance, considerations of

procedure and fairness.  *See, e.g., Zivali*, 784 F. Supp. 2d at 459; *Beauperthuy v. 24 Hour Fitness USA, Inc.,* 772 F. Supp. 2d 1111, 1131 (N.D. Cal. 2011) ("Ultimately, the decision whether to proceed as a collective or class action turns on whether this device is the superior way of resolving a controversy."); *Johnson v. Big Lots Stores, Inc.,* 561 F. Supp. 2d 567, 574 (E.D. La. 2008) ("[T]he more dissimilar plaintiffs are and the more individuated [defendant's] defenses are, the greater doubts there are about the fairness of a ruling on the merits—for either side—that is reached on the basis of purportedly representative evidence.").  Therefore, decertification is warranted.

For largely the same reasons, common issues do not predominate, and Plaintiffs' motion for Rule 23 class certification is therefore denied.  Plaintiffs' motion to strike the expert report of Dr. Joseph Krock (the "Report") is denied because the limited propositions from the Report on which the Court relies are relevant, permissible, and uncontroverted.   Because the Court does not rely on the Rule 23 Affirmation of Sarah E. Cressman, Defendants' motion to strike that affirmation is denied as moot.  Finally, although Plaintiffs have engaged in questionable tactics and conduct in pursuing this case, the Court, exercising its discretion, declines to impose Rule 11 sanctions on Plaintiffs and their counsel.

## I.    **Background**[3]

---

[3]      The Court considers the instant motion in the context of the entire procedural history of this case, which is discussed briefly here and, as relevant, elsewhere in this Memorandum & Order.  On August 23, 2010, Plaintiffs first moved for conditional certification of the FLSA claims alleged in their amended complaint (Dkt. 100).  On the same day, Defendants moved to dismiss the Amended Complaint (Dkt. 98), and thereafter moved to dismiss the Plaintiffs' Second Amended Complaint (Dkt. 145).  By Order dated March 16, 2011, the Court granted Defendants' motion to dismiss Plaintiffs' FLSA and NYLL claims—along with their claims under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 *et seq.* ("ERISA"), the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 *et seq.* ("RICO"), and various state common law claims.  *DeSilva v. N. Shore-Long Island Jewish Health Sys., Inc.*, 770 F. Supp. 2d 497, 548 (E.D.N.Y. 2011) (Bianco, J.) ("*DeSilva I*").  Plaintiffs

Named Plaintiffs in this action are or were LIJ employees at various locations throughout the North Shore-Long Island Jewish Health System ("LIJ Health System") during the time period relevant to this litigation. *DeSilva II*, 2012 WL 748760 at *1. Defendants are health care facilities and officials involved in the LIJ Health System. (TAC ¶ 15.) Managers at LIJ locations use a timekeeping system called "Kronos," or colloquially "myTime," to track employee time worked. (Dkt. 394-1 ("myTime Training Manual") at 5, 7, 59-86.) The program enables managers to enter employees' schedules into the system, and employees verify their hours by "badging" (swiping a security badge) in and out. (*Id.* at 5 ("Employees swipe at the Badge Reader and the time is collected and sent to myTime"); Dkt. 395-2 ("Bosco Dep.") at 51:14-53:10.) Employees do not badge in and out for meal periods; rather, Kronos is programmed to automatically deduct a half-hour meal period for employees who work six or more hours in a single day. (Dkt. 417 (myTime Rules for Managers) at 10; Bosco Dep. 54:4-57:22.) Employees are paid for their scheduled shift hours minus the automatic meal deduction, unless a manager cancels the automatic meal deduction in Kronos to add time worked during a meal period to the employee's time card. (Dkt. 395-1 (myTime policy document).) Moreover, only supervisors have the ability to approve overtime and adjust the employee's work hours and pay accordingly. (myTime Training Manual at 38.) Plaintiffs allege that, as a result of the

---

subsequently filed a Third Amended Complaint ("TAC") (Dkt. 163) and renewed their motion for conditional certification (Dkt. 164). Thereafter, Defendants moved to dismiss the claims in Plaintiffs' TAC, except as to Plaintiffs' re-pled FLSA and NYLL claims. The Court granted Defendants' motion on March 7, 2012. *DeSilva v. N. Shore-Long Island Jewish Health Sys., Inc.*, 3310-CV-1341, 2012 WL 748760, *2, n. 2 (E.D.N.Y. Mar. 7, 2012) (Bianco, J.) ("*DeSilva II*").

myTime system and policy, they were not compensated for meals and breaks, despite working through those breaks, in violation of the FLSA. (TAC ¶¶ 100, 103, 105-06, 111.)[4]

## II.    FLSA § 216(b) Certification

Courts in this Circuit use a two-step method in assessing whether to certify a collective action. *Myers v. Hertz Corp.*, 624 F.3d 537, 554 (2d Cir. 2010). At the conditional certification stage, Judge Bianco found Plaintiffs' allegations sufficient to satisfy the "modest factual showing" required at that stage to determine whether the named plaintiffs and potential opt-in plaintiffs "together were victims of a policy or plan that violated the [FLSA]." *Hoffmann v. Sbarro, Inc.,* 982 F. Supp. 249, 261 (S.D.N.Y. 1997); *see also Chowdhury v. Duane Reade, Inc.,* 06-CV-2295 (GEL), 2007 WL 2873929, *2 (S.D.N.Y. Oct. 2, 2007). He certified the following class for an FLSA collective action: "Hourly employees involved in direct patient care responsibilities whose scheduled hours include a deduction for an unpaid meal break and who would have had to report performing work during meal breaks in order to be paid for such work."[5] (Dkt. 212.)

---

[4]    In the TAC, Plaintiffs also allege that they suffered unpaid pre- and post-schedule work and training time (TAC ¶¶ 118, 127-135). However, Plaintiffs did not present argument about these categories of unpaid work in their motion to conditionally certify this collective action (Dkt. 100), nor did Judge Bianco include such categories in his order conditionally certifying the instant class. (Dkt. 112) (conditionally certifying for collective action "[h]ourly employees involved in direct patient care responsibilities whose scheduled hours include a deduction for an *unpaid meal break* and who would have had to report performing work during meal breaks in order to be paid for such work." (emphasis added)). Thus, the Court considers these claims waived. However, even were the Court to consider those collective and class allegations, both the Court's analysis and conclusions regarding the meal break deduction would apply with equal force to preclude collective action and certification on these claims.

[5]    Judge Bianco granted Plaintiffs' motion for reasons stated on the record during a conference on March 8, 2012. The transcript is attached at Dkt. 394.

Now at the second stage, on LIJ's post-discovery motion for decertification, the Court must apply heightened scrutiny in determining whether Plaintiffs are similarly situated for the purposes of the FLSA. [6] *Myers*, 624 F.3d at 555 ("At the second stage, the district court will, on a fuller record, determine whether a so-called 'collective action' may go forward by determining whether the plaintiffs who have opted in are in fact 'similarly situated' to the named plaintiffs."); *see also Jacobs v. N.Y. Foundling Hosp.*, 483 F. Supp. 2d 251, 265 (E.D.N.Y. 2007) (noting that second-stage certification requires the court to exercise "a more heightened scrutiny" in determining whether the potential plaintiffs are similarly situated); *Zivali*, 784 F. Supp. 2d at 460 (citing *Damassia v. Duane Reade, Inc.*, 04-CV-8819, 2006 WL 2853971, at *3 (S.D.N.Y. Oct. 5, 2006)). Although the Second Circuit has yet to endorse a set of criteria appropriate for consideration on a motion for decertification, district courts generally analyze whether the following factors counsel for or against maintaining a collective action: "(1) disparate factual and employment settings of the individual plaintiffs; (2) defenses available to defendants which appear to be individual to each plaintiff; and (3) fairness and procedural considerations." *Laroque v. Domino's Pizza, LLC*, 557 F. Supp. 2d 346, 352 (E.D.N.Y. 2008) (quoting *Guzman v. VLM, Inc.*, 07-CV-1126, 2007 WL 2994278, at *3 (E.D.N.Y. Oct. 11, 2007)); *see also, e.g., Zivali*, 784 F. Supp. 2d at 460; *Ayers v. SGS Control Servs., Inc.*, 03–CV–9077, 2007 WL

---

[6]    Opining on collective action certification under § 216(b) of the FLSA, the Second Circuit has noted, "district courts of this Circuit appear to have coalesced around a two-step method, a method which, while [] not required by the terms of FLSA or the Supreme Court's cases, [] is sensible. The first step involves the court making an initial determination to send notice to potential opt-in plaintiffs who may be 'similarly situated' to the named plaintiffs with respect to whether a FLSA violation has occurred." *Myers*, 624 F.3d at 554-55 (listing cases). "The court may send this notice after plaintiffs make a 'modest factual showing' that they and potential opt-in plaintiffs 'together were victims of a common policy or plan that violated the law.'" *Id.* at 555 (quoting *Sbarro*, 982 F. Supp. at 261). The standard of proof at this first stage is set necessarily low because it merely allows plaintiffs to discover "*whether* 'similarly situated' plaintiffs do in fact exist." *Id.*

646326, at *5 (S.D.N.Y. Feb. 27, 2007). If the court concludes that the plaintiffs are similarly situated, the action proceeds collectively; if not, "the class is decertified, the claims of the opt-in plaintiffs are dismissed without prejudice, and the class representative may proceed on his or her own claims." *Zivali*, 784 F. Supp. 2d at 460 (citing *Lee v. ABC Carpet & Home*, 236 F.R.D. 193, 197 (S.D.N.Y. 2006)).

*     *     *

Here, LIJ's official time-keeping and overtime compensation policies, as written, comply with the FLSA. Consequently, Plaintiffs have failed to identify any unlawful system-wide policy or practice that was applied uniformly to each of the named Plaintiffs. *Cf. White v. Baptist Mem'l Health Care Corp.*, 08-2478, 2011 WL 1883959 (W.D. Tenn. May 17, 2011) *aff'd*, 699 F.3d 869 (6th Cir. 2012) ("To bind together otherwise differently situated employees, an alleged common policy must potentially violate the FLSA.") To the contrary, Plaintiffs contend the alleged FLSA violations arise from a hodgepodge of procedures implemented in varying ways by different managers across numerous departments and locations. As a result, a determination on the merits is not susceptible to generalized proof; it would require individualized inquiries regarding the procedures in place at each department, and the conduct of individual managers and employees. For those reasons, decertification of Plaintiffs' collective action is warranted.

A.  Legality of LIJ's Compensation Policies

To the extent Plaintiffs assert that a collective action is appropriate due to Defendants' common policy of automatically deducting 30 minutes per employee shift for lunch, their argument fails because, as courts in this circuit have recognized, automatic meal deduction policies are not *per se* illegal. *See, e.g., Wolman v. Catholic Health Sys. of Long Island, Inc.*, 2012 WL 566255, at *7 (E.D.N.Y. Feb.16, 2012); *see also Ellis v. Common Wealth Worldwide*

7

*Chauffeured Transp. of NY, LLC*, 10-CV-1741 DLI JO, 2012 WL 1004848, at * 9-10 (E.D.N.Y. Mar. 23, 2012).  Without more, a legal automatic meal deduction for previously scheduled breaks cannot serve as the common bond around which an FLSA collective action may be formed.  *See, e.g., White,* 2011 WL 1883959 at *8 (the defendant's "mere adoption of a system that, by default, deducts meal breaks from its employees' compensation does not constitute a unified policy of FLSA violations capable of binding together the Opt-in Plaintiffs"); *Camesi v. Univ. of Pittsburgh Med. Ctr.,* No. 09–85J, 2011 WL 6372873, *5 (W.D. Pa. Dec. 20, 2011) (the defendant's "implementation of an automatic deduction policy does not, in and of itself, warrant final certification"); *Camilotes v. Resurrection Health Care Corp.*, 286 F.R.D. 339, 350 (N.D. Ill. 2012) (same) (collecting cases).  Though not controlling, the sheer number of district courts that have decertified "automatic deduction" collective actions in the context of hospital breaks, and the rationales on which they have relied, are persuasive.  *See, e.g., Camilotes*, 286 F.R.D. at 351 (decertifying collective action in the context of automatic deduction policy at hospital); *Kuznyetsov v. W. Penn Allegheny Health Sys., Inc.*, 10-CV-948, 2011 WL 6372852, 2011 WL 6372852 (same); *Camesi,* 2011 WL 6372873; *White,* 2011 WL 1883959 (same); *Frye v. Baptist Mem'l Hosp.*, Inc., No. 07–2708, 2010 WL 3862591, *3 (W.D. Tenn. Sept. 27, 2010), *aff'd* 495 F. App'x. 669, 2012 WL 3570657 (6th Cir. Aug. 21, 2012) (same).

An employer's timekeeping policies are legal as long as they "allow[] for the complete and accurate recording of all time worked."  *Zivali*, 784 F. Supp. 2d at 461.  Here, Plaintiffs concede that LIJ's formal policies and procedures made it at least possible for employees to receive proper compensation.  LIJ's relevant overarching polices were "to ensure that pay received by health system employees accurately reflects each employee's time worked" and "to provide eligible health system employees with an opportunity to take rest periods and meal

breaks during the course of a workday." (Santiago Decl. Exs. 5, 6.[7]) Employees were required to review their facility's timekeeping policies and participate in timekeeping training. (Dkt. 388-1 at 7-8, n. 15 (incorporating accompanying exhibits).) Supervisors were trained to provide employees opportunities for meal and rest breaks, and to ensure employees were compensated for all time worked, including how to provide proper pay when employees worked, in whole or in part, through meal periods. (*Id.* at n. 16 (incorporating accompanying exhibits).)

Perhaps in recognition of the precedent mounting against them, Plaintiffs now argue that it is not merely the "auto-deduct" policy itself that violates the FLSA, but Defendants' implementation of the automatic deduction policy.[8] Specifically, Plaintiffs have pivoted from an "auto-deduct" policy to an "overtime approval" policy as the basis for their FLSA claim. (Dkt. 403 at 12) ("Plaintiffs here are not relying on an argument that defendants' auto-deduct policy, in and of itself, is illegal . . . .") Plaintiffs' new argument is essentially that three of Defendants' separate policies converge to form a single FLSA violation: (1) automatically deducting meal time; (2) relying on employees to report missed meal period work; and (3) paying only for reported time that is approved by a manager.

---

[7]     The declaration of Arlene Santiago is located at Dkt. 388-7 at ECF 136. (Citations to "ECF" pages refer to the page numbering of the Electronic Court Filing ("ECF") system, and not the document's internal page numbers.) Exhibit 5 to the Santiago Decl. is a copy of LIJ's "Meal Times and Rest Periods Policy." Exhibit 6 to the Santiago Decl. is a copy of LIJ's "Overtime Policy." (Santiago Decl. ¶¶ 8, 9.)

[8]     Plaintiffs' counsel, Thomas & Solomon LLP, has filed at least a dozen similar class actions, *Lundy v. Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106, 110 (2d Cir. 2013), many of which are cited in this Memorandum & Order; none of which have succeeded. Thus, the Court finds Plaintiffs' counsel's lack of success is as likely a motivation for the switch as Plaintiffs' stated reason, which is that "plaintiffs have discovered that [LIJ's] pay policies are even worse than they initially thought." (Dkt. 403 at 1.)

The problems with Plaintiffs' new collective action theory are three-fold. First, Plaintiffs "approval policy" class was never conditionally certified, and only raised for the first time, in the long history of this case, in Plaintiffs' certification-related briefs. As discussed *supra*, Judge Bianco conditionally certified a collective action for "[h]ourly employees involved in direct patient care responsibilities whose scheduled hours include a deduction for an unpaid meal break and who would have had to report performing work during meal breaks in order to be paid for such work." (Dkt. 212.) Thus, the "approval policy" class that Plaintiffs now seek to have finally certified was never conditionally certified. While conditional certification may not be an absolute prerequisite to final certification, it would be unfair and inefficient to allow Plaintiffs to change their legal theory *after* obtaining conditional certification, sending notice to potential class members, and conducting discovery based on that theory. This is especially so where, as here, Plaintiffs knew, or should have known, the facts giving rise to their new theory at the outset, namely that compensation for work performed during a meal break had to be approved by a supervisor.

Second, Plaintiffs' latest iteration of the "auto-deduct" policy theory is no more persuasive than the original. Tacking the "reporting policy" and "approval policy" onto the lawful "auto-deduct" policy is not enough to convert LIJ's legal compensation scheme into a FLSA violation. While "meal periods are compensable under the FLSA when employees during a meal break perform duties predominantly for the benefit of the employer," *Reich v. S. New Eng. Telecomms. Corp.*, 121 F.3d 58, 65 (2d Cir. 1997), the FLSA does not prescribe any particular form of recordkeeping. *See*, *e.g.*, 29 C.F.R. § 516.1(a) ("No particular order or form of records is prescribed by the regulations in this part."). Moreover, though an employer may not prevent an employee from reporting overtime work that he or she actually performed, there is no

specific prohibition against requiring an employee to report having worked in order to receive pay for time worked. *See Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 35-57 (2d Cir. 2011). There is also no legal requirement that employers contemporaneously record time worked. *Zivali*, 784 F. Supp. 2d at 461. It simply cannot be the case that merely establishing a process for an employee to report overtime worked transforms a legal policy, namely "auto-deduct," into an illegal one. *See e.g., White v. Baptist Mem'l Health Care Corp.*, 699 F.3d at 876 (citation omitted) (holding that when an employer merely sets up a "reasonable process for an employee to report uncompensated time," it "is not liable for non-payment if the employee fails to follow the established process.") It would be impossible for an organization as large as LIJ to keep track of their employees' extemporaneously performed overtime without the employees notifying a manager or personally amending their time charts to reflect overtime worked.

Third, Plaintiffs' new "approval policy" theory makes the relevant inquiry even more individualized and further cuts against their argument that Plaintiffs were subject to a system-wide policy. *See, e.g., Blaney v. Charlotte–Mecklenburg Hosp. Auth.,* 10–CV–592–FDW–DSC, 2011 WL 4351631, *7 (W.D.N.C. Sept. 16, 2011) (denying certification of a FLSA collective action where "Defendant ha[d] established that many of the alleged common policies the Plaintiffs complain of are actually left to the decentralized discretion of the individual units and their exempt and non-exempt management staff.") As the certification-related motions are currently before the Court, the Court focuses on the individualized inquiries raised by Plaintiffs' collective and class action theory.

*       *       *

Because Plaintiffs were not subject to a uniform illegal compensation policy, they cannot point to a common violation of law that binds the purported collective action. Absent a unifying

illegal policy, Plaintiffs must demonstrate that they are factually similarly situated or that the employer's practice was to systematically disregard its own legal policy. *See, e.g., White*, 2011 WL 1883959 at *9-10 ("Where an employer's formal policy is to compensate employees for all time worked, courts have generally required a showing that the employer's common or uniform practice was to not follow its formal, written policy.") Moreover, for those arguments to be pertinent to certification, Plaintiffs must demonstrate that the illegal practices about which they complain are sufficiently uniform and pervasive as to warrant class treatment, *i.e.,* that these violations can be generalized across the 1,196 opt-in Plaintiffs in this case such that collective treatment would further procedural and fairness considerations. *See Zivali*, 784 F. Supp. 2d at 463. They have not.

### 1. Factual and Employment Settings

Plaintiffs have not demonstrated that they had similar job duties or were subjected to the same system-wide meal break policies. Rather, the evidence points to an extremely wide range of compensation practices across facilities in the context of varied employment settings. Each facility had "discretion to independently establish their own tailored . . . practices on meal and rest breaks, overtime authorization, and timekeeping within the requirements of federal law." (Dkt. 388-4, Exs. 6, 7 ("Bosco Decl." at Ex. 7 ¶ 5).) The opt-in Plaintiffs worked in 395 departments in 39 business units at 59 locations within the LIJ Health System. (Dkt. 388-9 ("Krock Dec.") ¶ 69.) They held 235 different positions during the claim period, were comprised of both union and non-union members, worked on and off-site, and had varying degrees of patient responsibility. (*Id.* at 24; Dkt. 388-11, Ex. 59 ("Hall Dep.") 185:9-16, 329:25-330:4 (had direct patient care duties as off-site field nurse and on-site nurse manager, but not when working as floor nurse); Dkt. 388-8, Ex. 45 ("Abrams-Brown Dep.") 19:1-20:22, 31:8-10 (did not provide

direct patient care as non-unionized RN manager); Dkt. 388-9 ("Hayes Dep.") 73:25-74 (almost all work was done off-site).) Even those involved in direct patient care often performed very different tasks involving varying levels of patient interaction. (Hall Dep. 329:25-330:23; Dkt. 388-9, Ex. 73 ("Viola Dep.") 35:7-11, 36:5-7, 36:18-37:17; Dkt. 388-8, Ex. 56 ("Green Dep.") 57:4-21.) As a result of their varied duties, Plaintiffs scheduled their meal breaks differently. (*See* Dkt. 388-1 at n. 10-14 (incorporating accompanying exhibits).) These variations militate against proceeding as a collective action because whether and when Plaintiffs took meal breaks, and the frequency with which they took them depended upon their particular work environment and their job duties. *See, e.g., Camilotes*, 286 F.R.D. at 347 (citing *White*, 2011 WL 1883959 at *7 ("Differences in the Opt-in Plaintiffs' job duties are highly relevant to their claims that they worked during meal breaks without compensation because their job duties dictated whether and why they experienced missed or interrupted meal breaks."); *Kuznyetsov*, 2011 WL 6372852 at *5 ("Job duties are highly relevant in terms of how, why and whether the employees were compensated properly for missed or interrupted meal breaks.").

In addition, Plaintiffs recorded their time using different methods. Some Plaintiffs testified that they "badge" or "punch" in and out, creating a log of the time that they started work, left for a meal period, returned from a meal period, and ended work. (Dkt. 388-9, Ex. 62 ("Iwasiuk Dep.") 198:3-22; Dkt. 388-9, Ex. 74 ("Weisenbach Dep.") 35:20-36:5; Dkt. 388-9, Ex. 76 ("Yang Dep.") 67:9-68:1; Dkt. 388-8, Ex. 48 ("Bharat Dep.") 100:3-101:2.) Those employees would then claim credit for time worked during their meal periods in different ways; some included a handwritten notation on their punch card, while others were required to notify a supervisor who would make the notation for the employee. (Dkt. 388-9, Ex. 63 ("Kohler Dep.")

51:10-15; Yang Dep. 87:23-88:7; 89:19-90:7; Dkt. 388-8, Ex. 54 ("Fisher Dep.") 44:19-24; Dkt. 388-7, Ex. 21 ("Norr Decl.") ¶ 20.)

The means by which Plaintiffs were required notify supervisors that they had worked during a lunch period also varied. For some, informal notification sufficed; others had to fill out an approval form. (Dkt. 388-1 at n. 34-37 (compiling testimony describing various methods of notifying supervisors).) Still other employees, who recorded all of their time on handwritten time sheets, were required to account precisely for their time in/out during meal periods, while others who also hand-recorded their hours, were not. (Weisenbach Dep. 35:20-36:5; Dkt. 388-9, Ex. 65 ("Perniciaro Dep.") 22:17-23:20; Dkt. 388-9, Ex. 68 ("Ross Dep.") 34:7-35:2; 54:13-57:11; Dkt. 388-4, Ex. 10 ("Doyle Decl.") ¶ 34.) Most, but not all, of the above systems required a supervisor to transpose the net hours worked by an employee, as initially recorded by the individual employee, onto a "master time sheet" for the unit or department each week. (Dkt. 388-4, Ex. 14 ("Goffin Decl.") ¶ 14; Dkt. 388-4 ("Goldberg Dep.") 30:14-19; Weisenbach Dep. 23:13-25:19; Dkt. 388-7, Ex. 32 ("Wiggins Decl.") ¶ 15.) Taken together, these factual variations demonstrate that Defendants did not uniformly implement the overtime reporting or approval policies, but rather allowed each department individually to implement those policies in a way that addressed the particular needs of the department. *See, e.g, White,* 2011 WL 1883959 at *1 (decertifying automatic meal deduction collective action where, in implementing the automatic meal deduction policy, each of the defendants' departments were "free to formulate . . . procedure[s] that work[ed] best for its employees"); *Camesi*, 2011 WL 6372873 at *7 (decertifying automatic meal deduction collective action, in part, because "[s]ome employees would not have a scheduled time for meal breaks and would take them when they could, other

employees had regularly scheduled 30–minute breaks, and others had scheduled breaks that could not always be followed").

The methods through which Plaintiffs could recover automatically deducted meal periods to accurately reflect hours worked varied greatly. First, a Plaintiff may have received compensatory time off, rather than overtime pay, in exchange for working through a meal break. (Dkt. 388-7, Ex. 26 ("Sabatino Decl. I") ¶ 11; Dkt. 388-7, Ex. 27 ("Sabatino Decl. II") ¶ 18; Dkt. 388-4 ("Bentson Decl.") ¶ 14; Dkt. 388-7, Ex. 28 ("Salvo Decl.") ¶ 15; Dkt. 388-4, Ex. 8 ("Cenac Decl.") ¶ 10.) Second, after receiving a paycheck, an employee who noticed missing overtime may have complained to the appropriate LIJ supervisor, human resources department, or her union representative, and subsequently received the overtime compensation on a later paycheck. (Kohler Dep. 100:3-101:11; Yang Dep. 73:8-75:7; Dkt. 388-9, Ex. 64 ("Lambdin Dep.") 177:23-178:14; Weisenbach Dep. 54:22-55:8; Dkt. 388-9, Ex. 69 ("Sabatino Dep.") 85:20-86:2.) Third, a Plaintiff may have combined two unpaid 15-minute rest breaks with one 30-minute paid break to take an hour-long break, and then treated only a half-hour as unpaid time. (Dkt. 388-8, Ex. 55 ("Gaines Dep.") 108:13-109:1; Dkt. 388-8, Ex. 50 ("Casaceli Dep.") 130:8-131:10; Dkt. 388-8, Ex. 55 ("Correa-Tiernan Dep.") 132:5-7; Viola Dep. 39:11-23, 113:14-22.)

While they did so by different methods, it is clear that LIJ employees were able to recover compensation for overtime worked. LIJ paid out more than $551 million in overtime compensation between March 24, 2007 and February 24, 2013, the period relevant to Plaintiffs' FLSA claim, (Krock Dec. ¶ 58.9.3), a fact which "strongly suggests" LIJ managers honored plaintiffs' request for meal and rest break adjustments when properly requested. *See Zivali*, 784 F. Supp. 2d at 467. On the basis of this record, the Court cannot conclude that LIJ had any

uniform business practice across its many locations that intended to prevent employees from receiving compensation for all of the time that they worked.

### 2. Individualized Defenses

The second relevant factor is the extent to which Defendants will assert individualized defenses. When the employer's defenses are highly individualized as to each Plaintiff, "this factor weighs heavily against proceeding . . . as [an FLSA] collective action." *Zivali*, 784 F. Supp. 2d at 467-68.

LIJ's defenses appear to be specific to individual Plaintiffs or groups of Plaintiffs. For example, in order for Plaintiffs to prevail on their claims, they must demonstrate that LIJ had actual or constructive knowledge of the meal-period work performed. *See Kuebel*, 643 F.3d at 361 ("To establish liability under the FLSA on a claim for unpaid overtime, a plaintiff must prove that he performed work for which he was not properly compensated, and that the employer had actual or constructive knowledge of that work"); *see also Wolman*, 853 F. Supp. 2d at 301 ("[I]t is the *failure to compensate* an employee who worked with the employer's knowledge through an unpaid meal break . . . that potentially violates the FLSA."); *Zivali*, 784 F. Supp. 2d at 468 (citing *Singh v. City of New York*, 418 F. Supp. 2d 390, 397 (S.D.N.Y. 2005)). Where, as here, there is no uniform policy or practice, "plaintiffs will have to demonstrate that each individual manager had actual or constructive knowledge that plaintiffs were performing off-the-clock work without proper compensation." *Zivali*, 784 F. Supp. 2d at 468; *see also Kuebel*, 643 F.3d at 361.

Plaintiffs' testimony suggests that the knowledge of each individual manager regarding employees' unpaid work varied widely. Some knew, or should have known, that not all meal period work was properly compensated, while others may not have been aware that Plaintiffs

were performing such work. (Perniciaro Dep. 105:11-16 (does not recall complaining to supervisory staff or HR); Bharat Dep. 37:19-39:3 (spoke to his supervisor about breaks); Green Dep. 94:23-95:8 (same); Iwasiuk Dep. 133:20-134:17 (complained about not getting overtime); Yang Dep. 90:18-92:2, 99:8-101:11 (did not report all hours worked, but was paid for all the hours she reported).)

In addition, Defendants intend to argue that Plaintiffs' proposed collective action includes exempt employees, who, by definition, are not eligible for overtime. *Rams v. Baldor Specialty Foods, Inc.*, 687 F.3d 554, 556 (2d Cir. 2012) (exempt employees are not entitled to overtime pay"); *Young v. Cooper Cameron Corp.*, 586 F.3d 201, 204 (2d Cir. 2009) ("employee[s] employed in a bona fide . . . professional capacity are exempt from the FLSA's overtime requirements") (citation and internal quotation marks omitted). Here, a significant portion— perhaps as many as 547—of the conditionally certified class of 1,196 employees are or were classified as exempt under the FLSA. (Krock Dec. ¶ 58.9.1.) Plaintiffs argue that no unique inquiry is required because "exempt classification" is "based on the individual's job title, not any individualized inquiry into the job duties of any particular [P]laintiff." (Dkt. 403 at 18.) However, as the Second Circuit has held, "FLSA regulations are explicit that the determination of an employee's exemption status must be based on the specific employee's actual primary duties, not on his or her title or position." *Gold v. New York Life Ins. Co.*, 730 F.3d 137, 145 (2d Cir. 2013); *see also Myers*, 624 F.3d at 549 ("[T]he exemption inquiry requires examination of the duties that the employee actually performs.") (quoting 29 C.F.R. § 541.700(a)).

Furthermore, LIJ may defend against Plaintiffs' claims by demonstrating that certain off-duty work was *de minimis*. "The *de minimis* doctrine permits employers to disregard, for purposes of the FLSA, otherwise compensable work '[w]hen the matter in issue concerns only a

few seconds of work beyond the scheduled working hours.'" *Singh v. City of New York*, 524 F.3d 361, 370-71 (2d Cir. 2008) (quoting *Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 692 (1946); *Reich*, 121 F.3d at 64 (excluding "infrequent interruptions of a short duration" from FLSA calculation); *see also* 29 C.F.R. § 785.47. For example, where, as here, an employee involved in direct patient care needed to tend to a patient for a few extra moments or minutes, the "extent to which work was *de minimis*, [] will necessarily vary widely according to the particular situation of each individual plaintiff." *Zivali,* 784 F. Supp. 2d at 468.

With these and other arguments available to Defendants, it is clear that their potential defenses will be highly fact specific and therefore weigh against proceeding with this case as a collective action.

### 3. Fairness and Procedural Considerations

Finally, the Court turns to whether fairness and procedural considerations counsel for or against decertification. In doing so, the Court considers "whether a collective action would lower costs to the plaintiffs through the pooling of resources, efficiently resolve common issues of law and fact, and coherently manage the class in a manner that will not prejudice any party." *Jason v. Falcon Data Com, Inc.*, 09-CV-03990 JG ALC, 2011 WL 2837488 (E.D.N.Y. July 18, 2011). Due to the many highly individualized factual issues this case presents, fairness and procedural considerations weigh significantly against proceeding collectively. *See White,* 2011 WL 1883959 at *14 ("Because [the plaintiff] has not shown that the Opt-in Plaintiffs are similarly situated . . . there is no judicial economy to be gained by allowing their claims to proceed collectively. The only possible results are unfairness to [the defendant] and manageability problems for the Court.")

Plaintiffs argue that a collective action "will undoubtedly lower the costs to [P]laintiffs through the pooling of resources" and that common questions of law and fact could be more efficiently resolved in a collective action as opposed to numerous individual proceedings. (Dkt. 403 at 30.) On the first score, Plaintiffs may be correct. However, cost savings "do[] not override the negative effects that certification is very likely to have on the fairness and manageability of the proceedings." *Camilotes*, 286 F.R.D. at 353; *see also Camesi,* 2011 WL 6372873 at *9 (balancing "the reduced litigation costs to individual plaintiffs with the potential effects that final certification may have on the fairness of the adjudication and the interests of manageability and judicial efficiency"). With respect to efficiency, Plaintiffs have not offered a manageable trial plan. Though Plaintiffs contend that "[a]djudication of the FLSA claims on a collective basis is easily manageable here," they do not say what the plan is, let alone provide specifics. (Dkt. 403 at 32.) As in other hospital "auto-deduct" cases that have been decertified, here Plaintiffs' "counsel generally suggest that the various individualized inquiries could be handled through representative testimony, bifurfacation or subclassification, [yet] they offer no meaningful explanations of how this could be accomplished." *Camesi*, 2011 WL 6372873 at *9. At this stage, Plaintiffs needed to provide more than bare assurances regarding trial manageability; it was incumbent on them to account for the rampant factual differences discussed *supra* and to demonstrate how this case could be tried fairly, based on common proof. They have utterly failed to do so.

The Court finds that the testimony Plaintiffs would offer would not be representative and could not fairly be extrapolated across the 1,196 individuals who have opted into this action. As another district court addressing non-payment of worked meal periods summarized the problem:

> As is no doubt evident, the [plaintiffs'] experiences concerning their meal breaks are diverse. In truth, whether Plaintiffs missed a meal break and reported it varies

> from assignment to assignment and from [plaintiff] to [plaintiff]. Attempting to generalize a [plaintiff's] experience using a representative sample would be a highly inaccurate method of determining the validity of Plaintiffs' claims. It is senseless to proceed as a collective action when Plaintiffs' experiences regarding missed meals vary from day to day, and from individual to individual. Even more troubling is that [the defendant] will not have an opportunity to meaningfully cross examine opt-in Plaintiffs concerning their meal breaks, which will produce unfairness on both sides.

*Reed v. County of Orange*, 266 F.R.D. 446, 450 (C.D. Cal. 2010) ("[d]ecertification is appropriate where plaintiffs are subject to varying work conditions in different work locations or under different supervisors," and where "the disparity between Plaintiffs' factual and employment settings as to . . . their meal breaks result[] in highly individualized questions of fact that make proceeding as a collective action impractical and prejudicial to the parties").

If the Court were to follow Plaintiffs' approach, it would be left in the untenable position of either having to hold, in effect, 1,196 mini-trials, or depriving Defendants of their due process right to present its full defense. *See Zivali*, 784 F. Supp. 2d at 469. The Court declines to do so.

\* \* \*

In sum, the three factors relevant to deciding the certification/decertification issue—disparateness of the factual and employment settings of the individual plaintiffs, whether the defenses available to Defendants are individualized, and fairness and procedural considerations—all favor decertification. Plaintiffs have failed to show that they were subject to any unlawful uniform policy or practice at LIJ or that there existed at LIJ any uniform policy or practice that resulted in systematic FLSA violations across the potential 1,196 member plaintiff class. Accordingly, the collective action that was conditionally certified under the FLSA is hereby decertified.

### III.   Plaintiffs' Motion for Rule 23 Class Certification

Plaintiffs move to certify the following class under Rule 23. (Dkt. 392.)

"The class plaintiffs seek to certify through this motion includes all current and former hourly employees of North Shore-LIJ who were subject to the approval pay policy and denied compensation for work performed during unpaid, automatically deducted meal periods and before and after their scheduled shifts because that additional time worked was not approved for payment by a manager or supervisor, divided into the following two subclasses: (1) employees who used the Kronos timekeeping system, which was implemented system-wide beginning in or about 2010; and (2) employees who worked at Manhasset, Southside, Huntington, Plainview, Syosset or in the LIJ Nursing Departments, prior to the implementation of Kronos at those locations." (Dkt. 392-1 at 4.)[9]

A number of district courts in this Circuit have observed that the second-stage "similarly situated" analysis under FLSA § 216(b) is "considerably less stringent than the requirement of Fed. R. Civ. P. ("FRCP") 23(b)(3) that common questions 'predominate.'" *Ayers,* 2007 WL 646326, at *4 (quoting *Rodolico v. Unisys Corp.,* 199 F.R.D. 468, 481 (E.D.N.Y. 2001)); *see also Perkins v. S. New England Tele. Co.,* 669 F. Supp. 2d 212, 218 (D. Conn. 2009). For largely the same reasons that Plaintiffs' FLSA claim does not warrant collective treatment, Plaintiffs' inadequate compensation claims, under the FLSA and NYLL,[10] are also inappropriate for class certification under Rule 23. In short, Plaintiffs have not met their burden of showing that common questions of law and fact predominate over individualized factual inquiries under Rule 23(b)(3), nor have they established that the case is manageable as a class action.

\*      \*      \*

"In determining whether class certification is appropriate, a district court must first ascertain whether the claims meet the preconditions of Rule 23(a) of numerosity, commonality, typicality, and adequacy." *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*,

---

[9]     The Court's analysis regarding the fact intensive nature of Plaintiffs' claims applies with the same, if not more, force to the non-Kronos subclass as it does to the Kronos subclass which the Court specifically addresses.

[10]     Although the allegations regarding Plaintiffs' FLSA and NYLL claims are the same, only the FLSA claims were conditionally certified for collective action. (Dkt. 212.) Plaintiffs now seek to certify both their FLSA and NYLL claims under Rule 23(a).

546 F.3d 196, 201-02 (2d Cir. 2008) ("*Bombardier*"). Once these prerequisites have been met, a court "may then consider granting certification where it 'finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.'" *Id.* (quoting FRCP 23(b)(3)); *see also In re Initial Pub. Offerings*, 471 F.3d. 24, 30 (2d Cir. 2006). "The party seeking class certification bears the burden of establishing by a preponderance of the evidence that each of Rule 23's requirements has been met." *Myers*, 624 F.3d 537, 547 (2d Cir. 2010) (citing *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 614 (1997); *Bombardier,* 546 F.3d at 196, 202–03).

Plaintiffs have not demonstrated that the questions they raise—namely whether individual employees worked uncompensated overtime because of LIJ's failure to enforce its timekeeping and overtime compensation policies, and whether LIJ had knowledge that these employees were not being paid correctly—will generate common class-wide answers, let alone that these questions predominate over the myriad individualized inquiries presented by the facts of this case. As discussed above, LIJ's official policies, consistent with the law, provide that all overtime worked should be compensated, and LIJ trains its managers on how to provide such compensation. (Santiago Decl. Exs. 5, 6.) In fact, LIJ has paid out more than $551 million in overtime compensation during the period relevant to Plaintiffs' FLSA claim (Krock Dec. ¶ 58.9.3.) Thus, as Plaintiffs concede, their claims hinge on whether an LIJ manager correctly used his or her *discretion* to approve overtime worked during a meal period: "in order for hourly employees to be paid for hours worked outside of their regularly scheduled shifts and during unpaid automatically deducted meal periods, *a manager must decide* which, if any, of that time should be paid and then enter whatever amount of time worked will be paid in Kronos." (Dkt.

392-1 at 9) (emphasis added.) But, as the Supreme Court held in *Wal-Mart v. Dukes*, "a corporate policy of . . . allowing discretion by local supervisors . . . is just the opposite of a uniform employment practice that would provide the commonality needed for a class action." 131 S. Ct. at 2554. In other words, even assuming a manager improperly disapproved payment for time that was actually worked for LIJ's benefit, while that violation may beget a claim for an individual employee, it does not support class treatment.

As Plaintiffs acknowledge, the elements of their NYLL claim are the same as their FLSA claim. (Dkt. 392-1 at 4-5.) Therefore, for the same reasons that Plaintiffs have failed to meet their burden for class certification under the FLSA, they have also failed to demonstrate, by a preponderance of the evidence, that common issues predominate over individual issues for their NYLL claim under Rule 23(b). *See, e.g., Hinterberger*, 2014 WL 1278919, at *30 (proposed hospital employee class did not satisfy Rule 23(b)(3) where implementation of the defendants' automatic break deduction policy varied from department manager to department manager).

In sum, because the question of LIJ's FLSA and NYLL liability necessarily depends on whether, on a department-by-department basis, a particular manager failed to follow LIJ's directive to approve reported mealtime worked or knew that such work was performed but did compensate employees as required, Plaintiffs cannot meet Rule 23(b)'s commonality pre-condition, nor can it satisfy the Rule's predominance requirement. *See Bombardier*, 546 F.3d at 201-02. Accordingly, the Court denies Plaintiffs' motion for Rule 23 certification of the proposed class under FLSA and NYLL.

### IV.   Motions to Strike

A.  Expert Report of Dr. Joseph Krock

Plaintiffs move to strike the expert report of Dr. Joseph Krock, which Defendants submitted in support of their motion for decertification.  (Dkt. 389.)  Plaintiffs cite three reasons for their motion.  First, Defendants did not disclose Dr. Krock's report to Plaintiffs prior to Defendants' motion for decertification.  (Dkt. 389-1 at 1.)  Second, Dr. Krock's report "contains an impermissible legal conclusion."  (*Id.*)  Third, "Dr. Krock's testimony is inadmissible under Federal Rule of Evidence 702 because it is neither relevant nor reliable."  (*Id.*)

At the outset, the Court notes its limited reliance on Dr. Krock's report in deciding the certification issues before it.  The Court cites to the Report as to only three uncontroverted facts—the number of different positions held by opt-in Plaintiffs, the amount of overtime compensation paid by LIJ to its employees, and the number of LIJ employees exempt under the FLSA.  That Plaintiff does not dispute these facts weighs heavily in favor of denying Plaintiffs' motion to strike.

1.  Failure to Disclose – FRCP 26(a)(2)

Plaintiffs seek to strike Dr. Krock's report because Defendants did not disclose it to Plaintiffs prior to the filing of Defendants' motion for decertification.  (Dkt. 389-1 at 1.)

Expert testimony must satisfy the disclosure requirements under FRCP 26(a)(2).  The party seeking to admit such testimony must (i) "disclose to the other parties the identity of any witness it may use at trial to present evidence," FRCP 26(a)(2)(A); (ii) accompany such disclosure with "a written report—prepared and signed by the witness—if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony," FRCP 26(a)(2)(B); and (iii) submit

the disclosure and written report "at the times and in the sequence that the court orders" or, "[a]bsent a stipulation or a court order, . . . at least 90 days before the date set for trial or for the case to be ready for trial," FRCP 26(a)(2)(D). These requirements are intended to ensure that, "sufficiently in advance of *trial*[,] . . . opposing parties have a reasonable opportunity to prepare for effective cross examination and perhaps arrange for expert testimony from other witnesses." FRCP 26 Advisory Committee Notes to 1993 Amendments (emphasis added).

A textual reading of the rule supports the conclusion that, absent a stipulation or court order, a party need not disclose its expert testimony until 90 days prior to trial. *See, e.g., Weiss v. Nat'l Westminster Bank, PLC*, 242 F.R.D. 33, 63 (E.D.N.Y. 2007). Here, given the absence of a scheduling order and trial date, Defendants' duty to disclose was never triggered. Thus, the timing of the disclosure does not, in itself, justify striking the report.

To the extent Plaintiffs claim that they were prejudiced by the timing of the Report's disclosure (Dkt. 389 at 5-6), the Court would ordinarily consider permitting Plaintiffs the opportunity to depose Dr. Krock, and then have the parties re-file their certification briefs. However, given the Court's limited reliance on the Report, such additional discovery would be futile and the resulting delay unwarranted.

## 2. Legal Conclusions

Plaintiffs also argue that "Dr. Krock's expert report must be stricken because it opines as to the ultimate legal conclusion that is for this Court to decide," namely "whether there is sufficient commonality among the opt-in plaintiffs such that liability can be adjudicated collectively." (*Id.* at 6.) The Court agrees that Dr. Krock's report includes impermissible legal conclusions that the Court should not consider in deciding the certification issue, on summary judgment or at trial. *See United States v. Scop*, 846 F.2d 135, 139, 142 (2d Cir. 1988), *rev'd in*

*part on other grounds*, 856 F.2d 5 (2d Cir. 1988) (expert witness statement "embodying legal conclusion exceeded the permissible scope of opinion testimony under the Federal Rules of Evidence").  For example, the Report states:

> After an extensive review of the available data and other materials, I have concluded that:
>
> 1) The determination of liability and damages for working through all or part of meal periods is fact specific and requires individual inquiry into each alleged, uncompensated missed meal period for each Opt-In Plaintiff.
>
> 2) The members of the collective action have such varied employment experiences that sampling them cannot be used to estimate collective class wide liability and damages.

(Krock Dec. ¶ 39.)

However, in its limited use of Dr. Krock's report, the Court has not relied on the disputed conclusory statements or any legal conclusions asserted by Dr. Krock.  Furthermore, that the Report contains limited legal conclusions does not provide a basis to strike the entirety of the report.  *See, e.g., Ebbert v. Nassau County*, 2008 WL 4443238, at *13 (E.D.N.Y. Sept. 26, 2008) (denying motion to strike entire expert report, striking only the legal conclusions from the expert report) (collecting cases).

3.  Admissibility – Fed. R. Evid. 702

Plaintiffs assert that the Report is irrelevant and unreliable.  Federal Rule of Evidence ("FRE") 702 governs the admissibility of expert testimony:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:  (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

The district court must perform a "gatekeeping role" in applying FRE 702, "ensuring that an expert's testimony both rests on a *reliable* foundation and is *relevant* to the task at hand." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993) (emphasis added). In addition to the relevance and reliability requirements, district courts are also required to consider "whether a witness is '*qualified* as an expert by knowledge, skill, experience, training, or education' to render his or her opinions." *Nimely v. City of N.Y.*, 414 F.3d 381, 395 n.11 (2d Cir. 2005) (emphasis added). In short, expert testimony must satisfy three requirements—relevance, reliability, and qualification—to be admissible.

Plaintiffs do not challenge Dr. Krock's qualifications; rather, they challenge his report as both irrelevant, because it "primarily relates to damages and is therefore not relevant to certification," and unreliable because it is "based on flawed analyses." (Dkt. 389-1 at 8, 11.) The Court has not relied on any of the Report's damages calculations or "rate of meal period cancellation" analysis to which Plaintiffs object. The specific portions of Dr. Krock's report on which the Court relied, and which were undisputed by the parties, are both relevant and reliable to the degree necessary for consideration. *See, e.g., Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 213-14 (2d Cir. 2009) (expounding on the high bar required to find evidence unreliable). It is unnecessary for the Court to address Plaintiff's challenges to the remainder of the Report at this time.

Accordingly, Defendants' motion to strike Dr. Krock's Report is denied.

B. Rule 23 Affirmation of Sarah E. Cressman

Defendants move to strike the Rule 23 Affirmation of Sarah E. Cressman, which Plaintiffs submitted in support of their motion for class certification. (Dkt. 390.) Because the Court does not rely on Ms. Cressman's affirmation, Defendants' motion is denied as moot.

## V.    Sanctions

Defendants urge the Court to impose both monetary and non-monetary sanctions on Plaintiffs and their attorneys, Thomas & Solomon LLP, pursuant to FRCP 11.  (Dkt. 391.)

Rule 11 provides that a court may impose sanctions either by motion or by its own initiative, when, *inter alia*, an attorney falsely certifies that "factual contentions have any evidentiary support" or are "likely [to] have any evidentiary support after a reasonable opportunity for further investigation or discovery."  Fed. R. Civ. P. 11(b)-(c); *see also Ipcon Collections LLC v. Costco Wholesale Corp.*, 698 F.3d 58, 63 (2d Cir. 2012) ("Sanctions may be—but need not be—imposed when court filings are used for an 'improper purpose,' or when claims are not supported by existing law, lack evidentiary support, or are otherwise frivolous."). "[E]ven when a district court finds a violation of Rule 11, 'the decision whether to impose a sanction for a Rule 11(b) violation is . . . committed to the district court's discretion.'"  *Ipcon Collections*, 698 F.3d at 63 (quoting *Perez v. Posse Comitatus*, 373 F.3d 321, 325 (2d Cir. 2004)).  District courts must exercise restraint in determining whether sanctions are necessary. *Storey v. Cello Holdings, L.L.C.*, 347 F.3d 370, 387 (2d Cir. 2003) (citation omitted).

Here, Defendants contend that Plaintiffs, under the direction and guidance of their attorneys, Thomas & Solomon LLP, submitted false affirmations in support of their motion for conditional certification.  (Dkt. 391-1.)  Where, as here, a motion for sanctions is based on the submission of unsupported factual allegations, "sanctions may not be imposed unless a particular allegation is utterly lacking in support."  *Storey*, 347 F.3d at 388 (quoting *O'Brien v. Alexander*, 101 F.3d 1479, 1489 (2d Cir. 1996); *see also Kiobel v. Millson*, 592 F.3d 78, 81 (2d Cir. 2010) ("A statement of fact can give rise to the imposition of sanctions only when the particular allegation is utterly lacking in support.")

Defendants contend that absent Plaintiffs' false affirmations, the Court would not have conditionally certified Plaintiffs' collective action. (Dkt. 408 at 1.) In support of their argument, Defendants have submitted a 35-page chart containing alleged contradictions between Plaintiffs' affirmations and their deposition testimony. (Dkt. 408-1, Ex. A.) Though Defendants take issue with particular contradictory statements, Defendants' overarching complaint is best summed up by the following statement from their brief:

> This [case] is an example of opportunistic class action lawyering at its worst: in a rushed effort to get a class conditionally certified and investigate grounds for the lawsuit later, Plaintiffs' counsel cut and pasted affirmations from their other "auto-deduct" cases – and the Plaintiffs blindly signed them – without regard for their truth or falsity. (Dkt. 408 at 1.)

Indeed, given the number of statements that Plaintiffs subsequently disavowed or admitted were not based on personal knowledge (*see* Dkt. 391-1 at 7-13), the fact that Plaintiffs' affirmations appear to simply track the allegations in the TAC (*see, e.g.,* Dkt. 391-1 at 5-6), and the fact that Thomas & Solomon LLP has filed more than a dozen putative class actions against healthcare systems in the Northeast based on almost identical allegations, *Lundy v. Catholic Health Sys. of Long Island Inc.*, Case No. 12-1453, 2013 WL 765117 at *1 (2d Cir. Mar. 1, 2013), Defendants' criticisms are legitimate and their frustration warranted. In fact, Plaintiffs' counsel have already been sanctioned once, *Pruell v. Caritas Christi*, 09-cv-11466, Dkt. 141, Slip Op. at 1-2 (D. Mass. May 31, 2013), and chastised in other instances. *See, e.g.*, *Nakahata v. New York-Presbyterian Healthcare Sys., Inc.*, 10 CIV. 2661 PAC, 2011 WL 321186, at *6 (S.D.N.Y. Jan. 28, 2011) *aff'd in part, vacated in part, remanded,* 723 F.3d 192 (2d Cir. 2013) ("The very fact that this boilerplate complaint has been used, with identically vague and conclusory allegations, in more than a dozen actions in New York and

elsewhere is a vivid demonstrative of how not to plead."); *DeSilva I*, 770 F. Supp. 2d at 547 ("If plaintiffs choose to re-plead, their Third Amended Complaint 'should not take a blunderbuss approach of alleged wrongs, multiple defendants who are not employers, and random citation of inapplicable statutes.'" (quoting *Nakahata*, 2011 WL 321186, at *6)).

However, while the Court does not approve of the tactics and conduct of Plaintiffs' counsel in pursuing this case, including what can charitably be described as taking "shortcuts" in preparing Plaintiffs' affirmations (*see, e.g.,* Dkt. 408-1), in light of the seriousness with which the Court regards the imposition of sanctions, the Court declines to do so at this time. This decision is based primarily on the Court's finding that the allegedly false statements and inaccuracies in Plaintiffs' affirmations were not outright lies or fabrications, but amounted to overstatements and partial inaccuracies caused by Plaintiffs' counsel's sloppy cut-and-paste approach to drafting the affirmations. Moreover, given the number of affirmations and the diversity of Plaintiffs' work experiences, their cumulative effect provided at least some factual support for Plaintiffs' theory of the case, namely that LIJ maintained system-wide time-keeping and overtime compensation policies that may not have been consistently enforced by individual managers. *See Kiobel*, 592 F.3d at 81 (sanctions may not be imposed unless a particular allegation is "utterly lacking" in support). The Court therefore does not accept Defendants' contention that conditional certification of the collective action would have been denied but for the inaccuracies in Plaintiffs' affirmations.

The inaccuracies in Plaintiffs' affirmations were generally either: (1) statements purportedly based on "personal knowledge" when, in reality, Plaintiffs were *inferring* facts based on their own experiences; or (2) statements purportedly based on the

declarant's "work[] throughout the [LIJ] health system" when, in reality, he or she had only worked at one or more, but not all, facilities within the LIJ Health System. (*See, e.g.,* Dkt. 408-1 at Ex A. 1-13, 19-20, 34-35.) At worst, these inaccuracies amounted to overstatement, *i.e.*, drawing broader generalizations from the declarant-Plaintiff's own experiences but presenting these generalizations as fact based on personal knowledge. As the Second Circuit has held, "Rule 11 neither penalizes overstatement nor authorizes an overly literal reading of each factual statement." *Kiobel*, 592 F.3d at 83 (citation and quotation marks omitted).[11]

---

[11]    In some cases, the affirmation statements identified as false or inaccurate by Defendants were not actually *directly* contradicted by the plaintiff's later deposition testimony. A representative example from Defendants' Chart is Plaintiff Haas's Declaration (Dkt. 388-7, Ex. 37), which in Paragraph 7 states: "In fact . . . hourly employees, including myself, often performed work for the Hospital System during [meal periods], even though under the Hospital System's auto deduct policy[,] it did not pay us for that time." The portions of Haas's deposition that Defendants identified as contradictory to this affirmation statement are:

> Q. And do you know whether any of the departments at the hospital system outside of what you already testified to with the two ICU units you worked in, do you know whether any other departments of the hospital required their employees to work during meal breaks?
>
> A. I don't know. (Dkt. 388-9, Ex. 58 ("Haas Dep.") 141:11-18)
>
> Q. And do you have any information about how employees in other North Shore facilities took their meal breaks?
>
> A. No. (Haas Dep. 103:13-16)

Haas's affirmation can be reconciled with his deposition testimony. The affirmation statement very well may have meant that Haas and other employees *whom he knew or worked with* were not paid for work they performed during meal breaks. This statement is not necessarily inconsistent with his deposition responses about lacking information at to employees *outside* of the units he worked in. Without having been asked at deposition whether *any* LIJ employees were subject to auto-deduct, the Court cannot definitively determine that Haas's affirmation statement and deposition testimony were contradictory.

Accordingly, the Court denies Defendants' motion for sanctions in its entirety.

## CONCLUSION

For the foregoing reasons: Defendants' motion to decertify Plaintiffs' conditionally certified class (Dkt. 388) is GRANTED; Plaintiffs' motion for Rule 23 and FLSA final certification (Dkt. 392) is DENIED; Plaintiffs' motion to strike the expert report of Dr. Joseph Krock (Dkt. 389) is DENIED; Defendants' motion to strike the Rule 23 Affirmation of Sarah E. Cressman (Dkt. 390) is DENIED as moot; and Defendants' motion for sanctions (Dkt. 391) against Plaintiffs and their counsel is DENIED.

Accordingly, the class is decertified, the claims of the opt-in plaintiffs are dismissed without prejudice, and the named Plaintiffs have the option of pursuing their claims on individual bases. The parties shall meet and confer and submit a joint letter to the Court by July 1, 2014 as to how the parties plan to proceed.

---

Likewise, with respect to alleged misrepresentations identified by Defendants regarding whether meal breaks were given and properly recorded, it is impossible for the Court to determine without further context whether a Plaintiff's affirmation statement is in fact contrary to his or her deposition testimony. For example, Defendants claim ¶ 26 of Plaintiff DeSilva's affirmation, which states, "[o]ther hourly employees had conversations with our managers in which we discussed how we are working through these meal periods and were not getting paid for such work," is contradicted by her deposition testimony. (Dkt. 388-7, Ex. 35 ¶ 3, 9, 13, 14, 20.) During her deposition, when questioned about system-wide timekeeping and meal break policies, DeSilva responded, "[a]ll I can speak for is the other North Shore employees that I'm with." (Dkt. 388-8, Ex. 52 171:16-173:16, 185:16-21, 187:14-188:25, 190:18-24.) That testimony does not directly conflict with DeSilva's affirmation because in her affirmation, as during her deposition, she could have been referring only to employees with whom she had contact. Furthermore, Defendants fail to mention that DeSilva later testified in her deposition that employees complained to management about working through meal periods without pay during monthly staff meetings. (Dkt. 400-4 (DeSilva Tr.) 189:1-190:1, 196:19-22, 251:16-252:1, 253:1-21.) Plaintiffs provide another example where context is important: "that Gregg Lambdin may have been able to take a meal break whenever he worked with another nurse clinician is not a far cry from his assertion that he was not relieved by other employees to take a break; defendants fail to point out that Lambdin rarely, if ever, worked with another nurse clinician alongside him." (Dkt. 400 at 3 (citing Lambdin Dep. 68:11-69:12, 101:9-107:20).)

SO ORDERED:

 /s/ Pamela K. Chen
PAMELA K. CHEN
United States District Judge

Dated: June 5, 2014
Brooklyn, New York